**12 CIV 2313**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMENICO DE SOLE and ELEANORE DE SOLE, individually and as assignees of LAURA DE SOLE, <br><br> Plaintiffs, <br><br> v. <br><br> KNOEDLER GALLERY, LLC D/B/A KNOEDLER & COMPANY, and ANN FREEDMAN, <br><br> Defendants. | No. _____ <br><br> **ECF Case** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

*[received stamp: MAR 28 2012 U.S.D.C. S.D. N.Y. CASHIERS]*

Plaintiffs Domenico De Sole and Eleanore De Sole, in their individual capacities and as assignees of Laura De Sole, by and through their undersigned attorneys, Clarick Gueron Reisbaum LLP, for their complaint against defendants Knoedler Gallery, LLC d/b/a Knoedler & Company, and Ann Freedman allege as follows, on knowledge as to themselves and their own acts and on information and belief as to all other matters:

### Nature Of The Action

1.      This case is about greed and fraud in the highest echelons of the oldest and once most prestigious art gallery in New York City. Plaintiffs Domenico and Eleanore De Sole seek redress for Knoedler Gallery and Ann Freedman's sale to them of a counterfeit painting, purportedly by Mark Rothko, titled *Untitled, 1956* (the "Work"), in December 2004, for $8.3 million. Banking on their unblemished and impeccable reputations, Knoedler and Freedman fraudulently warranted that the Work was an authentic Rothko, when they knew or should have known otherwise, lied about their knowledge of the Work's provenance, and hid the true facts. With this unlawful conduct, Knoedler and Freedman induced the De Soles to buy the Work, fraudulently obtaining $8.3 million from the De Soles in exchange for a canvas that is unsalable

and worthless.  The De Soles bring this action to recover their losses, and to expose and seek an appropriate recovery for Knoedler and Freedman's participation in a scheme to enrich themselves and Knoedler's ultimate owner, Michael Hammer, by defrauding numerous unsuspecting collectors out of as much as $37 million.  The De Soles seek no less than $25 million in damages, plus interest, attorneys' fees, and costs.

       2.      In November 2004, when the De Soles visited Knoedler – at the time, the oldest and most venerable art gallery in New York City – Freedman, the Gallery's long-time president, told the De Soles a compelling story:  in the late 1950s, David Herbert, a since deceased art dealer who knew Rothko personally, arranged for a Swiss collector to purchase the Work directly from the artist; when the Swiss collector died, his son inherited the Work and then retained Knoedler to sell it.  Freedman vouched for the father and the son – who Freedman said insisted upon anonymity but were Knoedler's clients and personally known to her and Knoedler.  Freedman also said that a list of experts had authenticated the Work, including Rothko scholar Dr. David Anfam and Rothko's son, Christopher Rothko.

       3.      This sales pitch, while convincing, was a scam.  Knoedler and Freedman hid the true facts from the De Soles, including that:  (a) Knoedler and Freedman had *no* idea – and in fact still have *no* idea – where the Work came from, other than that they had obtained it from Glafira Rosales, a little known art dealer from Long Island, whom defendants did not know and made no effort to investigate; (b) Knoedler and Freedman relied exclusively upon Rosales' word about the Work's provenance; (c) Knoedler and Freedman had *no* connection to the purported Swiss collector or his son, and did not even know their names, as remains true today; (d) Rosales told Knoedler and Freedman, *incredibly*, that the Work was one of a treasure trove of approximately 20 previously "undiscovered" works that the Swiss collector and Herbert had

amassed and that reportedly were painted by, and obtained directly from, the most celebrated artists of their generation: Franz Kline, Willem de Kooning, Robert Motherwell, Barnett Newman, Jackson Pollock, Rothko and Clyfford Still (the "Rosales Collection"); (e) at least one work from the Rosales Collection that Knoedler sold in 2003 had been returned after the International Foundation for Art Research (IFAR) refused to certify its authenticity; (f) not one work in the Rosales Collection had a single piece of paper establishing its provenance before arriving at Knoedler; and (g) neither Dr. Anfam, Christopher Rothko nor any of the other numerous experts named by Freedman in her pitch to the De Soles had authenticated the Work – rather, Knoedler and Freedman exaggerated certain experts' informal impressions to make fraudulent assertions bolstering the impression that the Work was authentic.

4.     Thus, Knoedler and Freedman induced the De Soles to purchase the Work based on a fiction.  Had Knoedler and Freedman been honest, the De Soles never would have bought it. It is now clear that the Work is of questionable provenance, as neither Knoedler nor Freedman knows its history, and Rosales – who guards all knowledge of its origins – has refused to disclose the source of the works in the Rosales Collection.  Instead, when called to testify about another work in the Rosales Collection, Rosales invoked her right not to incriminate herself under the Fifth Amendment of the United States Constitution, raising the specter of the truth:  the Rosales Collection is rife with forgeries.  With no provenance tracing the Work to Rothko, the previously undisclosed truth has decimated the Work's value in the marketplace.  Were that not damaging enough, expert testing now has conclusively determined that – as Knoedler and Freedman knew or should have known – the Work indeed is counterfeit.

5.     The De Soles do not stand alone.  Knoedler, Freedman, and Rosales used the same scheme to defraud others into purchasing counterfeit abstract expressionist "masterpieces"

3

over years, in furtherance of a conspiracy that greatly enriched Knoedler (and its owners, including Michael Hammer), Freedman, Rosales, and others, and caused tens of millions of dollars of harm.  Accordingly, with Rosales and others, Knoedler and Freedman engaged in a pattern of activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*

6.     As a result of Knoedler and Freedman's fraud, fraudulent concealment, and racketeering scheme, the De Soles were induced to pay $8.3 million for a painting that is counterfeit, unsalable, and worthless, even though the market for Rothko paintings has substantially increased in the years since the purchase.  The De Soles are entitled to judgment awarding them no less than $25 million in compensatory, consequential, treble, and/or punitive damages, together with attorneys' fees and costs.

## The Parties

7.     Plaintiffs Domenico De Sole and Eleanore De Sole are married individuals residing at 16 Marsh Wren, Hilton Head, South Carolina.  The De Soles bring this action in their individual capacities and as assignees of their daughter Laura De Sole.

8.     Defendant Knoedler is a Delaware limited liability company with its principal place of business located at 19 East 70th Street, New York, New York.  Knoedler's sole member is 8-31 Holdings, Inc., a Delaware corporation whose principal place of business also is located at 19 East 70th Street, New York, New York.  Michael Hammer is (and was, at all relevant times) directly responsible for the operations of Knoedler, the managing member of Knoedler, and an officer and director of 8-31 Holdings, of which he is the sole owner or beneficial owner.

9.     At the time of the De Soles' purchase in November 2004, Knoedler was the oldest art gallery in New York City and, for over a century, was highly respected worldwide.  Knoedler

traded in works by master artists from its establishment in 1846 until it abruptly ceased

operations in December 2011, immediately after allegations were made that another painting

defendants had sold from the Rosales Collection was counterfeit.

10. Freedman was the Director and President of Knoedler during all relevant times

and, on information and belief, resides in New York County and continues to conduct business in

New York County. At all relevant times, Freedman also was a Director of 8-31 Holdings, Inc.

**Jurisdiction And Venue**

11. This Court has federal question jurisdiction over this action pursuant to the federal

racketeering statute, 18 U.S.C. § 1964(c), as well as supplemental jurisdiction under 28 U.S.C. §

1367.

12. This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. §

1332 because the action is between citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

13. This Court has personal jurisdiction over the defendants because they are

domiciled and regularly transact business in New York City. To the extent that any defendant is

not located in New York, this Court also has personal jurisdiction because this action arises out

of the transaction of business in New York City.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all

defendants reside in this District, a substantial part of the events or omissions giving rise to the

claims occurred in this District, and a substantial part of the conduct complained of herein

occurred in this District.

## Statement Of Facts

15.     In Fall 2004, the De Soles called Ann Freedman at Knoedler to set up a meeting to discuss the possible purchase of a painting by the artist Sean Scully.  The meeting was set for late November 2004 and, as Freedman knew, the De Soles arrived intending to spend approximately $1 million for a Scully work.  At the meeting, however, Freedman disclosed that she had no Scully works available.  Instead, Freedman presented the De Soles with a work purportedly by the world-famous abstract expressionist painter Mark Rothko, which over the following weeks she persuaded them to purchase.  The sale closed in mid-December 2004 for $8.3 million, at a cost that was a significant multiple of any art work the De Soles ever had purchased previously.

16.     To induce the De Soles to purchase the Work, Knoedler and Freedman spun a tantalizing and credible – given Knoedler's gravitas and goodwill developed over 165 years in the fine art business – tale about the elite provenance and authenticity of the Work using a slew of misrepresentations and carefully concealed facts.

### Knoedler and Freedman's Fraudulent Statements to the De Soles

17.     In their face-to-face meetings with the De Soles and their agent Jim Kelly, and in several writings, in or around late November and early December 2004, Knoedler and Freedman affirmatively and knowingly made an array of material false representations to induce the De Soles to purchase the Work.

18.     Freedman personally met with Domenico and Eleanore De Sole at Knoedler in late November 2004.  In the weeks after, Freedman also met twice met with the De Sole's consultant and agent Jim Kelly, who the De Soles informed Freedman would contact her on their behalf.  In these meetings, all of which took place at Knoedler, Freedman and the De Soles (and

subsequently Kelly) discussed the De Soles' proposed purchase of the Work. In these discussions, Freedman unequivocally, repeatedly, and consistently represented to the De Soles and Kelly that the Work was an authentic Mark Rothko

19.     Further, to assure the De Soles of the Work's authenticity, Freedman informed the De Soles and Kelly at their meetings that Rothko's son, Christopher Rothko, and numerous experts (notably including Dr. David Anfam who had created Rothko's catalogue raisonné) had examined the Work and attested to its authenticity. In truth, neither Christopher Rothko nor Dr. Anfam had authenticated the Work; other experts had seen the Work, at most, only briefly and none had examined the Work for the purpose of providing an expert authenticity opinion.

20.     At the meetings, Freedman also falsely represented to the De Soles and Kelly that the seller (purportedly the son of the Swiss collector) was Knoedler's client and that he and his father were personally known to Knoedler. In truth, as Freedman has now admitted, neither the Swiss collector nor his son was personally known to Knoedler or Freedman. In fact, Knoedler had no direct knowledge of a Swiss collector obtaining the Work from Rothko via Herbert, and knew nothing of the purported collector's supposed son or any fact whatsoever about the Work's true provenance: all Freedman and Knoedler knew was that Glafira Rosales had provided them the Work. While Rosales may know the provenance, she has refused to reveal any facts about the Rosales Collection, invoking her Fifth Amendment rights.

21.     Knoedler and Freedman also represented to the De Soles and Kelly that the Work was "one of two previously undiscovered works" by Rothko and Pollock. Indeed, Freedman and Knoedler tried to sell the De Soles both the Work and the Pollock, stating, in sum or substance that "they came from the same client" and "look so good together." In truth, the Work came from the Rosales Collection, a cache of approximately 20 "undiscovered" works that an

7

incredible array of world-renowned abstract expressionist artists purportedly created and that included multiple works attributed to each of Rothko and Pollock.

22.     Freedman further told the De Soles and Kelly, when they met, that the son of the Swiss collector wanted the Work to be sold to a collector, rather than someone who intended to re-sell the Work.  Freedman told the De Soles that the two works – the Rothko Work and the Pollock – came from the same Knoedler client (the Swiss collector) who had passed away, and that, in sum or substance, she was "trying to find a home" for them.  In truth, as neither Freedman nor Knoedler knew the Swiss collector's son, Freedman had no basis to state that the owner wanted the Work to be sold to another collector.

23.     Finally, Knoedler and Freedman told the De Soles and Kelly that the Work would be included in a forthcoming supplement to the Rothko catalogue raisonné being prepared by the National Gallery of Art.  In truth, the National Gallery's position at the time, which Knoedler knew, was only that, *if* it published a supplement, it *intended* to include the Work in the catalogue.  The National Gallery in fact has not published any such supplement; the Work is not included in the Rothko catalogue raisonné, and, now that Freedman and Knoedler's lies about the provenance of the entire Rosales Collection have been revealed, it will not be included in the catalogue raisonné.

**The De Soles Purchase the Work**

24.     Following the De Soles' and Kelly's meetings with Ann Freedman at Knoedler, in the last days of November 2004, Kelly (in New Mexico) and Freedman (in New York) spoke by telephone, to negotiate a sale of the Work to the De Soles.  After Freedman offered to "discount" the Work by $200,000, a price of $8.4 million was agreed, including a $100,000 commission payable to Kelly.

25.     On or about November 30, 2004, Knoedler sent Kelly an invoice (by mail or

FedEx) for the sale of the Work, seeking payment in the amount of $8.3 million (the "Knoedler

Invoice," a true and correct copy of which is attached hereto as Exhibit A). The Knoedler

Invoice reiterated the misrepresentation that the Work was an authentic Rothko, as follows:

> **Mark Rothko (1903-1970)**
> *Untitled*
> 1956
> Oil on canvas
> 50 1/8 x 40 1/4 inches
> Signed and dated on verso
> A 12322

26.     The Knoedler Invoice also reiterated the misrepresentation that the Work

belonged to the son of a Swiss collector (whom Knoedler and Freedman had described as having

obtained the Work directly from Rothko through David Herbert), as follows:

> **Provenance**
> The Artist
> Private Collection Switzerland
> By descent to the present owner

27.     The Knoedler Invoice also again represented that the Work was, definitively, "to

be included in the forthcoming supplement to the 1998 Rothko catalogue raisonné under

preparation by the National Gallery of Art, Washington D.C."

28.     On December 7, 2004, the De Soles wired $8.4 million from their Morgan Stanley

account in New York to Kelly in New Mexico in preparation for the De Soles' purchase of the

Work. To that end as well, on December 9, 2004, Kelly sent the De Soles an invoice for a total

purchase price of $8.4 million (*i.e.*, the agreed purchase price plus Kelly's commission).

Because the De Soles intended, as Kelly knew, to own the Work and bequeath it to their

daughter Laura De Sole if they still owned it upon their deaths, Kelly addressed the invoice to

"Laura De Sole" at Domenico and Eleanore De Sole's South Carolina home address.

29.     Still, the De Soles sought further written assurances concerning the origin and authenticity of the Work before closing the purchase.  Those assurances came on December 11, 2004, when, Knoedler and Ann Freedman (in New York) faxed Kelly (in New Mexico) a letter explicitly warranting the authenticity of the Work, again stating its supposed origin and identifying the experts who supposedly had authenticated the work (the "Knoedler Letter," a true and correct copy of which is attached as Exhibit B).  (The Knoedler Letter is addressed to "Laura De Sole" at Domenico and Eleanore De Sole's South Carolina home address.)

30.     Thus, the Knoedler Letter explicitly provided:  "Knoedler warrants the authenticity and good title of" the Work.

31.     The Knoedler Letter also went to lengths to reassure the De Soles that the Work in fact was authentic.  The Letter recited that Dana Cranmer, former conservator of the Rothko Foundation, had confirmed that the Work was in "remarkably good condition"; stated that the National Gallery intended to include the Work in the "forthcoming catalogue raisonné supplement"; advised that Knoedler anticipated a loan request from Foundation Beyeler, in Basel Switzerland (whose curator, Oliver Wick, they said, considered the Work "to be of superior museum quality"); and enclosed a list of the experts whom Knoedler and Freedman previously had informed the De Soles had authenticated the Work, including Christopher Rothko and Dr. Anfam, as well as E.A. Carmean, Jr., Bonnie Clearwater, Dana Cranmer, Jack Flam, Laili Nasr, Stephen Polcari, Earl A. Powell III, Irving Sandler, and Oliver Wick – despite the fact that, unbeknownst to the De Soles, none of these experts actually had examined the Work for the purpose of providing an expert opinion as to its authenticity and many had seen the Work, at most, only briefly.

10

32.     The De Soles decided to proceed.  After receiving the Knoedler Letter and in reliance upon the misrepresentations contained therein, in the Knoedler Invoice, and previously made by Freedman in meetings at Knoedler, the De Soles authorized Kelly to make the purchase payment on their behalf.  Accordingly, on December 17, 2004, Kelly wired Knoedler the purchase price of $8.3 million on behalf of the De Soles from his First National Bank account in New Mexico to Knoedler's HSBC account in New York.

33.     Thereafter, Knoedler shipped the Work directly to the De Soles at their home in South Carolina, where the Work remained until December 2011.

34.     At all times, Knoedler and Freedman were directly aware that Knoedler was selling the Work to the De Soles, and not to Jim Kelly, his company James Kelly Contemporary, Inc., or Laura De Sole.  Rather, Knoedler and Freedman knew – both when they spoke and transacted business with him – that Kelly acted only as the De Soles' disclosed agent and at their direction, and that the De Soles were purchasing the Work with the hope and ultimate intention of bequeathing it to their daughter many years after the purchase.  The sale structure in every respect was consistent with common practice in the art industry.  For the avoidance of doubt, Laura De Sole has assigned to Domenico and Eleanore De Sole any right that she might have held in the Work or the claims made in this lawsuit, even though neither the De Soles nor Laura De Sole believe that the latter had any such rights.

**Freedman and Knoedler Fraudulently Concealed Critical Facts from the De Soles**

35.     The De Soles have now learned that, to induce them to purchase the Work, Knoedler and Freedman hid the truth.  Knoedler and Freedman intentionally concealed material facts that Knoedler and Freedman knew but the De Soles did not and could not know and that Knoedler and Freedman used to mislead the De Soles.  These facts, uniquely known to Knoedler,

would have exposed Knoedler's lies and caused the De Soles to decline the offered sale.

36.     Thus, Knoedler and Freedman did not tell the De Soles that:

a.  Knoedler had obtained the Work from Rosales, a little-known Long Island art dealer whose partner had been accused of selling forgeries as early as 1999.

b.  Knoedler and Freedman had *no* relationship whatsoever with, or any actual knowledge of, either the Swiss collector who purportedly had purchased the Work from Rothko or his son who purportedly had inherited and was selling the Work.

c.  Rosales' oral statements alone – and nothing more – provided support for Knoedler and Freedman's representations about the Work's provenance.

d.  Knoedler and Freedman knew that Rosales, implausibly, was selling a cache of approximately 20 "undiscovered" works purportedly painted by the most celebrated abstract expressionist artists, including Kline, de Kooning, Motherwell, Newman, Pollock, Rothko, and Still, all of which purportedly had gone directly from the artists, through Herbert, to the Swiss collector and his son, and not even one of which had a single sheet of paperwork to verify its provenance, including any transfer to or conveyance from the Swiss collector, his son, or Rosales.

e.  Knoedler had sold one work – a purported Pollock – from the Rosales Collection to Jack Levy, co-chairman of mergers and acquisitions at Goldman Sachs, for $2 million in or around 2003, but was forced to buy back the work that same year after IFAR refused to certify the painting's authenticity.

f.  Knoedler and Freedman had met Rosales through a Knoedler employee and made no effort whatsoever to investigate Rosales or confirm her story – even after learning that her partner, Jose Carlos Bergantinos Diaz had been implicated in the

sale of forged artwork or after IFAR refused to authenticate the "Pollock" work.

g.   Rather than disclose the true facts about the origins of the Work, Knoedler and

Freedman had told the National Gallery the same misrepresentations they told the

De Soles.

37.   Had the De Soles known the truth about the Work, including about its lack of

known provenance, the De Soles would not have purchased the Work.

**While Knoedler and Freedman Knew Or Should Have Known That Their**
**Representations Were False, The De Soles Reasonably Relied On Them**

38.   Knoedler and Freedman used Knoedler's preeminent reputation to support their

representations regarding the authenticity of the Work.  The De Soles reasonably relied on these

material representations when they agreed to purchase the Work.  At the time, Knoedler's

reputation was impeccable and collectors of wide-ranging sophistication in the art market relied

upon it.  For instance, the National Gallery had relied on Knoedler's very same

misrepresentations in stating its intention to include the Work in the catalogue raisonné; likewise,

the Beyeler Foundation in Basel, Switzerland, no doubt also accepted Freedman's

representations about the Work's authenticity and supposed provenance in indicating its interest

in exhibiting the Work.  Moreover, with the Knoedler Letter (Ex. B), the De Soles requested and

obtained a written warranty of authenticity to confirm Knoedler's oral representations.

39.   Knoedler and Freedman, for their part, knew or should have known that their

representations to the De Soles regarding the Work, including regarding its provenance and

authenticity, had no factual basis and were false.  Indeed, at the very least, Knoedler and

Freedman abdicated their responsibilities and recklessly disregarded the truth.

40.   Knoedler and Freedman were uniquely in possession of information that raised

myriad red flags about the Work's authenticity – that Rosales was the source, that Rosales would

not reveal the collector's identity, that Rosales claimed that the collection included as many as 20 works by the most important abstract expressionist painters, that not a single piece of paper documented the provenance of any of these works, that IFAR already had refused to certify the authenticity of one Rosales Collection work – information that Knoedler and Freedman hid from the De Soles even as it put Knoedler and Freedman on direct notice that the Work had no known provenance and cast significant doubt on the Work's authenticity. In these circumstances, Knoedler and Freedman recklessly disregarded the truth and knew, or should have known, that the Work was counterfeit.

41.     Thus, Knoedler and Freedman had superior knowledge of the material facts but failed to disclose them. Knoedler and Freedman knew that this information was not otherwise available to the De Soles and that the De Soles bought the Work relying upon Knoedler and Freedman's unproven tale about its provenance and false representations about its authenticity. Indeed, had the De Soles known the truth – or even part of the truth – they would not have purchased the Work.

**Knoedler and Freedman Cover Up Their Fraud**

42.     In the years after selling the Work to the De Soles, Knoedler and Freedman never once communicated with the De Soles to correct their misrepresentations, to disclose the truth about the Work and its provenance, or to communicate that events had transpired that independently cast grave doubt on the Work's authenticity and value.

43.     Instead, Knoedler and Freedman covered up their fraud. For example, in early 2008, the De Soles contacted Freedman to request that Knoedler provide an insurance appraisal for the Work. On or about January 19, 2008, Knoedler complied, sending the De Soles a written appraisal. In the appraisal, Knoedler valued the Work at $9 million, explaining that the appraisal

represented its "estimate of the probable cost of replacing the work with a similar work." The estimate continued to cover up Knoedler and Freedman's fraud and, in fact, failed to consider or disclose rapidly unfolding events that, *at that very moment*, confirmed their unlawful conduct and the inauthenticity of the Work.

44.     In three meetings during December 2007 and January 2008 between Freedman and the Dedalus Foundation, Inc. – which is responsible for the Robert Motherwell catalogue raisonné – Dedalus had advised Freedman that it believed seven purported Motherwell works from the Rosales Collection, including four Knoedler had handled (a former Knoedler employee Julian Weissman handled the other three), were fakes.  Notably, Dedalus rejected Freedman's assertions that – just like the Rothko Work here – the Motherwell works were sold, through David Herbert, directly by Motherwell to a collector.  On December 12, 2007, Dedalus informed Freedman that the Motherwell works included stylistic anomalies and were of questionable provenance; on December 20, 2007, Dedalus reiterated its conclusions; and, on January 10, 2008, at a third meeting, Dedalus board member Jack Flam explained in detail the factors causing Dedalus to suspect the works were fakes, challenging the tale of their provenance and Herbert's supposed role in assembling the collection.

45.     Thus, when the De Soles sought an appraisal in early 2008, Knoedler and Freedman knew that as many as eight Rosales Collection works were suspected of being forgeries: the Rosales Collection Pollock that IFAR had refused to authenticate in 2003 and the seven Rosales Collection Motherwells that Dedalus now was refusing to authenticate in 2008.

46.     Barely a week after the third meeting with Dedalus, on January 19, 2008, Knoedler and Freedman issued the appraisal to the De Soles without disclosing any further information about the Work or any concern about its authenticity – despite the significant issues

that Dedalus had raised pertaining to the entirety of the Rosales Collection. Knoedler and Freedman again hid the truth.

47.     In fact, as it subsequently attempted to defend the Motherwell works it held from the Rosales Collection and continued to discuss these works with Dedalus, Knoedler retained James Martin of Orion Analytical, LLP, to conduct scientific testing of two of these paintings in its possession. On information and belief, Martin's testing found anomalies in these works, including staining on the canvas backs and pigments on the surface that post-dated the attributed dates of the works by ten years. For Dedalus, these results confirmed its own conclusion that Motherwell did not make these two paintings. Further, Dedalus declined to certify as authentic a third work attributed to Motherwell from the Rosales Collection that became the subject of a litigation against the Julian Weissman Gallery (which had sold it). As a part of the settlement of the action against Julian Weissman, the Rosales Collection Motherwell at issue in that case now bears an indelible, unalterable stamp that reads: "AFTER PHYSICAL EXMINATION AND FORENSIC TESTING, THE ROBERT MOTHERWELL CATALOGUE RAISONNÉ PROJECT OF THE DEDALUS FOUNDATION, INC., HAS DETERMINED THAT THIS PAINTING IS NOT AN AUTHENTIC WORK BY ROBERT MOTHERWELL BUT A FORGERY."

48.     Knoedler and Freedman never disclosed to the De Soles any of these further developments directly related to the value of the Work.

49.     Meanwhile, the De Soles continued to invest in the Work. For example, in the years since the De Soles purchased the Work, the De Soles spent approximately $64,000 to insure the Work, believing it to be an authentic Rothko. In fact, were it an authentic Rothko, over these years, the Work would have appreciated in value significantly above the $8.3 million

the De Soles paid Knoedler for it in 2004.

**The De Soles Discover Knoedler and Freedman's Fraud**

50.     The De Soles discovered Knoedler and Freedman's fraud only after *The New York Times*, in December 2011, reported that Knoedler had announced its permanent closing after 165 years in business, the day after Knoedler's customer Pierre Lagrange filed a lawsuit against Knoedler and Freedman alleging a substantially similar swindle.

51.     Lagrange's description of a tale nearly identical to the one Knoedler and Freedman had told the De Soles prompted the De Soles to consider – for the first time – that Knoedler and Freedman had lied to them and that the Work might not be authentic.

52.     The De Soles also learned that Freedman's former Knoedler colleague Julian Weissman had sold at least the Rosales Collection Motherwell that, after litigation, now bears the permanent stamp on its back marking it a forgery.

53.     Shortly thereafter, the De Soles confronted Freedman with their concerns and demanded to know the identity of Knoedler's client – the son of the Swiss collector who had bought the Work from Rothko through David Herbert.  Freedman admitted her deceit by responding that she would soon be learning the name of the son and the Swiss collector.  In other words, Freedman disclosed that the most basic foundation for Knoedler and Freedman's assurances as to the authenticity of the Rothko was a lie:  Knoedler and Freedman did *not* know the identity of the supposed collector, their supposed client.

54.     Counsel for the De Soles then retained the distinguished forensic conservator James Martin of Orion Analytical, LLP, to investigate the authenticity of the Work.  Orion Analytical's forensic report establishes conclusively that Mark Rothko did not create the Work and, therefore, that the Work is a forgery.  (A true and correct copy of the report is attached as

Exhibit C.)

55.    The Orion Analytical forensic analysis resulted in three findings that "are inconsistent and irreconcilable with the claim" that the Work was painted by Rothko:  (a) the Work displays crossbar marks that Rothko deliberately avoided by routinely applying support to his canvas at the back of the stretcher, rather than next to the canvas; (b) the Work contains two white opaque primers, but from the late 1940s onward, Rothko used a mixture of rabbit-skin glue and pigments (not opaque primers) to size and prime his canvases; and (c) the Work contains (i) polyvinyl acetate, which Rothko did not use, and (ii) acrylic polymer emulsion, which Rothko did not use until the mid 1960s, nearly a decade after the Work purportedly was created.

56.    In addition, the forensic analysis noted the presence of aragonite and titanium dioxide, a relatively rare finding, in the pigment used for the second primer on what appears to be a re-used canvas.

**Defendants' Racketeering Scheme**

57.    The fraud Knoedler and Freedman perpetrated against the De Soles – selling them the counterfeit Rothko Work – was not an isolated incident.  It was part of an ongoing racketeering scheme that Knoedler, Freedman, Rosales, and others devised and orchestrated, at least since 2003, to market numerous "previously undiscovered" – but in truth counterfeit – abstract expressionist paintings in the Rosales Collection and to use Knoedler's 165-year history of preeminence and goodwill to sell them to collectors.

58.    Freedman already has testified about the scope of this scheme, attesting to the fact that Knoedler held on consignment as many as 20 paintings from the Rosales Collection and that she and Knoedler sold at least several of these works for as much as $37 million in total.

59.    Rosales, for her part, already has refused to testify about the scheme, invoking her Fifth Amendment right against self-incrimination and creating a presumption that the works in the Rosales Collection – including the Work at issue here – came from an illicit source, not from the artists to whom the works were attributed.

60.    While the full scope of the scheme will be revealed in discovery, details of several sales of fraudulent Rosales Collection works already have emerged.

61.    As an overriding matter, at all relevant times, Knoedler and Freedman recklessly disregarded the truth about the provenance and authenticity of the works comprising the Rosales Collection, which they knew or should have known were counterfeit.  Knoedler and Freedman had no reliable or credible basis to believe in the legitimacy of the works in light of the facts that they uniquely possessed and concealed, as alleged in Paragraph 36(a)-(g), *supra*.  Indeed, to this day, Knoedler and Freedman stand by their reckless and unsupported position that the Rosales Collection works are authentic.

62.    Knoedler and Freedman nevertheless sold and continued to sell works from the Rosales Collection.  In addition to the 2004 sale to the De Soles, in or around 2003, Knoedler sold a purported Jackson Pollock from the Rosales Collection to Jack Levy, which sale was rescinded after the painting failed IFAR's examination and IFAR declined to certify the authenticity of the painting, citing questions about its provenance and authenticity.

63.    In or around November 2007, Knoedler sold Pierre Lagrange a purported Pollock, for $17 million from the Rosales Collection.  In December 2011, Lagrange filed suit against Knoedler and Freedman for fraud, alleging that this painting too is a forgery and proceeding only after James Martin of Orion Analytical analyzed this painting as well and likewise concluded that it too is a forgery.

64.     Further, on information and belief, to induce Lagrange to purchase the work, Knoedler and Freedman represented to Lagrange's consultant, Jaime Frankfurt, that the Pollock painting was offered for sale from a private collection of the heir to a collector who had obtained it directly from Jackson Pollock, through David Herbert, and said that the heir insisted on anonymity.  On or about November 6, 2007, Knoedler provided Frankfurt an invoice for the sale describing the provenance as follows:  "The artist (via David Herbert); Private collection; By descent to present owner."

65.     As with the De Soles, Knoedler and Freedman had no basis to make these representations.  Indeed, in the action Lagrange filed, Freedman now has testified that she did not – and, today, still does not – know the identity of either the supposed Rosales Collection collector or his supposed heir.

66.     On information and belief, on or about November 7, 2007, by the use of international wires, Lagrange wired $17 million to Frankfurt at his Citibank account located in Los Angeles, California, to purchase the painting, and Frankfurt thereafter wired $15.3 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York – consummating the sale.

67.     Thus, in total, no fewer than five works from the Rosales Collection that Knoedler handled or sold – the Work, the Pollock sold to Levy, the two Motherwell paintings, and the Pollock sold to Lagrange – have been submitted to expert testing, yielding conclusions that each such work is not authentic.  On information and belief, other Rosales Collection works, including without limitation the Motherwell at issue in the litigation against Weissman, have fared no better under expert scrutiny.

68.     In these circumstances, the De Soles seek to recover their damages caused by the wide-ranging scheme that Knoedler, Freedman, Rosales, and others deployed to defraud the art collecting public.

### FIRST CAUSE OF ACTION
**Fraud**

69.     The De Soles repeat and reallege the allegations contained in Paragraphs 1 through 68 as if fully set forth herein.

70.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work was authentic when, in truth, the Work is a forgery.

71.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally, who inherited it from a private collector who had obtained it directly from the artist (with the assistance of Herbert), when in reality Freedman and Knoedler did not know the collector who had originally obtained the Work purportedly from the artist, or that collector's son.

72.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work was one of only two "previously undiscovered" works by Rothko and Pollock that Knoedler's purported collector client had obtained from the artists with Herbert's assistance when, in reality Knoedler and Freedman knew that there were approximately 20 such "previously undiscovered" works the purported collector purportedly had gathered directly from world-famous artists with Herbert's assistance.

73.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by embellishing the lie that they knew the owner by stating that he wanted to

sell the Work to another collector and find it a good home.

74.    Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by falsely representing that the following experts had examined the Work and had expressed the opinion that it was authentic, when defendants knew this not to be the case: David Anfam, E.A. Carmean, Jr., Bonnie Clearwater, Dana Cranmer, Jack Flam, Laili Nasr, Stephen Polcari, Earl A. Powell III, Christopher Rothko, Irving Sandler, and Oliver Wick.

75.    Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by falsely representing that the National Gallery of Art definitively would publish a supplement to the Rothko catalogue raisonné that would include the Work, while knowing that the National Gallery had made no such representation.

76.    Knoedler's and Freedman's misrepresentations were material because the De Soles would not have purchased the Work had they known them to be false.

77.    The De Soles' reliance on these misrepresentations was reasonable given, among other things, Knoedler's and Freedman's superior knowledge, Knoedler's 165-year old reputation as one of the world's finest art galleries, and the warranty of authenticity the De Soles obtained from Knoedler.

78.    In reliance on Knoedler's and Freedman's material misrepresentations and omissions, the De Soles were damaged in the amount of at least $8.4 million.

79.    Freedman, personally, is liable for fraud because she made the fraudulent statements and thus participated in the fraud alleged and/or had actual knowledge of it.

80.    Knoedler is liable for fraud because when Freedman made the fraudulent statements, she did so in her capacity as President of Knoedler.

81.     Knoedler and Freedman's misrepresentations damaged the De Soles because they would not have purchased the Work had they known the truth.  The true provenance of the Work, which at all times was known to Knoedler and Freedman and hidden from the De Soles – that it is a part of the Rosales Collection and has no known source other than Rosales – renders the Work worthless, damaging the De Soles.  Likewise, the Work is worthless for the additional reason that it is not a genuine Rothko.

82.     As a result of the defendants' failure to provide the De Soles with the full information at only the defendants' disposal, the De Soles – as the defendants intended – purchased the Work and suffered damages as a result of paying $8.4 million for a forgery.

83.     Because Knoedler and Freedman engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage the De Soles, the De Soles are entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
### Fraudulent Concealment

84.     The De Soles repeat and reallege the allegations contained in Paragraphs 1 through 83 as if fully set forth herein.

85.     Defendants Knoedler and Freedman fraudulently concealed from the De Soles facts about which the Defendants had superior knowledge, which information was not readily available to the De Soles, and the Defendants intended and understood that the De Soles would purchase the Work on the basis of the incomplete and incorrect information the Defendants provided to them.

86.     If the De Soles had known the facts that Knoedler and Freedman had concealed from them, they would not have bought the Work.

87.     Among other things, Freedman and Knoedler did not tell the De Soles that:

a.   Knoedler had obtained the Work from Rosales.

b.   Knoedler and Freedman had *no* relationship whatsoever with, or even direct knowledge of, either the purported Swiss collector who purportedly had purchased the Work from Rothko or his son who purportedly had inherited and was selling the Work.

c.   Rosales' oral statements alone – and nothing more – provided support for their representations about the Work's provenance.

d.   Knoedler and Freedman knew that Rosales was selling a cache of approximately 20 "undiscovered" works purportedly painted by the most celebrated abstract expressionist artists, including Kline, de Kooning, Motherwell, Newman, Pollock, Rothko, and Still, all of which purportedly had gone directly from the artists, through Herbert, to the Swiss collector and his son, and not even one of which had a single sheet of paperwork to verify its provenance, including the transfer to or conveyance from the Swiss collector, his son, or Rosales.

e.   Knoedler had sold a purported Pollock from the Rosales Collection to Jack Levy, in or around 2003, but bought the work back that same year after IFAR refused to certify the painting's authenticity, citing questions about its provenance and style.

f.   Knoedler and Freedman had met Rosales through Jaime Andrade, a Knoedler employee, and did no due diligence or investigation of Rosales or her story about the Work's provenance – even after learning that her partner, Jose Carlos Bergantinos Diaz had been implicated in the sale of forged artwork or after IFAR refused to authenticate the "Pollock" work.

g.   Rather than disclose the true facts about the origins of the Work, they had told the National Gallery the same misrepresentations they told the De Soles.

88.   Freedman, personally, is liable for fraudulent concealment because she perpetrated the fraudulent concealment and thus participated in the fraud alleged and/or had actual knowledge of it.

89.   Knoedler is liable for fraudulent concealment because Freedman perpetrated the fraudulent concealment in her capacity as President of Knoedler.

90.   Knoedler and Freedman's failure to disclose the true facts has damaged the De Soles because they would not have purchased the Work had they known the truth.  The true provenance of the Work, which at all times was known to Knoedler and Freedman and hidden from the De Soles – that it is a part of the Rosales Collection and has no known source other than Rosales – renders the Work valueless, damaging the De Soles.  Likewise, the Work is worthless for the additional reason that it is not a genuine Rothko.

91.   As a result of the defendants' failure to provide the De Soles with the full information at only the defendants' disposal, the De Soles – as the defendants intended – purchased the Work and suffered damages as a result of paying $8.4 million for a forgery.

92.   Because Knoedler and Freedman engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage the De Soles, the De Soles are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)

93.   Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 92 as if fully set forth herein.

94.     The association of defendants and other individuals, including Rosales,

constituted an enterprise within the meaning of 18 U.S.C. § 1961(c), which enterprise was

engaged in, and whose activities affected, interstate and foreign commerce.  This enterprise was

continuous in that it lasted for more than two years, had an ascertainable structure, and acted in

ways distinct from the predicate offenses alleged by the De Soles.  This enterprise was

continuous for the additional reason that the predicate acts were a regular way of conducting

Knoedler's ongoing business and of conducting or participating in the ongoing RICO enterprise.

95.     Each defendant is a person within the meaning of 18 U.S.C. § 1961(3) and

separate from the enterprise.

96.     Freedman, a Director and the President of Knoedler, was a critical and willing

participant in the racketeering scheme at issue.  By lending her name and reputation, as well as

Knoedler's, to fraudulent sales of forged artworks, she enabled the enterprise to thrive.

97.     Knoedler used its name, reputation, and access to collectors to sell forged

artworks into the marketplace.

98.     Defendants' scienter is established by the pattern of intentional and knowing

fraudulent, material misrepresentations and omissions described above.

99.     Defendants participated, and conspired with others (whose identities, other than

Rosales and Weissman, are known only to defendants at this time) to participate in the affairs of

the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth

below, all in violation of 18 U.S.C. § 1962(c).

**Wire and Mail Fraud (Violations of 18 U.S.C. §§ 1341, 1343)**

100.     Defendants and other members of the enterprise, having devised the scheme or

artifice to defraud, and/or for obtaining money or property by means of false or fraudulent

pretenses, representations, or promises, transmitted or caused to be transmitted by means of mail, wire, radio, or television communication in interstate or foreign commerce writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice (namely, to sell forged paintings).  Specifically,

    a.  In late November 2004, by use of interstate telephone wires, Knoedler and Freedman negotiated the sales price of the Work with Kelly, who was acting on behalf of the De Soles.

    b.  On or about November 30, 2004, defendants in New York, by the use of interstate mails, sent the Knoedler Invoice to Kelly in New Mexico;

    c.  On or about December 7, 2004, the De Soles, by the use of interstate wires, wired $8.4 million from their Morgan Stanley account in New York to Kelly in New Mexico for Kelly to use to pay defendants for the Work;

    d.  On or about December 11, 2004, defendants in New York, by the use of interstate telephone wires, sent the Knoedler Letter by facsimile to Kelly in New Mexico;

    e.  On or about December 17, 2004, Kelly, by the use of interstate wires, wired from his account at First National Bank in New Mexico to Knoedler's HSBC Bank in New York, the purchase price of $8.3 million.

    f.  On or about November 7, 2007, by the use of international wires, Lagrange wired $17 million to Frankfurt at his Citibank account located in Los Angeles, California, and Frankfurt, using domestic wires, Frankfurt wired $15.3 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York – consummating the sale.

101.    Each participant knew, expected, reasonably foresaw, and intended that these transmissions by means of mail, wire, radio, or television communication in interstate or foreign commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

102.    Defendants willfully and with intent to defraud sold forged artworks to the De Soles, Levy, Lagrange and, on information and belief, other victims and also misrepresented and/or concealed the material facts from them, as discussed above.

103.    The De Soles and the other victims relied upon defendants' misrepresentations, and such reliance was reasonable, as discussed above.

104.    The De Soles and the other victims were injured by defendants' fraudulent conduct, as discussed above.

**Pattern of Racketeering Activity**

105.    The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.  The pattern of racketeering activity defendants engaged in consisted of a scheme executed by the aforementioned conspirators from at least 2003 and continuing at least through November 2007 and likely until Knoedler closed its doors in December 2011, to obtain from Rosales, and to distribute, market, and sell numerous counterfeit paintings purportedly by multiple abstract expressionist artists.  That pattern included multiple predicate acts of mail and wire fraud.

106.    The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a common goal, including the goal of profiting illegally by fraudulently inducing individuals to buy counterfeit

works of art; (b) used similar methods to perpetrate the frauds; (c) had similar participants; and (d) had similar victims.

107.    The acts of racketeering activity, discussed above, extended over a substantial period of time from 2003, and continued until at least November 2007.  Additionally, the racketeering acts were a regular way of conducting defendants' ongoing business and of conducting or participating in the ongoing RICO enterprise.  They were sufficiently continuous to form a pattern of racketeering activity.

108.    Defendants participated in the scheme through themselves and, in the case of Knoedler, its representatives, employees, agents, officers, and others whose identities are known only to defendants at this time.  Defendants benefitted enormously from the profits they made from the scheme, and the various amounts collected unlawfully.

109.    Each defendant's participation was critical to the racketeering scheme, as was the participation of Rosales.  They enabled, conducted, maintained, aided, abetted, and profited from the racketeering scheme by:

    a.  procuring from Rosales counterfeit paintings that they fraudulently misrepresented as works of master abstract expressionist artists;

    b.  drafting and preparing letters, fraudulent "background materials," fraudulent invoices, and other documents;

    c.  supervising, conducting, and monitoring the conduct of the fraudulent scheme;

    d.  concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

    e.  willfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering;

    f.   willfully misrepresenting, or being recklessly indifferent to, the material facts

        surrounding the provenance and authenticity of the counterfeit works that they

        passed off as genuine; and

    g.   directly and/or indirectly sharing with Rosales the proceeds of their unlawful

        scheme.

110.    The precise role each defendant played is known only to defendants at this time. Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of defendants.

111.    The De Soles have been injured in their business or property by reason of defendants' violations of 18 U.S.C. § 1962(c). As a direct and proximate result of these violations, the De Soles have lost millions of dollars that they invested in a purportedly authentic work of art that turns out to be worthless. In addition, even if the Work at issue in this case were authentic, defendants' fraudulent misrepresentations and pattern of racketeering activity related to other apparently counterfeit works has tainted the Work and reduced its value to the point where it now is unsalable and valueless.

112.    By reason of this violation of 18 U.S.C. § 1962(c), the De Soles are entitled to recover from defendants treble damages plus pre- and post-judgment interest, costs, and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(d)**

113.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 112 as if fully set forth herein.

114.    In violation of 18 U.S.C. § 1962(d), defendants and others whose identities are known only to defendants at this time conspired to violate the provisions of 18 U.S.C. § 1962(c)

in that, beginning no later than 2003 and continuing through at least November 2007, they knowingly agreed and conspired with Rosales and others to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The sophisticated frauds that were perpetrated, and the continuance of the scheme at issue for at least four years, could not have occurred without the consent and knowing connivance of defendants and other conspirators, including without limitation Rosales.

115.    As part of and in furtherance of their conspiracy, each defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each defendant agreed to and did commit at least two predicate acts of racketeering.  Further, each defendant's actions are attributable to the other defendants.

116.    None of the defendants have withdrawn, or otherwise dissociated themselves, from the conspiracy at issue or the other conspirators.

117.    As a direct and proximate result of each defendant's violations, the De Soles have been injured as aforesaid in business or property by reason of defendants' violations of 18 U.S.C. § 1962(d).

118.    By reason of defendants' violations of 18 U.S.C. § 1962(d), the De Soles are entitled to treble damages plus interest, costs, and attorneys' fees.

## JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter a Judgment:

A.      Awarding plaintiffs compensatory damages in an amount to be determined at trial, but no less than $8.3 million, plus interest;

B.      Awarding plaintiffs consequential damages in an amount to be determined at trial, but not less than $5 million, plus interest;

C.      Awarding plaintiffs punitive damages in the amount of not less than $15 million, on their First and Second Causes of Action by virtue of defendants' willful and intentional tortious misconduct;

D.      Awarding plaintiffs treble damages under 18 U.S.C. § 1962(c) and (d), on their Third and Fourth Causes of Action;

E.      Awarding plaintiffs their costs, expenses, disbursements and reasonable attorneys' fees in an amount to be determined at trial; and

F.      Awarding plaintiffs such other relief as the Court deems just and proper.


Dated: March 28, 2012                     CLARICK GUERON REISBAUM LLP
       New York, New York


                                          By: _____
                                              Gregory A. Clarick
                                              Emily Reisbaum
                                              Isaac B. Zaur
                                              40 West 25th Street
                                              New York, NY  10010
                                              Phone:  (212) 633-4310
                                              Fax:  (646) 478-9484

                                              *Attorneys for Plaintiffs Domenico and
                                              Eleanore De Sole*


32