**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DOMENICO DE SOLE and ELEANORE DE SOLE,
individually and as assignees of LAURA DE SOLE,

Plaintiffs,

v.

KNOEDLER GALLERY, LLC D/B/A KNOEDLER &
COMPANY, ANN FREEDMAN, GLAFIRA
ROSALES, JOSE CARLOS BERGANTINOS DIAZ,
MICHAEL HAMMER, and JAIME ANDRADE,

Defendants.

No. 12 Civ. 2313 (PGG)

**ECF Case**

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

RECEIVED
SEP 1 3 2012
S.D.N.C.

Plaintiffs Domenico De Sole and Eleanore De Sole, in their individual capacities and as

assignees of Laura De Sole, by and through their undersigned attorneys, Clarick Gueron

Reisbaum LLP, for their complaint against defendants Knoedler Gallery, LLC d/b/a Knoedler &

Company, Ann Freedman, Glafira Rosales, Jose Carlos Bergantinos Diaz, Michael Hammer, and

Jaime Andrade, allege as follows, on knowledge as to themselves and their own acts and on

information and belief as to all other matters:

<u>**Nature of The Action**</u>

1.      This case is about greed and fraud in the highest echelons of the oldest and once

most prestigious art gallery in New York City.  Plaintiffs Domenico and Eleanore De Sole seek

redress for Knoedler Gallery and Ann Freedman's sale to them of a counterfeit painting,

purportedly by Mark Rothko, titled *Untitled, 1956* (the "Work"), in December 2004, for $8.3

million.  Banking on their unblemished and impeccable reputations, Knoedler and Freedman

fraudulently warranted that the Work was an authentic Rothko, when they knew or should have

known otherwise, lied about their knowledge of the Work's provenance, and hid the true facts.

With this unlawful conduct, Knoedler and Freedman induced the De Soles to buy the Work, fraudulently obtaining $8.3 million from the De Soles in exchange for a canvas that is unsalable and worthless.  The De Soles bring this action to recover their losses, and to expose and seek an appropriate recovery for Knoedler and Freedman's participation in a scheme to enrich themselves and Knoedler's ultimate owner, Michael Hammer, by defrauding—using the very same lies and concealed facts that deceived the De Soles—numerous other unsuspecting collectors out of as much as $60 million.  The De Soles seek no less than $25 million in damages, plus interest, attorneys' fees, and costs.

       2.       In November 2004, when the De Soles visited Knoedler—at the time, the oldest and most venerable art gallery in New York City—Freedman, the Gallery's long-time president and director, told the De Soles a compelling story:  in the late 1950s, David Herbert, a since-deceased art dealer who knew Rothko personally, arranged for a Swiss collector to purchase the Work directly from the artist; when the Swiss collector died, his son inherited the Work and then retained Knoedler to sell it.  Freedman vouched for the father and the son—who Freedman said insisted upon anonymity but were Knoedler's clients and personally known to her and Knoedler. Freedman also said that a list of experts had authenticated the Work, including leading Rothko scholar Dr. David Anfam (who had compiled the definitive catalog of the artist's paintings) and Rothko's son, Christopher Rothko.

       3.       This sales pitch, while convincing, was a scam.  Knoedler and Freedman hid the true facts from the De Soles, including that:

           a.     Knoedler and Freedman had *no* connection to the purported Swiss collector or his son, and did not even know their names—indeed, they filed documents related to this collector in folders labeled "Secret Santa"—as remains true today;

b. Knoedler and Freedman had *no* idea—and in fact still have *no* idea—where the Work came from, other than that they had obtained it from Glafira Rosales, a little known art dealer from Long Island;

c. Knoedler and Freedman relied exclusively upon Rosales' word about the Work's provenance;

d. Knoedler itself had, in fact, purchased the Work from Rosales one year earlier for the inexplicable below-market price of $950,000, a mere fraction of the price for which it was sold to the De Soles;

e. the Work was, according to Rosales, one of a treasure trove of approximately 20 (and, ultimately, nearly 40) previously "undiscovered" works that the Swiss collector had amassed and that reportedly were painted by, and obtained directly from, the most celebrated artists of their generation:  Franz Kline, Willem de Kooning, Robert Motherwell, Barnett Newman, Jackson Pollock, Rothko and Clyfford Still (the "Rosales Collection");

f. at least one work from the Rosales Collection that Knoedler sold in 2003 had been returned after the International Foundation for Art Research (IFAR) refused to certify its authenticity;

g. David Herbert, whose role in the process as the critical intermediary between the artists and the purported Swiss collector was repeatedly emphasized to the De Soles, had been introduced into the provenance story only recently, years after Knoedler began selling Rosales Collection works and only after IFAR rejected as "inconceivable" Rosales's initial version of the story in which artist Alfonso Ossorio, not Herbert, acted as intermediary;

h.  Knoedler's research into both David Herbert and Alfonso Ossorio failed to confirm *either* version of Rosales's tale;

i.  not one of the dozens of Rosales Collection works had a single piece of paper establishing its provenance before arriving at Knoedler; and

j.  neither Dr. Anfam, Christopher Rothko nor any of the other numerous experts named by Freedman in her pitch to the De Soles had authenticated the Work— in fact, Dr. Anfam had not even "viewed" the Work at all, none of these experts actually had examined the Work for the purpose of providing an expert opinion, and many had seen the Work, at most, only briefly.

4.  Thus, Knoedler and Freedman induced the De Soles to purchase the Work based on a story as fictional as Santa himself.

5.  Had Knoedler and Freedman been honest—had they told the De Soles, for example, that they had no knowledge of the Swiss collector or even the David Herbert story apart from what Rosales had been told them; or that Rosales had previously "confirmed" a story that Ossorio was the collector's agent; or that IFAR already had refused to authenticate one Rosales Collection work; or that Rosales was offering at least 20 other "undiscovered" works for sale—the De Soles never would have bought the Work.

6.  It is now clear that the Work is, at best, of questionable provenance, as neither Knoedler nor Freedman knows its history, and Rosales—who guards all knowledge of its origins—has refused to disclose the source of the works in the Rosales Collection.  Instead, when called to testify about another work in the Rosales Collection, Rosales invoked her right not to incriminate herself under the Fifth Amendment of the United States Constitution, raising the specter of the truth:  the Rosales Collection is rife with forgeries.  With no provenance tracing

the Work to Rothko, the previously undisclosed truth has decimated the Work's value in the marketplace.

7.      Were that not damaging enough, expert testing now has conclusively determined that—as Knoedler and Freedman knew or should have known—the Work indeed is counterfeit.

8.      Ongoing discovery has confirmed that Knoedler, Freedman and Rosales (and her partner Bergantinos Diaz) perpetrated the scheme with others.  Knoedler's and Freedman's documents confirm that (a) Jaime Andrade acted as Knoedler's "gateway" to the Rosales Collection and approved the *second* provenance tale, injecting his then-deceased longtime companion Herbert into the center of the story; and (b) Michael Hammer also facilitated and supported the scheme.  Hammer knew of the outsized profits Knoedler derived from sales of the Rosales Collection, which became increasingly brazen as the scheme progressed.  Over time, Knoedler sold Rosales Collection works for three, five, or even ten times what they paid to purchase them from Rosales (or provided to her for placing works on consignment). In the end, as Hammer was well aware, Knoedler's profits were heavily dependent on the Rosales Collection sales, and Knoedler collapsed when they ceased.  Hammer also determined and approved Freedman's compensation based on Knoedler's profits and twice rewarded Freedman with lavish raises based on such profits during the years when Rosales Collection sales were at their peak.  Hammer was kept abreast of details concerning the sale of Rosales Collection works, putting him on direct notice of red flags related to the Collection; for example, he was promptly informed of IFAR's rejection of one Rosales Collection work and repeatedly assured that, despite the IFAR findings, a third-party investment transaction related to that work would proceed.  Hammer also reaped tens of millions of dollars of profits from the Rosales Collection sales and took no steps to stop the fraud, despite being the single supervisor of Ann Freedman,

the owner of the business, and, hence, the only person (other than Freedman) in a position to stop

the fraud and spare new victims.  Indeed, Hammer did eventually call the fraud to a halt—

directing that the Gallery cease selling Rosales Collection works—but only after a grand jury

was empaneled and subpoenas issued to investigate Knoedler's activities, and only after he,

Freedman, and Knoedler had made off with tens of millions of dollars.

9.      Unfortunately, the De Soles were not the only victims of this scheme.  The

defendants used the same lies and deceptions to defraud numerous others into purchasing dozens

of counterfeit abstract expressionist "masterpieces" over a decade, in furtherance of a conspiracy

that greatly enriched (a) Knoedler; (b) its owners, including Michael Hammer; (c) Freedman,

whose share of Knoedler's profits Hammer increased as the scam grew more profitable; and (d)

Rosales and Bergantinos Diaz, who received millions in payments for providing the "Secret

Santa" works  to Knoedler, all causing tens of millions of dollars of harm to numerous

unsuspecting collectors.  These other purchasers—including established galleries and veteran

collectors—reasonably relied on the very same misrepresentations and were duped by the very

same omissions that took in the De Soles.  Accordingly, with the assistance and support of

Rosales, Bergantinos Diaz, Hammer, Andrade and others, Knoedler and Freedman engaged in a

pattern of activity in violation of the Racketeer Influenced and Corrupt Organizations (RICO)

Act, 18 U.S.C. § 1961, *et seq*.

10.      As a result of defendants' fraud, fraudulent concealment, and racketeering

scheme, the De Soles were induced to pay $8.3 million for a painting that is counterfeit,

unsalable, and worthless, even though the market for Rothko paintings has substantially

increased in the years since the purchase.  The De Soles are entitled to judgment awarding them

no less than $25 million in compensatory, consequential, treble, and/or punitive damages,

together with attorneys' fees and costs.

## The Parties

11.     Plaintiffs Domenico De Sole and Eleanore De Sole are married individuals residing at 16 Marsh Wren, Hilton Head, South Carolina.  The De Soles bring this action in their individual capacities and as assignees of their daughter Laura De Sole.

12.     Defendant Knoedler is a Delaware limited liability company with its principal place of business located, according to the New York Secretary of State, at 19 East 70th Street, New York, New York, but, upon information and belief, is in fact located elsewhere in New York County.  Knoedler's sole member is 8-31 Holdings, Inc., a Delaware corporation whose principal place of business is also, according to the New York Secretary of State, located at 19 East 70th Street, New York, New York.

13.     At the time of the De Soles' purchase in November 2004, Knoedler was the oldest art gallery in New York City and, for over a century, was highly respected worldwide.  Knoedler traded in works by master artists from its establishment in 1846 until it abruptly ceased operations in December 2011, immediately after allegations were made that another painting defendants had sold from the Rosales Collection was counterfeit.

14.     Defendant Michael Hammer is (and was, at all relevant times) directly responsible for the operations of Knoedler, holding himself out as its Chairman.  Hammer is currently the Sole Manager of Knoedler.  Hammer also is President of 8-31 Holdings (Knoedler's parent), of which he is the sole or beneficial owner.  At all relevant times, in these roles Hammer managed the officer-level personnel and company finances of Knoedler.  Upon information and belief, Hammer resides in or near Santa Barbara, California.

15.     Defendant Freedman began working at Knoedler in the 1970s, and was the

Director and President of Knoedler and a Director of 8-31 Holdings, Inc., between 1995 and

October 2009.  At all relevant times, Freedman was employed and compensated at Hammer's

discretion:  Hammer personally appointed her Director in or about 1995 and terminated her in

October 2009.  On information and belief, Freedman resides in New York County and continues

to conduct business in New York County.

16.     Upon information and belief, defendant Glafira Rosales resides in Sands Point,

New York.

17.     Upon information and belief, defendant Bergantinos Diaz resides in Sands Point,

New York.

18.     Upon information and belief, defendant Jamie Andrade resides in New York,

New York.

### Jurisdiction And Venue

19.     This Court has federal question jurisdiction over this action pursuant to the federal

racketeering statute, 18 U.S.C. § 1964(c), as well as supplemental jurisdiction under 28 U.S.C.

§ 1367.

20.     This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C.

§ 1332 because the action is between citizens of different states and the amount in controversy

exceeds $75,000, exclusive of interest and costs.

21.     This Court has personal jurisdiction over the defendants because they are

domiciled and/or regularly transact business in New York City.  To the extent that any defendant

is not located in New York, this Court also has personal jurisdiction because this action arises

out of the transaction of business in New York City.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the

defendants reside in this District, a substantial part of the events or omissions giving rise to the claims occurred in this District, and a substantial part of the conduct complained of herein occurred in this District.

## Statement of Facts

### 1994-2003:  The Beginning of the Scheme

23.     Knoedler employee Jaime Andrade persuaded Long Island art dealer Glafira Rosales to bring a collection of previously unknown "masterworks" to Ann Freedman and Knoedler in the mid-1990s.  Andrade introduced Rosales to Freedman and others at Knoedler, had no prior relationship with Rosales.  Andrade was later described to Hammer as the "gateway" to the Rosales Collection.

24.     After initially claiming to have some works to sell belonging to a "friend," Rosales eventually told an enticing story—an art dealer's dream.  As a child (apparently in Mexico), Rosales claimed, she met a husband and wife who were European Jewish émigrés.  For business reasons, the husband travelled frequently to the United States between the 1940s and the 1970s and, on those trips, bought a number of artworks directly from a veritable who's-who of now world-famous abstract expressionist artists, including Mark Rothko, Jackson Pollock, Franz Kline, Clyfford Still, Robert Motherwell, and Barnett Newman.  The couple died in the early 1990s, and these works—the number of which was then unspecified—were bequeathed to their children, a daughter and son, who resided in Mexico and Switzerland, were uninterested in art, wished to remain strictly anonymous, and were looking to sell.

25.     Rosales offered no corroboration for her story.

26.     In one meeting, Rosales asserted that letters had been exchanged between the various artists and the anonymous collector, but that they were "disposed of" after his death.

Rosales did, however, report that the purported collector's son "remembers seeing artists in his father's home."

27.     In a subsequent meeting with Freedman, Rosales further explained the lack of documentation by stating that all purchases had been made in cash.  Again, Rosales reported that "[t]he son of the collector remembered seeing his parents pay in cash to one of the artists."

28.     Notwithstanding this uncorroborated, undocumented, and thin story, Freedman admits that she did not investigate Rosales or her partner Bergantinos Diaz.  Had anyone investigated, they would quickly have learned that Bergantinos Diaz had previously been implicated in the sale of forged artwork.

29.     In or around 2000, Rosales further embellished her story, stating that her client— the son of the mystery collector—had "confirmed" that his father did not purchase the works at issue alone, but rather through and/or with the advice of Alfonso Ossorio, another abstract expressionist artist, friend and colleague of, among others, Pollock, Rothko, Styll and other artists whose works were represented in the Rosales Collection.

30.     In 2000 and the years after, Rosales repeatedly reaffirmed that Ossorio had acted as the collector's agent, noting—among other things—that both Ossorio's parents and the collectors were "in the sugar business."  Again, however, Rosales asserted that any relevant correspondence between Ossorio and the collector had been lost or thrown out after the collector's death.

31.     In or around 2001, Knoedler employees and retained experts attempted to verify Rosales's story regarding the connection between the anonymous collector and Ossorio by, among other things, reviewing files relating to Ossorio and Jackson Pollock at the Smithsonian's Archives of American Art.  No corroborating evidence was located linking the works in the

Rosales Collection with Ossorio, linking Ossorio to a Mexican/Swiss collector who might have purchased those works, or, indeed, confirming that any of the Rosales Collection works existed before their arrival at Knoedler.  Nevertheless, Knoedler blithely associated Ossorio's name with the provenance of Rosales Collection works, including in connection with its sale in 2002 of at least one work by Mark Rothko for $5.5 million.

32.     In December 2001, Rosales called Freedman to inform her that "Gerzo" was a "family name" connected to the collector—but was not his name.  Knoedler then investigated a possible connection between Ossorio, the artists whose works appeared in the Rosales Collection, and well-known Mexican artist Gunther Gerzso, who had died a few months earlier.  Again, it found no corroborating evidence.

33.     Despite Rosales's failure to provide evidence to support her amazing story and despite Knoedler's failure to independently locate such evidence, between 1996 and 2003, Knoedler sold on consignment or purchased (and then resold) from Rosales approximately 20 works, all attributed to leading abstract expressionist artists.

34.     These transactions were immensely profitable for Knoedler, in part because Rosales made the works available for prices far below the market value for legitimate works by these artists.  For example, in 2000, Knoedler accepted a purported Pollock from Rosales on consignment, agreed to pay $670,000 to the "owner" of the work (identified to the buyer as "Private Collector, Switzerland"), and sold it later that year for $3.1 million.  Similarly, the Rothko mentioned above was purchased by Knoedler for $750,000 in 2001 and sold for $5.5 million in 2002.

35.     From 1996 to 2003, Knoedler turned a profit on Rosales Collection works alone of more than $11 million.

36.     As Freedman, Hammer, and others at Knoedler knew, Knoedler's viability as a business was substantially—and, in some years, almost entirely—dependent on sales from the Rosales Collection.  For example, upon information and belief, Knoedler's 2002 profits were approximately $5.6 million; that same year, Knoedler's sales of Rosales Collection works netted well over $6 million, apparently contributing the vast portion of the Gallery's profit for the year.

37.     Freedman and Hammer were the principal beneficiaries of this windfall.  In 2002, Hammer personally saw to it that Freedman's compensation in the form of a share of Knoedler's profits was increased—from 16% to 25%—giving her a total compensation of nearly $2 million. Hammer reaped the rest of the windfall through his holding company, 8-31 Holdings, which on information and belief received regular profit distributions from Knoedler.

38.     Rosales and Bergantinos Diaz also profited.  During this period, Knoedler paid approximately $6 million to Rosales and Bergantinos Diaz for Rosales Collection works that Knoedler then resold.  The transfers to Rosales and Bergantinos Diaz consistently included $9,000 in cash delivered to Rosales and the lion's share of payments sent by wire to Bergantinos Diaz and/or his brother, Jesus Bergantinos Diaz, at a bank account in Spain.  Notably, no funds ever were transferred by Knoedler to the supposed Swiss seller or even into Switzerland (or Mexico)—yet another red flag.

**2003:  IFAR Rejects the Levy Pollock; Defendants Come Up With a New Story**

39.     Among the Rosales Collection works Knoedler handled during this period was an untitled painting purportedly made by Jackson Pollock in 1949 and sold to Jack Levy, a sophisticated and experienced art collector (the "Levy Pollock").

40.     Typically, Knoedler made a healthy profit on the same: Knoedler purchased the Levy Pollock from Rosales in March 2001 for $750,000 and sold it to Levy several months later

for $2 million.  Consistent with the then-current version of Rosales's tale—and despite the lack of corroborating proof—Knoedler and Freedman induced Levy to purchase the work by representing that it was purchased directly from Pollock with the assistance of Alfonso Ossorio and making no mention of Rosales's role.

41.     The contract of sale to Levy was accompanied by a rider acknowledging that Levy would submit the work for review by IFAR and providing that, if IFAR determined that the work has been "misattributed" to Pollock, Knoedler would refund the purchase price.

42.     IFAR issued its report on the Levy Pollock in October 2003 (the "IFAR Report"), which concluded that the organization "cannot currently support [the painting's] addition to the artist's *oeuvre*."

43.     With respect to Rosales and Knoedler's claim that Ossorio had acted as the agent for the anonymous collector who supposedly purchased the Levy Pollock from the artist, IFAR was definitive.  Based on expert analysis, archival research, and interviews with Ossorio's associates, IFAR deemed the Ossorio story "inconceivable," "improbable," and "difficult to believe," particularly given the lack of any proof linking Ossorio to the Levy Pollock or even substantiating the general notion that Ossorio might have acted as a conduit for "undiscovered" Pollock paintings.

44.     At Freedman's explicit direction, the IFAR Report was promptly sent to Hammer. Hammer also was provided documents demonstrating Knoedler's efforts to verify the connection between Ossorio and the Rosales Collection.

45.     Further in a fax cover to Hammer dated December 15, 2003, Freedman discussed fallout from the IFAR Report with Hammer (specifically, the willingness of a partner to continue to invest in the work). Notably, a handwritten note on the reverse side of the fax cover sheet

contains the following phrases in quotation marks: "discreet sources are my stock in trade,"
"don't kill the goose that's laying the Golden egg," and "I am not going to change my way of
doing business.  If you are not [comfortable]—step away."

46.     After the IFAR Report was issued, Levy returned the work and Knoedler
refunded the purchase price.

47.     In addition, after the IFAR Report was issued, Rosales, Freedman, Andrade, and
Knoedler conspired to change their story about the origins of the Rosales Collection.  David
Herbert—another deceased art-world figure with relationships with the artists in the Rosales
Collection and Andrade's longtime companion—was substituted in for Ossorio as the "advisor"
or "agent" who worked with the anonymous collector to amass the Rosales Collection.  At this
time, Andrade claimed to have introduced Rosales to Herbert before his death in 1995.

48.     As with the Ossorio story, no documentary evidence was offered to corroborate
any link between Herbert and the Rosales Collection works, despite the fact that Andrade was
the executor of Herbert's estate, which included an extensive archive of materials relating to his
art dealings that Andrade had donated to the Archives of American Art and other institutions.
Knoedler employees and retained experts would later comb these papers in vain seeking support
for this new story.

49.     Conveniently, however, according to notes taken by Knoedler employees, Rosales
reported that her purported client "*confirmed* that Herbert was the advisor" (emphasis in
original)—just as he previously had "confirmed" Ossorio's role.

**2004:  The Fraudulent Sale to the De Soles**

50.     In Fall 2004—not long after the IFAR Report issued and Herbert was substituted
in for Ossorio in the tale concocted by Rosales and the other defendants—the De Soles called

Ann Freedman at Knoedler to set up a meeting to discuss the possible purchase of a painting by the artist Sean Scully.  The meeting was set for late November 2004 and, as Freedman knew, the De Soles arrived intending to spend approximately $1 million for a Scully work.

51.     At the meeting, however, Freedman disclosed that she had no Scully works available.  Instead, Freedman presented the De Soles with a work purportedly by the world-famous abstract expressionist painter Mark Rothko.

52.     To induce the De Soles to purchase the Work, Knoedler and Freedman spun a tantalizing and credible—given Knoedler's gravitas and goodwill developed over 165 years in the fine art business—tale about the elite provenance and authenticity of the Work using a slew of affirmative and knowing misrepresentations and carefully concealed facts.

53.     Freedman personally met with Domenico and Eleanore De Sole at Knoedler in late November 2004.  In the weeks after, Freedman also met twice met with the De Sole's consultant and agent Jim Kelly, who the De Soles informed Freedman would contact her on their behalf.  In these meetings, all of which took place at Knoedler, Freedman and the De Soles (and subsequently Kelly) discussed the De Soles' proposed purchase of the Work.

54.     In these discussions, Freedman unequivocally, repeatedly, and consistently represented to the De Soles and Kelly that the Work was an authentic Mark Rothko.

55.     At the meetings, Freedman represented to the De Soles and Kelly that the anonymous seller of the Work (the son of a Swiss collector) was Knoedler's client, that he and his father were personally known to Knoedler, and that his father had obtained the Work from Rothko directly, with the advice of David Herbert.  (After the purchase was complete, Freedman bolstered this story by telling the De Soles that the son of the Swiss collector wanted the Work to find a "home" with another collector, rather than be sold to someone who intended to re-sell it.)

56.     Further, to assure the De Soles of the Work's authenticity, Freedman informed the De Soles and Kelly at their meetings that Rothko's son, Christopher Rothko, and numerous experts—notably including Dr. David Anfam who had created Rothko's catalogue raisonné—had examined the Work and attested to its authenticity.

57.     Knoedler and Freedman also represented to the De Soles and Kelly that the Work was "one of two previously undiscovered works" by Rothko and Pollock.  Indeed, on this basis, Freedman and Knoedler tried to sell the De Soles both the Work and the Pollock, stating, in sum or substance that "they came from the same client" and "look so good together."

58.     Finally, Knoedler and Freedman told the De Soles and Kelly that the Work would be included in a forthcoming supplement to the Rothko catalogue raisonné being prepared by the National Gallery of Art.

59.     Following the De Soles' and Kelly's meetings with Ann Freedman at Knoedler, in the last days of November 2004, Kelly (in New Mexico) and Freedman (in New York) spoke by telephone to negotiate a sale of the Work to the De Soles.  After Freedman offered to "discount" the Work by $200,000, a price of $8.4 million was agreed, including a $100,000 commission payable to Kelly, far more than the De Soles had ever previously paid for a work of art.

60.     On or about November 30, 2004, Knoedler sent Kelly an invoice (by mail or FedEx) for the sale of the Work, seeking payment in the amount of $8.3 million (the "Knoedler Invoice," a true and correct copy of which is attached hereto as Exhibit 1).  The Knoedler Invoice reiterated that the Work was an authentic Rothko, as follows:

> **Mark Rothko (1903-1970)**
> *Untitled*
> 1956
> Oil on canvas
> 50 1/8 x 40 1/4 inches
> Signed and dated on verso

A 12322

61.     The Knoedler Invoice also reiterated that the Work belonged to the son of a Swiss collector, as follows:

> **Provenance**
> The Artist
> Private Collection Switzerland
> By descent to the present owner

62.     The Knoedler Invoice also again represented that the Work was, definitively, "to be included in the forthcoming supplement to the 1998 Rothko catalogue raisonné under preparation by the National Gallery of Art, Washington D.C."

63.     On December 7, 2004, the De Soles wired $8.4 million from their Morgan Stanley account in New York to Kelly in New Mexico in preparation for the De Soles' purchase of the Work.  To that end as well, on December 9, 2004, Kelly sent the De Soles an invoice for a total purchase price of $8.4 million (*i.e.*, the agreed purchase price plus Kelly's commission). Because the De Soles intended, as Kelly knew, to own the Work during their lifetimes and to bequeath it to their daughter Laura De Sole if they still owned it upon their deaths, Kelly addressed the invoice to "Laura De Sole" at Domenico and Eleanore De Sole's South Carolina home address.

64.     Still, the De Soles sought further written assurances concerning the origin and authenticity of the Work before closing the purchase.  Those assurances came on December 11, 2004, when, Knoedler and Ann Freedman (in New York) faxed Kelly (in New Mexico) a letter explicitly warranting the authenticity of the Work (the "Knoedler Letter," a true and correct copy of which is attached as Exhibit 2).  (The Knoedler Letter is addressed to "Laura De Sole" at Domenico and Eleanore De Sole's South Carolina home address.)  The Knoedler Letter went to great lengths to reassure the De Soles that the Work in fact was authentic.

65.     The Knoedler Letter states that "[t]his classic Rothko painting was acquired directly from the artist through the advice and counsel of David Herbert," whom the Letter described as "so critical to many of the seminal artists and collectors of the 1950s." The Letter attached a "David Herbert Profile" (drafted by an expert retained by Knoedler) purporting to describe David Herbert's career and noting that "Knoedler & Company is currently in the process of an in-depth exploration and study of the heretofore unknown career of David Herbert."   The Letter also:

    a.   recited that Dana Cranmer, former conservator of the Rothko Foundation, had confirmed that the Work was in "remarkably good condition";

    b.   stated that the National Gallery intended to include the Work in the "forthcoming catalogue raisonné supplement";

    c.   advised that Knoedler anticipated a loan request from Foundation Beyeler, in Basel Switzerland (whose curator, Oliver Wick, they said, considered the Work "to be of superior museum quality"); and

    d.   enclosed a list of the experts whom Knoedler and Freedman previously had informed the De Soles had authenticated the Work, including Christopher Rothko and Dr. Anfam, as well as E.A. Carmean, Jr., Bonnie Clearwater, Dana Cranmer, Jack Flam, Laili Nasr, Stephen Polcari, Earl A. Powell III, Irving Sandler, and Oliver Wick.

66.     Thus, the Knoedler Letter explicitly concluded:  "Knoedler warrants the authenticity and good title of" the Work.  (At the De Sole's request, Kelly also executed a similar letter that incorporated the representations that Freedman and Knoedler had made.)

67.     After receiving the Knoedler Letter and in reliance upon the misrepresentations contained therein, in the Knoedler Invoice, and previously made by Freedman in meetings at Knoedler, the De Soles authorized Kelly to make the purchase payment on their behalf. Accordingly, on December 17, 2004, Kelly wired Knoedler the purchase price of $8.3 million on behalf of the De Soles from his First National Bank account in New Mexico to Knoedler's HSBC account in New York.

68.     At all times, Knoedler and Freedman knew that Knoedler was selling the Work to the De Soles, and not to Jim Kelly, his company James Kelly Contemporary, Inc., or Laura De Sole.  Knoedler's contemporaneous records of the sale confirm that, rather, Knoedler and Freedman knew—both when they spoke and transacted business with him—that Kelly acted only as the De Soles' disclosed agent and at their direction, and that the De Soles were purchasing the Work with the hope and ultimate intention of bequeathing it to their daughter many years after the purchase.  The sale structure in every respect was consistent with common practice in the art industry.  For the avoidance of doubt, Laura De Sole has assigned to Domenico and Eleanore De Sole any right that she might have held in the Work or the claims made in this lawsuit, even though neither the De Soles nor Laura De Sole believe that the latter had any such rights.

**Freedman and Knoedler Fraudulently Concealed Critical Facts from the De Soles**

69.     The De Soles have now learned—and discovery to date in this Action has confirmed—that nearly everything Freedman and Knoedler told them to induce them to purchase the Work was false and that Knoedler and Freedman hid critical material facts from them that Knoedler and Freedman knew but the De Soles did not and could not know.  Had Knoedler and Freeman told the truth and disclosed the facts uniquely known to them (and the other defendants), the De Soles would have declined the offered sale.

70.     Thus:

a.   Knoedler and Freedman lied about their relationship with the purported Swiss "collector" and his son.  Knoedler and Freedman had *no* relationship whatsoever with, or even actual knowledge of, either the Swiss collector who purportedly had purchased the Work from Rothko or his son who purportedly had inherited and was selling the Work.

b.   Knoedler and Freedman did not disclose that, in fact, Knoedler had obtained the Work from Rosales, a little-known Long Island art dealer whose partner, Bergantinos Diaz, had been accused of selling forgeries as early as 1999.

c.   Knoedler and Freedman did not disclose that, in fact, the true "seller" of the work was Knoedler itself, which had purchased the Work from Rosales a year earlier.

d.   Knoedler and Freedman did not disclose that Rosales' statements  alone—and nothing more—provided support for Knoedler and Freedman's representations about the Work's provenance;

e.   Knoedler and Freedman did not disclose that another work from the same Rosales Collection had been rejected by IFAR the previous year and that the organization had concluded that the provenance claimed by Rosales and Knoedler was "inconceivable," "improbable," and "difficult to believe."

f.   Knoedler and Freedman did not disclose—despite their unequivocal representation that the Work "was acquired directly from the artist through the advice and counsel of David Herbert"—that (1) until IFAR dismissed the story out of hand, Alfonso Ossorio had supposedly played Herbert's role; (2) as recently as 2002, Knoedler had sold another Rothko from the Rosales Collection

claiming Ossorio, not Herbert, acted as advisor; and (3) Knoedler had no basis for making this assertion apart from the word of Rosales, who had likewise previously "confirmed" the discarded Ossorio story.  Indeed, as late as 2008, a Knoedler employee recognized that, if Rosales Collection works were challenged, "we haven't enough to go on with D. Herbert."

g.   Knoedler and Freedman told the De Soles that, plausibly, the Work was only "one of two previously undiscovered works" by Rothko and Pollock, when they knew that Rosales, implausibly, was selling a cache of approximately 20 such "undiscovered" works—including *six* other Rothkos—purportedly painted by the most celebrated abstract expressionist artists, all of which purportedly had gone directly from the artists (through Herbert or Ossorio, depending on when the story was told) to the anonymous Swiss collector and his son.

h.   Knoedler and Freedman did not mention that not one of the 20 works in the Rosales Collection had a single sheet of paperwork to verify its provenance, including any transfer to or conveyance from the Swiss collector, his son, or Rosales, or any record in the archives of the artist(s) or another collector reflecting that the works existed before they arrived at Knoedler.

i.   Knoedler and Freedman knowingly misrepresented that an august list of experts, including Christopher Rothko and Dr. Anfam, had "viewed" and authenticated the Work, when, in fact, none of these experts actually had examined the Work for the purpose of providing an expert opinion; many had seen the Work, at most, only briefly; and (as discovery has shown) Dr. Anfam—author of the Rothko catalogue raisonné and thus the most critical expert on the list—had never even

"viewed" the Work, much less authenticated it.

71.      Knoedler and Freedman used Knoedler's preeminent reputation to support these material misrepresentations regarding the authenticity of the Work and the De Soles reasonably relied on them when they agreed to purchase the Work.  At the time, Knoedler's reputation was impeccable and collectors of wide-ranging sophistication in the art market relied upon it.  Thus:

    a.   The National Gallery relied solely on Knoedler's very same misrepresentations in stating its intention to include the Work in the catalogue raisonné.

    b.   The Foundation Beyeler also accepted Freedman and Knoedler's representations about the Work's authenticity in agreeing to exhibit the Work in its Rothko Rooms alongside documented Rothko works.

    c.   Dozens of other sophisticated purchasers—including other art professionals and galleries—also relied on Knoedler's history and reputation in purchasing other works from the Rosales Collection based on these same misrepresentations.

    d.   Finally, and perhaps most tellingly, Freedman expressly told at least one other prospective purchaser of a Rosales Collection work that it was standard practice for purchasers to rely on her "word" and the representations made in Knoedler's invoice alone, and that seeking additional guarantees of authenticity was inappropriate and unprecedented.

72.      The De Soles's reliance also was reasonable because they requested and obtained, in the Knoedler Letter (Ex. 2), a written warranty of authenticity that confirmed Knoedler's oral representations.

73.      Defendants knew or should have known that Knoedler and Freedman's representations to the De Soles regarding the Work, including regarding its provenance and

22

authenticity, had no factual basis and were false.  Indeed, at the very least, all of the defendants abdicated their responsibilities and recklessly disregarded the truth.

74.     Moreover, Knoedler, Freedman, Hammer, and Andrade were uniquely in possession of information that raised myriad red flags about the Work's authenticity: that Rosales was the source, that Rosales would not reveal the collector's identity; that Rosales claimed that the collection included more than 20 works by the most important abstract expressionist painters; that not a single piece of paper documented the provenance of any of these works; that Rosales's story shifted over time but could never be confirmed; that IFAR had refused to certify the authenticity of one Rosales Collection work and flatly rejected the initial story Rosales had offered regarding the manner in which the works were collected; that Knoedler reaped an outsized profit on works delivered by Rosales because they were offered for prices well below those paid for legitimate works by leading abstract expressionist artists; and that the Work was no exception, having been purchased by Knoedler for $950,000 and resold for $8.3 million.

75.     Knoedler and Freedman hid these red flags from the De Soles even as they put Knoedler, Freedman, Hammer, and Andrade on direct notice that the Work had no known provenance and cast significant doubt on the Work's authenticity.  In these circumstances, the defendants recklessly disregarded the truth and knew, or should have known, that the Work was counterfeit.  At the very least, Knoedler and Freedman knew that, if the full truth about the Work's provenance were disclosed, the Work's authenticity would be drawn into sufficient doubt such that it would become effectively worthless and unsalable.

76.     In sum, Knoedler and Freedman had superior knowledge of the material facts but failed to disclose them.  Knoedler and Freedman knew that this information was not otherwise

available to the De Soles and that the De Soles bought the Work reasonably relying upon Knoedler and Freedman's unproven tale about its provenance and false representations about its authenticity.  Had the De Soles known the truth—or even part of the truth—they would not have purchased the Work.

**2005 to 2011: Defendants Continue and Cover Up Their Fraud**

77.      In the years after selling the Work to the De Soles, Knoedler and Freedman did not communicate with the De Soles to correct their misrepresentations, to disclose the truth about the Work and its provenance, or to reveal that events had transpired that cast still further doubt on the Work's authenticity and value.  Instead, the defendants both continued and covered up their fraud.

### *The Beyeler Pamphlet*

78.      After the De Soles's purchase was complete, the anticipated loan request from the Foundation Beyeler arrived and the De Soles agreed to have the Work shipped to Switzerland to be prominently displayed in the Rothko Rooms at the Foundation.  The De Soles were not told, however, that this loan was to be used to further the defendants' fraudulent scheme.

79.      The Foundation published a brief pamphlet on the exhibition, authored by Oliver Wick, that discussed the provenance of the Work that stated, in relevant part:  "The collector, since deceased, regularly travelled through the U.S. in the 1950s and acquired a small group of works by artists of the New York School.  He was anything but a collector in the conventional sense.  As he once explained, his purchases were motivated by a desire to help artists of his period to a humble livelihood."  The pamphlet also stated that this "collector" had "obtained professional advice from David Herbert," who, among other things, had "mount[ed] private 'apartment exhibitions,' where he attempted to arouse collectors' interest" in abstract

expressionist works, and speculated that "[i]t can be assumed that the work on view here was acquired at such an apartment sale."

80.     Readers were not informed, however, that this portion of the pamphlet—which, upon information and belief, is the only published text that corroborates the existence of the mysterious "collector" or the David Herbert story—had been drafted by someone on the Knoedler payroll who provided the proposed text to Wick and who, like everyone at Knoedler, (a) had no idea who this "collector" was, much less what the collector had ever "explained" to anyone; (b) knew that there was no evidence to support speculation regarding the sale of the Work at one of Herbert's "apartment sales"; and (c) knew that Rosales had "confirmed" only a short time before that someone *other than* Herbert had advised the anonymous collector, including in the purchase of other works by Rothko.

81.     Nevertheless, the text was planted to good effect.  Once published, prospective purchasers of Rosales Collection works were shown the Beyeler pamphlet as evidence that the "collector" truly existed and that the David Herbert story was believed by reputable authorities.

### *Rosales Refuses to Obtain Authentication of the Works—But the Scheme Continues*

82.     In connection with the consignment or sale of many of the Rosales Collection works, Rosales signed an authorization form confirming that she was the authorized agent "of a private collector residing in Mexico City and Zurich" who inherited the works from his father who, in turn, had obtained them directly from the artists.

83.     In May 2005, Freedman and Knoedler asked Rosales to revise the form (a) to include reference to David Herbert; and (b) to confirm that the current owner "has guaranteed the[] authenticity" of the works.

84.     According to contemporaneous records, Rosales informed Knoedler that, while

25

she was "very comfortable about including David Herbert" because "the owner *has confirmed*

that Herbert was the advisor" (emphasis in original), she was "not comfortable about including

the authenticity clause."  She resisted that request, explaining that asking the collector's son to

confirm the works' authenticity "might raise his hackles" and that she did "not want to

jeopardize the relationship by pressing him."

85.     Despite Rosales's refusal to obtain a guarantee of authenticity from the purported

owner, Knoedler and Freedman continued to arrange for the sale of Rosales Collection works to

unsuspecting buyers.  As before, the buyers were not told about Rosales's existence, the failure

to obtain a guarantee of authenticity from the purported "owner," or any of the other red flags

defendants concealed.

86.     Between 2004 and 2008—in addition to the more than $7 million in profit made

from the sale of the Work to the De Soles—Knoedler made at least six additional major sales of

Rosales Collection works, turning a profit of more than $13 million on sales of more than $20

million, all supposedly drawn from the anonymous collector.

### *Motherwell's Foundation Brands a Rosales Collection Work a Forgery*

87.     In three meetings during December 2007 and January 2008 between Freedman

and the Dedalus Foundation, Inc.—which is responsible for the Robert Motherwell catalogue

raisonné—Dedalus advised Freedman that it believed seven purported Motherwell works from

the Rosales Collection, including four Knoedler had handled (a former Knoedler employee

Julian Weissman handled the other three), were fakes.  Notably, Dedalus rejected Freedman's

assertions that—just like the Rothko Work here—the Motherwell works were sold, through

David Herbert, directly by Motherwell to a collector.  On December 12, 2007, Dedalus informed

Freedman that the Motherwell works included stylistic anomalies and were of questionable

provenance; on December 20, 2007, Dedalus reiterated its conclusions; and, on January 10, 2008, at a third meeting, Dedalus board member Jack Flam explained in detail the factors causing Dedalus to suspect the works were fakes, challenging the tale of their provenance and Herbert's supposed role in assembling the collection.

88.     Under pressure from Dedalus, Knoedler and Freedman again asked Rosales to provide information that would support her claims regarding the provenance of the Rosales Collection works.  In letters in January 2008, Freedman informed Rosales that Dedalus had charged that the Motherwells were "false, illegal, or part of a dishonest scheme," and that Knoedler needed a "bonafide defense" to respond to the charge (which, apparently, they did not have).

89.     In an effort to induce Rosales to provide corroborating evidence, Freedman and Knoedler (a) signed a confidentiality agreement promising not to disclose any information about the purported owner; (b) drafted a letter for the purported owner to sign confirming the essentials of Rosales's story and the authenticity of the works; (c) drafted a second letter, addressed to the owner, informing him that Dedalus had "strongly questioned the authenticity and legality of these paintings" and "suggest[ed] that we are selling and trading in art that is counterfeit"; and (d) provided Rosales a blank form for her to complete disclosing the identity of the original collector and his son.

90.     Rosales refused to disclose or obtain any of the requested information.

91.     Undeterred and unwilling to "kill the Goose that's laying the Golden egg," without corroborating evidence from Rosales, Knoedler attempted to defend the Motherwell works it held from the Rosales Collection by retaining James Martin of Orion Analytical, LLP, to conduct scientific testing of two of these paintings in its possession.

92.     Martin's analysis only confirmed that the works were suspect.  Martin's testing
found anomalies in these works, including staining on the canvas backs and pigments on the
surface that post-dated the attributed dates of the works by ten years and were "inconsistent with
the understanding that the paintings were made in the 1950s."  Martin noted the use of acrylic
polymer emulsion paint on the works—purportedly from 1953 and 1955—which he found was
"remarkably inconsistent with what is known about Motherwell's use of acrylic paints" and that
"raise[s] questions about when the works actually were painted."  He further observed that the
*same* anomalous paint appeared in both of the works under review.  Finally, he noted that "both
paintings display patterns of circular abrasions, visible only with magnification, that point
[check] to the use of an electric sander."

93.     Apparently unhappy with their expert's opinion, Knoedler embarked on a
campaign to convince Martin to abandon his conclusions—providing hypotheses for how
Motherwell might have obtained seemingly anachronistic paints—but Martin repeatedly
reiterated his findings.

94.     Knoedler, Freedman, and Andrade also sought to salvage the situation by taking
the then-familiar approach of asking Rosales to have the "owner" "confirm" new facts that could
explain away Martin's findings.  Thus, on October 24, 2008, Freedman met with Rosales and
told her "about the preliminary report from Orion and the problems it raises regarding the dating
of the works," and asked Rosales "if she might ask Mr. X" whether his father might have, in fact,
purchased works as late as 1964 or 1965 (when the anomalous paints Martin detected were on
the market), despite the previous assumption that such "off the record" purchases must have
ceased in 1959, when David Herbert opened his own gallery.

95.     Freedman also "asked Mrs. Rosales to approach Mr. X and ask again if there

exists *any* tangible evidence related to these transactions" or "something which documents the link to David Herbert and/or the artists in some way."

96.     Through Rosales, the anonymous owner conveniently and promptly "confirmed" that the transactions between Mr. X [his father] and the artists continued from the late 1940s through 1964," and that the owner "remembers" travelling with his father to artists' studios and "remembers this ending in 1964."   As always, however, no "tangible evidence" or "documents" were provided.

97.     Knoedler ultimately decided to simply dismiss Martin's analysis as "conjecture," and provided Dedalus only a redacted version of Martin's report, omitting Martin's ultimate conclusions.   Nevertheless, even Martin's truncated analysis confirmed Dedalus's independent conclusion that Motherwell did not make these two paintings.

98.     Further, Dedalus declined to certify as authentic a third work attributed to Motherwell from the Rosales Collection that subsequently became the subject of litigation against the Julian Weissman Gallery (which had sold it).   As a part of the settlement of the action against Julian Weissman, the Rosales Collection Motherwell at issue in that case now bears an indelible, unalterable stamp that reads:   "AFTER PHYSICAL EXMINATION AND FORENSIC TESTING, THE ROBERT MOTHERWELL CATALOGUE RAISONNÉ PROJECT OF THE DEDALUS FOUNDATION, INC., HAS DETERMINED THAT THIS PAINTING IS NOT AN AUTHENTIC WORK BY ROBERT MOTHERWELL BUT A FORGERY."

99.     Despite these events, the scheme—and the sales—continued.   In 2008, Knoedler sold a Rosales Collection Rothko for more than $7 million and a Rosales Collection Kline for more than $3 million, turning a profit on those two sales alone of approximately $4.7 million.

100.     Also during this period, in April 2008, Hammer personally approved an increase

in Freedman's profit sharing, increasing her take from 25% to 30%.  Notably, this profit sharing

increase was approved by Hammer only six days before the sale of the $7 million Rothko.

### *Freedman and Knoedler Provide a Fraudulent Insurance Appraisal to the De Soles*

101.    In January 2008—as Dedalus was declaring several Rosales works to be forgeries

and while Rosales was continuing her refusal to provide any evidence to support her story—

Eleanore De Sole wrote to Freedman to request an updated appraisal of the Work for insurance

purposes.

102.    On or about January 19, 2008, Knoedler complied, sending the De Soles a written

appraisal.  In the appraisal, Knoedler valued the Work at $9 million, explaining that the appraisal

represented its "estimate of the probable cost of replacing the work with a similar work."

103.    The estimate continued to cover up Knoedler and Freedman's fraud and failed to

consider or disclose rapidly unfolding events that, at that very moment, confirmed their unlawful

conduct and the inauthenticity of the Work.

104.    When the De Soles sought the appraisal, the defendants knew, in addition to the

facts they failed to disclose at the time of the De Soles' purchase, (a) that as many as eight

Rosales Collection works were suspected of being forgeries, two of which had been subjected to

scientific analysis and found to have inexplicable anomalies; (b) that Rosales had repeatedly

declined (both in 2005 and 2008) to provide any support for her claim that the Rosales Collection

works were genuine and acquired directly from the artists; (c) that Knoedler's own research—

which continued throughout this period—also failed to uncover so much as a single piece of

paper reflecting that any of the Rosales Collection works existed before they came in the door at

Knoedler; (d) that there was, in fact, no "tangible evidence related to these transactions" or

anything that "documents the link to David Herbert and/or the artists in some way"; and (e) that,

since the De Soles's purchase, the Rosales Collection had, improbably, grown by another approximately 10 works, all "undiscovered masterpieces" that, again, had no supporting documentation.

105.    Unaware of these facts (and the others hidden from them from the beginning), the De Soles continued to invest in the Work.  For example, in the years since the De Soles purchased the Work, the De Soles spent approximately $64,000 to insure the Work, believing it to be an authentic Rothko.  In fact, were it an authentic Rothko, over these years, the Work would have appreciated in value significantly above the $8.3 million the De Soles paid Knoedler for it in 2004.

### *The FBI Investigates, Freedman Is Fired, and Knoedler's Business Dries Up*

106.    Upon information and belief, in or around 2009, a grand jury was empaneled to investigate Freedman, Rosales, Knoedler and the Rosales Collection works.  In September 2009, the grand jury issued subpoenas to Freedman and Knoedler seeking information.

107.    Shortly after Knoedler received the grand jury subpoena, Hammer fired Freedman.

108.    Under Hammer's direction, Freedman's departure—which attracted significant press attention—was carefully managed to ensure that no connection could be drawn between Freedman's supposed "resignation" and the Rosales Collection works.   Hammer, in his role as Chairman of Knoedler, also sent letters to every Knoedler customer and contact informing them of this personnel change.

109.    In connection with Freedman's termination, Hammer also personally saw to it that the remaining Rosales Collection works in Knoedler's inventory were marked "not for sale." Hammer also directed employees not to speak about the Rosales Collection with any third

parties.

110.    Without the Rosales Collection to prop up the business, Knoedler's profits promptly disappeared.  According to Hammer, in 2009 Knoedler incurred an operating loss of $2.3 million, and incurred a $1.6 million loss in 2010.

## December 2011:  The De Soles Discover Knoedler and Freedman's Fraud

111.    The De Soles discovered Knoedler and Freedman's fraud only after *The New York Times*, in December 2011, reported that Knoedler had announced its permanent closing after 165 years in business, the day after Knoedler's customer Pierre Lagrange filed a lawsuit against Knoedler and Freedman alleging a substantially similar swindle.

112.    Hammer has testified that he personally made the decision to close Knoedler.

113.    Lagrange's description of a tale nearly identical to the one Knoedler and Freedman had told the De Soles prompted the De Soles to consider—for the first time—that Knoedler and Freedman had lied to them and that the Work might not be authentic.

114.    The De Soles also learned that Freedman's former Knoedler colleague Julian Weissman had sold at least the Rosales Collection Motherwell that, after litigation, now bears the permanent stamp on its back marking it a forgery.

115.    Shortly thereafter, the De Soles confronted Freedman with their concerns and demanded to know the identity of Knoedler's client—the son of the Swiss collector who had bought the Work from Rothko through David Herbert.  Freedman admitted her deceit by responding that she would soon be learning the name of the son and the Swiss collector.  In other words, Freedman disclosed that the most basic—and compelling, to the De Soles—foundation for Knoedler and Freedman's assurances as to the authenticity of the Rothko was a lie:  Knoedler and Freedman did *not* know the identity of the supposed collector, their supposed client.

Moreover, given Rosales's repeated and insistent refusal to identify her "Secret Santa," Freedman's claim that she would "soon" learn his identity was yet another lie.

116.    Counsel for the De Soles then retained the distinguished forensic conservator James Martin of Orion Analytical, LLP, to investigate the authenticity of the Work.  Orion Analytical's forensic report establishes conclusively that Mark Rothko did not create the Work and, therefore, that the Work is a forgery.  (A true and correct copy of the report is attached as Exhibit 3.)

117.    The Orion Analytical forensic analysis resulted in three findings that "are inconsistent and irreconcilable with the claim" that the Work was painted by Rothko:  (a) the Work displays crossbar marks that Rothko deliberately avoided by routinely applying support to his canvas at the back of the stretcher, rather than next to the canvas; (b) the Work contains two white opaque primers, but from the late 1940s onward, Rothko used a mixture of rabbit-skin glue and pigments (not opaque primers) to size and prime his canvases; and (c) the Work contains (i) polyvinyl acetate, which Rothko did not use, and (ii) acrylic polymer emulsion, which Rothko did not use until the mid-1960s, nearly a decade after the Work purportedly was created.

118.    In addition, the forensic analysis noted the presence of aragonite and titanium dioxide, a relatively rare finding, in the pigment used for the second primer on what appears to be a re-used canvas.

**Defendants' Racketeering Scheme**

119.    The fraud Knoedler and Freedman perpetrated against the De Soles—selling them the counterfeit Work—was not an isolated incident.  It was part of an ongoing racketeering scheme that Knoedler, Freedman, Rosales, Hammer, Bergantinos Diaz, Andrade and others devised and orchestrated, at least since 1998, to market numerous "previously undiscovered"—

33

but in truth counterfeit—abstract expressionist paintings in the Rosales Collection and to use Knoedler's 165-year history of preeminence and goodwill to sell them to collectors.

120.    Freedman already has testified about the scope of this scheme, attesting to the fact that Knoedler held on consignment as many as 20 paintings from the Rosales Collection and that she and Knoedler sold at least several of these works for as much as $37 million in total.  In fact, Knoedler records reflect that Knoedler sold nearly 40 works from Rosales for approximately $60 million, turning an astounding profit of nearly $40 million.

121.    Rosales, for her part, refused to testify about the scheme, invoking her Fifth Amendment right against self-incrimination and creating a presumption that the works in the Rosales Collection—including the Work at issue here—came from an illicit source, not from the artists to whom the works were attributed.

122.    While the full scope of the scheme is still developing in discovery, details of several sales of fraudulent Rosales Collection works already have emerged.

123.    As an overriding matter, at all relevant times, Knoedler and Freedman recklessly disregarded the truth about the provenance and authenticity of the works comprising the Rosales Collection, which they knew or should have known were counterfeit.  Knoedler and Freedman had no reliable or credible basis to believe in the legitimacy of the works in light of the facts that they uniquely possessed and concealed.  Their flippant references to "Secret Santa" and the "Goose that's laying the golden egg" colorfully illustrate their reckless state of mind.

124.    Knoedler and Freedman nevertheless sold and continued to sell works from the Rosales Collection, reaping tremendous profits for themselves and for Hammer.

125.    In addition to the 2004 sale to the De Soles, in or around 2003, Knoedler sold a purported Jackson Pollock from the Rosales Collection to Jack Levy, which sale was rescinded

after the painting failed IFAR's examination and IFAR declined to certify the authenticity of the painting, citing questions about its provenance and authenticity.

126.    In or around November 2007, Knoedler sold Pierre Lagrange a purported Pollock, for $17 million from the Rosales Collection.  In December 2011, Lagrange filed suit against Knoedler and Freedman for fraud, alleging that this painting too is a forgery and proceeding only after James Martin of Orion Analytical analyzed this painting as well and likewise concluded that it too is a forgery.

127.    Thus, in total, no fewer than five works from the Rosales Collection that Knoedler handled or sold—the Work, the Pollock sold to Levy, the two Motherwell paintings, and the Pollock sold to Lagrange—have been submitted to expert testing, yielding conclusions that each work is not authentic.  On information and belief, other Rosales Collection works, including without limitation the Motherwell at issue in the litigation against Weissman, have fared no better under expert scrutiny.

128.    Further, on information and belief, to induce Lagrange to purchase the work, Knoedler and Freedman represented to Lagrange's consultant, Jaime Frankfurt, that the Pollock painting was offered for sale from a private collection of the heir to a collector who had obtained it directly from Jackson Pollock, through David Herbert, and said that the heir insisted on anonymity.  On or about November 6, 2007, Knoedler provided Frankfurt an invoice for the sale describing the provenance as follows:  "The artist (via David Herbert); Private collection; By descent to present owner."

129.    As with the De Soles, Knoedler and Freedman had no basis to make these representations.  Indeed, in the action Lagrange filed, Freedman testified that she did not—and, today, still does not—know the identity of either the supposed Rosales Collection collector or his

supposed heir.

130.    On information and belief, on or about November 7, 2007, by the use of international wires, Lagrange wired $17 million to Frankfurt at his Citibank account located in Los Angeles, California, to purchase the painting, and Frankfurt thereafter wired $15.3 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York—consummating the sale.

131.    In or around June 2007, Knoedler sold John Howard a purported work by Willem de Kooning for $4 million.  In July 2012, Howard filed suit against Knoedler, Freedman, Rosales, Hammer, Bergantinos Diaz, Andrade and 8-31 Holdings, alleging that this painting too is a forgery.

132.    Upon information and belief, Howard was told substantially the same story regarding the provenance of the de Kooning—that it had been obtained directly from the artist by an anonymous collector with the assistance of David Herbert.  Again, Knoedler and Freedman had no basis to make these representations.

133.    Upon information and belief, in or around June 2007, by the use of interstate wires, Howard wired $4 million to Frankfurt at his Citibank account located in Los Angeles, California, to purchase the painting, and Frankfurt thereafter wired $3.5 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York.

134.    Finally, Knoedler's and Freedman's documents confirm that dozens of nearly identical transactions—involving different victims but the same misrepresentations, concealed facts, suspect works, and wire transfers—took place between 1998 and 2008.

135.     In these circumstances, the De Soles seek to recover their damages caused by the wide-ranging scheme that Knoedler, Freedman, Hammer, Andrade, Rosales, Bergantinos Diaz, and others deployed to defraud the art collecting public.

### FIRST CAUSE OF ACTION
**Fraud**
**(Against Knoedler and Freedman)**

136.     The De Soles repeat and reallege the allegations contained in Paragraphs 1 through 135 as if fully set forth herein.

137.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work was authentic when, in truth, the Work is a forgery.

138.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally, who inherited it from a private collector who had obtained it directly from the artist (with the assistance of Herbert), when in reality Freedman and Knoedler did not know the collector who had originally obtained the Work purportedly from the artist, or that collector's son, and in fact had purchased the Work from Rosales.

139.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by knowingly misrepresenting that the Work was one of only two "previously undiscovered" works by Rothko and Pollock that Knoedler's purported collector client had obtained from the artists with Herbert's assistance when, in reality Knoedler and Freedman knew that there were approximately 20 such "previously undiscovered" works the purported collector purportedly had gathered directly from world-famous artists with Herbert's assistance.

140.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by falsely representing that the following experts had examined the Work and had expressed the opinion that it was authentic, when defendants knew this not to be the case: David Anfam, E.A. Carmean, Jr., Bonnie Clearwater, Dana Cranmer, Jack Flam, Laili Nasr, Stephen Polcari, Earl A. Powell III, Christopher Rothko, Irving Sandler, and Oliver Wick.

141.     Defendants Knoedler and Freedman fraudulently induced the De Soles to purchase the Work by falsely representing that the National Gallery of Art definitively would publish a supplement to the Rothko catalogue raisonné that would include the Work, while knowing that the National Gallery had made no such representation.

142.     Knoedler's and Freedman's misrepresentations were material because the De Soles would not have purchased the Work had they known them to be false.

143.     The De Soles' reliance on these misrepresentations was reasonable given, among other things, Knoedler's and Freedman's superior knowledge, Knoedler's 165-year old reputation as one of the world's finest art galleries, and the warranty of authenticity the De Soles obtained from Knoedler.

144.     In reliance on Knoedler's and Freedman's material misrepresentations and omissions, the De Soles were damaged in the amount of at least $8.4 million.

145.     Freedman, personally, is liable for fraud because she made the fraudulent statements and thus participated in the fraud alleged and/or had actual knowledge of it.

146.     Knoedler is liable for fraud because when Freedman made the fraudulent statements, she did so in her capacity as President of Knoedler.

147.    Knoedler and Freedman's misrepresentations damaged the De Soles because they would not have purchased the Work had they known the truth.  The true provenance of the Work, which at all times was known to Knoedler and Freedman and hidden from the De Soles—that it is a part of the Rosales Collection and has no known source other than Rosales—renders the Work worthless, damaging the De Soles.  Likewise, the Work is worthless for the additional reason that it is not a genuine Rothko.

148.    As a result of the defendants' failure to provide the De Soles with the full information at only the defendants' disposal, the De Soles—as the defendants intended—purchased the Work and suffered damages as a result of paying $8.4 million for a forgery.

149.    Because Knoedler and Freedman engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage the De Soles, the De Soles are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**Fraudulent Concealment**
**(Against Knoedler and Freedman)**

150.    The De Soles repeat and reallege the allegations contained in Paragraphs 1 through 149 as if fully set forth herein.

151.    Defendants Knoedler and Freedman fraudulently concealed from the De Soles facts about which the defendants had superior knowledge, which information was not readily available to the De Soles, and the defendants intended and understood that the De Soles would purchase the Work on the basis of the incomplete and incorrect information the defendants provided to them.

152.    If the De Soles had known the facts that Knoedler and Freedman had concealed from them, they would not have bought the Work.

153.    Among other things, Freedman and Knoedler did not tell the De Soles that:

a.  Knoedler had obtained the Work from Rosales.

b.  Knoedler and Freedman had *no* relationship whatsoever with, or even direct knowledge of, either the purported Swiss collector who purportedly had purchased the Work from Rothko or his son who purportedly had inherited and was selling the Work.

c.  Rosales' oral statements alone—and nothing more—provided support for their representations about the Work's provenance.

d.  Knoedler and Freedman knew that Rosales was selling a cache of approximately 20 "undiscovered" works purportedly painted by the most celebrated abstract expressionist artists, including Kline, de Kooning, Motherwell, Newman, Pollock, Rothko, and Still, all of which purportedly had gone directly from the artists, through Herbert, to the Swiss collector and his son, and not even one of which had a single sheet of paperwork to verify its provenance, including the transfer to or conveyance from the Swiss collector, his son, or Rosales, or any record in the archives of the artist or another collector reflecting that the works existed before they arrived at Knoedler.

e.  Knoedler had sold a purported Pollock from the Rosales Collection to Jack Levy, in or around 2003, but bought the work back that same year after IFAR refused to certify the painting's authenticity, citing questions about its provenance and style.

f.  Until the IFAR Report was issued, Knoedler claimed and Rosales had "confirmed" that artist Alfonso Ossorio, not Herbert, had acted as advisor to the purported collector—and, indeed Knoedler had sold other Rosales Collection

Rothko's using this story—but abandoned that claim after IFAR concluded that the story was "inconceivable," "improbable," and "difficult to believe."

g.   The true "seller" of the work was Knoedler itself, which had purchased the Work from Rosales a year earlier.

h.   Rather than disclose the true facts about the origins of the Work, they had told the National Gallery the same misrepresentations they told the De Soles.

154.   Freedman, personally, is liable for fraudulent concealment because she perpetrated the fraudulent concealment and thus participated in the fraud alleged and/or had actual knowledge of it.

155.   Knoedler is liable for fraudulent concealment because Freedman perpetrated the fraudulent concealment in her capacity as President of Knoedler.

156.   Knoedler and Freedman's failure to disclose the true facts has damaged the De Soles because they would not have purchased the Work had they known the truth.  The true provenance of the Work, which at all times was known to Knoedler and Freedman and hidden from the De Soles—that it is a part of the Rosales Collection and has no known source other than Rosales—renders the Work valueless, damaging the De Soles.  Likewise, the Work is worthless for the additional reason that it is not a genuine Rothko.

157.   As a result of the defendants' failure to provide the De Soles with the full information at only the defendants' disposal, the De Soles—as the defendants intended— purchased the Work and suffered damages as a result of paying $8.4 million for a forgery.

158.   Because Knoedler and Freedman engaged in the fraudulent conduct stated in this Complaint willfully and maliciously, and with the intent to damage the De Soles, the De Soles are entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION
### Violation of 18 U.S.C. § 1962(c)
### (Against all Defendants)

159.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 158 as if fully set forth herein.

160.    The association of defendants and other individuals, constituted an enterprise within the meaning of 18 U.S.C. § 1961(c), which enterprise was engaged in, and whose activities affected, interstate and foreign commerce.  This enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and acted in ways distinct from the predicate offenses alleged by the De Soles.  This enterprise was continuous for the additional reason that the predicate acts were a regular way of conducting Knoedler's ongoing business and of conducting or participating in the ongoing RICO enterprise.

161.    Each defendant is a person within the meaning of 18 U.S.C. § 1961(3) and separate from the enterprise.

162.    Freedman, a Director and the President of Knoedler, was a critical and willing participant in the racketeering scheme at issue.  By lending her name and reputation, as well as Knoedler's, to fraudulent sales of forged artworks, she enabled the enterprise to thrive.

163.    Knoedler used its name, reputation, and access to collectors to sell forged artworks into the marketplace.

164.    Hammer, the beneficial owner of Knoedler, was a critical and willing participant in the racketeering scheme.  By knowingly permitting Knoedler and Freedman fraudulently to sell forged artworks, by rewarding Freedman for her unlawful conduct and incentivizing her to continue it, and by taking the ill-gotten gains from those sales for his own benefit, Hammer encouraged and enabled the enterprise.

165.     Andrade was an integral member of the enterprise.  He is responsible for having introduced Rosales to Knoedler and Freedman and for encouraging Rosales to bring her forged works to Knoedler, and he was recognized as the "gateway" to the Rosales Collection.  He also lent the name and reputation of his now-deceased longtime companion (for whose estate he had served as executor) to enable this fraudulent scheme.

166.     Rosales and Bergantinos Diaz, along with Jesus Bergantinos Diaz all knowingly brought these forged artworks into the market through Knoedler and Freedman and received compensation for having done so.

167.     Defendants' scienter is established by the pattern of intentional and knowing fraudulent, material misrepresentations and omissions described above.

168.     Defendants participated, and conspired with others (whose identities, other than Weissman, are known only to defendants at this time) to participate in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, all in violation of 18 U.S.C. § 1962(c).

**Wire and Mail Fraud (Violations of 18 U.S.C. §§ 1341, 1343)**

169.     Defendants and other members of the enterprise, having devised the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmitted or caused to be transmitted by means of mail, wire, radio, or television communication in interstate or foreign commerce writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice (namely, to sell forged paintings).  Specifically,

        a.   In late November 2004, by use of interstate telephone wires, Knoedler and
             Freedman negotiated the sales price of the Work with Kelly, who was acting on

behalf of the De Soles.

b.   On or about November 30, 2004, Knoedler and Freedman in New York, by the use of interstate mails, sent the Knoedler Invoice to Kelly in New Mexico;

c.   On or about December 7, 2004, the De Soles, by the use of interstate wires, wired $8.4 million from their Morgan Stanley account in New York to Kelly in New Mexico for Kelly to use to pay Knoedler for the Work;

d.   On or about December 11, 2004, Knoedler and Freedman in New York, by the use of interstate telephone wires, sent the Knoedler Letter by facsimile to Kelly in New Mexico;

e.   On or about December 17, 2004, Kelly, by the use of interstate wires, wired from his account at First National Bank in New Mexico to Knoedler's HSBC Bank in New York, the purchase price of $8.3 million—consummating the De Sole sale.

f.   On or about June 13, 2007, Knoedler and Freedman in New York, by the use of interstate wires, sent the Howard Invoice by email to Frankfurt in Los Angeles, California.

g.   On or about June 13, 2007, by the use of interstate wires, Howard wired $4 million to Frankfurt at his Citibank account located in Los Angeles, California, and Frankfurt then wired $3.5 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York—consummating the Howard sale.

h.   On or about September 18 - 21, 2007, Knoedler and Freedman in New York, by the use of interstate wires, sent multiple emails to Frankfurt in Los Angeles regarding the Howard purchase.

i.   On or about November 7, 2007, by the use of international wires, Lagrange wired

$17 million to Frankfurt at his Citibank account located in Los Angeles, California, and Frankfurt, using domestic wires, Frankfurt wired $15.3 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York—consummating the Lagrange sale.

j.   On numerous dates and occasions not yet known to the De Soles, defendants used the domestic and international wires to make payments to or for the benefit of Rosales and Bergantinos Diaz and to receive funds and communicate with unsuspecting purchasers of works in the Rosales Collection.

170.   Each participant knew, expected, reasonably foresaw, and intended that these transmissions by means of mail, wire, radio, or television communication in interstate or foreign commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

171.   Defendants willfully and with intent to defraud sold forged artworks to the De Soles, Levy, Howard, Lagrange and, on information and belief, other victims and also misrepresented and/or concealed the material facts from them, as discussed above.

172.   The De Soles and the other victims relied upon defendants' misrepresentations, and such reliance was reasonable, as discussed above.

173.   The De Soles and the other victims were injured by defendants' fraudulent conduct, as discussed above.

**Pattern of Racketeering Activity**

174.   The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.  The pattern of racketeering activity defendants engaged in

consisted of a scheme executed by the aforementioned conspirators from at least 1998 and continuing at least through October 2009, if not longer, to obtain from Rosales, and Bergantinos Diaz and to distribute, market, and sell numerous counterfeit paintings purportedly by multiple abstract expressionist artists.  That pattern included multiple predicate acts of mail and wire fraud.

175.    The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a common goal, including the goal of profiting illegally by fraudulently inducing individuals to buy counterfeit works of art; (b) used similar methods to perpetrate the frauds, including the use of similar misrepresentations regarding the provenance of the counterfeit works; (c) had similar participants; and (d) had similar victims.

176.    The acts of racketeering activity, discussed above, extended over a substantial period of time from 1998, and continued until at least October 2009.  Additionally, the racketeering acts were a regular way of conducting defendants' ongoing business and of conducting or participating in the ongoing RICO enterprise. Indeed, the racketeering acts were a critical means of supporting defendants' business.  They were sufficiently continuous to form a pattern of racketeering activity.

177.    Defendants participated in the scheme through themselves and, in the case of Knoedler, its representatives, employees, agents, officers, and others whose identities are known only to defendants at this time.  Defendants benefitted enormously from the profits they made from the scheme, and the various amounts collected unlawfully.

178.    Each defendant's participation was critical to the racketeering scheme.  They enabled, conducted, maintained, aided, abetted, and profited from the racketeering scheme:

a. Rosales and Bergantinos Diaz by bringing to market counterfeit paintings that they fraudulently misrepresented as works of master abstract expressionist artists;

b. Andrade by introducing Rosales to Knoedler and Freedman, encouraging Rosales to sell her counterfeit works through Knoedler, and attempting to imbue authenticity into the tale of the Rosales Collection by lending the name of his deceased, esteemed companion to the "provenance" of the Collection;

c. Knoedler and Freedman by drafting and preparing letters, fraudulent "background materials," fraudulent invoices, and other documents, and making oral misrepresentations;

d. Knoedler, Freedman, and Hammer by funding, supervising, conducting, and monitoring the conduct of the fraudulent scheme;

e. All defendants by concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

f. All defendants by willfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering;

g. All defendants by willfully misrepresenting, or being recklessly indifferent to, the material facts surrounding the provenance and authenticity of the counterfeit works that they passed off or schemed to pass off as genuine; and

h. All defendants by directly and/or indirectly sharing the proceeds of their unlawful scheme.

179.    The precise role each defendant played is known only to defendants at this time. Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of defendants.

180.    The De Soles have been injured in their business or property by reason of
defendants' violations of 18 U.S.C. § 1962(c).  As a direct and proximate result of these
violations, the De Soles have lost millions of dollars that they invested in a purportedly authentic
work of art that turns out to be worthless.  In addition, even if the Work at issue in this case were
authentic, defendants' fraudulent misrepresentations and pattern of racketeering activity related
to other apparently counterfeit works has tainted the Work and reduced its value to the point
where it now is unsalable and valueless.

181.    By reason of this violation of 18 U.S.C. § 1962(c), the De Soles are entitled to
recover from defendants treble damages plus pre- and post-judgment interest, costs, and
attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Violation of 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

182.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through
181 as if fully set forth herein.

183.    In violation of 18 U.S.C. § 1962(d), defendants and others whose identities are
known only to defendants at this time conspired to violate the provisions of 18 U.S.C. § 1962(c)
in that, beginning no later than 1998 and continuing through at least October 2009, they
knowingly agreed and conspired together and with others to conduct or participate, directly or
indirectly, in the affairs of an enterprise through the pattern of racketeering activity described
above.  The sophisticated frauds that were perpetrated, and the continuance of the scheme at
issue for at least ten years, could not have occurred without the consent and knowing connivance
of the defendants together and other conspirators.

184.    As part of and in furtherance of their conspiracy, each defendant agreed to and

conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity.  As part of and in furtherance of their conspiracy, each defendant agreed to and did commit at least two predicate acts of racketeering.  Further, each defendant's actions are attributable to the other defendants.

185.    None of the defendants have withdrawn, or otherwise dissociated themselves, from the conspiracy at issue or the other conspirators.

186.    As a direct and proximate result of each defendant's violations, the De Soles have been injured as aforesaid in business or property by reason of defendants' violations of 18 U.S.C. § 1962(d).

187.    By reason of defendants' violations of 18 U.S.C. § 1962(d), the De Soles are entitled to treble damages plus interest, costs, and attorneys' fees.

## FIFTH CAUSE OF ACTION
### Aiding and Abetting Fraud
### (Against Andrade, Bergantinos Diaz, Hammer, and Rosales)

188.    Plaintiffs repeat and reallege the allegations contained in Paragraphs 1 through 187 as if fully set forth herein.

189.    Defendants Knoedler and Freedman perpetrated a fraud on the De Soles as set forth in this Amended Complaint.

190.    Rosales, Hammer, Bergantinos Diaz and Andrade had actual knowledge of the fraud, or at a minimum, consciously avoided knowledge of the fraud.

191.    Rosales and Bergantinos Diaz had knowledge of the fraud by virtue of the fact that they provided the forged works to Freedman, receiving compensation for the same.

192.    Andrade had knowledge of the fraud by virtue of the fact that he introduced Rosales to Freedman and others at Knoedler in the mid-1990s and participated in meetings

relating to the fraud thereafter.

193.    Hammer had knowledge of the fraud by virtue of, *inter alia*, (a) the IFAR report, (b) the documents demonstrating Knoedler's failed efforts to verify the Rosales Collection, and/or (c) the outsized profits Knoedler made on the sales of works from the Rosales Collection, which for years accounted for a substantial portion of Knoedler's profits.

194.    Rosales and Bergantinos Diaz provided substantial assistance by providing the forged works to Freedman and introducing them into the market.

195.    Hammer provided substantial assistance by personally approving an increase in Freedman's profit sharing in 2002 and again in 2008, thereby rewarding and incentivizing the fraud.

196.    Andrade provided substantial assistance by introducing Freedman to Rosales and by providing Freedman with the name of his personal friend David Herbert, lending credence to the scheme.

197.    Rosales, Hammer, Bergantinos Diaz and Andrade's actions in assisting and concealing the fraud are the proximate cause of the damages the De Soles have suffered.

198.    By virtue of the fraud, the De Soles suffered damages in an amount no less than $8.4 million.

**SIXTH CAUSE OF ACTION**
**Conspiracy to Commit Fraud**
**(Against all Defendants)**

199.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 198 as if fully set forth herein.

200.    Defendants Freedman and Knoedler perpetrated a fraud on the De Soles as set forth in this Amended Complaint.

201.    Along with Freedman and Knoedler, defendants Rosales, Hammer, Bergantinos Diaz and Andrade maintained a corrupt agreement and enterprise in which they knowingly misrepresented the provenance of paintings provided by Rosales for the purpose of selling the forged works as authentic.

202.    Rosales, Bergantinos Diaz, Andrade, and Freedman participated in multiple meetings to discuss and alter the story regarding the provenance of the Rosales Collection works, giving rise to the inference of a conscious, corrupt agreement.

203.    Hammer had knowledge of the fraud and perpetuated it by personally approving an increase in Freedman's profit sharing in 2002 and 2008, fully aware that a substantial percentage of those profits were derived from the fraud, thereby rewarding and incentivizing the fraud.

204.    Rosales, Bergantinos Diaz, Andrade, Freedman and Knoedler each committed an overt act in furtherance of the conspiracy by falsely stating the provenance of the works, both orally and in writing.

205.    Hammer committed an overt act in furtherance of the conspiracy by incentivizing Freedman to perpetuate the fraud and by participating in the concealment of the fraud despite his unique position to disclose it and to end it.

206.    Defendants were members of the conspiracy to defraud art collectors.

207.    As a result of the conspiracy to commit fraud, the De Soles have suffered damages of no less than $8.3 million.

208.    Because the defendants engaged in the conspiracy to commit fraud stated in this Amended Complaint willfully and maliciously, and with the intent to damage the De Soles, the De Soles are entitled to an award of punitive damages.

## JURY TRIAL DEMAND

Plaintiffs hereby request a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court enter a Judgment:

A.  Awarding plaintiffs compensatory damages in an amount to be determined at trial, but no less than $8.3 million, plus interest;

B.  Awarding plaintiffs consequential damages in an amount to be determined at trial, but not less than $5 million, plus interest;

C.  Awarding plaintiffs punitive damages in the amount of not less than $15 million, on their First, Second, Fifth and Sixth Causes of Action by virtue of defendants' willful and intentional tortious misconduct;

D.  Awarding plaintiffs treble damages under 18 U.S.C. § 1962(c) and (d), on their Third and Fourth Causes of Action;

E.  Awarding plaintiffs their costs, expenses, disbursements and reasonable attorneys' fees in an amount to be determined at trial; and

F.  Awarding plaintiffs such other relief as the Court deems just and proper.

Dated: September 13, 2012
      New York, New York

CLARICK GUERON REISBAUM LLP

By: _____
Gregory A. Clarick
Emily Reisbaum
Aaron H. Crowell
40 West 25th Street
New York, NY  10010
Phone:  (212) 633-4310
Fax:  (646) 478-9484

*Attorneys for Plaintiffs Domenico and
Eleanore De Sole*