UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2013

DOMENICO DE SOLE, AND ELEANOR
DE SOLE, individually and as assignee of
LAURA DE SOLE,

                                    Plaintiffs,

                - against -

KNOEDLER GALLERY, LLC D/B/A
KNOEDLER & COMPANY, ANNE
FREEDMAN, GLAFIRA ROSALES, JOSE
CARLOS BERGANTINOS DIAZ,
MICHAEL HAMMER, and JAIME
ANDRADE,
                                    Defendants.

**MEMORANDUM
OPINION & ORDER**

12 Civ. 2313 (PGG)

JOHN D. HOWARD, individually and as
assignee of Jaime Frankfurt, LLC,

                                    Plaintiff,

                - against -

ANN FREEDMAN, GLAFIRA ROSALES,
KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, MICHAEL
HAMMER, 8-31 HOLDINGS, INC., JOSE
CARLOS BERGANTINOS DIAZ, and
JAIME R. ANDRADE,
                                    Defendants.

12 Civ. 5263 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        In these actions, Plaintiffs claim that paintings that they purchased from

Defendant Knoedler Gallery, LLC ("Knoedler") – on the representation that they had been

created by Mark Rothko and Willem de Kooning – were forgeries. In addition to Knoedler, the

named defendants include 8-31 Holdings Inc., Knoedler's sole member; Michael Hammer,

Knoedler's managing member and the owner of 8-31 Holdings, Inc.; Ann Freedman, Knoedler's

former president; Jaime Andrade, a former Knoedler employee; Glafira Rosales, a Long Island

art dealer and the alleged source of the forged paintings; and Carlos Bergantinos Diaz, Rosales'

"longtime companion."  Plaintiffs claim that Knoedler sold nearly forty paintings it acquired

from Rosales, all of which were represented to be works created by well-known abstract

expressionist artists, but which were in fact forgeries.  Plaintiffs further allege that as early as

October 2003, Knoedler and Freedman had reason to doubt the authenticity of these paintings,

but nonetheless continued to sell the works Rosales produced until 2007.

Plaintiffs' complaints assert claims under the Racketeer Influenced and Corrupt

Organizations Act ("RICO"), and state law causes of action for fraud, breach of warranty, and

unilateral and mutual mistake.

Defendants in both actions have moved to dismiss all claims against them.

## BACKGROUND

I. FACTS

### A. The Knoedler Gallery, Ann Freedman, and Glafira Rosales

Defendant Knoedler Gallery, LLC was founded in 1846, and for more than a

century, it was one of New York City's most respected art galleries.  (Howard Cmplt. ¶ 7)

Defendant Ann Freedman began working at Knoedler in the 1970s, and in 1995 she became its

president and a director of 8-31 Holdings, Inc.  Defendant Michael Hammer is the owner and

chairman of Knoedler, and also the president and owner of 8-31 Holdings, Inc.  (De Sole Am.

Cmplt. ¶¶ 14, 15; Howard Am. Cmplt. ¶ 7)

In the mid-1990's, Defendant Jaime Andrade, a Knoedler employee, introduced

Defendant Glafira Rosales to Freedman and others at Knoedler.  (De Sole Am. Cmplt. ¶ 23;

Howard Cmplt. ¶ 4)  Rosales was a Long Island art dealer who claimed to have access to a

collection of previously unknown "masterworks" by certain abstract expressionist artists.  (De Sole Am. Cmplt. ¶ 23)  Rosales initially claimed that these paintings belonged to a friend.  (De Sole Am. Cmplt. ¶ 24)

        Rosales later explained to Freedman that, as a child in Mexico, she had met a couple who were European Jewish émigrés.  (De Sole Am. Cmplt. ¶ 24)  The husband made frequent business trips to the United States between the 1940's and 1970's.  (De Sole Am. Cmplt. ¶ 24)  During his visits to the U.S., the husband purchased artworks directly from a number of now well-known abstract expressionist artists, including Mark Rothko, Jackson Pollock, Franz Kline, Clyfford Still, Robert Motherwell, and Barnett Newman.  (De Sole Am. Cmplt. ¶ 24)  The couple died in the early 1990s, leaving these works to their children.  (De Sole Am. Cmplt. ¶ 24)  According to Rosales, the children – a daughter and son – lived in Mexico and Switzerland, were not interested in art, were interested in selling the paintings, and wished to remain strictly anonymous.  (De Sole Am. Cmplt. ¶ 24)  Rosales referred to the deceased collector and his son as "Mr. X" and "Mr. X, Jr."  (Howard Cmplt. ¶¶ 3, 41)

        Rosales also told Freedman that the deceased collector had corresponded with the various artists, but that these letters had been "disposed of" after his death.  (De Sole Am. Cmplt. ¶ 26)  Rosales reported that the collector's son "remembers seeing artists in his father's home" and "remembered seeing his parents pay in cash to one of the artists."  (De Sole Am. Cmplt. ¶¶ 26-27)

        At some point in 2000, Rosales told Freedman that the son of the collector had "confirmed" that his father – in purchasing these paintings – had relied on the advice of Alfonso Ossorio, another abstract expressionist artist, who was a friend and colleague of the artists whose works the collector had purchased.  (De Sole Am. Cmplt. ¶¶ 29-30)  Rosales explained that all

correspondence between Ossorio and the collector had likewise been thrown out after the collector's death.  (De Sole Am. Cmplt. ¶ 30)  In or around 2001, Knoedler employees and retained experts attempted to verify Rosales' story regarding the connection between the collector and Ossorio.  (De Sole Am. Cmplt. ¶ 31)  Knoedler did not find any evidence corroborating the link between the collector and Ossorio.  (De Sole Am. Cmplt. ¶ 31)  In December 2001, Rosales told Freedman that "Gerzo" was a "family" name connected to the collector, but not his name.  (De Sole Am. Cmplt. ¶ 32)  Knoedler then investigated – without success – whether there was a connection between Ossorio and a well-known Mexican artist, Gunther Gerzso.  (De Sole Am. Cmplt. ¶ 32)

**B.    Levy's 2001 Purchase of the "Green Pollock"**

In late 2001, Freedman and Knoedler sold a purported Jackson Pollock – Untitled 1949 (the "Green Pollock") – to Jack Levy for $2 million.  (Howard Cmplt. ¶ 43)  Knoedler purchased this work from Rosales in March 2001 for $750,000.  (De Sole Am. Cmplt. ¶ 40)

Freedman and Knoedler represented to Levy that Mr. X had acquired the work through Ossorio, who lived near Pollock on Long Island.  (Howard Cmplt. ¶ 44)  The sale to Levy was conditioned on a favorable review of the work's provenance[1] and authenticity by the International Foundation for Art Research ("IFAR").  (Howard Cmplt. ¶ 45)

In October 2003, Levy obtained the IFAR report.  (Howard Cmplt. ¶ 46)  The report states that "IFAR believes that too many reservations exist to make a positive attribution to Jackson Pollock."  (Howard Cmplt. ¶ 46)  The report also states that it is "inconceivable" that Pollock sold this work through Ossorio.  (Howard Cmplt. ¶¶ 47-48)  As a result of the IFAR

---

[1]  The Merriam-Webster dictionary defines "provenance" as "the history of ownership of a valued object or work of art or literature."  Merriam Webster, http://www.merriam-webster.com/dictionary/provenance (last visited September 23, 2013)

report, the sale of the alleged Pollock was cancelled, and Knoedler refunded the purchase price to Levy.  (<u>Howard</u> Cmplt. ¶ 51)  After receiving the negative IFAR report concerning the alleged Pollock, Knoedler did not submit any additional works obtained from Rosales to IFAR for analysis. [2]  (<u>Howard</u> Cmplt. ¶ 54)

On December 15, 2003, at Freedman's direction, the IFAR report was faxed to Hammer.  (<u>De Sole</u> Am. Cmplt. ¶ 44)  In the fax cover sheet accompanying the report, Freedman discussed the fallout from the IFAR report, including the effect that the report would have on a partner's willingness to continue to invest in the Green Pollock.  (<u>De Sole</u> Am. Cmplt. ¶ 45)  A handwritten note on the reverse side of the fax cover sheet contains the following phrases in quotation marks:  "discreet sources are my stock in trade," "don't kill the goose that's laying the Golden egg," and "I'm not going to change my way of doing business.  If you are not [comfortable] – step away."  (<u>De Sole</u> Am. Cmplt. ¶ 45)  Plaintiffs have not alleged who wrote these notes.

---

[2]  In 2007, Freedman and Knoedler tried to sell the Green Pollock to the "Taubman family." (<u>Howard</u> Cmplt. ¶ 71)  Freedman and Knoedler "never disclosed the IFAR Report to anyone in the Taubman family," and represented that the Green Pollock would be included in the revised Jackson Pollock catalogue raisonné.  (<u>Howard</u> Cmplt. ¶¶ 72-73)

A catalogue raisonné is a "definitive catalogue of the works of a particular artist."  <u>Thome v. Alexander & Louisa Calder Found.</u>, 890 N.Y.S.2d 16, 20 (1st Dept. 2009)(citing <u>Kirby v. Wildenstein</u>, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992)("A catalogue raisonné is regarded as a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work, while non-inclusion suggests that the work is not genuine.").  Freedman has previously testified that there were no plans for a revised Pollock catalogue raisonné.  (<u>Howard</u> Cmplt. ¶¶ 76-77)

Freedman rejected the Taubman family's request that Knoedler make a representation that there had been "no challenges [or] disputes . . . relating to . . . [the] attribution [or] authenticity" of the Green Pollock.  (<u>Howard</u> Cmplt. ¶ 78)  Freedman asked the Taubmans to accept "our word," and represented that an "invoice is always our legal guarantee."  (<u>Howard</u> Cmplt. ¶¶ 79-80)  No sale of the Green Pollock to the Taubman family was ever consummated.  (<u>Howard</u> Cmplt. ¶ 81)

After the IFAR report was issued, Rosales, Freedman, Andrade, and Knoedler changed their story about the origin of the works Rosales had obtained.  (De Sole Am. Cmplt. ¶ 47)  These defendants substituted David Herbert – a deceased art world figure and Andrade's long-time companion – for Ossorio as the "advisor" or "agent" who had assisted Mr. X in buying these works.[3]  (De Sole Am. Cmplt. ¶ 47)[4]  Andrade claimed to have introduced Rosales to Herbert before his death in 1995.  (De Sole Am. Cmplt. ¶ 47; Howard Cmplt. ¶ 27)

**C.**     **The De Soles' December 2004 Purchase of a "Rothko"**

In the fall of 2004, the De Soles called Freedman and Knoedler to arrange a meeting to discuss the possible purchase of a painting by Sean Scully.  (De Sole Am. Cmplt. ¶ 50)  At a November 2004 meeting, Freedman told the De Soles that she did not have any Scully works available, and she instead showed them a work allegedly created by Mark Rothko.  (De Sole Am. Cmplt. ¶ 51)  Rosales had brought this work to Knoedler.  (De Sole Am. Cmplt. ¶ 74)  After this meeting, Freedman also met twice with Jim Kelly, the De Soles' consultant and agent.

---

[3]  In connection with the sale of many of the works she brought to Knoedler, Rosales signed an authorization form confirming that she was the agent "of a private collector residing in Mexico City and Zurich" who had inherited works that his father had obtained directly from the artists. (De Sole Am. Cmplt. ¶ 82)  In May 2005, Freedman and Knoedler asked Rosales to revise the form to (1) include a reference to David Herbert; and (2) confirm that the current owner "has guaranteed the [] authenticity of the works."  (De Sole Am. Cmplt. ¶ 83)

Rosales informed Knoedler that while she was "very comfortable about including David Herbert" – because "the owner has confirmed that Herbert was the advisor" – she was "not comfortable about including the authenticity clause."  (De Sole Am. Cmplt. ¶ 84)  Rosales explained that asking the collector's son to confirm the works' authenticity "might raise his hackles" and that she did "not want to jeopardize the relationship by pressing him."  (De Sole Am. Cmplt. ¶ 84)  Despite Rosales' refusal to obtain the authenticity guarantee, Knoedler and Freedman continued to sell works brought to the gallery by Rosales.  (De Sole Am. Cmplt. ¶ 85)

[4]  Herbert's papers had been donated to the Archives of American Art and other institutions. Knoedler employees and retained experts studied these materials, but could find no link between Herbert and the paintings brought to Knoedler by Rosales.  (De Sole Am. Cmplt. ¶ 48)

(<u>De Sole</u> Am. Cmplt. ¶ 53)  Freedman unequivocally, repeatedly, and consistently represented to the De Soles and Kelly that the purported Rothko was authentic.  (<u>De Sole</u> Am. Cmplt. ¶ 54)

At these meetings, Freedman also represented to the De Soles and to Kelly that the anonymous seller of the Rothko was Knoedler's client, that the seller and his father were personally known to Knoedler, and that the father had obtained the work directly from Rothko, with the advice of David Herbert.  (<u>De Sole</u> Am. Cmplt. ¶ 55)  Freedman also told the De Soles and Kelly that Christopher Rothko, Rothko's son, and numerous Rothko experts, including Dr. David Anfam (who had prepared the catalogue raisonné for Rothko's work) had examined the work and had attested to its authenticity.  (<u>De Sole</u> Am. Cmplt. ¶ 56)

Freedman and Knoedler also represented to the De Soles and Kelly that the work would be included in a supplement to the Rothko catalogue raisonné then being prepared by the National Gallery.  (<u>De Sole</u> Am. Cmplt. ¶ 58)

After Freedman's meetings with the De Soles and Kelly, Freedman (in New York) and Kelly (in New Mexico) spoke by telephone to negotiate a sale of the alleged Rothko to the De Soles.  (<u>De Sole</u> Am. Cmplt. ¶ 59)  The two agreed on a purchase price of $8.4 million, which included a $100,000 commission payable to Kelly.  (<u>De Sole</u> Am. Cmplt. ¶ 59)  Knoedler had purchased this work from Rosales for $950,000.  (<u>De Sole</u> Am. Cmplt. ¶ 74)

On November 30, 2004, Knoedler sent Kelly an invoice – either by Federal Express or by U.S. Mail – for the sale of the work, seeking a payment of $8.3 million.  (<u>De Sole</u> Am. Cmplt. ¶ 60)  The Knoedler invoice states that the alleged Rothko is "[t]o be included in the forthcoming supplement to the 1998 Rothko catalogue raisonné under preparation by the National Gallery of Art, Washington, D.C."  (<u>De Sole</u> Am. Cmplt. ¶ 62; Ex. 1)

7

On December 7, 2004, the De Soles wired $8.4 million from their bank account in New York to Kelly in New Mexico, in preparation for the purchase of the work.  (De Sole Am. Cmplt. ¶ 63)  Prior to Kelly transmitting payment to Freedman and Knoedler, the De Soles sought additional written assurances from Freedman.  (De Sole Am. Cmplt. ¶ 64)  In a December 10, 2004 letter that Freedman faxed to Kelly, Freedman states that "[t]his classic Rothko painting was acquired directly from the artist through the advice and counsel of David Herbert," whom the letter describes as "so critical to many of the seminal artists and collectors of the 1950s."  (De Sole Am. Cmplt. ¶¶ 64-65; Ex. 2 at 1)  Freedman's letter further states that the "painting has been viewed by a number of eminent scholars on Rothko as well as specialists on the Abstract Expressionist movement."  (De Sole Am. Cmplt. ¶ 65; Ex. 2 at 1)  The letter also states that "Laili Nasr, manager of the Rothko catalogue raisonné project of the National Gallery . . . has written to us about her inten[t]ion to include the Rothko in the forthcoming catalogue raisonné supplement."  (De Sole Am. Cmplt. ¶ 65; Ex. 2 at 1)  The letter concludes, "[i]n summ[a]ry, Knoedler warrants the authenticity and good title of the painting, Untitled, 1956. . . ."  (De Sole Am. Cmplt. ¶ 66; Ex. 2 at 2)

On December 17, 2004, Kelly wired Knoedler the purchase price of $8.3 million from his account at the First National Bank in New Mexico to Knoedler's HSBC account in New York.  (De Sole Am. Cmplt. ¶ 67)

After the sale, the De Soles received a loan request for the painting from the Foundation Beyeler in Basel, Switzerland.  (De Sole Am. Cmplt. ¶ 78) The De Soles agreed to have the work displayed in the Rothko Rooms at the Foundation.  (De Sole Am. Cmplt. ¶ 78) The Foundation published a pamphlet on the exhibition that discussed the provenance of the De Soles' Rothko, as reported by Freedman to the De Soles.  (De Sole Am. Cmplt. ¶ 79) ("The

8

collector, since deceased, regularly travelled through the U.S. in the 1950s and acquired a small group of works by artists of the New York School;" the "collector" had "obtained professional advice from David Herbert.")  This account was drafted by a Knoedler employee and provided to the Foundation.  (<u>De Sole</u> Am. Cmplt. ¶ 80)  Knoedler later distributed copies of the pamphlet to prospective customers interested in paintings brought to the gallery by Rosales.  (<u>De Sole</u> Am. Cmplt. ¶ 81)

        In January 2008, the De Soles asked Freedman to provide an updated appraisal of the Rothko for insurance purposes.  (<u>De Sole</u> Am. Cmplt. ¶ 101)  On January 19, 2008, Freedman sent the De Soles an appraisal valuing the work at $9 million.  (<u>De Sole</u> Am. Cmplt. ¶ 102)

**D.**     **<u>Howard's June 2007 Purchase of a "de Kooning"</u>**

        In February 2007, at an art fair at the New York Armory,  Jaime Frankfurt – John Howard's advisor and agent – introduced Howard to Freedman.  (<u>Howard</u> Cmplt. ¶¶ 211, 224-25)  Freedman showed Howard a painting that she represented as "'a distinctive and rare' de Kooning landscape."  (<u>Howard</u> Cmplt. ¶ 230)  Knoedler had obtained this painting from Rosales.  (<u>Howard</u> Cmplt. ¶ 258)  Freedman told Howard that "the [w]ork was a de Kooning of 'impeccable' quality and provenance;" that "the [w]ork was owned by a man whom she knew directly;" that "the [w]ork was owned by a man who acquired the [w]ork through an inheritance from his father;" that "the owner of the [w]ork and his family were very private and would not permit her to identify him (or them) under any circumstances;" that "the owner of the [w]ork and his family lived in Switzerland;" and that "the provenance of the [w]ork was above reproach[,] as demonstrated by the fact that she had 'personally' purchased a [painting by] 'Motherwell' directly from the same owner."  (<u>Howard</u> Cmplt. ¶ 230)

9

Knoedler delivered the work to Howard's home so that he could "live with it" before deciding whether to purchase it.  (Howard Cmplt. ¶ 238)  In or about June 2007, Howard purchased the work from Knoedler and Freedman for $4 million.  (Howard Cmplt. ¶¶ 239-41)  Knoedler had purchased this work from Rosales for $750,000.[5]  (Howard Cmplt. ¶ 258)  Howard wired $4 million to Frankfurt in California to purchase the painting.  (De Sole Am. Cmplt. ¶ 133)  On June 13, 2007, Knoedler submitted an invoice to Frankfurt in the amount of $3.5 million, so that Frankfurt could retain $500,000 of Howard's money as a commission.  (Howard Cmplt. ¶ 243)  Frankfurt wired $3.5 million from California to Knoedler's HSBC account in New York.  (De Sole Am. Cmplt. ¶ 133)

### E.    Lagrange's November 2007 Purchase of the "Silver Pollock"

In November 2007, Knoedler sold Pierre Lagrange a purported work by Jackson Pollock for $17 million (the "Silver Pollock").  (Howard Cmplt. ¶ 141; De Sole Am. Cmplt. ¶ 126)  Knoedler had obtained the alleged Pollock from Rosales.  (De Sole Am. Cmplt. ¶ 126)

Jaime Frankfurt assisted the buyer with this acquisition.  (Howard Cmplt. ¶ 142)  Prior to the sale of the alleged Pollock, Freedman and Knoedler represented to Lagrange – via Frankfurt – that the Pollock was genuine and had been deemed authentic by numerous Pollock experts.  (Howard Cmplt. ¶¶ 143-44)  Freedman and Knoedler further represented that the work would be included in the next edition of the Pollock catalogue raisonné then being prepared by the Pollock-Krasner Foundation.  (Howard Cmplt. ¶¶ 146, 149)  Freedman and Knoedler also told Frankfurt and Lagrange that the Pollock had been acquired by "Mr. X" through David

---

[5]  Knoedler's payment to Rosales was made as follows:  $9,000 in cash given to Rosales; a $31,000 check made payable to her; and a $711,000 wire transfer to Jesus A. Bergantinos in Spain.  Jesus Bergantinos is the brother of Defendant Carlos Bergantinos Diaz.  (Howard Cmplt. ¶¶ 260-64)  Defendant Bergantinos Diaz is Rosales' "live-in companion."  (Howard Cmplt. ¶ 2)

Herbert, and was being sold by "Mr. X, Jr.," who had acquired the Pollock "by descent."

(Howard Cmplt. ¶ 152)

        Knoedler's November 6, 2007 invoice for the "Silver Pollock" states:  "The artist

(via David Herbert); Private collection; By descent to present owner."  (De Sole Am. Cmplt.

¶ 128)  To purchase the painting Lagrange – located overseas – wired $17 million to Frankfurt at

his Citibank account in California, Frankfurt then wired $15.3 million from his California

Citibank account to Knoedler's HSBC account in New York.  (De Sole Am. Cmplt. ¶ 130)

    **F.**    **The Dedalus Foundation's December 2007**
           **Claim that the "Motherwells" Rosales had**
           <u>**Brought to the Knoedler Gallery were Forgeries**</u>

        The Dedalus Foundation, Inc. is responsible for the Robert Motherwell catalogue

raisonné.  (De Sole Am. Cmplt. ¶ 87)  In three meetings with Freedman in December 2007 and

January 2008, Dedalus Foundation representatives told Freedman that they believed seven

purported Motherwell works that Rosales had brought to Knoedler were forgeries.  (De Sole Am.

Cmplt. ¶ 87)  In January 2008, Freedman told Rosales about the Dedalus Foundation's claims

and the need to prepare a "bona[]fide defense" to these allegations.  (De Sole Am. Cmplt. ¶ 88)

        As part of that effort, Freedman and Knoedler provided Rosales with (1) a form to

complete disclosing the identity of the original collector and his son; (2) a confidentiality

agreement requiring Knoedler not to disclose any information about the purported owner; (3) a

letter for the owner to sign confirming the essential details of Rosales' story and the authenticity

of the works Rosales has provided to Knoedler; and (4) a second letter, addressed to the owner,

informing him that the Dedalus Foundation had "strongly questioned the authenticity and legality

of [the Motherwells]" that Rosales had provided to Knoedler and "suggest[ed] that [Knoedler

was] selling and trading in art that is counterfeit." (De Sole Am. Cmplt. ¶ 89) Rosales refused to disclose or obtain any of the requested information. (De Sole Am. Cmplt. ¶ 90)

Knoedler then retained James Martin of Orion Analytical, LLP, to conduct forensic tests of two of the alleged Motherwells Rosales had brought to Knoedler. (De Sole Am. Cmplt. ¶ 91) Martin's analysis indicated that the works were not authentic. The works were allegedly created in 1953 and 1955, but the pigments used in the paintings did not exist until ten years after the 1950s. Moreover, the same acrylic polymer emulsion paint had been used to create both works, and such paint was "'remarkably inconsistent with what is known about Motherwell's use of acrylic paints,'" "'rais[ing] questions about when the works were actually painted.'" Finally, "'both paintings display[ed] patterns of circular abrasions, visible only with magnification, that point . . . to the use of an electric sander.'" (De Sole Am. Cmplt. ¶ 92)

On October 24, 2008, Freedman told Rosales "about the preliminary report from Orion and the problems it raises regarding the dating of the works." (De Sole Am. Cmplt. ¶ 94) Freedman asked Rosales "if she might ask Mr. X, [Jr.,]" whether his father might have purchased works as late as 1964 or 1965. (De Sole Am. Cmplt. ¶ 94) Freedman also "asked Mrs. Rosales to approach Mr. X, [Jr.,] and ask again if there exists any tangible evidence related to these transactions" or "something which documents the link to David Herbert and/or the artists in some way." (De Sole Am. Cmplt. ¶ 95) Rosales reported back that Mr. X, Jr. had "confirmed" that the transactions between Mr. X and the artists continued from the late 1940s through 1964, and that he "remembers" travelling with his father to artists' studios as late as 1964. (De Sole Am. Cmplt. ¶ 96)

On October 27 and November 7, 2008, Freedman, Rosales, and Andrade met to discuss how to address the implications of the Orion report, and the inconsistencies regarding

Herbert's and Ossorio's alleged involvement in the acquisition of these works.  (<u>Howard</u> Cmplt.

¶¶ 138-39)  "Knoedler ultimately decided to simply dismiss Martin's analysis as 'conjecture,'

and provided [the] Dedalus [Foundation] only a redacted version of Martin's report, omitting

Martin's ultimate conclusions."  (<u>De Sole</u> Am. Cmplt. ¶ 97)

> ### G. The September 2009 Grand Jury Subpoena, the Termination of Freedman's Employment, and Hammer's Direction <u>that No Additional Rosales-Related Works be Sold</u>

In September 2009, a grand jury sitting in the Southern District of New York

issued subpoenas to Freedman and Knoedler seeking information about the sale of paintings

Rosales had brought to Knoedler.  (<u>De Sole</u> Am. Cmplt. ¶ 106; <u>Howard</u> Cmplt. ¶ 195)  Shortly

after Knoedler received a grand jury subpoena, Hammer fired Freedman.  (<u>De Sole</u> Am. Cmplt. ¶

107; <u>Howard</u> Cmplt. ¶¶ 194-96)  Hammer also ordered that all remaining works in Knoedler's

inventory associated with Rosales be marked "not for sale."  (<u>De Sole</u> Am. Cmplt. ¶ 109)

Hammer further directed employees not to speak to any third party about the paintings Rosales

had brought to Knoedler.  (<u>De Sole</u> Am. Cmplt. ¶ 109)

Knoedler's records reveal that the gallery sold nearly forty works provided by

Rosales for approximately $60 million, earning a profit of nearly $40 million.  (<u>De Sole</u> Am.

Cmplt. ¶ 120)  After the gallery stopped selling Rosales-related paintings, it rapidly became

unprofitable.  (<u>De Sole</u> Am. Cmplt. ¶ 110)

> ### H. <u>The Knoedler Gallery Closes</u>

In October 2011, Lagrange hired Orion Analytical to run forensic tests on the

Silver Pollock he had purchased from Knoedler in November 2007.  (<u>Howard</u> Cmplt. ¶ 155)  On

November 29, 2011, Orion issued a report stating that its analysis of "materials used to create the

[Silver Pollock] revealed physical evidence that certain materials are inconsistent with and

evidently irreconcilable with the claimed attributes that Jackson Pollock painted the [Silver Pollock] in 1950 – or any other date." (<u>Howard</u> Cmplt. ¶ 157)  The report conclusively "rule[d] out Jackson Pollock as the source of both the [work] and [the] signature." (<u>Howard</u> Cmplt. ¶ 158; <u>De Sole</u> Am. Cmplt. ¶ 126)

On November 29, 2011, Lagrange provided Knoedler with a copy of Orion's report declaring the Silver Pollock a forgery. (<u>Howard</u> Cmplt. ¶¶ 160, 204)  The next day – although "in the midst of an ongoing exhibition" – Knoedler announced that it would close, ending 165 years in business. (<u>De Sole</u> Am. Cmplt. ¶ 111; <u>Howard</u> Cmplt. ¶ 160)  The news of Knoedler's closing was reported in the <u>The New York Times</u>. (<u>De Sole</u> Am. Cmplt. ¶ 111)  On December 1, 2011, Pierre Lagrange filed a lawsuit in the Southern District of New York alleging that the Pollock he had purchased was a forgery. (<u>Lagrange</u> Cmplt.; De <u>Sole</u> Am. Cmplt. ¶ 111)

After seeing the <u>Times</u> article, the De Soles demanded that Freedman disclose the identity of Knoedler's client. (<u>De Sole</u> Am. Cmplt. ¶ 115)  Freedman said that she would soon be learning the name of the Swiss collector and his son. (<u>De Sole</u> Am. Cmplt. ¶ 115)  The De Soles hired Orion Analytical to determine the authenticity of the alleged Rothko they had purchased. (<u>De Sole</u> Am. Cmplt. ¶ 116)  Orion's forensic analysis resulted in several findings that "'are inconsistent and irreconcilable with the claim [that the painting is a Rothko]," including the following:

> (a) the Work displays crossbar marks that Rothko deliberately avoided by routinely applying support to his canvas at the back of the stretcher, rather than next to the canvas; (b) the Work contains two white opaque primers, but from the late 1940s onward, Rothko used a mixture of rabbit-skin glue and pigments (not opaque primers) to size and prime his canvases; and (c) the Work contains (i) polyvinyl acetate, which Rothko did not use; and (ii) acrylic polymer emulsion, which Rothko did not use until the mid-1960s, nearly a decade after the Work purportedly was created.

(<u>De Sole</u> Am. Cmplt. ¶ 117)[6]

## II.    PROCEDURAL HISTORY

### A.    <u>De Sole</u>

On September 13, 2012, Plaintiffs Domenico De Sole and Elenaore De Sole, in their individual capacities and as assignees of Laura De Sole, filed their amended complaint against defendants Knoedler Gallery, LLC d/b/a Knoedler & Company, Ann Freedman, Glafira Rosales, Jose Carlos Bergantinos Diaz, Michael Hammer, and Jaime Andrade.  (<u>De Sole</u> (Dkt. No. 17) Am. Cmplt.)  The amended complaint pleads the following causes of action:  (1) fraud and fraudulent concealment claims against Knoedler and Freedman; (2) substantive RICO and RICO conspiracy claims against all Defendants; (3) an aiding and abetting fraud claim against Andrade, Bergantinos Diaz, Hammer, and Rosales; and (4) a fraud conspiracy claim against all Defendants.  (<u>Id.</u>)

---

[6]  After the complaints in these actions were filed, Rosales was charged with conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, money laundering, subscribing to false tax returns, and failing to file reports of foreign bank and financial accounts. <u>United States v. Rosales</u>, 13 Cr. 518 (KPF) (S.D.N.Y.) (Dkt. No. 14)

On September 16, 2013, Rosales pled guilty to these charges, pursuant to a cooperation agreement.  At the plea hearing, Rosales made the following statement:

> From in or around the 1990s through 2009, I was engaged in the business of dealing fine arts personally and through Glafira Rosales Fine Arts, LLC.  This entity was formed under the laws of the State of New York and conducted business within the Southern District of New York.  During that period, I agreed with others to sell works of art claimed to be created by various expressionist artists, including Mark Rothko, Jackson Pollock, and Robert Motherwell, and to make false representations as to the authenticity and provenance of those works.  These works of art were actually fakes created by an individual residing in Queens.

(<u>Id.</u>, Dkt. No. 18 (Plea Transcript) at 26)  Rosales' arrest, indictment, guilty plea, and Rule 11 allocution have played no part in this Court's determination of the pending motions to dismiss.

All Defendants have moved to dismiss the claims against them.  (<u>De Sole</u> Dkt. Nos. 24, 27, 63, 71, 75)

**B.    <u>Howard</u>**

On July 6, 2012, John D. Howard, individually and as assignee of Jaime Frankfurt, LLC, filed a complaint against Ann Freedman, Glafira Rosales, Knoedler Gallery, LLC, d/b/a Knoedler & Company, Michael Hammer, 8-31 Holdings, Inc., Jose Carlos Bergantinos Diaz, and Jaime R. Andrade.  (<u>Howard</u> (Dkt. No. 1) Cmplt.)  The <u>Howard</u> complaint pleads the following causes of action:  (1) substantive RICO and RICO conspiracy claims against all Defendants; (2) a fraud claim against Freedman and Knoedler; (3) fraudulent concealment and fraud conspiracy claims against Freedman, Knoedler and Hammer; (4) an aiding and abetting fraud claim against Hammer; (5) a breach of warranty claim against Freedman and Knoedler; and (6) claims of unilateral mistake and mutual mistake against Knoedler.  (<u>Howard</u> Cmplt. (Dkt. No. 1))

All Defendants have moved to dismiss the claims against them.  (<u>Howard</u> Dkt. Nos. 35, 39, 45, 48, 74, 76)

<b><u>DISCUSSION</u></b>

**I.    <u>MOTION TO DISMISS STANDARD</u>**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)).  "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," <u>Kassner v. 2nd Ave. Delicatessen Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007) (citing <u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002)),

16

and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).  A district court may also "rely on matters of public record in deciding a motion to dismiss under [R]ule 12(b)(6)." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 75 (2d Cir. 1998); see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public records . . . in deciding a motion to dismiss.")  "In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'" Schubert v. City of Rye, 775 F. Supp. 2d 689, 698 (S.D.N.Y. 2011) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991)).

Fed. R. Civ. P. 9(b) sets standards for pleading fraud claims, and requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b); see also In re Pfizer Inc. Sec. Litig., 584 F.

17

Supp. 2d 621, 632-33 (S.D.N.Y. 2008).  Rule 9(b) requires a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted)).

## II.   STATUTE OF LIMITATIONS

Defendants in De Sole argue that the statute of limitations has expired on all of Plaintiffs' claims, because they purchased the Rothko in 2004 but did not file their lawsuit until 2012.  (De Sole Dkt. No. 25 at 4-5)

### A.   Applicable Law

#### 1.   Limitations Periods for Fraud and RICO

New York law[7] provides that fraud claims, including claims of aiding and abetting fraud and conspiracy to commit fraud, must be commenced within "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff . . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8); see also Koch v. Christie's Int'l PLC, 699 F.3d 141, 154 (2d Cir. 2012) (addressing aiding and abetting fraud and fraud conspiracy claims); Sargiss v. Magarelli, 12 N.Y.3d 527, 532 (2009) (same).

"The statute of limitations for a civil RICO claim is four years."  Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 361 (2d Cir. 2013) (citing Rotella v. Wood, 528 U.S. 549, 552 (2000); Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 156 (1987)).  In a RICO

---

[7]  All parties agree that New York law applies.  (De Sole Dkt. No. 25 at 6; Dkt. No. 31 at 17; Howard Dkt No. 40 at 15, Dkt. No. 42 at 22)

case, "a plaintiff's action accrues against a defendant for a specific injury on the date that

plaintiff discovers or should have discovered that injury." <u>Bankers Trust v. Rhoades</u>, 859 F.2d

1096, 1103 (2d Cir. 1988).

    The "injury discovery rule" applies when a plaintiff is "placed on notice of facts

which should arouse suspicion." <u>In re Integrated Res., Inc. Real Estate Ltd. P'ships Sec. Litig.</u>,

851 F. Supp. 556, 567 (S.D.N.Y. 1994).  Therefore, "the limitations period does not begin to run

until [a plaintiff has] actual or inquiry notice of the injury." <u>In re Merrill Lynch Ltd. P'ships</u>

<u>Litig.</u>, 154 F.3d 56, 60 (2d Cir.1998).  "In the case of a RICO claim predicated on fraud, a

plaintiff should have discovered his injury when he has received information sufficient to alert a

reasonable person to the probability that he has been misled." <u>Takeuchi v. Sakhai</u>, No. 05 Civ.

6925 (JSR), 2006 WL 119749, at *2 (S.D.N.Y. Jan. 17, 2006).

    **2.**  <u>**Inquiry Notice**</u>

    One is placed on inquiry notice when "'a person of ordinary intelligence would

consider it "probable" that fraud had occurred.'" <u>Koch v. Christie's Int'l PLC</u>, 699 F.3d 141,

151 n.3 (2d Cir. 2012) (quoting with approval <u>Koch v. Christie's Int'l PLC</u>, 785 F. Supp. 2d 105,

114 (S.D.N.Y. 2011); <u>see also</u> <u>Lentell v. Merrill Lynch & Co., Inc.</u>, 396 F.3d 161, 168 (2d Cir.

2005) ( a party is on "'[i]nquiry notice . . . when the circumstances would suggest to an investor

of ordinary intelligence the probability that she has been defrauded'") (quoting <u>Levitt v. Bear</u>

<u>Stearns & Co., Inc.</u>, 340 F.3d 94, 101 (2d Cir.2003)).  "Inquiry notice imposes an obligation of

reasonable diligence." <u>Cohen</u>, 711 F.3d at 362.  "[T]he date on which knowledge of a fraud will

be imputed to a plaintiff can depend on the plaintiff's investigative efforts." <u>Id.</u> at 361.  "If the

plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the

date the duty arose." <u>Id.</u> at 361-62 (quotations and citations omitted); <u>see also</u> <u>Koch</u>, 699 F.3d at

155 ("New York law recognizes . . . that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations[,] if the plaintiff does not pursue a reasonable investigation.")  "[I]f some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."  Cohen, 711 F.3d at 362 (brackets, quotations and citations omitted).

"Although determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss, [the Second Circuit] ha[s] found dismissal appropriate where the facts needed for determination of when a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers integral to the complaint," id. (alterations, quotations and citations omitted), as well as from matters of which judicial notice may properly be taken.  Staehr v. Hartford Fins. Servs. Grp., 547 F.3d 406, 427 (2d Cir. 2008); see id. ("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.").  "[I]t is proper under New York law to dismiss a fraud claim on a motion to dismiss pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued."  Koch, 699 F.3d at 155-56.  In sum, "where the facts would suggest the probability of fraud to a reasonably intelligent person, failure to investigate will prove fatal to the plaintiff's claim if such a claim is not brought within the statutory limitations period beginning from the time of such inquiry notice."  Id. at 156.  "Whether a plaintiff was placed on inquiry notice is analyzed under an objective standard."  Staehr, 547 F.3d at 427.

B.      **Analysis**

Defendants Freedman and Knoedler[8] argue that the statute of limitations period

for the De Soles' fraud claims began to run when they purchased the purported Rothko in 2004.

(De Sole Dkt. No. 25 at 5 (citing Brown v. Kay, No. 11 Civ. 7304, 2012 WL 408263, at *11

(S.D.N.Y. Feb. 9, 2012))  In support of their argument, Defendants argue that Plaintiff "could

have conducted . . . scientific tests" at the time of purchase to confirm the work's authenticity.

(De Sole Dkt. No. 25 at 5)  Defendants further contend that statements made by Freedman at the

time of purchase put Plaintiffs on inquiry notice.  (De Sole Dkt. No. 25 at 7)

1.      **The Availability of Forensic Testing at the Time of Purchase**

As noted above, under New York law, the statute of limitations for fraud claims is

"the greater of six years from the date the cause of action accrued or two years from the time the

plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y.

C.P.L.R. § 213(8).  The De Soles allege that they did not learn of Defendants' fraud until

December 2011, when they read about Knoedler's closing and Lagrange's suit in The New York

Times.  (De Sole Am. Cmplt. ¶ 111)  The De Soles confronted Freedman and then retained Orion

Analytical to conduct a forensic examination of the alleged Rothko they had purchased.  (Id. ¶¶

115-16)  On February 2, 2012, Orion informed the De Soles that the Rothko was a forgery.  (Id.

¶¶ 116-17; Ex. 3)  The De Soles filed suit on March 8, 2012.  (De Sole Cmplt. (Dkt. No. 1)).

As to Defendants' argument that the De Soles could have arranged for a forensic

examination at the time of purchase, the Second Circuit rejected a similar argument in Rosen v.

Spanierman, 894 F.2d 28 (2d Cir. 1990).  In Rosen, plaintiffs purchased a portrait in 1968 that

---

[8]  Defendants Hammer and Andrade have adopted Knoedler and Freedman's arguments.  (De
Sole Dkt. No. 28 at 8; Dkt. No. 64 at 2)  Defendants Rosales and Bergantinos Diaz have not
argued that Plaintiffs' claims in De Sole should be dismissed on statute of limitations grounds.

was represented to be an original work by John Singer Sargent.  Id., 894 F.2d at 30.  Nearly

twenty years later, plaintiffs decided to sell the painting.  Christie's told plaintiffs that the

painting was a fake, however, and an independent art expert plaintiffs consulted agreed.  Id.

Plaintiffs then sued the gallery from which they had purchased the painting, alleging, inter alia,

fraud and breach of warranty.  Id.  Defendants moved for summary judgment, arguing, inter alia,

that the statute of limitations on plaintiffs' fraud claim had expired.  Id.  The district court

granted defendants' motion on other grounds, id. at 29, but the Second Circuit reversed.  In doing

so, the Circuit addressed, in dicta, defendants' statute of limitations argument on the fraud claim:

> The Rosens could have discovered Spanierman's asserted fraud immediately after
> their purchase by presenting the painting to an independent expert, and this ability
> to discover bars their breach of warranty claim.  But New York courts have
> exhibited a reluctance to impute discovery to a plaintiff maintaining a claim of
> fraud who has no reason to suspect that he has been defrauded.  See, e.g., Trepuk
> v. Frank, 44 N.Y.2d 723, 724-25 (1978); Azoy v. Fowler, 57 A.D.2d 541, 541-42,
> (2d Dept. 1977).  On the facts as alleged, the Rosens had no reason to suspect the
> authenticity of their painting until they tried to sell it in 1987.  Thus, their fraud
> claim appears to be timely brought.

Id. at 36 n.2.

Here, while it is true that the De Soles could have arranged for a forensic

examination at the time of purchase, they had "no reason to suspect the authenticity of their

painting" at that time.  See id.  The De Soles purchased the purported Rothko from Knoedler – at

that time, the oldest and most venerable art gallery in New York City.  (De Sole Am. Cmplt. ¶ 2)

Freedman, Knoedler's president, "unequivocally, repeatedly, and consistently" represented to the

De Soles that the work was an authentic Rothko.  (Id. ¶¶ 2, 54)  Knoedler also represented that

the anonymous seller was Knoedler's client, that he and his father were personally known to

Knoedler, and that the father had obtained the work directly from Rothko, on the advice of David

Herbert.  (Id. ¶ 55)  Moreover, Freedman told the De Soles that Mark Rothko's son, Christopher

Rothko, and other Rothko experts, including the individual responsible for the Rothko catalogue

raisonné, had examined the work and had attested to its authenticity.  (Id. ¶ 56)  Freedman also

told the De Soles that the purported work would be included in a forthcoming supplement to the

Rothko catalogue raisonné, then being prepared by the National Gallery of Art.  (Id. ¶ 58)

       In addition to these oral representations, Defendants provided written assurances

concerning the origin and authenticity of the work prior to the purchase.  (Id. ¶ 64)  In a

December 10, 2004 letter, Freedman confirmed many of her oral representations and added that a

host of experts had commented favorably on the work, including the former conservator of the

Rothko foundation and the curator of the Foundation Beyeler in Basel, Switzerland.  (Id. ¶¶ 64-

65; Ex. 2)

       In sum, the fact that forensic testing was available to the De Soles at the time of

purchase does not trigger the running of the two-year discovery period, because the De Soles

"had no reason to suspect the authenticity of their painting [at the time of purchase]."  Rosen,

894 F.2d at 36 n.2.

## 2.     The De Soles Were Not Put on Inquiry Notice

       As noted above, "'where the circumstances are such as to suggest to a person of

ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if

he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts

which call for investigation, knowledge of the fraud will be imputed to him.'"  Koch, 699 F.3d at

155 (quoting Gutkin v. Siegal, 85 A.D.3d 687, 688 (1st Dept. 2011)).

       Defendants argue that the De Soles were put on inquiry notice because (1) they

had not been provided with any documents that corroborated Freedman's account of the

23

provenance of the Rothko; and (2) Freedman's oral representations about the authenticity of the Rothko were different from the representations set forth in her December 11, 2004 letter.  (De Sole Dkt. No. 25 at 6, 7, 11)

With respect to Defendants' first argument, this Court cannot conclude, as a matter of law, that the absence of documents supporting Defendants' claimed provenance for the Rothko put the De Soles on inquiry notice.  Defendants allegedly provided the De Soles with a great deal of information concerning the provenance of the painting, both verbally and in writing, and represented that it had been acknowledged as a Rothko by experts in the field.  The fact that Defendants did not produce an invoice reflecting a transfer from Rothko to Mr. X is not sufficient to support a finding as a matter of law that Plaintiffs were on inquiry notice.  See Cohen, 711 F.3d at 362 ("determining whether a plaintiff had sufficient facts to place her on inquiry notice is often inappropriate for resolution on a motion to dismiss"); Staehr, 547 F.3d at 427 ("Inquiry notice may be found as a matter of law only when uncontroverted evidence clearly demonstrates when the plaintiff should have discovered the fraudulent conduct.")

Defendants' second argument – that Freedman's December 10, 2004 letter differs in significant respects from her verbal representations to the De Soles – is frivolous.  The December 10 letter could hardly be more dispositive as to the authenticity of the Rothko.  The letter begins:  "This classic Rothko painting was acquired directly from the artist through the advice and counsel of David Herbert (1920-1995)."  (De Sole Am. Cmplt., Ex. 2 at 1)  The letter goes on to represent that the painting will be included in the forthcoming catalogue raisonné for Rothko, and that the Foundation Beyeler – "the greatest European repository of the work of Mark Rothko" – wants to borrow the painting for exhibition purposes.  (Id. at 1-2)  The letter

concludes, "Knoedler warrants the authenticity and good title of the painting, Untitled, 1956 . . . ." (Id. at 2)

In sum, Defendants have not demonstrated that "a reasonable plaintiff of ordinary intelligence would have been aware of the existence of fraud." [9] Cohen, 711 F.3d at 362. Accordingly, Defendants' motions to dismiss the De Soles' claims on statute of limitations grounds will be denied.[10]

## III.     VIOLATION OF 18 U.S.C. § 1962(c):  SUBSTANTIVE RICO CLAIM

### A.     Applicable Law

To sustain a private cause of action under RICO, a plaintiff must allege:  "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).  An underlying violation of RICO occurs when "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, . . . conduct[s] or participate[s], directly or indirectly, in

---

[9]  Brown v. Kay, 889 F. Supp. 2d 468 (S.D.N.Y. 2012), cited by Defendants Knoedler and Freedman (De Sole Dkt. No. 25 at 5), is not to the contrary.  In Brown, the plaintiff sued his father's estate in 2011 for fraud relating to certain allegedly fake paintings that plaintiff's father had provided to plaintiff's mother under a separation agreement forty years earlier.  The court dismissed the fraud claim for several reasons, including the existence of a release and res judicata.  Brown, 889 F. Supp. 2d at 481-84.  As to statute of limitations, the court found that "by no later than 2002, when [plaintiff] brought suit in state court against his father . . . [he] was well aware of the key pillars of the fraud claim."  Id. at 483.

[10]  Defendant Rosales argues in the Howard action that the Second Circuit erred in adopting the "injury discovery" rule, and that "Congress would have preferred" that the court adopt a "straight injury rule."  (Howard Dkt. No. 75 at 21, 24-25)  Second Circuit law is binding on this Court and it will be applied here.  Rosales' motion to dismiss in Howard on statute of limitations grounds will be denied.

the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  18 U.S.C. 1962(c).  Thus, in addition to injury and causation, a plaintiff must allege:  "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

   The "pattern of racketeering activity" elements are adequately pled where plaintiff makes factual allegations sufficient to demonstrate that defendants committed two or more predicate acts as part of a pattern of racketeering activity.  Here, Plaintiffs allege that Defendants committed two or more acts of mail and wire fraud; mail and wire fraud are included in the statutory definition of "racketeering activity."  18 U.S.C. § 1961(1)(B).[11]

   To establish RICO claims based on mail and wire fraud, a complaint must, as a threshold matter, allege "the existence of a fraudulent scheme."  McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992).  The complaint must also allege that "the defendant 'caused' the mailing or use of the wires" and that "the mailing or use of the wires 'was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.'"  Maersk, Inc. v. Neewra, Inc., 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) (quoting United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989)).  In short, a RICO complaint must provide "a detailed description of the underlying [fraudulent] scheme and the connection of the mail and/or wire communications to the scheme."  In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

---

[11]  Howard also alleges that Defendants trafficked in counterfeit labels, in violation of 18 U.S.C. § 2318.  Trafficking in counterfeit labels is listed in 18 U.S.C. § 1961(1) as an offense that constitutes racketeering activity.

A RICO plaintiff must also plead facts sufficient to demonstrate that the plaintiff's injury was caused by the defendant's racketeering activities.  See Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 323 (2d Cir. 2011).  Where, as here, a RICO violation is predicated on acts of fraud, a plaintiff must allege that the defendant's acts were not only the "but for" cause of plaintiff's injury, but the proximate cause as well, necessitating "some direct relation between the injury asserted and the injurious conduct alleged"; "[a] link that is too remote, purely contingent, or indirect is insufficient."  Hemi Grp., LLC v. City of New York, 559 U.S. 1, 8 (2010) (internal quotation marks and alteration omitted).  This causation requirement is necessary because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors."  Ideal Steel, 652 F.3d at 316 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458  (2006) (alteration omitted)).

      **B.**    **Analysis**

          **1.**    **The Alleged Enterprise**

"'Any principled analysis of a RICO claim . . . must begin from an understanding of what enterprise is alleged.'"  Freund v. Lerner, 09 Civ. 7117 (HB), 2010 WL 3156037, at *6 (S.D.N.Y. Aug. 10, 2010) (quoting Spira v. Nick, 876 F. Supp. 553, 561 (S.D.N.Y. 1995))  An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir. 2004)  This definition "is obviously broad. . . . The term 'any' ensures that the definition has wide reach, and the very concept of an association in fact is expansive."  Boyle v United States, 556 U.S. 938, 944 (2009); see also Automated Teller Mach. Advantage LLC v. Moore, No. 08 Civ. 3340, 2009 WL 2431513, at *6

(S.D.N.Y. Aug. 6, 2009) (Boyle "establishes a low threshold for pleading [an association-in-fact]

enterprise").  Thus, RICO reaches "a group of persons associated together for a common purpose

of engaging in a course of conduct."  United States v. Turkette, 452 U.S. 576, 583 (1981).

                Where, as here, the alleged enterprise is a "group associated in fact although not a

legal entity," see 18 U.S.C. § 1961(4), "the persons to be held liable are the individual

defendants who participated in the association by committing predicate acts which related to and

furthered the association's purported common purpose."  In re Gas Reclamation, Inc. Sec. Litig.,

659 F. Supp. 493, 518 (S.D.N.Y. 1987)  The "'person'" and the "'enterprise'" are thus

"'distinct.'"  Id. at 517 (quoting Rush v. Oppenheimer & Co., Inc., 628 F. Supp. 1188, 1194

(S.D.N.Y. 1985)); see also In re Energy Sys. Equip. Leasing Sec. Litig., 642 F. Supp. 718, 740-

41 (E.D.N.Y.1986) ("enterprise composed of an association-in-fact, even if made up entirely of

individual defendants deemed to be § 1961(3) 'persons,' is to be viewed for purposes of RICO

claims as possessing a separate existence from its individual members. . . . [T]he various

defendants constitute persons under RICO, while the interaction and relationship between these

defendants with regard to the alleged scheme . . . comprises an association-in-fact enterprise

separate and distinct from those individual persons."); Fustok v. Conticommodity Servs., Inc.,

618 F. Supp. 1074, 1076 (S.D.N.Y. 1985) ("association-in-fact which constitutes a RICO

enterprise is not merely a synonym for the collection of 'individuals' which form the association,

but instead it is a distinct entity").

                Plaintiffs in the instant actions allege that Knoedler, Freedman, Rosales, Hammer,

Andrade, Bergantinos Diaz and others joined forces for the purpose of selling forged artworks.

Plaintiffs further allege that each Defendant had a relationship with the others and with the

enterprise:  Andrade was the "gateway" for Rosales and Bergantinos Diaz to deliver forged

artworks to Knoedler for sale; Knoedler and Freedman marketed and sold the forged artworks to customers; Hammer coached Freedman and rewarded her for her efforts, and reaped the benefits of her fraud.  Plaintiffs also allege that the enterprise was of sufficient duration to pursue its purpose:  it successfully sold nearly forty forged artworks to dozens of unsuspecting collectors for some $60 million over more than a decade.  (De Sole Dkt. No. 31 at 36 (citing De Sole Am. Cmplt. ¶¶ 8-9, 34-76, 119-20); Howard Dkt. No. 42 at 9-14 (citing Howard Cmplt. ¶¶ 2-8, 305-11))

           Here, the complaints aver "a purpose, relationship among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946.  These allegations are sufficient to make out a RICO enterprise.  See Galerie Furstenberg v. Coffaro, 697 F. Supp. 1282, 1287 (S.D.N.Y. 1998) (finding a RICO enterprise where defendants had been "continuously distributing, advertising, offering for sale and/or selling . . . forged or counterfeited [works of art]"); Boyle, 556 U.S. at 941 (RICO enterprise existed where "loosely and informally organized" group participated in more than thirty bank robberies during a ten-year period, "met beforehand to plan the crime[s] . . . and [to] assign roles that each participant would play," and split the proceeds of the robberies, even though the enterprise had no "leader or hierarchy" and no "long-term master plan or agreement").

### 2.      Defendants' Participation in the RICO Enterprise

           A RICO plaintiff must also allege that the defendants "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); see Reves v. Ernst & Young, 507 U.S. 170, 177-79 (1993).  In Reves, the Supreme Court explained that this statutory language means that the

defendant must have had "some part in directing [the enterprise's] affairs." <u>Reves</u>, 507 U.S. at

179. "Of course, the word 'participate' makes clear that RICO liability is not limited to those

with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly'

makes clear that RICO liability is not limited to those with a formal position in the enterprise[;]

but some part in directing the enterprise's affairs is required." <u>Id.</u> (footnote omitted). "The

[Supreme] Court acknowledged . . .that those who 'operate' or 'direct' a RICO enterprise

sufficiently to 'conduct' its affairs within the meaning of RICO need not be 'upper

management,' but might also be 'lower rung participants in the enterprise who are under the

direction of upper management.'" <u>United States v. Allen</u>, 155 F.3d 35, 42-43 (2d Cir. 1998)

(quoting <u>Reves</u>, 507 U.S. at 184).

       In <u>Reves</u>, the Supreme Court ruled that "[t]he 'operation or management' test

[employed by the Eighth and D.C. Circuits] expresses [RICO's] requirement[s] in a formulation

that is easy to apply." <u>Reves</u>, 507 U.S. at 179. Simply put, "one is liable under RICO only if he

'participated in the operation or management of the enterprise itself.'" <u>Azrielli v. Cohen Law</u>

<u>Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994).

       With these precedents in mind, the Court will analyze Plaintiffs' allegations

concerning each defendant and their respective roles in the conduct of the affairs of the alleged

racketeering enterprise.

### a.    <u>Freedman and Knoedler</u>

       The facts alleged in each complaint provide an ample record on which to

conclude that Freedman, and Knoedler acting through Freedman, its president, participated or

"played some part in directing" the affairs of the alleged racketeering enterprise and had primary

responsibility for operating, managing and directing its affairs.

The facts pleaded in the complaints demonstrate that Freedman – in her capacity as Knoedler's president – made numerous misrepresentations to Howard and the De Soles and their agents concerning the provenance and authenticity of the forged paintings they purchased. The complaints also plead facts more broadly demonstrating that Freedman likely knew – at the time she made her representations about the provenance and authenticity of paintings brought to the gallery by Rosales – that her statements were false.  For example, Freedman is alleged to have made numerous misrepresentations about her personal knowledge of Mr. X and his son and whether Rosales-related paintings would be included in upcoming catalogue raisonnés.  (De Sole Am. Cmplt. ¶¶ 2, 3, 55); Howard Cmplt. ¶¶ 11, 89)  Rosales' shifting stories about the roles of Ossorio and Herbert and the timing of when the fictional collector procured the paintings, and her inability to obtain any written corroboration or endorsement from the alleged owner, provide circumstantial evidence that Freedman – in her capacity as president of Knoedler – knowingly made materially false statements to Howard and the De Soles and their agents.  (See, e.g., De Sole Am. Cmplt. ¶¶ 8-9, 48-49, 55-58, 64-66, 87-90, 92, 94-95, 119-20, 132; Howard Cmplt. ¶¶ 3, 5-7, 11-13, 30-31, 56, 83-84, 86, 89-90, 230-233, 236, 268 305-11)

### b.    **Hammer**

The Plaintiffs allege that "Hammer, the beneficial owner of Knoedler, was a critical and willing participant in the racketeering scheme."  (De Sole Am. Cmplt. ¶ 164; see also Howard Cmplt. ¶ 8 ("Although Hammer played a 'behind-the-scenes' role in the enterprise, he was an active participant in and beneficiary of the conspiracy to defraud."))  Plaintiffs' complaints contain the following factual allegations concerning Hammer:

> (1)  In 2003, Freedman faxed to Hammer a 2003 IFAR report related to a purported Jackson Pollock sold to Jack Levy.  The report called into question the provenance of the painting.  (De Sole Am. Cmplt. ¶ 44; Howard Cmplt. ¶¶ 65-67)

(2)  A handwritten note on the reverse side of the cover sheet for the above-referenced fax contains the following phrases in quotation marks:  "discreet sources are my stock in trade," "don't kill the goose that's laying the Golden egg," and "I am not going to change my way of doing business.  If you are not [comfortable] – step away."  (Howard Cmplt. ¶¶ 69, 183; see also De Sole Am. Cmplt. ¶ 45)

(3)  Hammer determined Freedman's compensation based on Knoedler's profits, and – during the years that sales of Rosales-related paintings were at their peak – he twice increased her compensation.  (De Sole Am. Cmplt. ¶¶ 8, 15, 100)

(4)  Hammer was aware that payments to Rosales were wired to Bergantinos Diaz's brother in Spain.  (Howard Cmplt. ¶¶ 38, 192)

(5)  Hammer knew of the outsized profits Knoedler derived from sales of paintings obtained from Rosales.  (De Sole Am. Cmplt. ¶ 8; Howard Cmplt. ¶¶ 186, 278)

(6)  Hammer profited from the fraudulent scheme.  (De Sole Am. Cmplt. ¶ 8)

These allegations are not sufficient to demonstrate that Hammer "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the alleged] enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Indeed, these allegations are not adequate to sustain any of the causes of action that are pled against Hammer.

The 2003 IFAR report is not sufficient to demonstrate that Hammer was put on notice of the alleged fraud.  The report states that "IFAR believes that too many reservations exist to make a positive attribution to Jackson Pollock."  (Howard Cmplt. ¶ 46)  According to Plaintiffs' complaints, the report does not state or suggest that the painting is a forgery.  (De Sole Am. Cmplt. ¶ 42; Howard Cmplt. ¶¶ 46-48)  The report goes on to say that it is "inconceivable" that Pollock sold the work through Ossorio.  (Howard Cmplt. ¶¶ 46-48)  While this aspect of the report questions the alleged provenance of the work, it does not directly challenge its authenticity.  (Id.)

As to the handwritten statements on the back of the fax cover sheet, the complaints do not allege who authored them, nor do Plaintiffs allege that these statements were shared with Hammer.

Hammer's role in determining Freedman's compensation does not demonstrate that he knew of the alleged ongoing fraud. Similarly, Plaintiffs do not explain why Hammer's knowledge that payments to Rosales were being wired to Bergantinos Diaz's brother should have led him to suspect that the paintings Rosales was providing to Knoedler were forged. It is apparent – from the facts alleged in the complaints – that the use of intermediaries in the art world is common. The De Soles, Howard, and Lagrange all wired their payments through intermediaries. (De Sole Am. Cmplt. ¶¶ 63, 130, 133; Howard Cmplt. ¶ 321; Lagrange Cmplt. ¶ 40)

Finally, Plaintiffs allege that Hammer was aware of the large profits Knoedler realized on the sale of works obtained from Rosales. Plaintiffs have not alleged, however, what mark-ups are customary in the industry for works created by artists of this stature.

In sum, neither complaint alleges sufficient facts to demonstrate that Hammer "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the alleged] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Plaintiffs' allegations are likewise not sufficient to demonstrate that Hammer committed fraudulent concealment, aided and abetted fraud, or conspired to commit fraud. All of these claims fail because of the absence of facts sufficient to demonstrate that Hammer "knew or should have known about the . . . [f]raud." In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 498 (S.D.N.Y. 2005) Accordingly, all claims against Hammer will be dismissed.

33

c.      **8-31 Holdings, Inc.**

The <u>Howard</u> complaint alleges that

> Knoedler's sole member is defendant 8-31 Holdings, Inc., a Delaware corporation
> which lists its most recent principal place of business with the New York
> Secretary of State as 19 East 70th Street, New York, New York but, on
> information and belief, is actually located at a warehouse somewhere on
> Manhattan's West Side.  On information and belief, 8-31 Holdings, Inc. also owns
> Hammer Galleries, LLC (another art gallery) and Knoedler Archivum, Inc., the
> latter of which, on information and belief, owns one of the most-valuable art
> archives and libraries in the world.

(<u>Howard</u> Cmplt. ¶ 18)  No additional allegations are pled against 8-31 Holdings, Inc.  The

sallegation set forth above is not sufficient to sustain any cause of action against this defendant.

Accordingly, all claims against 8-31 will be dismissed.[12]

d.      **Rosales**

Rosales' role could not be more central to the alleged racketeering enterprise.  She

provided the high-quality forged artworks for sale, created the false provenance story for the

---

[12]  "A member of a limited liability company 'cannot be held liable for the company's
obligations by virtue of his [or her] status as a member thereof.'"  <u>Matias v. Mondo Props. LLC</u>,
43 A.D.3d 367, 367-368 (1st Dept. 2007) (quoting <u>Retropolis, Inc. v. 14th St. Dev. LLC</u>, 17
A.D.3d 209, 210 (1st Dept. 2005)); <u>see also</u> N.Y. Limited Liability Company Law §§ 609, 610.
"However, a party may seek to hold a member of an LLC individually liable despite this
statutory proscription by application of the doctrine of piercing the corporate veil."  <u>Grammas v.
Lockwood Assocs., LLC</u>, 95 A.D.3d 1073, 1074-76 (2d Dept. 2012) (citing <u>Matias</u>, 43 A.D.3d
367; <u>Retropolis</u>, 17 A.D.3d 209).  In order to state a viable cause of action under the doctrine of
piercing the corporate veil, a "plaintiff must allege facts that, if proved, indicate that the
shareholder exercised complete domination and control over the corporation [or LLC] and
'abused the privilege of doing business in the corporate [or LLC] form to perpetrate a wrong or
injustice.'"  <u>Id.</u> at 1075 (quoting <u>Matter of Morris v New York State Dept. of Taxation & Fin.</u>, 82
N.Y.2d 135, 142 (1993)).  "Factors to be considered in determining whether an individual has
abused the privilege of doing business in the corporate or LLC form include the failure to adhere
to LLC formalities, inadequate capitalization, commingling of assets, and the personal use of
LLC funds."  <u>Grammas</u>, 95 A.D.3d at 1076.

Howard has not pled facts sufficient to demonstrate that it would be appropriate to pierce the
corporate veil, nor has he presented a piercing the corporate veil analysis in his briefing.

forged works, and worked with Freedman and Andrade to create a new provenance story when aspects of the initial tale were called into question.  (De Sole Am. Cmplt. ¶¶ 24-30, 33, 47-48, 69; Howard Cmplt. ¶¶ 2, 5, 10, 41)

>           **e.**       **Andrade**

Andrade, was a "long-time employee of Knoedler" and is alleged to have "persuaded" and "encouraged" Rosales to bring the forged artworks to Knoedler, and then to have introduced Rosales to Freedman and Knoedler.  (De Sole Am. Cmplt. ¶¶ 23, 165; Howard Cmplt. ¶¶ 4, 26, 232(e), 347(e))  Both complaints assert that the alleged racketeering enterprise could not have existed without Andrade's introduction of Rosales to Freedman and Knoedler. (De Sole Am. Cmplt. ¶¶ 23, 165, 178(b); Howard Cmplt. ¶¶ 4, 26)  Andrade's role went beyond the original introduction of Rosales, however.  When the IFAR report cast doubt on Ossorio's role as the advisor or intermediary for the fictional collector's purchases (Howard Cmplt. ¶¶ 47-48), Andrade met with Freedman and Rosales to develop a new provenance story for Rosales' forged paintings.  (De Sole Am. Cmplt. ¶¶ 47-49, 192, 196, 202; Howard Cmplt. ¶¶ 4, 27-28, 55-56, 138-40)

The three decided to substitute David Herbert for Ossorio. (De Sole Am. Cmplt. ¶ 47)  Herbert was Andrade's deceased "longtime companion," a prominent figure in the art world, and was known to have had relationships with the artists who allegedly created Rosales' forged paintings.  (Id.)  It is a fair inference that the purpose of changing the provenance story was to keep the enterprise alive.  (Howard Cmplt. ¶ 140)  It is also a fair inference that Andrade knew that the newly created story about Herbert was false and that this false story would be used to assist Freedman and Knoedler in selling the forged paintings brought to the gallery by Rosales. In sum, both complaints plead sufficient facts to demonstrate that Andrade "conduct[ed] or

participate[d], directly or indirectly, in the conduct of [the alleged] enterprise's affairs." 18

U.S.C. § 1962(c).

      **f.**     <u>**Bergantinos Diaz**</u>

          Neither complaint contains meaningful factual allegations against Defendant

Carlos Bergantinos Diaz. Plaintiffs assert that Rosales was in a relationship with Bergantinos

Diaz (<u>De Sole</u> Am. Cmplt. ¶ 8 ("her partner"); <u>Howard</u> Cmplt. ¶ 2 (her "live-in companion")),

and that Bergantinos Diaz had previously been "accused of" selling forged artwork in Spain.

(<u>De Sole</u> Am. Cmplt. ¶¶ 28, 70(b); <u>Howard</u> Cmplt. ¶¶ 37, 232(l), 347(l)) Rosales also instructed

Knoedler to wire most of her sales proceeds to Bergantinos Diaz's brother, Jesus Bergantinos

Diaz, in Spain. (<u>De Sole</u> Am. Cmplt. ¶ 38; <u>Howard</u> Cmplt. ¶¶ 9, 38, 165, 232(k), 347(k)) These

allegations are not sufficient to demonstrate that Defendant Bergantinos Diaz had knowledge of

the fraud. The remaining allegations against this defendant are conclusory. (<u>See</u>, <u>e.g.</u>, <u>Howard</u>

Cmplt. ¶ 10 (the alleged de Kooning was "[l]ikely created by Bergantinos Diaz or a person or

persons supplying or working with him and Rosales"))

          In sum, neither complaint alleges sufficient facts to demonstrate that Bergantinos

Diaz "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the alleged]

enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Plaintiffs'

allegations are likewise not sufficient to demonstrate that this defendant aided and abetted fraud,

or conspired to commit fraud. Accordingly, all claims against Bergantinos Diaz will be

dismissed.

      **2.**     <u>**The Racketeering Activity**</u>

          A RICO plaintiff must also show a "pattern of racketeering activity" based upon

the occurrence of at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). The

predicate acts must be "related" and "amount to or pose a threat of continued criminal activity."

H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989).  The continuity requirement can be

satisfied by either "closed-ended" or "open-ended" continuity.  Grimes v. Fremont Gen. Corp.,

785 F. Supp. 2d 269, 300 (S.D.N.Y. 2011)

a.      **Open-Ended Continuity**

To establish open-ended continuity, it need not be shown that predicate acts were

committed over an extended period of time.  Instead, a RICO plaintiff must show that there was

a threat of continuing criminal activity "extending indefinitely into the future."  H.J., Inc., 492

U.S. at 242.  This threat of continuing criminal activity must extend "beyond the period during

which the predicate acts were performed."  De Falco v. Bermas, 244 F.3d 286, 323 (2d Cir.

2001) (quoting, Cofacredit v SA Windsor Plumbing Supply Corp., 187 F.3d 229 242 (2d Cir.

1999)).  The key factors to consider in connection with the question of open-ended continuity are

the nature of the enterprise and the predicate acts alleged.  See Cofacredit, 187 F.3d at 242.  If

the alleged enterprise is engaged in "inherently unlawful" acts, and there is a threat of continuing

criminal activity, open-ended continuity exists.  Id.

On the other hand, if the enterprise is engaged in a legitimate business, an

allegation of open-ended continuity requires evidence supporting an inference that the predicate

acts are the regular way of doing business, or that the nature of the predicate acts themselves

implies a threat of continuing criminal activity.  Id.; see also GICC Capital Corp. v. Tech Fin.

Grp., 67 F.3d 463, 466 (2d Cir. 1995); Allen v. New World Coffee, Inc., No. 00 Civ. 2610

(AGS), 2001 WL 293683, at *6 (S.D.N.Y. March 27, 2001); Jordan (Bermuda) Inv. Co., Ltd. v.

Hunter Green Invs. Ltd., 154 F. Supp. 2d 682, 694-95 (S.D.N.Y. 2001).

### b.    Closed-Ended Continuity

A RICO plaintiff may also satisfy the continuity element by a showing of "closed-ended" continuity. Closed-ended continuity is shown by proving "a series of related predicate acts extending over a substantial period of time." Cofacredit, 187 F.3d at 242. When calculating the relevant time period, courts consider only the time period during which defendants committed the alleged predicate acts. DeFalco, 244 F.3d at 321. Actions that do not constitute predicate acts are not considered when calculating the relevant time period. GICC Capital Corp., 67 F.3d at 468.

The Second Circuit has never found a period of less than two years of activity sufficient to satisfy the closed-ended continuity requirement. See De Falco, 244 F.3d at 321; see also Serin v. N. Leasing Sys., Inc., No. 06 Civ. 1625, 2009 WL 7823216, at *10 (S.D.N.Y. Dec. 18, 2009) (predicate acts spanning three-and-a-half years satisfied "substantial" amount of time requirement). While the closed-ended continuity analysis primarily focuses on the time period during which predicate acts were committed, courts also consider the "number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes" in determining whether closed-ended continuity exists. Id.; New York Transp., Inc. v. Naples Transp., Inc., 116 F. Supp. 2d 382, 388 (E.D.N.Y. 2000).

### c.    Predicate Acts

Here, Plaintiffs have alleged predicate acts consisting of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. In addition, Howard alleges false labeling of visual art, in violation of 18 U.S.C. § 2318, as a predicate act. All of these offenses are forms of racketeering for purposes of RICO. See 18 U.S.C. § 1961(1); Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 454 (2006).

To prove mail or wire fraud, "it is not necessary to show that [defendants] actually mailed [or wired] . . . anything themselves." Pereira v. United States, 347 U.S. 1, 8 (1954). Instead, "it is sufficient if [defendants] caused it to be done." Id. Moreover, where the mails or wires are used in furtherance of fraud, the communications need not contain false or misleading information themselves. See Schmuck v. United States, 489 U.S. 705, 715 (1989). "It is sufficient for the mailing [or transmission] to be incident to an essential part of the scheme or a step in the plot." Id. at 710-11.

In order to properly allege a claim under the counterfeit label statute, 18 U.S.C. § 2318, a plaintiff must plead facts demonstrating that a defendant "knowingly traffic[ked] in – (A) a counterfeit label, or illicit label affixed to, enclosing or accompanying or designed to be affixed to, enclose, or accompany – . . . (vi) a work of visual art." 18 U.S.C. § 2318.

### i.    De Sole

The De Soles argue that they have alleged a pattern of racketeering activity based on both "closed-ended" and "open-ended" continuity. The Amended Complaint lists ten predicate acts:

(1) In late November 2004, by use of interstate telephone wires, Knoedler and Freedman negotiated a sales price of the [purported Rothko] with Kelly, who was acting on behalf of the De Soles[;]

(2) On or about November 30, 2004, Knoedler and Freedman in New York, by the use of interstate mails, sent the Knoedler Invoice to Kelly in New Mexico;

(3) On or about December 7, 2004, the De Soles, by the use of interstate wires, wired $8.4 million from their Morgan Stanley account in New York to Kelly in New Mexico for Kelly to use to pay Knoedler for the [Rothko];

(4) On or about December 11, 2004, Knoedler and Freedman in New York, by the use of interstate telephone wires, sent the Knoedler Letter by facsimile to Kelly in New Mexico[;]

(5)  On or about December 17, 2004, Kelly, by the use of interstate wires, wired from his account at First National Bank in New Mexico to Knoedler's HSBC Bank in New York, the purchase price of $8.3 million – consummating the De Sole sale[;]

(6)  On or about June 13, 2007, Knoedler and Freedman in New York, by the use of interstate wires, sent the Howard Invoice by email to Frankfurt in Los Angeles, California[;]

(7)  On or about June 13, 2007, by the use of interstate wires, Howard wired $4 million to Frankfurt at his Citibank account located in Los Angeles, California, and Frankfurt then wired $3.5 million from his Los Angeles account to Knoedler at its HSBC Bank account in New York – consummating the Howard sale[;]

(8)  On or about September 18-21, 2007, Knoedler and Freedman in New York, by the use of interstate wires, sent multiple emails to Frankfurt in Los Angeles regarding the Howard purchase;

(9)  On or about November 7, 2007, by the use of international wires, Lagrange wired $17 million to Frankfurt at his Citibank account located in Los Angeles, California, and Frankfurt, using domestic wires, wired $15.3 million from his Los Angeles account to Knoedler at its HSBC Bank account in NewYork – consummating the Lagrange sale;

(10)  On numerous dates and occasions not yet known to the De Soles, defendants used the domestic and international wires to make payments to or for the benefit of Rosales and Bergantinos Diaz and to receive funds and communicate with unsuspecting purchasers of works in the Rosales Collection.

(De Sole Am. Cmplt. ¶ 169)

The De Soles argue that these allegations – along with the allegations concerning the scope and conduct of the Defendants' fraudulent scheme, including the alleged repeated misrepresentations and omissions, and the alleged defrauding of dozens of collectors through the sale of nearly forty forged artworks for some $60 million over a decade – establish continuity for the purpose of showing a pattern of racketeering activity.  (De Sole Dkt. No. 31 at 45)

Defendants Freedman and Knoedler argue, however, that predicate acts 3, 5, 7, and 9 were not committed by a member of the purported enterprise and therefore do not qualify

40

as predicate acts.  (De Sole Dkt. No. 25 at 21)  Defendants further contend that predicate acts 6,

8, and 10 do not satisfy Rule 9(b) and therefore do not qualify as predicate acts.  (De Sole Dkt.

No. 25 at 21-22)  Finally, Defendants argue that the three remaining predicate acts span less than

one month, and therefore do not extend over a sufficient period of time to satisfy the

requirements for closed-ended continuity.  (De Sole Dkt. No. 25 at 23)

        As discussed above, however, to prove mail or wire fraud, and to demonstrate that

acts of mail or wire fraud are predicate acts within the meaning of RICO, "it is not necessary to

show that [defendants] actually mailed [or wired] . . . anything themselves."  Pereira, 347 U.S. at

8.  Instead, "it is sufficient if [defendants] caused it to be done."  Id.; see McLaughlin v.

Anderson, 962 F.2d 187, 191 (2d Cir. 1992) (noting, in context of civil RICO claim based on

mail fraud predicates, that "there is no requirement that the defendant personally mail a letter";

that defendant "caused the mailing is sufficient"); see also City of New York v. Smokes-

Spirits.com., Inc., 541 F.3d 425, 446 (2d Cir. 2008) ("defendant commits wire fraud where he

was one of the participants in a fraudulent scheme which was furthered by the use of interstate

transmission facilities").  Accordingly, predicate acts 3, 5, 7, and 9 are properly alleged.

        Defendants' second argument has no merit.  Where the mails are used to further a

fraud, the communications themselves need not contain false or misleading information.

Schmuck, 489 U.S. at 715; see also In re Sumitomo Copper Litig., 995 F. Supp. 451, 456

(S.D.N.Y. 1998) ("In complex civil RICO actions involving multiple defendants, therefore, Rule

9(b) does not require that the temporal or geographic particulars of each mailing or wire

transmission made in furtherance of the fraudulent scheme be stated with particularity. . . . In

such cases, Rule 9(b) requires only that the plaintiff delineate, with adequate particularity in the

body of the complaint, the specific circumstances constituting the overall fraudulent scheme.").

Here, the amended complaint details "the contents of the communications" that Freedman and Knoedler issued to perpetrate the fraud against the De Soles, including "who was involved, [and] where and when they took place, and . . . why they were fraudulent."  (De Sole Am. Cmplt. ¶¶ 3, 64-65, 70-71, 169)  The predicate acts took place over at least three years, establishing closed-ended continuity.[13]  See Cofacredit, 187 F.3d at 242 (citing, inter alia, Metromedia Co. v. Fugazy, 983 F.2d 350, 369 (2d Cir. 1992) (noting that Second Circuit has found closed-ended continuity where "a series of related predicates extending over [two years]" was demonstrated).

ii.   **Howard**

Howard alleges a pattern of racketeering activity based upon both closed-ended and open-ended continuity.  The predicate acts section of the Howard complaint includes the following allegations:

> 317.  Each [falsely labeled, Rosales-related artwork sold to customers], including the [de Kooning], was trafficked in the United States and shipped via mail or other interstate common carrier.

> 318.  Moreover, payments for each work were transmitted via mail, wire, or another similar facility of interstate or foreign commerce.

> 320.  In this case alone, members of the enterprise engaged in multiple e-mails and telephone calls with Howard and Frankfurt.

> 321.  The defendants shipped the [de Kooning] to Howard via common carrier, and paid and received the funds via wire or mail.

_____

[13]  The De Soles have not pled facts sufficient to demonstrate open-ended continuity.  In particular, the De Soles have not alleged any facts suggesting that the racketeering activity will continue into the future.  See Grimes, 785 F. Supp. 2d at 301.  To the contrary, the De Soles allege that the last Rosales-related artwork was sold in 2007.  (De Sole Am. Cmplt. ¶ 141) Moreover, Freedman has not been employed at Knoedler since 2009, and Knoedler itself closed its doors in 2011.  (De Sole Am. Cmplt. ¶¶ 13, 15)

322.  Each of these patterns was repeated each time a[] [painting from Rosales] was marketed and/or sold.

323.  Moreover, the defendants communicated among themselves by mail and wire.  For example, Freedman faxed the IFAR Report to Hammer in 2003, and shortly thereafter, the two had the "don't kill the goose laying the golden egg" conversation by telephone.

324.  Upon information and belief, there were scores of additional phone conversations, e-mail exchanges and other relevant communications between and among the defendants.

(Howard Cmplt. ¶¶ 317-18, 320-34)

These allegations are not sufficient to allege a pattern of racketeering activity. Howard does not allege the content, speaker, date and nature of fraudulent communications.  His general allegations that "defendants communicated among themselves by mail and wire" are insufficient.  See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987) (In most contexts, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.");  Sony Music Entmt. Inc. v. Robison, No. 01 Civ. 6415 (LMM), 2002 WL 272406, at *5 (S.D.N.Y. Feb.26, 2002) (dismissing RICO counterclaims because the defendants failed to specify the specific dates and details of the fraudulent communications, the people involved, and why the acts constituted fraud);  Odyssey Re (London) Ltd. v Stirling Cooke Brown Holdings Ltd., 85 F. Supp. 2d 282, 301 (S.D.N.Y. 2000) ("Where a complaint does not delineate specifics regarding the defendant's use of mail or wire, there can be no predicate act of mail or wire fraud.");  Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F. Supp. 1224, 1232 (E.D.N.Y. 1996) (dismissing RICO claims where mail and wire fraud predicate acts were not adequately pleaded; "the amended complaint contains sweeping and general allegations of mail and wire fraud

43

directed at all the defendants rather than connecting the alleged fraud to the individual

defendants").

    Howard's additional predicate acts based on violation of the counterfeit labels

statute, 18 U.S.C. § 2318, do not salvage his RICO claims.  All of the alleged predicate acts of

trafficking took place over a nine-month period between February and November 2007 (Howard

Cmplt. ¶¶ 99, 141, 258), well short of the two-year period required to demonstrate closed-ended

continuity.  See De Falco, 244 F.3d at 321.

    Because Howard has not adequately pled a pattern of racketeering activity,

Defendants' motion to dismiss his substantive RICO claim will be granted.[14]

### 3.  Injury

    To state a civil RICO claim, a plaintiff is required to show that a RICO predicate

offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."

Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).  Proximate cause for RICO

purposes requires "some direct relation between the injury asserted and the injurious conduct

alleged." Id.  A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient.[15]  Id.

at 271.

---

[14]  Howard's open-ended continuity argument fails for the same reason discussed in connection
with the De Soles' complaint:  Howard has not alleged any facts suggesting that the racketeering
activity will continue into the future.  See Grimes, 785 F. Supp. 2d at 301.

[15]  Rosales argues that Plaintiffs lack standing to bring RICO claims against her.  (De Sole Dkt.
No. 84 at 6-14; Howard Dkt. No. 75 at 6-14)  A RICO plaintiff lacks standing where "the link is
too remote" between the fraudulent acts of the enterprise and the harm to plaintiff.  Holmes, 503
U.S. at 271.  Rosales appears to be arguing that she is not liable under RICO because she had no
direct contact with Howard or with the De Soles.

The Supreme Court rejected this argument in Bridge v. Phoenix Bond & Indem. Co., 553 U.S.
639 (2008).  In Bridge, a losing bidder for the purchase of city tax liens sued the winning bidder
for fraudulently violating the bidding rules.  It was undisputed that the defendant had only made

Here, the <u>De Sole</u> Plaintiffs purchased a painting for $8.4 million that was represented to be a genuine Mark Rothko, but which turned out to be a forgery.  (<u>See</u> <u>De Sole</u> Am. Cmplt. ¶ 180)  Similarly, Howard purchased what was represented to be an authentic de Kooning for $4 million, but that painting likewise was determined to be a forgery.  (<u>Howard</u> Cmplt. ¶ 241; <u>De</u> <u>Sole</u> Am. Cmplt. ¶ 133).  These allegations are sufficient to demonstrate that both the De Soles and Howard suffered injury arising out of the acts of the alleged racketeering enterprise.

## IV.    <u>VIOLATION OF 18 U.S.C. § 1962(d):  RICO CONSPIRACY CLAIM</u>

### A.    <u>Applicable Law</u>

Section 1962(d) prohibits any person from conspiring to violate any of the substantive provisions of subsections § 1962(a)-(c).  A RICO conspiracy claim requires an allegation that the defendants agreed to participate "'in a charged enterprise's affairs' through a

---

representations to the city auctioning off the tax liens, and had not made any misrepresentations to the plaintiff.  The defendant argued that the link between the RICO violation and the injury was thus too attenuated to support standing.  In rejecting this argument, the Supreme Court stated that

> . . . first-party reliance [is not] necessary to ensure that there is a sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury to satisfy the proximate-cause principles . . . .  Again, this is a case in point. Respondents' alleged injury – the loss of valuable liens – is the direct result of petitioners' fraud.  It was a foreseeable and natural consequence of petitioners' scheme to obtain more liens for themselves that other bidders would obtain fewer liens.  And here . . .  there are no independent factors that account for respondents' injury, there is no risk of duplicative recoveries by plaintiffs removed at different levels of injury from the violation, and no more immediate victim is better situated to sue.

<u>Bridge</u>, 553 U.S. at 658.

Here, Plaintiff's alleged injury – the purchase of forged paintings – is the direct result of Rosales' fraud.  "It was a foreseeable and natural consequence of [Rosales'] scheme [to sell forged paintings]" that individuals such as Plaintiffs would suffer injury.  <u>Id.</u>

pattern of racketeering, 'not a conspiracy to commit predicate acts.'" <u>United States v. Pizzonia</u>, 577 F.3d 455, 463 (2d Cir. 2009) (quoting <u>United States v. Persico</u>, 832 F.2d 705, 713 (2d Cir. 1987)). The <u>Reves</u> "operation or management" test, however, does not apply to RICO conspiracy. <u>Pizzonia</u>, 577 F.3d at 462 n. 4. "Assuming that a RICO enterprise exists, [one] must prove only that the defendants . . . know the general nature of the conspiracy and that the conspiracy extends beyond [their] individual roles." <u>United States v. Zichettello</u>, 208 F.3d 72, 99 (2d Cir. 2000) (quotes and citations omitted); <u>see also</u> <u>Salinas v. United States</u>, 522 U.S. 52, 64 (1997) ("A person . . . may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense."); <u>see</u> <u>United States v. Yannotti</u>, 541 F.3d 112, 122 (2d Cir. 2008) ("[D]efendant need only know of, and agree to, the general criminal objective of a jointly undertaken scheme.").

      **B.**      <u>**Analysis**</u>

          **1.**      <u>**De Sole**</u>

      Defendants argue that the <u>De Sole</u> Plaintiffs' claims under the RICO conspiracy provision, 18 U.S.C. § 1962(d), must be dismissed because they have failed to plead a legally sufficient substantive RICO violation. The Court has found, however, that the De Soles have adequately pleaded a substantive RICO claim as to Knoedler, Freedman, Rosales, and Andrade. The Court further concludes that the De Soles have adequately pleaded a RICO conspiracy claim as to these defendants.

      The <u>De Sole</u> Plaintiffs have pled facts demonstrating – as to these defendants – that they conspired with each other to commit predicate acts in furtherance of their scheme to sell forged artworks; that each of the individual defendants, by nature of their positions in the alleged racketeering enterprise, knew of the general nature of the conspiracy and facilitated the

furtherance of the conspiracy; and that none of these defendants withdrew from the conspiracy. The De Sole Plaintiffs' factual allegations are sufficient to make out a RICO conspiracy claim against Knoedler, Freedman, Rosales, and Andrade.

      **2.**     **Howard**

      Because Howard has failed to plead a substantive violation of RICO, § 1962(c), his RICO conspiracy claim under § 1962(d) must be dismissed. See, e.g., Fuji Photo Film U.S.A., Inc. v. McNulty, 640 F. Supp. 2d 300, 312 (S.D.N.Y. 2009) ("a plaintiff's RICO conspiracy claim fails if the plaintiff's substantive RICO claims are deficient") (internal citations omitted); Maersk, Inc. v. Neewra, Inc., 554 F. Supp. 2d 424, 462 (S.D.N.Y. 2008) ("There can be no RICO conspiracy without a substantive RICO violation.") (internal quotations omitted).

## V.    **FRAUD**

    **A.**    **Applicable Law**

      In New York, a claim for fraud consists of "(1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Granite Partners, L.P. v. Bear, Stearns & Co., 17 F. Supp. 2d 275, 286 (S.D.N.Y. 1998)).

      As noted earlier, Fed. R. Civ. P. 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b); In re Pfizer Inc. Sec. Litig., 584 F. Supp. 2d 621, 632-33 (S.D.N.Y. 2008). Particularity requires the plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Kottler, 607 F. Supp. 2d at 462 (quoting

Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted)).

      **B.**    <u>**Analysis**</u>

          The <u>De Sole</u> and <u>Howard</u> complaints' fraud claims are brought against Freedman and Knoedler.  (See <u>De Sole</u> Am. Cmplt. ¶¶ 136-49, First Claim for Relief; <u>Howard</u> Cmplt. ¶¶333-43, Third Claim for Relief.)  These claims meet the Rule 9(b) pleading standard.

          First, Plaintiffs specify the statements that they contend are fraudulent by pointing to particular declarations made by Freedman, on behalf of Knoedler, concerning the origin and provenance of the paintings.  (<u>De Sole</u> Am. Cmplt. ¶¶ 51, 64-66; <u>Howard</u> Cmplt. ¶ 230)  Plaintiffs have also identified the material information Freedman and Knoedler failed to disclose regarding the origin of the paintings.  (<u>De Sole</u> Am. Cmplt. ¶ 69; <u>Howard</u> Cmplt. ¶ 232)  Second, Plaintiffs identify the speaker as Freedman, who was then president of Knoedler.  (<u>De Sole</u> Am. Cmplt. ¶¶ 51-58; <u>Howard</u> Cmplt. ¶¶ 226, 228, 230)  Third, Plaintiffs specify where and when the statements were made.  The De Soles allege that they discussed the alleged Rothko with Freedman at the Knoedler Gallery in the fall of 2004.  (<u>De Sole</u> Am. Cmplt. ¶ 50)  Howard alleges that he and Freedman discussed the de Kooning at the New York Armory art show in February 2007, and later at the Knoedler Gallery.  (<u>Howard</u> Cmplt. ¶¶ 221-229, 236)  Fourth, the Plaintiffs explain why the statements Freedman made to them were fraudulent, describing in detail the conspiracy perpetrated by the Defendants.  This proof has been discussed in connection with the RICO claim, and the Court will not repeat that discussion here.  In sum, Plaintiffs have satisfied Rule 9(b)'s heightened pleading requirement.

          Plaintiffs have also pleaded sufficient facts to make out the five substantive elements of a fraud claim.  The first element is a misrepresentation of a material fact.  As

discussed above, Plaintiffs have sufficiently alleged that Freedman, on behalf of Knoedler, misrepresented the origin and provenance of the works they purchased through false statements and omissions.

Freedman and Knoedler contend, however, that "a statement of who painted a work of art is merely an 'educated guess or opinion,'" and therefore "not actionable as fraud." Defendants cite no case law that supports their argument, which is not an accurate statement of the law.  See Rosen v. Spanierman, 894 F.2d 28 (2d Cir. 1990); Levin v. Dalva Bros., 459 F.3d 68, 77 (1st Cir. 2006) ("where an art merchant states to a lay person that a piece is by a specific author or can be attributed to a specific period," that representation is a statement of fact and not of opinion) (citing N.Y. Cult. Arts Law, § 13.01 (McKinney's 2004)).

The second element requires Plaintiff to plead the falsity of the misrepresentations.  As discussed in connection with the RICO claims, Plaintiffs have pleaded facts demonstrating why numerous statements made by Freedman about the origin and provenance of the paintings they purchased are false.

The third element requires a plaintiff to plead scienter, or intent to defraud. Although a plaintiff may make general allegations of scienter, he must allege "'facts that give rise to a strong inference of fraudulent intent.'"  B & M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 481 (S.D.N.Y. 2010) (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).  As discussed in connection with the RICO claims, Plaintiffs have offered ample evidence that Freedman knowingly made materially false statements to Plaintiffs and their agents about the origin and provenance of the paintings they purchased.

Element four requires reasonable reliance on a defendant's misrepresentation. This is the only element that Freeman and Knoedler contest.  They contend that Plaintiffs are

49

sophisticated art collectors or, alternatively, became sophisticated under the law, because they

had art consultants advising them about their purchase.  (De Sole Dkt. No. 25 at 25; Howard Dkt.

No. 40 at 16-17)  Defendants further argue that Plaintiffs failure to conduct an investigation

before their purchases defeats reasonable reliance.  (De Sole Dkt. No. 25 at 27; Howard Dkt.

40 at 18-19)

        "The question of what constitutes reasonable reliance is always nettlesome

because it is so fact-intensive."  Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d. 91, 98 (2d

Cir. 1997)  Generally, courts "consider the entire context of the transaction, including factors

such as its complexity and magnitude, the sophistication of the parties, and the content of any

agreements between them."  Emergent Capital Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d

189, 195 (2d Cir. 2003)  However, "if plaintiff has the means of knowing, by the exercise of

ordinary intelligence, the truth, or the real quality of the subject of the representation, he must

make use of those means, or he will not be heard to complain that he was induced to enter into

the transaction by misrepresentations."  Schlaifer Nance & Co., 119 F.3d. at 98; see also Crigger

v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2003)("A plaintiff cannot close his eyes to an

obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and

investigation if he has the ability through ordinary intelligence, to ferret out the reliability or

truth about an investment. . . ."

        The issue of whether Plaintiffs' reliance was reasonable cannot be resolved as a

matter of law at this stage of the proceedings.  Knoedler was a highly esteemed art gallery that

had been in business for more than one hundred years, and Defendants have not shown as a

matter of law that Plaintiffs should have suspected a fraud.  Whether Plaintiffs are sophisticated

art collectors, or whether they are treated under the law as sophisticated parties because they

used art advisers, cannot be resolved as a matter of law at the pleading stage.  The case cited by

Freedman and Knoedler for the proposition that non-sophisticated parties may become

sophisticated parties through their use of art consultants was decided at summary judgment, after

a complete factual record had been developed.  See Levin v. Gallery 63 Antiques Corp., No. 04

Civ. 1504, 2006 WL 2802008 (S.D.N.Y. Sept. 28, 2006).

The fifth element of fraud requires that damage to the plaintiff be caused by

reliance on the defendant's misrepresentations and omissions.  Plaintiffs have demonstrated that

their damages are predicated on such reliance.  (De Sole Am. Cmplt. ¶ 142-49; Howard Cmplt. ¶

339)

Freedman and Knoedler's motions to dismiss Plaintiffs' fraud claims will be

denied.

## VI.    FRAUDULENT CONCEALMENT

### A.    Applicable Law

"The elements of a fraudulent concealment claim under New York law are:  (1) a

duty to disclose material facts; (2) knowledge of material facts by a party bound to make such

disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6)

damages."  Woods v Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (cting Aetna Cas.

& Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005); see also Brass v. Am.

Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (New York recognizes a duty to disclose by

a party to a business transaction in three situations:  "first, where the party has made a partial or

ambiguous statement . . . second, when the parties stand in a fiduciary or confidential

relationship with each other . . . and third, 'where one party possesses superior knowledge, not

readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'").

With respect to the duty to disclose, "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair." Miele v. Am. Tobacco Co., 2 A.D.3d 799, 803 (2d Dept. 2003); see also Abrams v. Gen. Motors Corp., 120 Misc.2d 371, 374 (N.Y. Sup. Ct. 1983) ("If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and the silence would constitute fraud."); Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 293 (1942) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact.").

### B.   Analysis

Freedman and Knoedler argue that Plaintiffs' fraudulent concealment claims should be dismissed because they did not have a confidential or fiduciary relationship with Plaintiffs and therefore did not have a duty to disclose.   (De Sole Dkt. No. 25 at 33; Howard Dkt. No. 40 at 26)

Freedman and Knoedler have, however, ignored the case law holding that a fraudulent concealment claim may be brought where a defendant has made "a partial or ambiguous statement" or "where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Brass, 987 F.2d at 150.  Here, Plaintiffs have pled facts adequate for either theory.  (See, e.g., De Sole Am.

Cmplt. ¶¶ 3, 5, 69, 76; <u>Howard</u> Cmplt. ¶¶ 232, 345-47)  Freedman and Knoedler's motions to

dismiss the fraudulent concealment claims will be denied.[16]

## VII.   **CONSPIRACY TO COMMIT FRAUD**

### A.   **Applicable Law**

"To plead a valid cause of action for conspiracy under New York law, a plaintiff

must allege the primary tort [ – here, fraud – ] and four elements:  (a) a corrupt agreement

between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties'

intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or

injury."  <u>Kashi v. Gratsos</u>, 790 F.2d 1050, 1055 (2d Cir. 1986).

### B.   **Analysis**

#### 1.   **De Sole**

Defendants Freedman and Knoedler argue that the De Soles' conspiracy to

commit fraud claim must be dismissed against them because (1) the underlying fraud claim fails;

and (2) the conspiracy claim is duplicative of the underlying fraud claim against them.  (<u>De Sole</u>

Dkt. No. 25 at 34)  Defendant Andrade argues that this claim should be dismissed because the

<u>De Sole</u> Plaintiffs have failed to adequately allege his involvement in a conspiracy.  (<u>De Sole</u>

Dkt. No. 64 at 9)  Rosales argues that this claim should be dismissed because she "repeatedly

---

[16]  The cases cited by Defendants are not to the contrary.  <u>See</u> <u>Havell Capital Enhanced Mun.</u>
<u>Income Fund, L.P. v. Citibank, N.A.</u>, 84 A.D.3d 588, 589 (1st Dept. 2011) ("a sophisticated and
experienced hedge fund dealing in municipal bonds had access to the relevant market
information, and, moreover, its principal was admittedly aware that defendant's bids were too
low"); <u>Barron Partners v. Lab 123, Inc.</u>, 593 F. Supp. 2d 667, 672 (S.D.N.Y. 2009) ("defendants'
fraudulent inducement claim also must be dismissed because the alleged omission was
immaterial."); <u>Dopp v. Teachers Ins. & Annuity Ass'n of Am.</u>, No. 91 Civ. 1494, 1993 WL
404076, at *5 (S.D.N.Y. Oct. 1, 1993) (applying Delaware law); <u>HSH Nordbank AG v UBS AG</u>,
95 A.D.3d 185, 196 (1st Dept. 2012) ("Nowhere in the amended complaint does [plaintiff]
identify any kind of factual data [defendant] used in its internal analyses of the . . . deal that was
not readily accessible to finance professionals worldwide.")

refused to cooperate with Freedman," and thus there was no "corrupt agreement." (De Sole Dkt. No. 84 at 31)

        With respect to Freedman and Knoedler's first point, the court has not dismissed the fraud claim against them. As to the second point, the Court finds that the fraud conspiracy claim against them is in fact duplicative of the fraud claim against them, and accordingly must be dismissed.

        The Second Circuit has made clear that

> [a] plaintiff may not "reallege a tort asserted elsewhere in the complaint in the guise of a separate conspiracy claim." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 591 (2d Cir. 2005); accord Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc., No. 99 Civ. 9623, 2007 WL 1040809, 2007 U.S. Dist. LEXIS 27001 (S.D.N.Y. Apr. 2, 2007) ("[W]here the acts underlying a claim of conspiracy are the same as those underlying other claims alleged in the complaint, the conspiracy claim is dismissed as duplicative."); see also Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank, 755 F.2d 239, 251 (2d Cir. 1985) ("Count 7 added no new allegations to those of counts 1–6 except to reiterate that [defendants] had conspired to commit the acts heretofore described ... [and therefore] Count 7 was properly dismissed . . . as duplicative. . . .").

380544 Canada, Inc. v. Aspen Tech., Inc., 633 F. Supp. 2d 15, 36 (S.D.N.Y. 2009). Because the De Soles' fraud conspiracy claim against Freedman and Knoedler offers no new allegations beyond those alleged in support of their common law fraud claim against Freedman and Knoedler, the fraud conspiracy claim against Freedman and Knoedler will be dismissed as duplicative.

        With respect to Andrade and Rosales, the Court concludes – for the reasons discussed in connection with Plaintiffs' RICO claims – that the De Sole Plaintiffs have pleaded sufficient facts to demonstrate that both Andrade and Rosales had entered into a corrupt agreement with Freedman to sell forged paintings, including the forged painting sold to the De Soles, and that the De Sole Plaintiffs suffered damages as a result of the fraud conspiracy.

Accordingly, Andrade and Rosales' motions to dismiss the fraud conspiracy claim will be denied.

### 2.   **Howard**

Howard pleads a conspiracy to commit fraud claim against Freedman, Knoedler, and Hammer. That claim will be dismissed as to Freedman and Knoedler, because it is duplicative of Howard's fraud claim against them. With respect to Hammer, as discussed above, all claims against him have been dismissed on insufficiency grounds.

## VIII.   **AIDING AND ABETTING FRAUD**

### A.   **Applicable Law**

Aiding and abetting fraud has three elements: '"(1) that an independent wrong exist; (2) that the aider or abettor knows of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong."' Adelphia Recovery Trust v. Bank of Am., N.A., 624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting Landy v. Fed. Deposit Ins. Corp., 486 F.2d 139, 162-163 (3d Cir. 1973). To meet Rule 9(b) pleading requirements, '"a claim for aiding and abetting fraud requires plaintiff to plead facts showing the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission."' Adelphia Recovery Trust, 624 F. Supp. 2d at 312 (quoting Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000)).

### B.   **De Sole**

The De Soles allege an aiding and abetting fraud claim against Andrade and Rosales. [17] Andrade argues that the De Sole Plaintiffs have made only conclusory allegations

---

[17] The De Sole Plaintiffs have also named Hammer and Bergantinos Diaz in their aiding and abetting claim, while Howard's complaint includes an aiding and abetting claim against Hammer. All claims against Hammer and Bergantinos Diaz have already been dismissed.

against him, and that their Amended Complaint does not "allege facts that support the conclusion that Mr. Andrade provided substantial assistance to the fraud." (De Sole Dkt. No. 64 at 7-8) Rosales argues that the De Sole Plaintiffs have not adequately alleged a fraud or that she had knowledge of a fraud.   (De Sole Dkt. No. 84 at 24-29)

As discussed in connection with Plaintiffs' RICO claims, the De Soles' Amended Complaint pleads ample facts demonstrating Andrade and Rosales' critical role in the alleged fraud.  Andrade persuaded Rosales to bring the forged paintings to Knoedler and introduced Rosales to Freedman.  Andrade also helped create a new – and allegedly false – provenance story involving David Herbert, after the 2003 IFAR report cast doubt on Ossorio's role in serving as the fictional collector's advisor.   Rosales, of course, was a central player in the fraud, given that she was the source of the forged paintings.

Andrade and Rosales' motions to dismiss the aiding and abetting fraud claim will be denied.

## IX.   BREACH OF WARRANTY

Howard argues that Freedman and Knoedler's representations to him and Frankfurt constitute an express warranty under N.Y.U.C.C. § 2-313(1)[18].  (Howard Cmplt. ¶ 380)

---

[18]  N.Y.U.C.C. § 2-313 provides:

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

"An express warranty is "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  N.Y.U.C.C. § 2-313(1)(a).  "In order to demonstrate that an express warranty was created under New York law, a plaintiff 'must prove that the statement falls within the definition of warranty, that she relied on it, and that it became part of the basis for the bargain.'"  Kraft v. Staten Island Boat Sales, Inc., 715 F. Supp. 2d 464, 473 (S.D.N.Y. 2010) (quoting Daley v. McNeil Consumer Prod., Co., 164 F. Supp. 2d 367, 377 (S.D.N.Y. 2001).

Howard alleges that Freedman and Knoedler made the following representations to him and Frankfurt:

> (1) the [w]ork was created by Willem de Kooning in 1956-57; (2) the [w]ork was owned by the son of a Swiss private collector who obtained the [w]ork from de Kooning via David Herbert; (3) the [w]ork came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally; and (4) the [w]ork was a "rare" and "distinctive" example of a de Kooning landscape and that it was of "impeccable" quality and provenance.

(Howard Cmplt. ¶ 377)  Howard also argues that "the representations concerning authenticity and provenance in the invoice by defendants (who are art merchants) to Howard (who is not) constitute express warranties under § 13.01 of the New York Arts and Cultural Affairs Law." (Howard Cmplt. ¶ 381)

Freedman and Knoedler argue that Howard's breach of warranty claim must be dismissed because it is untimely and because Howard has not properly alleged a warranty.

---

> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

> (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

(Howard Dkt. No. 40 at 24-26; Dkt. No. 46 at 7)  In addition, Freedman argues that the warranty claim should be dismissed as against her because (1) she had no buyer-seller relationship with Howard; (2) she was not in privity with either Frankfurt or Howard; and (3) the alleged warranties constitute mere opinion.  (Howard Dkt. No. 46 at 7, 9)

Under Section 2-725(1) of New York's Uniform Commercial Code, an action for breach of warranty must be brought within four years of the date the cause of action accrues. N.Y. U.C.C. § 2-725(1).  Section 2-725(2) provides that

> [a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.Y. U.C.C. § 2-725(2).  The statute further provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach."  Id.  In sum, the plain language of the statute makes clear that the statute of limitations generally begins to run "on tender of delivery," and that lack of knowledge of a defect has no effect on the running of the limitations period.  See Brady v. Lynes, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *11 (S.D.N.Y. June 2, 2008) (argument that breach occurs upon discovery is "contrary to black letter law"); Morgan v. Abco Dealers, Inc., No. 01 Civ. 9564 (PKL), 2007 WL 4358392, at *6 (S.D.N.Y. Dec. 11, 2007); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001).

Here, it is undisputed that Howard purchased the painting from Freedman and Knoedler on June 13, 2007, and filed this action on July 6, 2012.  Accordingly, the breach of warranty claim is untimely unless the statute was extended for some reason.  Howard has not

pointed to any provision in the New York U.C.C. that would have extended the limitations period.[19]

        Having concluded that the breach of warranty claim is untimely, the Court must consider whether any equitable principle should be applied to preserve the claim.  Howard argues that the statute of limitations was equitably tolled as a result of Defendants' fraudulent concealment.  (Howard Dkt. No. 42 at 33)  The doctrine of equitable tolling applies where defendant's fraudulent conduct results in Plaintiff's lack of knowledge of a cause of action.  Pearl v. City of Long Beach, 296 F.3d 76, 82 (2d Cir. 2002).

        For equitable tolling to apply, plaintiff must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from commencing a timely action.  See Statistical Phone Philly v. NYNEX Corp., 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000).  "When deciding whether to toll the running

---

[19]  In Rosen v. Spanierman, 894 F.2d 28 (2d Cir. 1990), the Second Circuit considered N.Y. U.C.C. 2-725(2), which plaintiffs argued is an exception to the four-year limitations period. Rosen, 894 F.2d at 31.  N.Y. U.C.C. § 2-725(2) states:

> A cause of action accrues when a breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is discovered.

N.Y. U.C.C. § 2-725(2) (emphasis added).  The Rosen plaintiffs argued that "authenticity is a permanent quality, and any warranty of authenticity therefore necessarily extends to the future." Rosen, 894 F.2d at 31.

The Second Circuit rejected that argument, and concluded that the exception set forth in Section 2-725(2) does not apply in the context of a purchase of artwork.  Id. at 33.  The Second Circuit noted that "[a] contrary holding would provide purchasers of art with greater protection than purchasers of other types of goods, and would leave art dealers exposed to breach of warranty claims indefinitely. . . ."  Id.

of the statute of limitations, the issue is not whether Plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit." Statler, D.C., v Dell, Inc., 775 F. Supp. 2d 474, 483 (E.D.N.Y. 2011).

Howard alleges that "Freedman and Knoedler concealed . . . information [about authenticity and provenance] from Howard such that Howard was unable, despite due diligence, to bring his claims in a timely manner." (Howard Cmplt. ¶ 383)  To allege fraudulent concealment sufficient to justify equitable tolling, however, a plaintiff must either plausibly allege "that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." State of New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988).

Howard does neither.  His complaint alleges no facts indicating that Freedman and Knoedler prevented him from exercising his rights during the limitations period. Generalized or conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations.  See Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983).  Howard's complaint does not allege a single communication, interaction, or dealing with Freedman or Knoedler following the June 13, 2007 sale.  For equitable tolling to apply, a plaintiff may not rely on the same act that forms the basis for the claim – the later fraudulent misrepresentation must be for the purpose of concealing the former tort.  See Zumpano v Quinn, 6 N.Y.3d 666, 674 (2006).  Equitable tolling "'is triggered by some conduct on the part of the defendant after the initial wrongdoing; mere silence or failure to disclose the wrongdoing is insufficient.'"  Ross v. Louise Wise Servs., Inc., 8 N.Y.3d 478, 491-92 (2007) (quoting Zoe G. v. Frederick F.G., 208 AD.2d 675, 675-676 (2d Dept. 1994).

Accordingly, Freedman and Knoedler's motion to dismiss Howard's breach of warranty claim will be granted.

## X.      UNILATERAL AND MUTUAL MISTAKE

Howard asserts claims for unilateral mistake and mutual mistake against Knoedler.  (Howard Cmplt. ¶¶ 390-96)  Knoedler has moved to dismiss these claims, arguing that Howard did not have a contract with Knoedler, noting that Howard's "[c]omplaint acknowledges that Knoedler sent the invoice for the [w]ork to Frankfurt, and that the invoice was paid by Frankfurt."  (Howard Dkt. No 40 at 26 (citing Howard Cmplt. ¶¶ 234, 244, 250) Knoedler also argues that Frankfurt's mistake claims should be dismissed, because rescission cannot return the parties to the pre-sales status quo.  (Howard Dkt. No 40 at 26)  Finally, Knoedler argues that the mistake claims should be dismissed because Howard failed to exercise ordinary care and was "consciously ignorant" about the painting.  (Howard Dkt. No 40 at 28)

### A.      Applicable Law

#### 1.      Unilateral Mistake

A "unilateral mistake" occurs when "only one of the parties to a bilateral transaction is in error."  Healy v. Rich Prods. Corp., 981 F.2d 68, 73 (2d Cir. 1992).  "Under New York law, in order for a court to allow rescission of a contract on the basis of unilateral mistake, 'a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made.'"  Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 599 supplemented, 458 F. Supp. 2d 178 (S.D.N.Y. 2006) (quoting Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 795 (S.D.N.Y. 1993).

61

New York law does not permit reformation or rescission of a contract for unilateral mistake alone.  See Collins v. Harrison-Bode, 303 F.3d 429, 435 (2d Cir. 2002).  A unilateral mistake must be "coupled with some fraud." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1990); see also AMEX Assurance Co. v. Caripides, 316 F.3d 154, 161 (2d Cir. 2003) (holding that reformation requires "a mistake on one side, and fraud on the other").

### 2.     Mutual Mistake

"A 'mutual mistake' occurs when 'both . . . parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent.'" Creative Waste Mgmt., Inc., 429 F. Supp. 2d at 608 (quoting Healy, 981 F.2d at 73 (quoting 21 N.Y. Jur.2d Contracts § 121 (1982)).  Under New York law, "[w]hile mutual mistake will justify rescission where the mistake exists at the time the contract is entered into and the mistake is substantial . . . it may not be invoked by a party to avoid the consequences of its own negligence."  Da Silva v. Musso, 53 N.Y.2d 543 (1981) ; Vandervort v. Higginbotham, 222 A.D.2d 831, 832 (3rd Dept. 1995) (citations omitted).

"Even where a party must go beyond its own efforts in order to ascertain relevant facts (such as obtaining experts' reports), courts have held that the party must bear the risk of mistake if it chooses to act on its otherwise limited knowledge." P.K. Dev., Inc. v. Elvem Dev. Corp., 226 A.D.2d 200, 201-02 (1st Dept. 1996).   Thus, a party "bears the risk of mistake when . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient." Restatement (Second) of Contracts § 154.

B.    <u>Analysis</u>

Knoedler's threshold argument is that there is no contract between Howard and Knoedler.  Howard has pled sufficient facts at this stage, however, to demonstrate that Frankfurt was acting as his agent in purchasing the painting from Knoedler.  (<u>Howard</u> Cmplt. ¶ 242) Howard negotiated the purchase price directly with Freedman, and Knoedler delivered the art directly to Howard's home.  (<u>Howard</u> Cmplt. ¶¶ 238, 240-41)  This Court will not dismiss Howard's mistake claims at this stage of the proceedings on the basis that Howard had no contract with Knoedler.

Even if there were no contract between Howard and Knoedler, however, and the contract was actually between Frankfurt and Knoedler, Frankfurt has assigned all of his claims to Howard.  (<u>Howard</u> Cmplt. ¶ 247)  "'An assignment is a transfer or setting over of property, or of some right or interest therein, from one person to another, and unless in some way qualified, it is properly the transfer of one whole interest in an estate, or chattel, or other thing.'"  <u>In re Stralem</u>, 303 A.D.2d 120, 122 (2d Dept. 2003) (quoting <u>Griffey v. N.Y. Cent. Ins. Co.</u>, 100 N.Y. 417, 422 (1885)).  "[U]nder New York law, contracts are freely assignable in the absence of 'clear language expressly prohibiting assignment.'"  <u>Elliott Assocs., L.P. v. Republic of Peru</u>, 948 F. Supp. 1203, 1211 (S.D.N.Y. 1996) (quoting <u>Pravin Banker Assocs., Ltd. v. Banco Popular del Peru</u>, 895 F. Supp. 660, 668 (S.D.N.Y. 1995)); <u>Stralem</u>, 303 A.D.2d at 122 (same).

This Court further concludes that Howard has adequately pled both his unilateral mistake and mutual mistake claims against Knoedler.  As to unilateral mistake, it is clear (and uncontested) that Howard believed that the work he purchased was a genuine de Kooning.  (<u>Howard</u> Cmplt. ¶ 392)  Moreover, Howard has adequately pled that Knoedler knew or should have known that the de Kooning was not authentic, but that Freedman misrepresented it as such

anyway.  (Howard Cmplt. ¶¶ 232, 270).  As discussed above, Howard has sufficiently pleaded allegations of fraud against Knoedler.  Collins, 303 F.3d at 435.

While Knoedler argues that both mistake claims should be dismissed because Howard did not exercise ordinary care and was consciously ignorant of the work he purchased, these issues cannot be resolved as a matter of law at this stage of the proceedings.  The cases cited by Knoedler (Howard Dkt. No. 40 at 28-29) were decided at summary judgment, not on the pleadings.

Knoedler's motion to dismiss Howard's mistake claims will be denied.

## XI.   LEAVE TO AMEND

Leave to amend a complaint should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2).  It is within the sound discretion of the district court to grant or deny leave to amend.  McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). "Leave to amend, though liberally granted, may properly be denied for:  'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'"  Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

None of the exceptions discussed in Ruotolo are present here.  Moreover, "[r]epleading is generally permitted where fraud claims are dismissed for lack of specificity." Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F. Supp. 1224, 1233 (E.D.N.Y. 1996) (citing Official Publ'n., Inc. v. Kable News Co., 884 F.2d 664, 669 (2d Cir. 1989) (reversing district court's denial of leave to replead).  Accordingly, Plaintiffs are granted leave to amend.  Any amended complaint is to be filed by October 21, 2013.

## CONCLUSION

For the reasons stated above, with respect to the <u>De Sole</u> action, Freedman and Knoedler's motion to dismiss (<u>De Sole</u>, 12 Civ. 2313 (Dkt. No. 24)) is granted as to the De Soles' conspiracy to commit fraud claim, but is otherwise denied.  Hammer and Bergantinos Diaz's motions to dismiss (<u>De Sole</u>, 12 Civ. 2313 (Dkt. Nos. 27, 75)) are granted.  Andrade and Rosales' motions to dismiss (<u>De Sole</u>, 12 Civ. 2313 (Dkt. Nos. 63, 71)) are denied.

With respect to the <u>Howard</u> action, Hammer and 8-31 Holding Inc.'s motions to dismiss (<u>Howard</u>, 12 Civ. 5263 (Dkt. Nos. 35, 39)) are granted.  Freedman and Knoedler's motions to dismiss (<u>Howard</u>, 12 Civ. 5263 (Dkt. Nos. 39, 45)) are granted as to Howard's (1) RICO; (2) RICO conspiracy; (3) conspiracy to commit fraud; and (4) breach of warranty claims.  Defendant Freedman and Knoedler's motions to dismiss are otherwise denied.  Andrade and Rosales' motions to dismiss (<u>Howard</u>, 12 Civ. 5263 (Dkt. Nos. 48, 74)) are granted as to Howard's RICO and RICO conspiracy claims , but are otherwise denied.  Bergantinos Diaz's motion to dismiss (<u>Howard</u>, 12 Civ. 5263 (Dkt. No. 76)) is granted.

The Clerk of the Court is directed to terminate the following motions:  <u>De Sole</u>, 12 Civ. 2313 (Dkt. Nos. 24, 27, 63, 71, 75); <u>Howard</u>, 12 Civ. 5263 (Dkt. Nos. 35, 39, 45, 48, 74, 76)

Dated: New York, New York
       September 30, 2013

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

65