

GREGORY A. CLARICK
212 633 4313
GCLARICK@CGR-LAW.COM

**By ECF & Fax**                                                December 5, 2013

Hon. Paul G. Gardephe
United States District Court for the
Southern District of New York
40 Foley Square, Room 2204
New York, NY 10007

### *Domenico De Sole, et al. v. Knoedler Gallery, LLC, et al.*, 12 Civ. 2313 (PGG)

Dear Judge Gardephe:

We write on behalf of plaintiffs Domenico and Eleanore De Sole in response to four pre-motion letters submitted on November 18, 2013, by defendants (1) Ann Freedman, (2) Michael Hammer, (3) 8-31 Holdings, Inc., and (4) Knoedler Gallery, pursuant to Rule 4A.[1]  The letters declare defendants' intention to move to dismiss the De Soles' Second Amended Complaint, filed on October 21, 2013 ("SAC").  Defendants' proposed motions are little more than a delay tactic and, in Freedman's case, an egregiously improper one.  Now that the dozens of paintings at the heart of this case have been declared forgeries—including the $8.4 million "Rothko" sold to the De Soles—it is time for this case to move toward a resolution and for defendants to begin the process of repaying the $60 million they pocketed from selling these bogus works.  The Court should not permit these proposed motions.

**Defendant Ann Freedman**

Freedman's proposed "motion to dismiss" is—by her own admission—an untimely motion for reconsideration of this Court's denial of her prior motion to dismiss, which sustained the very same claims Freedman again seeks to challenge.  This Court should bar Freedman from filing such an improper motion and direct her to answer the SAC forthwith.

Freedman does not even attempt to hide the fact that her proposed motion seeks reconsideration.  She admits that she proposes filing a motion to dismiss "rather than filing a motion for reconsideration of the Court's September 30, 2013 Opinion and Order," which sustained the De Soles' claims against Freedman as presented in their Amended Complaint. (Freedman Ltr. at 1 n.1.)  Freedman then presents four pages of argument that are explicitly framed by the reconsideration standard, namely, that this Court supposedly "overlooked critical facts and controlling principles of law" in its 65-page Opinion.  (*Id.* at 2.)

---

[1] Defendant Andrade submitted an Answer to the SAC on October 21, 2013.  Defendants Rosales and Bergantinos Diaz defaulted, failing to submit a pre-motion letter, motion, or Answer.

Hon. Paul G. Gardephe
December 5, 2013
Page 2

Freedman's proposed motion is improper and a sham effort to delay her responsive pleading.  Freedman's time to file a motion for reconsideration expired on October 15, 2013, more than a month before she submitted her letter.  Freedman has no right to file her belated challenge to the Opinion.  *See* Local R. 6.3 (motion for reconsideration must be filed with fourteen days).  Indeed, her letter does not even attempt to explain (a) why she did not file a timely reconsideration motion, or (b) why she believes that a motion to dismiss the De Soles' SAC is an appropriate manner of seeking reconsideration.

The content of Freedman's proposed motion confirms that it is an improper, frivolous delay tactic: Freedman's letter does not identify any "matters or controlling decisions which counsel believes the Court has overlooked" that could support a reconsideration motion.  *Id.*  Her letter cites *no* "controlling authority" of any kind, but instead recites the same arguments this Court already has rejected—*i.e.*, that De Soles could or should have uncovered her massive fraud and racketeering scheme earlier—citing in support the very same cases she previously relied on, including *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224  (S.D.N.Y. 1995), *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228 (S.D.N.Y. 1999), *Terra Secs. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541 (S.D.N.Y. 2011), *Cohen v. Cohen*, 773 F. Supp. 2d 373 (S.D.N.Y. 2011), *ACA Galleries, Inc. v. Kinney*, 928 F. Supp. 2d 699 (S.D.N.Y. 2013), and *HSH Nordbank AG v. UBS AG*, 95 A.D.3d 185 (1st Dep't 2012).  (*See* Freedman Ltr. at 2-5.)  Every one of these cases was fully briefed by the parties during the prior round of motions to dismiss, and this Court expressly rejected defendants' arguments based on these authorities.  (*See* Sept. 30 Op. at 21-25, 48-51.)  Freedman's repetition of her prior arguments is no basis for another motion, whether for reconsideration or dismissal.  *See Ge Dandong v. Pinnacle Performance Ltd.*, --- F. Supp. 2d ----, 2013 WL 4482509, at *9 (S.D.N.Y. Aug. 22, 2013) (rejecting second motion to dismiss under law of the case doctrine where defendants' argument "boils down to a contention that [the prior Judge] got it wrong"); *Boyd v. J.E. Robert Co.*, 2010 WL 5772892, at *16 (E.D.N.Y. Mar. 31, 2010) (same where defendants moved "merely to reprise arguments offered in support of prior motions to dismiss that were ultimately rejected by this Court"); *In re Houbigant, Inc.*, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996)  (motion for reconsideration is not vehicle to present "those issues already considered when a party does not like the way the original motion was resolved").

Similarly, Freedman disingenuously asserts that her motion is justified by the "new allegations" made in the SAC, *see* Freedman Ltr. at 1-2, but the letter is nearly devoid of actual references to "new" allegations.  The *only* new allegation in the SAC that Freedman cites in her letter is buried in a footnote, namely, the allegation that the De Soles have now learned that Freedman's role in fabricating the provenance of the works at issue was even *more* extensive than previously known.  *See* Freedman Ltr. at 4 n.4 (discussing allegation that Freedman personally fabricated story that Alfonso Ossorio had some connection to the Rosales Collection works).  This "new allegation"—which underscores Freedman's personal culpability—in no way justifies this Court's reconsideration of its prior ruling or forms the basis for a new, non-frivolous motion to dismiss the same claims this Court has already upheld.

Hon. Paul G. Gardephe
December 5, 2013
Page 3

     Freedman should not file yet *another* motion, however styled, to dismiss the same claims this Court has sustained, based on the same arguments and authorities this Court has considered and rejected.  No case, rule, or doctrine justifies such a motion—and at least one, Local Rule 6.3, bars it.  Moreover, permitting such a motion would reward Freedman's misconduct by granting her the only relief she truly seeks: a reprieve from her obligation to file an Answer to the allegations against her, one which presents her with an array of unfortunate choices:  she can either (a) assert her Fifth Amendment rights, nearly ensuring her civil liability; (b) admit that certain damning facts are true; or (c) continue telling falsehoods about this scheme and run the risk that her admissions and denials will be used against her at a future criminal trial.  The Court should not countenance Freedman's sanctionable delay tactic and should require that Freedman expeditiously file a responsive pleading.

### Defendant Michael Hammer

     Michael Hammer takes the opposite approach: instead of claiming that unidentified "new allegations" warrant a new motion to dismiss, he simply pretends that the SAC has "no new allegations . . . about him that could support a claim."  (Hammer Ltr. at 1.)  This head-in-the-sand approach ignores the array of new allegations in the SAC concerning Hammer, which put to rest the issues the Court identified in its September 30 Opinion concerning the De Soles' prior claims against him.

#### *The SAC's New Allegations Regarding Hammer*

     As a general matter, this Court concluded that the allegations in the Amended Complaint were not sufficient to demonstrate that Hammer participated in the alleged fraud and RICO scheme, or that he "knew or should have known about the . . . fraud."  (Sept. 30 Op. at 33 (internal quotation marks omitted).)  The Opinion stated, *inter alia*: (1) that, while it was alleged that Hammer knew about the 2003 IFAR report—which declined to authenticate a Rosales Collection "Pollock"—the report only "question[ed] the alleged provenance of the work," and "d[id] not directly challenge its authenticity" (*id.* at 32); and (2) that while Hammer was aware of the "large profits" realized on Rosales Collection sales, no allegation identified "what mark-ups are customary in the industry for works created by artists of this stature" (*id.* at 33).

     Drawing on the discovery taken in the year after the filing of the Amended Complaint, the SAC adds numerous allegations about Hammer that squarely address the issues the Court identified and demonstrate beyond question that the De Soles have adequately pleaded that Hammer knew of, supported, and participated in the alleged fraud and RICO schemes.  Specific new allegations include:

- <u>Hammer Knew About Rosales and Every Rosales Collection Sale</u>:  The SAC alleges that, as Ann Freedman testified, Freedman personally informed Hammer about each and every Rosales Collection sale; that Hammer knew that Rosales was the source of these works; knew that these works were all purportedly "newly discovered" with no established provenance; and knew that Knoedler was "researching" the provenance in an effort to bolster it.  (SAC ¶ 47(a).)

Hon. Paul G. Gardephe
December 5, 2013
Page 4

Frank Del Deo—Freedman's successor—independently confirmed that Hammer and Freedman were in close contact and would have discussed Rosales and her Collection.  (*Id.* ¶ 47(b).) Finally, Hammer admitted under oath that he was "directly responsible for the operations" of Knoedler during the entire period in which the fraud was perpetrated.  (*Id.* ¶ 47(e).)

- The Rosales Profits Were Inexplicable By Art-World Standards—and Hammer Knew It:  The SAC now specifically alleges that, while art gallery commissions on sales typically range from 10% to 20%, the mark-up on Rosales Collection works was well over 200%, and was often far more—a clear red flag regarding the legitimacy of the Rosales transactions and the authenticity of the works.  (*Id.*  ¶ 44.)  Notably, the SAC also alleges that Hammer was well aware of this suspicious information:  an executive of Hammer Galleries—Knoedler's sister gallery, also owned by 8-31—testified that he was aware of the "large" profits Knoedler was making on the Rosales Collection sales, was "surprised that someone could make such large profits on a painting," and found the situation "troubling."  When he raised his concerns with another Hammer Galleries and 8-31 executive, he was assured that "Michael [Hammer] was aware" of the situation.  (*Id.* ¶ 47(c).)

- The IFAR Report Questioned the Authenticity of a Rosales Collection Work:  The SAC now clarifies that, in addition to rejecting the provenance story that Freedman and Rosales had concocted, the IFAR Report "directly suggested that the organization had a serious concern that the [Rosales Collection] Pollock might be a forgery."  (SAC ¶ 54.)  The SAC details—as does the IFAR Report—the questions IFAR raised about the work's authenticity, including the potential presence of a "suspect" signature and anomalous painting style.  (*Id.*)

- Hammer's Involvement After IFAR Was Extensive, Personal, and Intended to Support and Protect the Fraud:  As the SAC now alleges, Hammer (a) read the IFAR Report "very carefully" (in his words); (b) discussed it in detail with Freedman; (c) carefully reviewed a memo from 8-31 executives acknowledging that the Report questioned the "authenticity" and "authorship" of the supposed Pollock painting that was its subject; and (d) understood  that the Report raised "questions" and "concerns" about the work, which he "knew was delivered to Knoedler by Rosales and part of the broader Rosales Collection."  (*Id.* ¶ 58-61.)  Hammer also had numerous discussions with Knoedler attorneys at this time.  (*Id.* ¶ 58.)  And, critically, Hammer (as he testified) personally "insisted" that David Mirvish—who planned to partner with Knoedler and Freedman in investing in the work and attempting to profit from its re-sale—be provided a copy of the Report.  Hammer did *not*, however, direct that other, subsequent potential purchasers of the "Pollock" or any other Rosales Collection work be informed of the IFAR Report or its damning conclusions—and they, indeed, were not.  (*Id.* ¶ 61.)

- Hammer Knew That Knoedler Was Wholly Dependent on Rosales Sales:  Hammer attended regular 8-31 Board meetings at which Knoedler sales and expense figures were reviewed.  (*Id.* ¶ 47(d).)  Those figures showed that, for over a decade before it closed in 2011, Knoedler's profits were driven almost exclusively by the enormous, fraudulent sales of Rosales works.  (*Id.* ¶ 12(c).)  Indeed, in several years, *all* of Knoedler's profits were attributable to the Rosales Collection.  (*Id.* ¶ 46, 108.)

Hon. Paul G. Gardephe
December 5, 2013
Page 5

- <u>Hammer Personally Pocketed Millions from Rosales Sales</u>:  Due to his profit-sharing arrangement with 8-31, Hammer personally received millions during the course of the scheme that—as a result of his review of Knoedler's financials—he must have known were attributable solely to the suspiciously profitable Rosales Collection sales.  (*Id.* ¶ 48.)  Specifically, during the latter part of the scheme, Hammer received some $4.7 million in profit sharing from Knoedler, 91% of which was solely attributable to Rosales profits.  (*Id.* ¶ 109.)

- <u>Hammer Covered Up the Scheme When Freedman's "Resignation" Threatened to Expose It</u>:  Finally, the SAC alleges not only that Hammer fired Freedman after Knoedler received a grand jury subpoena in 2009, directed the public relations campaign that followed, and directed Knoedler to stop selling Rosales works (as did the prior pleading), it also more specifically alleges that Hammer personally wrote a letter to *every* Knoedler customer to falsely assure them than Freedman had simply "resigned"—a deliberate effort to paper over the fact that Hammer in fact had terminated Freedman due to the potential discovery of their massive fraudulent scheme.  (*Id.* ¶ 131.)

### *The New Allegations Support Fraud and RICO Claims Against Hammer*

Hammer's argument that there are no new allegations against him in the SAC to support a claim is utter nonsense.  The many new allegations directly address the concerns the Court identified in its Opinion, and demonstrate that Hammer's proposed motion should fail and, in fact, should not be made.

With respect to the RICO claim, the De Soles now adequately allege that Hammer had, to say the least, "some part in directing [the enterprise's] affairs." (Sept. 30 Op. at 30 (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 1779 (1993)).)  His extensive discussions with Freedman regarding the progress of the scheme, his direct handling of the scheme's most critical moment—the damning IFAR Report—his blatant cover-up to disguise and protect the scheme after the Government's investigation began, and his admitted responsibility for all of the gallery's affairs clearly meet that standard.  Moreover, Hammer's contention that he cannot be held liable under RICO because he did not personally commit or cause two predicate acts of wire fraud (Hammer Ltr. at 2) is precisely the argument that this Court properly rejected under governing Second Circuit authority when Freedman, Rosales, and Andrade offered it on prior motions to dismiss. (*See* Sept. 30 Op. at 41 (citing, *inter alia*, *City of New York v. Smokes-Spirits.com., Inc.*, 541 F.3d 425, 446 (2d Cir. 2008) ("defendant commits wire fraud where   he was one of the participants in a fraudulent scheme which was furthered by the use of interstate transmission facilities")).)

With respect the De Soles' claim that Hammer aided and abetted Freedman and Knoedler's fraud, Hammer's contention that the SAC does not sufficiently allege his "actual knowledge" of the scheme (Hammer Ltr. at 3) cannot withstand the slightest scrutiny.  (*See supra* p. 4.)  The alleged facts now give "rise to a strong inference of actual knowledge regarding the underlying fraud." *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 (S.D.N.Y. 2005).  Hammer's argument that the SAC does not allege that he provided "substantial assistance" to the fraud that was a proximate cause of the De Soles' injury (*id.*) fares no better.

Hon. Paul G. Gardephe
December 5, 2013
Page 6

As the authority cited by Hammer states, "'[s]ubstantial assistance' exists where a defendant 'affirmatively assists, helps to conceal, or by virtue of failing to act when required to do so enables the fraud to proceed.'" *Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007) (citation omitted). To take only the most obvious example, Hammer's decision to withhold the IFAR Report in 2003 from everyone but Knoedler's co-investor, David Mirvish, not only (a) "enable[d] the fraud to proceed" by covering up the questions that had been raised about the authenticity and provenance of these works, *id.*, it also (b) directly caused the De Soles' injury—namely, their purchase of an $8.4 million fake "Rothko" in 2004—because they would not have made that ill-fated purchase but for their ignorance of IFAR's troubling conclusions.

Hammer's proposed motion to dismiss the conspiracy to defraud claim fails for these same reasons. The self-serving assertion that it is "not plausible" that "the members of a conspiracy would have asked someone like Mr. Hammer to join the fraudulent conspiracy" is facially absurd. (Hammer Ltr. at 4.) Hammer contends that the other conspirators "did not need him" to accomplish their criminal goals (*id.*), but that is not so: Hammer was the owner of Knoedler and the person ultimately responsible for its operations. Indeed, as Hammer demonstrated in 2003, in connection with IFAR, he was the ultimate decision-maker for the gallery, and, in 2009, he was the only person capable of pulling the plug on the scheme. Thus, Hammer is not only a "plausible" co-conspirator, but a *necessary* one. Likewise, for the reasons stated above, the contentions that Hammer did not (a) commit an "overt act" in furtherance of the fraud, or (b) know that the De Soles were being lied to, are without foundation. (Hammer Ltr. at 4-5.) Hammer well knew that the De Soles were being sold a Rosales Collection painting but not being told critical information about its origins or the red flags that already had been raised concerning the Rosales Collection, and his repeated cover-ups of the scheme were certainly undertaken "in furtherance of the fraud."

Hammer has no viable motion and the Court should likewise direct him to answer the SAC forthwith.

## Defendant 8-31 Holdings

The pre-motion letter submitted by 8-31 Holdings, Inc., rehashes arguments it made opposing the De Soles' April 19, 2013 motion for leave to amend to add 8-31 as a defendant. Those arguments have no more merit now than they did then.[2]

8-31 initially asserts that the De Soles' claims are based on a "misunderstanding of how an LLC operates" because, under Delaware law, "the debts, obligations and liabilities of the

---

[2]  Although (a) the De Soles submitted a motion for leave to amend to add 8-31, which was fully briefed as of May 24, 2013 (*see* October 4, 2013 Clarick Ltr. to Court at 1-2); and (b) this Court then granted, in its September 30, 2013 Opinion, leave to amend the pleadings (Op. at 64), 8-31 nevertheless asserts that the De Soles do not have the right to include 8-31 in the SAC. (*See* 8-31 Ltr. at 1.) Given the De Soles' motion and this Court's ruling, the contention is meritless.

Hon. Paul G. Gardephe
December 5, 2013
Page 7

LLC"—here, Knoedler—"are not the responsibility of the LLC's member," in this instance, 8-31, Knoedler's sole owner and parent.  (8-31 Ltr. at 1.)  This legal principle is meaningless here: the De Soles do not contend that 8-31 is responsible for the massive fraud perpetrated by Knoedler simply because it owned Knoedler.  Rather, 8-31 is liable because it disregarded Knoedler's corporate form, used it like a piggy bank, and, in sum, acted as the company's alter ego.  Indeed, if there is anyone who suffers from a "misunderstanding of how an LLC operates" in relation to its member/owner, it is 8-31, which dramatically failed to maintain any distinction between it and its subsidiary.

  *Alter Ego Liability*

  "To prevail on an alter ego theory under Delaware law, a plaintiff must show: (1) that the parent and subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness . . . [is] present."  *Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (citations and internal quotation marks omitted).  The SAC's alter ego allegations easily clear this hurdle.

  *First*, the SAC alleges that Knoedler and 8-31 operated as a single economic entity, with 8-31 wholly disregarding Knoedler's separate corporate identity and exercising total control and domination over it.  8-31's letter seeks to pick these allegations apart (or, in some instances, to ignore them), asserting that none, standing alone, is sufficient to support an alter ego claim.  (8-31 Ltr. at 3.)  Viewed in their entirety, which 8-31 steadfastly refuses to do, the allegations tell a clear story:

  • <u>8-31 and Knoedler Were Physically Indistinguishable</u>: 8-31 was housed in the building that bore only Knoedler's name, did not have offices separate from Knoedler's space, and did not pay any rent to Knoedler for use of the space in Knoedler's building. (SAC ¶ 163-64.)  Likewise, 8-31 employees used Knoedler email addresses and shared a phone system with Knoedler. (*Id.* ¶ 165.)  An observer would have no idea where 8-31 ended and Knoedler began.

  • <u>Knoedler Maintained No Separate Corporate Identity:</u>  Knoedler had no board of directors, no separate financial records, did not pay its own taxes, did not file its own tax returns, and did not pay its own employees directly (but rather through 8-31).  (*Id.* ¶ 178.)

  • <u>8-31's Subsidiaries Were Treated as Interchangeable</u>: 8-31, Knoedler and Hammer Galleries indiscriminately shared funds, at 8-31's sole direction.  Knoedler transferred funds directly to Hammer Galleries (or indirectly, via 8-31) when the latter needed cash to support its operation.  The transfers occurred without any loan agreement between the two entities, without a charge of interest, and without any final accounting or allocation made to ensure that the appropriate LLC was charged for its own expenses. (*Id.* ¶¶ 168, 170.)

  • <u>8-31 Used Knoedler as a Piggybank</u>: Whenever 8-31 decided that it needed money, for whatever purpose, its CFO (who was also Knoedler's CFO) would simply transfer funds from Knoedler's account to 8-31's account (in which funds from 8-31, Hammer Galleries, and

Hon. Paul G. Gardephe
December 5, 2013
Page 8

Knoedler were comingled). Knoedler had no independent say in the matter—indeed, there was no independent Knoedler officer to exercise such judgment in any event. These transfers occurred with no loan documentation and no interest charge, and likewise never were repaid. (*Id.* ¶¶ 169, 171.) Between 2001 and 2012, 8-31 withdrew $23 million from Knoedler in this slap-dash, interest- and document-free manner—nearly the entire profit Knoedler earned during this period. (*Id.* ¶ 172.)

- <u>8-31 Altered Knoedler's Accounting To Suit Its Own Needs</u>:  Knoedler initially classified its transfers as "interdivisional receivables," that is, money that 8-31 owed back to Knoedler. Indeed, this "receivable" grew to become Knoedler's largest asset. Then, in 2010— just after the government began its investigation into Knoedler's fraud—8-31 promptly and unilaterally "reclassified" this "interdivisional receivable" as a "dividend," which, according to 8-31, meant that no repayment was necessary. 8-31 thus decreed that Knoedler would forgive tens of millions of dollars in loans that Knoedler had extended to 8-31 over the last decade, without any consideration, recompense, or business justification.  (*Id.* ¶¶ 171-75.)

- <u>Corporate Contracts and Formalities Were Ignored</u>:  8-31 and Knoedler also consistently disregarded corporate formalities and agreements. For example, the companies entered into a "Management Agreement" in 2001 calling for 8-31 to render certain services for Knoedler in exchange for a management fee. But while 8-31 employees and contractors did, in fact, render many of the services called for by the agreement, 8-31 never charged or collected the fee. Indeed, the current CFO for both 8-31 and Knoedler admitted that she did not consider, reference, or enforce the Management Agreement in the performance of her duties. (*Id.* ¶¶ 176). The idea that these two supposedly separate companies might have binding contractual obligations to one another seems not to have occurred to her.

These allegations, viewed together, paint a picture of two companies operating, for all intents and purposes, as a single entity, and clearly satisfy the first prong of the alter-ego test. *See, e.g.*, *NetJets Aviation, Inc. v. LHC Communications, LLC*, 537 F.3d 168, 182-83 (2d Cir. 2008) (sustaining alter ego claim under Delaware law where, *inter alia*, the LLC's sole member "essentially treated [the subsidiary's] bank account as one of his own pockets, [into which he reached when he desired or needed funds," booking the transaction as a "receivable" but failing to "prepare any "written agreements" or establish a "repayment program."). Indeed, even the cases relied on by 8-31 establish the soundness of the De Soles' claim.  *See Herzlinger v. Nichter*, 2011 WL 1434609, at *9 (S.D.N.Y. Feb. 9, 2011) (without more, shared office space, resources and employees are insufficient to show alter ego liability, because "trier of fact must consider the absence of corporate formalities, movement of funds between the two entities, overlap in ownership and directors, amount of business discretion in each entity, and whether the two entities are independent profit centers"—all of which show alter ego liability here); *126 Mulberry Street Realty Corp. v. Diamond State Ins. Co.*, 2009 WL 1835935, at *3 (S.D.N.Y. June 26, 2009) (without more, joint ownership by the same principal, operation from same building and use of shared equipment were not enough to establish alter ego liability where challenged parties employed separate staffs, filed separate tax returns, and occupied separate

Hon. Paul G. Gardephe
December 5, 2013
Page 9

floors with separate entrances in the shared building—the very opposite being true here, not to mention 8-31's financial domination and control of Knoedler.)

*Second*, the SAC also alleges facts showing that 8-31 used Knoedler's corporate form for fraudulent and unjust purposes. (8-31 Ltr. at 4.) The SAC alleges that Knoedler's entire business was, in substance, a racketeering scheme designed to sell fake artwork and enrich Hammer, 8-31, and Freedman, and that the company simply would not have existed without that scheme. (SAC ¶¶ 1, 46, 108.) The SAC further alleges that 8-31 abused Knoedler's purportedly separate corporate identity to protect its ill-gotten gains and compound the injustice done to the fraud's victims. As the SAC states, 8-31 "reclassified" Knoedler's prior loans to 8-31 to take some $23 million off Knoedler's books *just after* the Government's investigation into the alleged fraud began. (*Id.* ¶ 175.) The SAC alleges the natural inference to be drawn from this transaction: "this 'reclassification' was done with the purpose of shielding Knoedler's ill-gotten gains from the victims of the fraud, such as the De Soles." (*Id.*) Likewise, although Knoedler and 8-31 signed a "liquidation plan" after Knoedler closed in 2011 that required Knoedler to reserve funds for potential liabilities arising from legal actions against Knoedler, 8-31 and Knoedler ignored the directive—the CFO of 8-31/Knoedler was not even aware of the plan— and, as a result, between 2011 and 2012, 8-31 and/or Hammer Galleries took from Knoedler an additional $1 million in "interdivisional transfers," without consideration or documentation and without reference to Knoedler's contractual obligations. (*Id.* ¶ 177.)

In sum, when Knoedler got in trouble and the specter of civil and criminal claims arose, 8-31 took every step it could to strip Knoedler of its assets and to ensure that the ill-gotten millions that Knoedler had transferred to 8-31 over the years would be shielded from the gallery's inevitable creditors. This abuse of the corporate form is the quintessence of injustice that alter ego law is designed to stop, and 8-31 has no viable motion to make. *See, e.g.*, *TradeWinds Airlines, Inc. v. Soros*, No. 10 Civ. 8175, 2012 WL 983575, at* 7 (S.D.N.Y. Mar. 22, 2012) (allegation that parent siphoned funds from subsidiary and left it with insufficient funds to satisfy plaintiffs' claims "would support a claim of unfairness sufficient to make out a veil piercing claim under Delaware law").

<u>*Respondeat Superior* Liability</u>

8-31 also attacks the SAC's assertion that 8-31 is liable under a *respondeat superior* theory for the acts of its employees, Michael Hammer, Ann Freedman, and Jamie Andrade. (8-31 Ltr. at 4-5.) Apart from stating that "no allegations exist that support a claim against" Hammer (*id.* at 4), 8-31 does not deny that it is responsible for Hammer's actions, which, as discussed above, most surely *do* support fraud and RICO claims against him (and, by extension, 8-31). With respect to Freedman and Andrade, 8-31 denies that (a) Freedman or Andrade were employed by 8-31, or (b) that they undertook any of their fraudulent acts "to further 8-31's business or within the scope of their employment by 8-31." (*Id.* at 5.) 8-31 is wrong on both accounts.

Hon. Paul G. Gardephe
December 5, 2013
Page 10

Even putting aside the fact that both Freedman and Andrade were paid by 8-31, from 8-31 bank accounts, and issued W-2s stating that 8-31 was their "employer" (SAC ¶¶ 20, 23)—which 8-31 asserts is not sufficient to render them 8-31 employees for the purposes of *respondeat superior* liability—the fact remains that (a) as the SAC alleges, Ann Freedman was both the President of Knoedler and a Director of 8-31 Holdings (SAC ¶¶ 20, 167); and (b) Andrade expressly admitted in his recently filed Answer to the SAC that "he was employed by both Knoedler and 8-31." (*Compare* SAC ¶ 23 with Andrade Answer ¶ 23.) By any measure, these two defendants were "employed" by 8-31.

In addition, 8-31's assertion that the massive fraud perpetrated by Freedman and Andrade was not executed "to further 8-31's business" or within the scope of their 8-31 employment is risible. (8-31 Ltr. at 5.) The fraud alleged here tremendously enriched 8-31 (which siphoned some $23 million in Rosales-related profits from Knoedler) and its President and owner, Michael Hammer (who received millions in salary, expenses, and profit-sharing from the proceeds of the fraud). Indeed, as "a holding company" (8-31 Ltr. at 5), 8-31's *only* business was to manage and oversee its subsidiaries. As the SAC shows, 8-31 pursued that mission—by and through Hammer and, in turn, Freedman and Andrade—by facilitating, supporting and directing the massive fraud that supported Knoedler. These were not acts "wholly personal in nature," in which Hammer, Freedman or Andrade engaged solely on their own private whim, *Kawoya v. Pet Pantry Warehouse, Inc.*, 3 A.D.3d 368, 369) (1st Dep't 2004); rather, they were "doing [their] master's work," *Riviello v. Waldron*, 47 N.Y.2d 297, 302 (1979), and, it should be said, doing it quite well.

8-31 has no good faith motion to dismiss.

**<u>Knoedler Gallery</u>**

In the September 30 Opinion, this Court sustained the De Soles' fraud and RICO claims against Knoedler. (Sept. 30 Op. at 65.) Although Knoedler concludes its pre-motion letter by endorsing Freedman's absurd and improper proposed motion to reconsider that ruling (*see* Knoedler Ltr. at 5), the one-sentence joinder almost concedes the frivolousness of that effort. The thrust of Knoedler's letter is directed at the newly pleaded contractual claims against the gallery for breach of warranty and mutual and unilateral mistake. (SAC ¶¶ 266-92.) The proposed motion to dismiss these claims should also fail.

Knoedler spends the first two-plus pages of its letter asserting that these contract claims were improperly added to the SAC without leave of Court. Knoedler, of course, acknowledges that this Court "granted leave to amend" and directed that "[a]ny amended complaint is to be filed by October 21, 2013." (Sept. 30 Op. at 64.) Nevertheless, Knoedler maintains that, because this Court's Opinion did not specifically state that it was "modify[ing]the scheduling order to allow new claims," the grant of leave to amend implicitly *excluded* the addition of new claims. (Knoedler Ltr. at 1.) However, apart from Knoedler's say-so, there is no reason to read this Court's Opinion so narrowly: although the Court did note that "[r]epleading is generally permitted where fraud claims are dismissed for lack of specificity" (Sept. 30 Op. at 64), it did so

Hon. Paul G. Gardephe
December 5, 2013
Page 11

only after more broadly concluding that, in this case, there was no reason to deviate from the general principle that "[l]eave to amend a complaint should be freely given when justice so requires." (*Id.*)  The De Soles had every right to proceed as they did and to include whatever allegations and claims they believed were merited based on their knowledge to date.

Knoedler's insistence on this (invented) hurdle to the assertion of the De Soles' contract claims is explained by its feeble defense on the merits.  Knoedler principally argues that these claims are untimely because the doctrine of equitable estoppel—pleaded in the SAC (¶¶ 275-78)—does not apply.  Knoedler is wrong.  In the September 30 Opinion, this Court, citing *State of New York v. Hendrickson Bros.*, 840 F.2d 1065, 1083 (2d Cir. 1988), explained that equitable tolling applies if a plaintiff can "either plausibly allege 'that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.'"  (Sept. 30 Op. at 60.)  The SAC clearly and plausibly pleads *both* of these factors.

*First,* the De Soles allege that Knoedler made two direct misrepresentations to them in 2008 and 2009—years after their purchase—that were intended to prevent them from discovering that they had been sold a forged painting:

(1) In January 2008, Freedman sent the De Soles a written insurance appraisal for their "Rothko" which asserted that the work had a current insurance value of $9 million. Freedman and Knoedler knew this was false, not only because they already knew the work was fake, but also because, by 2008, numerous other red flags had surfaced about the Rosales Collection, including a direct accusation from a prominent foundation—made just days before the appraisal was sent to the De Soles—that the Rosales Collection was rife with forgeries.  (SAC ¶ 276.) Freedman and Knoedler knew that the value of the work would have been devastated if its association with other questionable works was known, but did not want to signal a potential problem by claiming that the work was worth any less than the $8.4 million that the De Soles paid for it.  (*Id.*)  Thus, for the express purpose of making sure that the De Soles would not become aware of a potential claim against the gallery, Freedman and Knoedler lied to the De Soles and claimed that the Work was worth $9 million.  (*Id.*)

(2) For the same purpose, after Hammer fired Freedman in 2009, he sent a letter to the De Soles (and all Knoedler customers) announcing that Freedman had "resigned," attaching a cover letter from Freedman's replacement, Frank Del Deo, further stating that the gallery was "respectful of Ann's decision." This was false: Freedman had not simply "decided" to "resign," but rather was pushed out as a direct result of the serious questions that had been raised about the authenticity of Rosales Collection works.  However, knowing that victims like the De Soles would become suspicious if they knew the true reason for Freedman's termination, Hammer and Knoedler lied to ensure that no connection would be drawn between Freedman's abrupt departure and problems with the Rosales Collection.  (*Id.* ¶ 277.)

Hon. Paul G. Gardephe
December 5, 2013
Page 12

These are precisely the kind of "affirmative steps to prevent the plaintiff's discovery of his claim or injury" that this Court confirmed would support equitable tolling. *See* Sept. 30 Op. at 60 (quoting *Hendrickson Bros.*, 840 F.2d at 1083).

*Second*, as the De Soles further alleged (SAC ¶ 278), the fraud at issue here was inherently "self-concealing." (*Id.*) As the authority this Court cited states, "[t]he passing off of a sham article as one that is genuine is an inherently self-concealing fraud." *Hendrickson Bros.*, 840 F.2d 1065, at 1083-84. Indeed, the alleged scheme could hardly have lasted a decade if it could have been so easily uncovered.

Finally, Knoedler argues that, even if the De Soles' warranty claim is timely, it fails because, under New York's Arts and Cultural Affairs Law, (a) a statement by a seller regarding the authorship of a work is a mere "opinion," and not a warranty; and (b) statements made to an art merchant intermediary—such as Jim Kelly, the De Soles' art advisor—cannot create a warranty. (Knoedler Ltr. at 4.) These are non-sequitors. The contention that the representations Knoedler made about these works were mere "opinions" was rejected out of hand by this Court in its September 30 Opinion. *See* Sept. 30 Op. at 47 (concluding that this "is not an accurate statement of the law"). Likewise, the fundamental basis for the De Soles' breach of warranty claim is not any statement made to Jim Kelly; rather, it is based on the *written warranty* that the De Soles specifically sought and received prior to their purchase. (SAC ¶¶ 85-87, 270 & Ex. 2). This letter provides an express warranty ("Knoedler warrants the authenticity and good title" of the work) and was sent directly to the De Soles, and does not depend upon the NYACAL's special protections to give it force. Knoedler has no basis to dismiss this claim and the Court should direct it to file an answer.

### Conclusion

For the foregoing reasons, the De Soles respectfully submit that the additional round of motions to dismiss proposed by the defendants is entirely unnecessary, if not outright improper. Accordingly, this Court should not permit such motions to be filed, but rather should direct that the defendants answer the SAC and that these matters proceed forthwith.

Respectfully submitted,

Gregory A. Clarick

cc: All counsel (via email)