UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DOMENICO DE SOLE, AND ELEANORE DE SOLE, individually and as assignee of LAURA DE SOLE, | |
| Plaintiffs, | |
| - against - | |
| KNOEDLER GALLERY, LLC D/B/A KNOEDLER & COMPANY, ANN FREEDMAN, GLAFIRA ROSALES, JOSE CARLOS BERGANTINOS DIAZ, MICHAEL HAMMER, 8-31 HOLDINGS, INC., and JAIME ANDRADE, Defendants. | |

| | |
|---|---|
| JOHN D. HOWARD, individually and as assignee of Jaime Frankfurt, LLC, | |
| Plaintiff, | |
| - against - | |
| ANN FREEDMAN, GLAFIRA ROSALES, KNOEDLER GALLERY, LLC, d/b/a KNOEDLER & COMPANY, MICHAEL HAMMER, 8-31 HOLDINGS, INC., JOSÉ CARLOS BERGANTINOS DIAZ, and JAIME R. ANDRADE, Defendants. | |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2015

**MEMORANDUM
OPINION & ORDER**

12 Civ. 2313 (PGG)

12 Civ. 5263 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiffs Domenico De Sole, Eleanore De Sole, and John Howard bring these

actions against Defendant Knoedler Gallery, LLC ("Knoedler"); 8-31 Holdings Inc. ("8-31"),

Knoedler's sole member; Michael Hammer, Knoedler's managing member and the owner of 8-

31 Holdings, Inc.; Ann Freedman, Knoedler's former president; Glafira Rosales, an art dealer

who brought certain paintings to Knoedler; Jose Carlos Bergantinos Diaz, Rosales's "longtime

companion"; and Jaime Andrade, a former Knoedler employee who introduced Rosales to Knoedler and Freedman.[1]  (Second Amended Complaint ("SAC") (De Sole Dkt. No. 118) ¶¶ 16-20, 226, 244, 248; Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 12, 23-25, 31-34)

On September 30, 2013, this Court issued a memorandum opinion and order granting in part, and denying in part, Defendants' motions to dismiss the complaints in both actions.  De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 285 (S.D.N.Y. 2013). Plaintiffs in both actions then filed amended complaints.  (See SAC (De Sole Dkt. No. 118); Am. Cmplt. (Howard Dkt. No. 179)).  The amended complaints allege that paintings that Plaintiffs purchased from Knoedler – on the representation that they had been created by Mark Rothko and Willem de Kooning – were forgeries.[2]  Plaintiffs assert causes of action arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, et seq., and state law causes of action for fraud, fraudulent concealment, aiding and abetting fraud, conspiracy to commit fraud, breach of warranty, and unilateral and mutual mistake.  (SAC (De Sole Dkt. No. 118) ¶¶ 181-292; Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 259-391)

On October 1, 2014, Defendants 8-31, Hammer, and Knoedler moved to dismiss certain claims in the De Sole Second Amended Complaint and the Howard Amended Complaint. (De Sole Dkt. Nos. 210, 211, 213, 215; Howard Dkt. Nos. 264, 266, 268)  For the reasons stated below, Defendants' motions to dismiss will be granted in part and denied in part.

---

[1]  This Court has entered default judgments against Rosales and Bergantinos Diaz.  (De Sole Dkt. Nos. 157, 164; Howard Dkt. Nos. 224, 228)

[2]  The De Sole Plaintiffs allege that they purchased a forged Rothko from Knoedler in December 2004.  (Second Amended Complaint (De Sole Dkt. No. 118) at ¶ 2)  Howard asserts that he purchased a forged de Kooning from Knoedler in June 2007.  (Am. Cmplt. (Howard Dkt. No. 179) ¶ 9)

## PROCEDURAL HISTORY[3]

### I.   CLAIMS PLED IN EARLIER COMPLAINTS

The De Sole action was filed on March 28, 2012, and the Howard action was filed

on July 6, 2012.  (Cmplt. (De Sole Dkt. No. 1); Cmplt. (Howard Dkt. No. 1))  On September 13,

2012, the De Sole Plaintiffs filed an amended complaint against Defendants Knoedler Gallery,

LLC d/b/a Knoedler & Company, Ann Freedman, Glafira Rosales, Jose Carlos Bergantinos Diaz,

Michael Hammer, and Jaime Andrade.  (Am. Cmplt. (De Sole Dkt. No. 17))  The De Sole

Amended Complaint pleads the following causes of action:

> (1) substantive RICO and RICO conspiracy claims against all Defendants;
>
> (2) fraud and fraudulent concealment claims against Knoedler and Freedman;
>
> (3) a fraud conspiracy claim against all Defendants; and
>
> (4) an aiding and abetting fraud claim against Hammer, Andrade, Bergantinos Diaz, and Rosales.

(Id. ¶¶ 136-208)  This complaint does not assert any claims against 8-31 Holdings, Inc.  See id.

Plaintiff Howard's original complaint asserted claims against Ann Freedman,

Glafira Rosales, Knoedler Gallery, LLC, d/b/a Knoedler & Company, Michael Hammer, 8-31

Holdings, Inc., Jose Carlos Bergantinos Diaz, and Jaime R. Andrade.  (Howard Dkt. No. 1

(Cmplt.))  Howard's Complaint pleads the following causes of action:

> (1) substantive RICO and RICO conspiracy claims against all Defendants;
>
> (2) a fraud claim against Knoedler and Freedman;
>
> (3) fraudulent concealment and a fraud conspiracy claim against Knoedler, Hammer, and Freedman;

---

[3]  The factual background concerning these cases is discussed at length in this Court's September 30, 2013 Memorandum Opinion and Order, familiarity with which is assumed.  De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 285-95 (S.D.N.Y. 2013).

> (4) an aiding and abetting fraud claim against Hammer;
>
> (5) a breach of warranty claim against Knoedler and Freedman; and
>
> (6) claims of unilateral mistake and mutual mistake against Knoedler.

(Id. ¶¶ 305-415)

The De Sole Amended Complaint and the Howard Complaint contain the

following factual allegations concerning Hammer:

> (1)  In 2003, Freedman faxed to Hammer a 2003 [International Foundation for Art Research] report related to a purported Jackson Pollock painting sold to Jack Levy.  The report called into question the provenance of the painting.  (Am. Cmplt. (De Sole Dkt No. 17) ¶¶ 39, 42-44; Cmplt. (Howard Dkt No. 1) ¶¶ 43, 46-48, 65-67)
>
> (2)  A handwritten note on the reverse side of the cover sheet for the above-referenced fax contains the following phrases in quotation marks:  "discreet sources are my stock in trade," "don't kill the goose that's laying the Golden egg," and "I am not going to change my way of doing business.  If you are not [comfortable] – step away."  (Cmplt. (Howard Dkt. No. 1) ¶ 69; Am. Cmplt. (De Sole Dkt. No. 17) ¶ 45)
>
> (3)  Hammer determined Freedman's compensation based on Knoedler's profits, and – during the years that sales of Rosales-related paintings were at their peak – he twice increased her compensation.  (Am. Cmplt (De Sole Dkt No. 17) ¶¶ 8, 15, 100)
>
> (4)  Hammer was aware that payments to Rosales were wired to Bergantinos Diaz's brother in Spain.  (Cmplt. (Howard Dkt. No. 1) ¶¶ 38, 192)
>
> (5)  Hammer knew of the outsized profits Knoedler derived from sales of paintings obtained from Rosales.  (Am. Cmplt. (De Sole Dkt. No. 17) ¶ 8; Cmplt. (Howard Dkt. No. 1) ¶¶ 186, 278)
>
> (6)  Hammer profited from the alleged fraudulent scheme.  (Am. Cmplt. (De Sole Dkt. No. 17) ¶ 8)

As to 8-31 Holdings, Inc., the Howard Complaint alleged that

Knoedler's sole member is defendant 8-31 Holdings, Inc., a Delaware corporation which lists its most recent principal place of business with the New York Secretary of State as 19 East 70th Street, New York, New York but, on

information and belief, is actually located at a warehouse somewhere on
Manhattan's West Side.  On information and belief, 8-31 Holdings, Inc. also owns
Hammer Galleries, LLC (another art gallery) and Knoedler Archivum, Inc., the
latter of which, on information and belief, owns one of the most-valuable art
archives and libraries in the world.

(Cmplt. (<u>Howard</u> Dkt. No. 1) ¶ 18)

With respect to Howard's breach of warranty claim against Knoedler and

Freedman, Howard asserted that Freedman and Knoedler made the following representations to

him and his advisor and agent – Jaime Frankfurt:

(1) the [w]ork was created by Willem de Kooning in 1956-57;

(2) the [w]ork was owned by the son of a Swiss private collector who obtained the
[w]ork from de Kooning via David Herbert;

(3) the [w]ork came directly to Knoedler from an individual, whom Knoedler and
Freedman knew personally; and

(4) the [w]ork was a "rare" and "distinctive" example of a de Kooning landscape
and that it was of "impeccable" quality and provenance.

(Cmplt. (<u>Howard</u> Dkt. No. 1) ¶ 377)  Howard further alleged that Knoedler and Freedman's

representations to Howard and Frankfurt constitute express warranties under N.Y. U.C.C. § 2-

313(1).  (<u>Id.</u> ¶ 380)  Howard also alleged that "the representations concerning authenticity and

provenance in the invoice by defendants (who are art merchants) to Howard (who is not)

constitute express warranties under § 13.01 of the New York Arts and Cultural Affairs Law."

(<u>Id.</u> ¶ 381)  Finally, Howard claimed that "Freedman and Knoedler concealed . . . information

[about authenticity and provenance] from Howard such that Howard was unable, despite due

diligence, to bring his claims in a timely manner."  (<u>Id.</u> ¶ 383)

With respect to Howard's unilateral mistake and mutual mistake claims against

Knoedler, the <u>Howard</u> Complaint alleges that "Howard [had a] mistaken belief that: (1) the

[w]ork was owned by a Swiss private collector who obtained the [w]ork through David Herbert

5

and passed title "by descent" to his son; (2) there were no questions about the [w]ork's authenticity; and (3) the [w]ork was fully marketable." (Id. ¶ 391) Howard purchased the painting "without any knowledge of these mistakes," "exercised reasonable diligence in investigating the [w]ork prior to its purchase," and "would not have been able to ascertain the truth concerning his mistaken belief at the time of the sale of the [w]ork because such information was exclusively in the defendants' possession." (Id. ¶¶ 392-94) Howard further alleged that a mutual mistake "existed by virtue of both Howard's and Knoedler's mutual mistake that the [w]ork was an authentic de Kooning." (Id. ¶ 406) The Howard Complaint pleads the same two mistake claims against Knoedler with respect to Frankfurt's mistaken belief.[4] (Id. ¶¶ 247, 397-404, 410-15)

## II.      RESOLUTION OF DEFENDANTS' FIRST MOTION TO DISMISS

All Defendants moved to dismiss. (De Sole Dkt. Nos. 24, 27, 63, 71, 75; Howard Dkt. Nos. 35, 39, 45, 48, 74, 76) On September 30, 2013, this Court granted in part and denied in part Defendants' motions. De Sole, 974 F. Supp. 2d 274.

### A.      Dismissal of All Claims Against Hammer

This Court dismissed all claims against Hammer in both cases, De Sole, 974 F. Supp. 2d at 302-04, reasoning as follows:

> The 2003 IFAR report is not sufficient to demonstrate that Hammer was put on notice of the alleged fraud. The report states that "IFAR believes that too many reservations exist to make a positive attribution to Jackson Pollock." (Howard Cmplt. ¶ 46) According to Plaintiffs' complaints, the report does not state or suggest that the painting is a forgery. (De Sole Am. Cmplt. ¶ 42; Howard Cmplt. ¶¶ 46-48) The report goes on to say that it is "inconceivable" that Pollock sold the work through Ossorio. (Howard Cmplt. ¶¶ 46-48) While this aspect of the

---

[4] Frankfurt has assigned all of his claims to Howard. See Cmplt. (Howard Dkt. No. 1) ¶ 247; Am. Cmplt. (Howard Dkt. No. 179) ¶ 166.

report questions the alleged provenance of the work, it does not directly challenge its authenticity.  (Id.)

As to the handwritten statements on the back of the fax cover sheet, the complaints do not allege who authored them, nor do Plaintiffs allege that these statements were shared with Hammer.

Hammer's role in determining Freedman's compensation does not demonstrate that he knew of the alleged ongoing fraud.  Similarly, Plaintiffs do not explain why Hammer's knowledge that payments to Rosales were being wired to Bergantinos Diaz's brother should have led him to suspect that the paintings Rosales was providing to Knoedler were forged.  It is apparent – from the facts alleged in the complaints – that the use of intermediaries in the art world is common.  The De Soles, Howard, and Lagrange all wired their payments through intermediaries.  (De Sole Am. Cmplt. ¶¶ 63, 130, 133; Howard Cmplt. ¶ 321; Lagrange Cmplt. ¶ 40)

Finally, Plaintiffs allege that Hammer was aware of the large profits Knoedler realized on the sale of works obtained from Rosales.  Plaintiffs have not alleged, however, what mark-ups are customary in the industry for works created by artists of this stature.

In sum, neither complaint alleges sufficient facts to demonstrate that Hammer "conduct[ed] or participate[d], directly or indirectly, in the conduct of [the alleged] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Plaintiffs' allegations are likewise not sufficient to demonstrate that Hammer committed fraudulent concealment, aided and abetted fraud, or conspired to commit fraud.  All of these claims fail because of the absence of facts sufficient to demonstrate that Hammer "knew or should have known about the . . . [f]raud."  In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433, 498 (S.D.N.Y. 2005)  Accordingly, all claims against Hammer will be dismissed.

De Sole, 974 F. Supp. 2d at 302-04.

## B.   Dismissal of All Claims Against 8-31

In Howard, this Court dismissed all claims against 8-31.  Id. at 304.  The

allegations against 8-31 were as follows:

Knoedler's sole member is defendant 8-31 Holdings, Inc., a Delaware corporation which lists its most recent principal place of business with the New York Secretary of State as 19 East 70th Street, New York, New York but, on information and belief, is actually located at a warehouse somewhere on Manhattan's West Side.  On information and belief, 8-31 Holdings, Inc. also owns

> Hammer Galleries, LLC (another art gallery) and Knoedler Archivum, Inc., the latter of which, on information and belief, owns one of the most-valuable art archives and libraries in the world.

De Sole, 974 F. Supp. 2d at 304 (quoting Cmplt. (Howard Dkt. No. 1) ¶ 18)  This Court held that

those allegations were "not sufficient to sustain any cause of action against [8-31]."  Id.  This

Court further noted that "Howard has not pled facts sufficient to demonstrate that it would be

appropriate to pierce the corporate veil, nor has he presented a piercing the corporate veil

analysis in his briefing."  Id. at 304 n.12.

## C.    Dismissal of Certain Claims Against Knoedler

In De Sole, as to Knoedler, this Court dismissed Plaintiffs' fraud conspiracy

claim, but otherwise denied Knoedler's motion.  Id. at 321.  In Howard, this Court dismissed

Plaintiff's RICO, RICO conspiracy, fraud conspiracy, and breach of warranty claims against

Knoedler, but otherwise denied Knoedler's motion.  Id.

Howard's breach of warranty claim against Knoedler was dismissed because it

was untimely and equitable tolling did not apply.  Id. at 318-19.  In reaching this conclusion, this

Court noted that "the plain language of the statute [N.Y. U.C.C. § 2-725(2)] makes clear that the

[four-year] statute of limitations generally begins to run 'on tender of delivery,' and that lack of

knowledge of a defect has no effect on the running of the limitations period."  Id. at 318.  Given

"that Howard purchased the painting from Freedman and Knoedler on June 13, 2007, and filed

this action on July 6, 2012," "the breach of warranty claim is untimely unless the statute was

extended for some reason."  Id.  "Howard ha[d] not pointed to any provision in the New York

U.C.C. that would have extended the limitations period," however.  Id. at 318.

This Court also concluded that equitable tolling did not apply, because Howard

had not "allege[d] [any] facts indicating that . . . Knoedler prevented him from exercising his

rights during the limitations period." Id. at 319.  In fact, "Howard's complaint does not allege a single communication, interaction, or dealing with . . . Knoedler following the June 13, 2007 sale." Id.  Although Howard alleged that "Knoedler concealed . . . information [about authenticity and provenance] from Howard such that Howard was unable, despite due diligence, to bring his claims in a timely manner" (Howard Cmplt. ¶ 383), this allegation is inadequate to invoke equitable tolling because "[g]eneralized or conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations," and because "a plaintiff may not rely on the same act that forms the basis for the claim" to support equitable tolling. De Sole, 974 F. Supp. 2d at 318-19 (citing Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983)).  This Court further noted that equitable tolling based on fraudulent concealment requires a plausible allegation "'that the defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing.'" Id. (quoting State of New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)).

As to Howard's mistake claims against Knoedler, this Court determined that both unilateral mistake and mutual mistake had been adequately pled.  "As to unilateral mistake, it is clear (and uncontested) that Howard believed that the work he purchased was a genuine de Kooning."[5] Id. at 320 (citing Cmplt. (Howard Dkt. No. 1) ¶ 392).  As to mutual mistake,

> Howard has adequately pled that Knoedler knew or should have known that the de Kooning was not authentic, but that Freedman misrepresented it as such anyway.  (Howard Cmplt. ¶¶ 232, 270).  As discussed above, Howard has sufficiently pleaded allegations of fraud against Knoedler.  Collins [v. Harrison-Bode, 303 F.3d 429, 435 (2d Cir. 2002).]

---

[5]  As to whether a contract existed between Howard and Knoedler, this Court concluded that "Howard has pled sufficient facts at this stage . . . to demonstrate that Frankfurt was acting as his agent in purchasing the painting from Knoedler," and noted that, in any event, "Frankfurt has assigned all of his claims to Howard." Id. (citing Cmplt. (Howard Dkt. No. 1) ¶¶ 242, 247).

> While Knoedler argues that both mistake claims should be dismissed because Howard did not exercise ordinary care and was consciously ignorant of the work he purchased, these issues cannot be resolved as a matter of law at this stage of the proceedings. The cases cited by Knoedler (Howard Dkt. No. 40 at 28-29) were decided at summary judgment, not on the pleadings.

Id. at 320-21.

## III.   THE *DE SOLE* SECOND AMENDED COMPLAINT AND *HOWARD* AMENDED COMPLAINT

On November 4, 2013, the De Sole Plaintiffs filed a Second Amended Complaint (De Sole Dkt. No. 118) and Howard filed an Amended Complaint (Howard Dkt. No. 179). The De Sole SAC includes many of the same claims pleaded in the Amended Complaint, but adds (1) breach of warranty, unilateral mistake, and mutual mistake claims against Knoedler; (2) 8-31 Holdings as a defendant and asserts claims for fraud, fraudulent concealment, substantive RICO and RICO conspiracy, aiding and abetting fraud, and fraud conspiracy against 8-31; and (3) and re-pleads RICO, RICO conspiracy, fraudulent concealment, fraud conspiracy, and aiding and abetting fraud claims against Hammer. Accordingly, the De Sole SAC pleads the following causes of action:

> (1) substantive RICO and RICO conspiracy claims against all Defendants;
>
> (2) fraud and fraudulent concealment claims against Knoedler, Freedman, and 8-31;
>
> (3) a fraud conspiracy claim against Hammer, 8-31, Andrade, Bergantinos Diaz, and Rosales;
>
> (4) an aiding and abetting fraud claim against Hammer, 8-31, Andrade, Bergantinos Diaz, and Rosales.
>
> (5) a breach of warranty claim against Knoedler; and
>
> (6) claims of unilateral mistake and mutual mistake against Knoedler.

(SAC (De Sole Dkt. No. 118) ¶¶ 181-292)

10

The <u>Howard</u> Amended Complaint reasserts all causes of action alleged in the original complaint, but adds causes of action for (1) fraudulent concealment, aiding and abetting fraud, and fraud conspiracy against 8-31; and (2) fraud conspiracy, and aiding and abetting fraud against Andrade.  Accordingly, Howard's Amended Complaint pleads the following causes of action:

(1) substantive RICO and RICO conspiracy claims against all Defendants;

(2) a fraud claim against Knoedler and Freedman;

(3) a fraudulent concealment claim against Hammer, 8-31, Knoedler, and Freedman;

(4) a fraud conspiracy claim against all Defendants;[6]

(5) aiding and abetting fraud claims against Hammer, 8-31, Andrade, Rosales, and Bergantinos Diaz;

(6) a breach of warranty claim against Knoedler; and

(7) claims of unilateral mistake and mutual mistake against Knoedler.

(Am. Cmplt. (<u>Howard</u> Dkt. No. 179) ¶¶ 259-391)

## IV.   <u>DEFENDANTS' SECOND ROUND OF MOTIONS TO DISMISS</u>

Defendant Hammer has moved to dismiss all claims brought against him in the <u>De Sole</u> SAC and in the <u>Howard</u> Amended Complaint.  (Hammer Br. (<u>De Sole</u> Dkt. No. 214) at 1; Hammer Br. (<u>Howard</u> Dkt. No. 267) at 1)

Defendant Knoedler has moved to dismiss the breach of warranty and mistake claims asserted against it in the <u>De Sole</u> SAC.  (Knoedler Br. (<u>De Sole</u> Dkt. No. 212) at 1) Knoedler argues that all of these claims are untimely (<u>id.</u> at 1-2); that no actionable warranties exist (<u>id.</u> at 10-12); and that any mistake is a result of Plaintiffs' own negligence.  (<u>Id.</u> at 13-15)

---

[6]  Howard has voluntarily dismissed this claim as to Knoedler.  (Howard Br. in Opp. to Summary Judgment (<u>Howard</u> Dkt. No. 292) at 140 n.35)

Knoedler has also moved to dismiss the breach of warranty claim asserted in the Howard Amended Complaint, arguing that that claim is time-barred.  (Knoedler Br. (Howard Dkt. No. 269) at 3-12)[7]

Defendant 8-31 has moved to dismiss the fraud, fraudulent concealment, aiding and abetting fraud, and conspiracy to commit fraud claims asserted against it in the De Sole SAC and Howard Amended Complaint, to the extent that those claims are founded on a respondeat superior theory of liability.  (8-31 Br. (De Sole Dkt. No. 216) at 1, 3; 8-31 Br. (Howard Dkt. No. 265) at 1, 3, 9)

## DISCUSSION

## I.   MOTION TO DISMISS STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . .  the court is to accept as true all facts alleged in the complaint,"  Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

---

[7]  Knoedler also moved to dismiss Howard's fraud conspiracy claim, but Howard has voluntarily dismissed that claim as against Knoedler.  (Howard Br. in Opp. to Summary Judgment (Howard Dkt. No. 292) at 140 n. 35)

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

       "In considering a motion to dismiss for failure to state a claim pursuant to Rule

12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to

the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco

v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner,

Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir.

1999)).  Moreover, "[w]here a document is not incorporated by reference, the court may

never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby

rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471

F.3d 391, 398 (2d Cir. 2006)).  A district court may also "rely on matters of public record in

deciding a motion to dismiss under Rule 12(b)(6)." Pani v. Empire Blue Cross Blue Shield, 152

F.3d 67, 75 (2d Cir. 1998); see also Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels &

Resorts Worldwide, Inc., 369 F.3d 212, 217 (2d Cir. 2004) ("[W]e may also look to public

records . . .  in deciding a motion to dismiss.")  "In the motion to dismiss context, . . . a court

should generally take judicial notice 'to determine what statements [the documents]

contain[ ] . . . not for the truth of the matters asserted.'" Schubert v. City of Rye, 775 F. Supp. 2d

689, 698 (S.D.N.Y. 2011) (quoting Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.

1991)).

       Fed. R. Civ. P. 9(b) sets standards for pleading fraud claims, and requires that

"[i]n alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b); see also In re Pfizer Inc. Sec. Litig., 584 F.

Supp. 2d 621, 632-33 (S.D.N.Y. 2008).  Rule 9(b) requires a plaintiff to "'(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Kottler v. Deutsche Bank AG, 607 F. Supp. 2d 447, 462 (S.D.N.Y. 2009) (quoting Stevelman v. Alias Research, Inc., 174 F.3d 79, 84 (2d Cir. 1999) (internal quotation marks and citation omitted)).

## II.   SUBSTANTIVE RICO CLAIM

### A.   Applicable Law

To sustain a private cause of action under RICO, a plaintiff must allege:  "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).  To prove a substantive RICO violation, a plaintiff must demonstrate, inter alia, that the defendant was "employed by or associated with an[] enterprise engaged in, or the activities of which affect, interstate or foreign commerce, . . . [and that the defendant] conduct[ed] or participate[ed], directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. . . ."  18 U.S.C. 1962(c). Accordingly, a plaintiff must plead facts demonstrating "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce."  Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir. 1983).

The "pattern of racketeering activity" elements are adequately pled where the plaintiff makes factual allegations sufficient to demonstrate that the defendants committed two or more predicate acts as part of a pattern of racketeering activity. Here, Plaintiffs allege that Defendants committed two or more acts of mail and wire fraud; mail and wire fraud are included in the statutory definition of "racketeering activity." 18 U.S.C. § 1961(1)(B).[8]

To establish RICO claims based on mail and wire fraud, a complaint must, as a threshold matter, allege "the existence of a fraudulent scheme." McLaughlin v. Anderson, 962 F.2d 187, 190-91 (2d Cir. 1992). The complaint must also allege that "the defendant 'caused' the mailing or use of the wires" and that "the mailing or use of the wires 'was for the purpose of executing the scheme or, in other words, incident to an essential part of the scheme.'" Maersk, Inc. v. Neewra, Inc., 687 F. Supp. 2d 300, 332 (S.D.N.Y. 2009) (quoting United States v. Bortnovsky, 879 F.2d 30, 36 (2d Cir. 1989)) (internal quotation marks omitted). In short, a RICO complaint must provide "a detailed description of the underlying [fraudulent] scheme and the connection of the mail and/or wire communications to the scheme." In re Sumitomo Copper Litig., 995 F. Supp. 451, 456 (S.D.N.Y. 1998).

A RICO plaintiff must also plead facts sufficient to demonstrate that plaintiff suffered an injury and that the plaintiff's injury was caused by the defendant's racketeering activities. See Ideal Steel Supply Corp. v. Anza, 652 F.3d 310, 323 (2d Cir. 2011). Where, as here, a RICO violation is predicated on acts of fraud, a plaintiff must allege that the defendant's acts were not only the "but for" cause of plaintiff's injury, but the proximate cause as well, necessitating "some direct relation between the injury asserted and the injurious conduct

---

[8]  Howard also alleges that Defendants trafficked in counterfeit labels, in violation of 18 U.S.C. § 2318.  Trafficking in counterfeit labels is listed in 18 U.S.C. § 1961(1) as an offense that constitutes racketeering activity.

alleged"; "[a] link that is too remote, purely contingent, or indirect is insufficient." Hemi Grp., LLC v. City of New York, 559 U.S. 1, 8 (2010) (internal quotation marks, citation, and alteration omitted). This causation requirement is necessary because "the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." Ideal Steel, 652 F.3d at 316 (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 458 (2006)) (internal quotation marks and alteration omitted).

**B.     Analysis**

Hammer contends that the RICO claims against him should be dismissed because Plaintiffs have not adequately alleged that he (1) conducted or participated in a RICO enterprise's affairs, (2) committed a predicate act, or (3) caused any injury. (Hammer Br. (De Sole Dkt. No. 214) at 9-16; Hammer Br. (Howard Dkt. No. 267) at 9-19)  Hammer does not challenge the existence of a RICO enterprise.[9]

**1.     Hammer's Participation in the RICO Enterprise**

A RICO plaintiff must allege that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of [a RICO] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c); see Reves v. Ernst & Young, 507 U.S. 170, 177-79 (1993). In other words, the defendant must have had "some part in directing [the enterprise's] affairs." Reves, 507 U.S. at 179. Hammer argues that Plaintiffs have not adequately alleged that he participated in the RICO enterprise. (Hammer Br. (De Sole Dkt. No. 214) at 2, 9; Hammer Reply Br. (De Sole Dkt. No 240) at 31)

---

[9]  This Court previously concluded – with respect to the De Sole Amended Complaint and the Howard Complaint – that Plaintiffs' "allegations are sufficient to make out a RICO enterprise." See De Sole, 974 F. Supp. 2d at 301. The same is true for the De Sole SAC and the Howard Amended Complaint.

In Reves, the Supreme Court has interpreted the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs," § 1962(c), to mean that "one must participate in the operation or management of the enterprise itself." Reves, 507 U.S. at 185.  Simply put, "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" Azrielli v. Cohen Law Offices, 21 F.3d 512, 521 (2d Cir. 1994) (quoting Reves, 507 U.S. at 185).  "In the Second Circuit, 'the "operation or management" test typically has proven to be a relatively low hurdle for plaintiffs to clear, especially at the pleading stage. . . .'" City of New York v. LaserShip, Inc., 33 F. Supp. 3d 303, 310 (S.D.N.Y. 2014) (quoting First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 175-76 (2d Cir.2004)).

Here, Plaintiffs allege that Hammer participated in the RICO enterprise by (1) "knowingly permitting Freedman to use Knoedler . . . to fraudulently sell forged artworks"; (2) "by rewarding Freedman for her unlawful conduct and incentivizing her to continue it"; and (3) "by taking the ill-gotten gains from [the fraudulent] sales for his own benefit."  (SAC (De Sole Dkt No. 118) ¶ 211; see also Am. Cmplt. (Howard Dkt. No. 179) ¶ 267)  The De Sole Plaintiffs also allege that Hammer participated in the enterprise "by directing that the . . . IFAR Report be shared only with Knoedler's investment partners, but not its [potential buyers]."  (SAC (De Sole Dkt. No. 118) ¶ 211)  The De Sole and Howard Plaintiffs both allege that Hammer, inter alia, "fund[ed], supervis[ed], conduct[ed], and monitor[ed] the conduct of the fraudulent scheme."  (SAC (De Sole Dkt. No. 118) ¶ 226(d); Am. Cmplt. (Howard Dkt. No. 179) ¶ 292)

The facts alleged in each complaint provide an ample record on which to conclude that Hammer participated in the operation or management or "played some part in directing" the affairs of the alleged racketeering enterprise.  Moreover, both the De Sole SAC

and the Howard Amended Complaint plead facts giving rise to a strong inference of Hammer's knowledge of the scheme and intent to defraud.  Hammer's overarching role in the alleged racketeering enterprise was to permit Freedman to use the Knoedler Gallery – a 165-year-old institution with an excellent reputation in the art world, and an institution that Hammer controlled – to facilitate the sale of paintings Hammer had reason to be believe were not authentic.  (SAC (De Sole Dkt. No. 118) ¶¶ 1-3, 19, 47(e), 73, 188; Am. Cmplt. (Howard Dkt. 179) ¶¶ 1, 25, 231, 267)

Knoedler's blue-chip reputation was a key element of the enormous success and longevity of the fraudulent enterprise.  Rosales – a "virtually unknown Long Island [art] dealer" – could not have commanded multi-million dollar prices for these undocumented forgeries without the backing of an esteemed "brand" in the art world.  (SAC (De Sole Dkt. No. 118) ¶ 4); Am. Cmplt. (Howard Dkt. 179) ¶¶ 2, 25)  Knoedler – the "oldest and most venerable art gallery in New York City" at that time – provided the credibility that drove the enterprise. (SAC (De Sole Dkt. No. 118) ¶ 3; Am. Cmplt. (Howard Dkt. 179) ¶¶ 1-2, 25)  The scheme used "Knoedler's gravitas and goodwill developed over 165 years in the fine art business" to sell forged artwork to Knoedler's customers.  (SAC (De Sole Dkt. No. 118) ¶ 73; Am. Cmplt. (Howard Dkt. 179) ¶¶ 25, 265-66, 313)  This element was Michael Hammer's central contribution to the enterprise.

Moreover, Plaintiffs have put forward many particularized allegations supporting an inference that Hammer had the requisite knowledge of the fraud.  Plaintiffs have alleged facts showing that

1. Hammer is the president and sole owner of 8-31 Holdings, Inc., which is the sole member and sole owner of Knoedler.  (SAC (De Sole Dkt. No. 118) ¶¶ 12, 16; Am. Cmplt. (Howard Dkt. 179) ¶¶ 32, 34)

2. Hammer was directly responsible for Knoedler's operations at all relevant times. (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 47(e); Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶ 34)

3. As Chairman of Knoedler and President of 8-31, Hammer had extensive knowledge of and involvement in Knoedler's business.[10]  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 12, 19, 46; Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶¶ 34, 231, 234, 246, 255)  In particular, Hammer managed and oversaw Knoedler's finances.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 19; Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶ 231)  In his role at Knoedler, Hammer personally reviewed detailed information about Knoedler's financial condition, sales, and profits and was responsible for determining the compensation of officer-level personnel, including Ann Freedman.[11]  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 12, 19, 47-48, 148; Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶¶ 120, 231)  Howard also alleges that Hammer received Knoedler's quarterly and annual financial statements, including summaries of significant transactions, and that Hammer "periodically requested and received information about the amount of cash Knoedler had on hand and about items in Knoedler's inventory."[12]  (Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶ 231)

4. Hammer knew that Glafira Rosales – an art dealer – was delivering to Knoedler numerous paintings (the "Rosales Paintings") allegedly created by the most important abstract expressionist painters, such as Pollock, Rothko, Motherwell, and de Kooning; that Rosales would not reveal the collector's identity; that there was no paperwork documenting the provenance of these works; that all of these paintings were purportedly "newly discovered" works with no established provenance; that efforts had been made to confirm the provenance of these paintings, and that that effort had not been successful.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 12(a), 47(a), 95, 245; Am. Cmplt. (<u>Howard</u> Dkt. 179) ¶¶ 27, 232, 240)[13]

---

[10] Knoedler did not maintain a board of directors or financial records separate and apart from 8-31's records.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 178; Am. Cmplt. (Howard Dkt. 179) ¶ 256)

[11] Hammer stated in a sworn declaration that he was "directly responsible for the operations" of Knoedler.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 47(e))

[12] As further indication of Hammer's active involvement in Knoedler's business, the Howard Amended Complaint alleges that Hammer charged $1.46 million to Knoedler in business-related expenses.  (Am. Cmplt. (Howard Dkt. 179) ¶ 235)

[13] Howard alleges that Hammer was aware contemporaneously of all the material circumstances of these transactions and discussed the circumstances of each transaction with Freedman at the time the sale occurred, including the "phony provenance" and, later, the "revised phony provenance."  (Am. Cmplt. (Howard Dkt. 179) ¶¶ 27, 232, 240)  Howard alleges that Hammer knew that the works "had been acquired from Rosales and Bergantinos Diaz, and were being sold with a phony provenance and for extraordinary profits."  (Am. Cmplt. (Howard Dkt. 179) ¶ 232)

5.  In his capacity as President of 8-31, Hammer appointed Freedman to serve as president and sole manager of Knoedler in or about 2001. (SAC (De Sole Dkt. No. 118) ¶¶16, 20, 39)  Freedman informed Hammer of every sale of a Rosales Painting at the time the sale was made.  (Id. at 12, 47, 147; Am. Cmplt. (Howard Dkt. 179) ¶¶ 27, 231-32)

6.  Hammer knew that Knoedler's mark-ups for Rosales Paintings were extraordinarily high.  SAC (De Sole Dkt. No. 118) ¶¶ 12(b)-(c), 211, 245, 257; Am. Cmplt. (Howard Dkt. 179) ¶¶ 27, 136)  During Hammer's tenure, profits on individual sales skyrocketed – all due to Rosales-sourced works.  From 1996 to 2003, Knoedler's average mark-up on sales of Rosales Paintings was over 200%.  (SAC (De Sole Dkt. No. 118) ¶ 45)  As to works the gallery purchased and resold, Knoedler saw profits as high as 630% and 1500%.[14]  (SAC (De Sole Dkt. No. 118) ¶¶ 42-44; Am. Cmplt. (Howard Dkt. 179) at 33; see also id. at 31-36)  Mark-ups of this magnitude are highly unusual in the art industry.[15]  (SAC (De Sole Dkt. No. 118) ¶¶ 12(b), 43, 47, 147, 257; Am. Cmplt. (Howard Dkt. 179) at 20 n.3 & ¶¶ 134-35)  Knoedler's profits from works sold on consignment also increased dramatically.  Whereas typical commissions on consigned works range from 10% to 20% above the sum payable to the original owner, profits on works consigned by Rosales were as high as 360%.[16]  (SAC (De Sole Dkt. No. 118) ¶¶ 42-44; Am. Cmplt. (Howard Dkt. 179) ¶ 134)  Such high-margin sales were highly unusual by both Knoedler's standards and by industry standards.  (SAC (De Sole Dkt. No. 118) ¶¶ 43-45, 147; Am. Cmplt. (Howard Dkt.

---

[14] In 2007, Pierre Lagrange purchased a Jackson Pollock for $15.3 million which Knoedler had purchased from Rosales for $950,000 – yielding over 1500% in profits.  See Am. Cmplt. (Howard Dkt. 179) at 33.  In 2001, Knoedler purchased a purported Rothko from Rosales for $750,000 and sold it the next year for $5.5 million – yielding over 630% in profits.  See SAC (De Sole Dkt. No. 118) ¶¶ 42-44.  Although art dealers commonly purchase works as investments, profits of this magnitude are highly unusual for gallery-purchased works sold in a short period of time, and a "red flag regarding the legitimacy of the transaction and authenticity of the work."  (SAC (De Sole Dkt. No. 118) ¶ 44)  The profits Knoedler received from the sale of the works at issue in these cases are no exception – Knoedler received profits of approximately 770% and 360% from the De Sole's Rothko and Howard's de Kooning, respectively.  (SAC (De Sole Dkt. No. 118) ¶¶ 88, 95; Am. Cmplt. (Howard Dkt. 179) ¶¶ 132(a)-(b))

[15] Howard alleges that "[a] gallery that purchases a work as an investment and holds it for several years can expect a higher return, but at the outset no more than three to four times the amount it paid."  (Am. Cmplt. (Howard Dkt. 179) ¶ 135)  Howard Shaw, the President of Hammer Galleries, testified that he found the size of the profits "surprising and troubling," but that Hammer was "contemporaneously aware of the mark-ups."  (Am. Cmplt. (Howard Dkt. 179) ¶ 136)

[16] In 2000, Knoedler accepted a purported Pollock from Rosales on consignment, agreeing to pay $670,000 to the "owner" of the work, and sold it later that year for $3.1 million – yielding over 360% in profits.  See SAC (De Sole Dkt. No. 118) ¶ 42.

179) ¶ 134)  That Knoedler was able to repeatedly purchase from Rosales – an art dealer – numerous previously unknown works from acknowledged masters such as Pollock, Rothko, Motherwell, and de Kooning for a fraction of the value such works commanded in the marketplace strongly suggested that the Rothko and the other Rosales Paintings were not authentic.  (SAC (De Sole Dkt. No. 118) ¶¶ 13, 28, 41-45, 95; Am. Cmplt. (Howard Dkt. No. 179) at ¶¶ 5(a), 11, 27)  As noted above, Hammer was contemporaneously aware of all of these sales and the profits Knoedler had realized on these sales.

7.  Hammer read "very carefully" an October 9, 2003 report from the International Foundation for Art Research (the "IFAR report") concerning the authenticity and provenance of a purported Jackson Pollock painting that Rosales had sold to Knoedler for $750,000 in March 2001, and which the gallery had sold several months later to a buyer named Jack Levy for $2 million.  (SAC (De Sole Dkt. No. 118) at ¶¶ 50-51, 148; Am. Cmplt. (Howard Dkt. No. 179) at ¶¶ 83, 91)  The sale to Levy was conditioned on a favorable review of the work's authenticity by the IFAR.  (SAC (De Sole Dkt. No. 118) at ¶ 52; Am. Cmplt. (Howard Dkt. No. 179) ¶ 84)  The IFAR report rejects Rosales's claim that her clients had acquired the Pollock through Alfonso Ossorio, Pollock's close friend and patron, and concludes that there are "disturbing" differences between the materials used to create the Levy Pollock and the materials used to create a painting known to be a Pollock [from the same period].  (Pl. Ex. 140 at 8, 10)  The conclusion of the IFAR report reads:  "given the several strongly negative opinions [from Pollock experts about the authenticity of the work] and the lack of information as to prior ownership, and with no documentation or other evidence to override the concerns of those who do not accept it as a work by Pollock, we cannot currently support its addition to the artist's oeuvre."  (Pl. Ex. 140 at 8)  Based on the IFAR report, Knoedler agreed to take back the purported Pollock from Levy and to refund the $2 million purchase price.  (SAC (De Sole Dkt. No. 118) ¶ 57; Am. Cmplt. (Howard Dkt. No. 179) at ¶¶ 84, 91)  Although Hammer insisted that a potential co-investor in the Pollock painting be provided with a copy of the IFAR Report (SAC (De Sole Dkt. No. 118) ¶¶ 12, 61; Am. Cmplt. (Howard Dkt. No. 179) ¶ 88), he took no steps to ensure that potential purchasers of other Rosales Paintings would receive a copy of that report.  (SAC (De Sole Dkt. No. 118) ¶¶ 12, 61; Am. Cmplt. (Howard Dkt. No. 179) ¶ 91)

8.  Given that Hammer was responsible for the gallery's operations and routinely reviewed detailed information concerning Knoedler's sales, expenses, and profits, he was aware that over the period between 1994 and Knoedler's closing in 2011, profits from sales of Rosales Paintings accounted for nearly all of Knoedler's profits.  (SAC (De Sole Dkt. No. 118) ¶¶ 12, 43, 46-47, 107-08, 135, 147; Am. Cmplt. (Howard Dkt. 179) ¶¶ 26, 231, 234)  Hammer also personally received millions in profits obtained by Knoedler from the sale of Rosales Paintings, and millions more in Knoedler profits were transferred to Hammer's holding company, 8-31.  (Id. at ¶¶ 12, 47, 109, 171-72, 180; Am. Cmplt. (Howard Dkt. 179) ¶¶ 26, 234)

21

9. Hammer directly supervised Freedman and determined her compensation. Freedman's compensation doubled during the period from 2002 to 2008, largely as a result of profits Knoedler realized from the sale of Rosales Paintings. Hammer steadily increased Freedman's share of Knoedler's profits from 16% in 2002 to 30% in 2008. The De Sole Plaintiffs contend that Hammer's repeatedly increased Freedman's profit share to incentivize her to continue to bring into the gallery, and sell, more of the Rosales Paintings. (SAC (De Sole Dkt. No. 118) ¶¶ 12, 13, 16, 20, 39, 48, 123, 247; Am. Cmplt. (Howard Dkt. No. 179) ¶ 120)[17]

10. After Knoedler received a grand jury subpoena, Hammer fired Freedman and then sent a letter to all Knoedler customers announcing that Freedman had "resigned."[18] (SAC (De Sole Dkt. No. 118) at ¶¶ 129-31, 277; Am. Cmplt. (Howard Dkt. 179) ¶¶ 121-24, 127, 237) Between 2001 and 2010, Hammer and 8-31 had built up $23 million of debt to Knoedler, classified as "interdivisional receivables," which indebtedness was reclassified in 2010 to be a "dividend" to 8-31 – effectively forgiving the loans and transferring those assets from Knoedler to 8-31. (Am. Cmplt. (Howard Dkt. 179) ¶¶ 251-54)

These pleaded facts are sufficient to create a plausible inference that Hammer participated in the operation and management of the alleged RICO enterprise, that he exercised some degree of control over the RICO enterprise, and that he knew of its fraudulent objective.

## 2.   Predicate Acts

The De Sole and Howard Plaintiffs have alleged predicate acts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. In addition, Howard alleges false labeling of visual art, in violation of 18 U.S.C. § 2318, as a predicate act. Hammer argues, however, that Plaintiffs have not alleged that Hammer committed a predicate act and, in particular, have not

---

[17] Howard alleges only that Hammer increased Freedman's profit sharing in April 2008 from 25% to 30%, and that this increase occurred six days before the sale of a $7 million Rothko. (Am. Cmplt. (Howard Dkt. 179) ¶ 120)

[18] While Hammer argues that acts such as this – which occurred many years after Plaintiffs purchased the art works at issue – do not constitute proof of Hammer's participation in the RICO enterprise (see Hammer Br. (De Sole Dkt. No. 214) at 13), "'[a] scheme to defraud may well include later efforts to avoid detection of the fraud.'" Hottinger v. Amcoal Energy Corp., No. 89 Civ. 6391 (LMM), 1994 WL 652499, at *6 (S.D.N.Y. Nov. 17, 1994) (quoting S.E.C. v. Holschuh, 694 F.2d 130, 143 (7th Cir. 1982)).

alleged that "Hammer used the mail or the wires for the purpose of executing the alleged

scheme." (Hammer Br. (De Sole Dkt. No. 214) at 16-17; Hammer Reply Br. (De Sole Dkt. No

240) at 29-31; Hammer Br. (Howard Dkt. No. 267) at 17-19)

   The Second Circuit has held, however, that "[t]o prove a violation of 18 U.S.C.

§ 1341, [one] need only show that a defendant was one of the participants in a scheme to

defraud, and that the mails were used in furtherance of that scheme." United States v. Corey,

566 F.2d 429, 431 (2d Cir. 1977); see also Chanayil v. Gulati, 169 F.3d 168, 170-71 (2d Cir.

1999) ("The elements of mail . . . fraud include (1) the existence of a scheme to defraud, (2) the

defendant's knowing participation in the scheme, and (3) the use of . . . mail . . . communications

in interstate commerce in furtherance of the scheme."); Blue Cross and Blue Shield of New

Jersey, Inc. v. Philip Morris, Inc., 113 F. Supp. 2d 345, 367 (E.D.N.Y. 2000) ("RICO liability for

any particular defendant is not . . . premised on establishing that each defendant actually

committed two predicate acts, but only that each defendant was 'involved' in the commission of

two predicate acts that are sufficiently related and continuous to establish a pattern.") (emphasis

and citations omitted). Likewise, "to prove a violation of 18 U.S.C. § 1343, it need only be

shown that a defendant was one of the participants in a fraudulent scheme which was furthered

by the use of interstate transmission facilities." Corey, 566 F.2d at 431; see also City of New

York v. Smokes-Spirits.com., Inc., 541 F.3d 425, 446 (2d Cir. 2008), rev'd and remanded on

other grounds sub. nom. Hemi Grp., LLC v. City of New York, 559 U.S. 1 (2010); United States

v. Fasciana, 226 F. Supp. 2d 445, 452 (S.D.N.Y. 2002) ("In order to prove wire fraud under 18

U.S.C. § 1343, [one] must prove a defendant was one of the participants in a fraudulent scheme

which was furthered by the use of interstate transmission facilities.").

Here, Plaintiffs have pleaded facts demonstrating that Hammer participated in a fraudulent scheme to sell forged artwork through his privately-owned art gallery – a scheme which was furthered by the use of interstate mails and wires.  Accordingly, Plaintiffs have pleaded sufficient facts to satisfy the predicate act requirement.

3.   **Causation**

Hammer also argues that he did not cause Plaintiffs any injury.  (Hammer Br. (De Sole Dkt. No. 214) at 9-16)  To state a civil RICO claim, a plaintiff is required to show that a RICO predicate offense "not only was a 'but for' cause of his injury, but was the proximate cause as well."  Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992).  Proximate cause for RICO purposes requires "some direct relation between the injury asserted and the injurious conduct alleged."  Id.

Here, Plaintiffs have alleged sufficient facts to demonstrate that they suffered an injury as a result of Hammer's actions in connection with the alleged racketeering enterprise.  As discussed above, "but for" Hammer's management of Knoedler – including his decision to permit Knoedler to be used for the purpose of selling the Rosales Paintings, paintings that Hammer had reason to believe were not authentic – neither the De Soles nor Howard would have suffered the injuries they allege.  Indeed, Plaintiffs allege that Knoedler's "preeminent" and "impeccable" 165-year-old reputation was a central factor in their decisions to purchase the works.  (SAC (De Sole Dkt. No. 118) ¶¶ 2-3, 92, 188; Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 202, 313)

\*      \*      \*      \*

The De Sole SAC and Howard's Amended Complaint allege sufficient facts to demonstrate that Hammer "conduct[ed] or participate[d], directly or indirectly, in the conduct of

[the alleged] enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

Accordingly, Hammer's motion to dismiss Plaintiffs' substantive RICO claim is denied.

### III.   RICO CONSPIRACY CLAIM

#### A.   Applicable Law

Section 1962(d) prohibits any person from conspiring to violate any of the

substantive provisions of subsections § 1962(a)-(c).  A plaintiff bringing a RICO conspiracy

claim must demonstrate that the defendant agreed to participate "'in a charged enterprise's

affairs' through a pattern of racketeering, 'not a conspiracy to commit predicate acts.'"  United

States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) (quoting United States v. Persico, 832 F.2d

705, 713 (2d Cir. 1987)).  The Reves "operation or management" test, however, does not apply

to RICO conspiracy.  Id. at 462 n.4.  "Assuming that a RICO enterprise exists, [one] must prove

only that the defendant[] . . . know[s] the general nature of the conspiracy and that the conspiracy

extends beyond [his] individual role[]."  United States v. Zichettello, 208 F.3d 72, 99 (2d Cir.

2000) (internal quotation marks and citations omitted); see also Salinas v. United States, 522

U.S. 52, 64 (1997) ("A person . . . may be liable for [RICO] conspiracy even though he was

incapable of committing the substantive offense."); United States v. Yannotti, 541 F.3d 112, 122

(2d Cir. 2008) ("[D]efendant need only know of, and agree to, the general criminal objective of a

jointly undertaken scheme.").

#### B.   Analysis

Hammer argues that Plaintiffs' RICO conspiracy claims must be dismissed

because they have failed to plead facts demonstrating that (1) he agreed to commit a predicate

act; or (2) knew about or took steps to participate in a scheme to sell forged artwork.  (Hammer

Br. (De Sole Dkt. No. 214) at 18; Hammer Reply Br. (De Sole Dkt. No. 240) at 37; Hammer Br.

(Howard Dkt. No. 267) at 19; Hammer Reply Br. (Howard Dkt. No. 302) at 37)

       A plaintiff bringing a RICO conspiracy claim is not required to demonstrate that

the defendant agreed to commit any predicate act, however.  Instead, plaintiff need only plead

facts demonstrating that the defendant agreed to join an enterprise with knowledge that predicate

acts would be committed by some member of the enterprise.  See Pizzonia, 577 F.3d at 463; see

also Fertitta v. Knoedler Gallery, LLC, No. 14 Civ. 2259 (JPO), 2015 WL 374968, at *6

(S.D.N.Y. Jan. 29, 2015).  Moreover, as to Hammer's argument that Plaintiffs have not pled facts

demonstrating that he knew about, or took steps to participate in a scheme to sell forged artwork,

this Court concluded above – in discussing Plaintiffs' substantive RICO claim – that Plaintiffs

had pled facts sufficient to demonstrate that Hammer knew of the fraudulent scheme and

participated in it through his management of Knoedler and interactions with Freedman.

       Plaintiffs' factual allegations are sufficient to make out a RICO conspiracy claim

against Hammer.  Hammer's motion to dismiss this claim is denied.

## IV.    **FRAUDULENT CONCEALMENT**

       Hammer has moved to dismiss Howard's fraudulent concealment claim.

(Hammer Br. (Howard Dkt. No. 267) at 23)

### A.    **Applicable Law**

       "The elements of a fraudulent concealment claim under New York law are:  (1) a

duty to disclose material facts; (2) knowledge of material facts by a party bound to make such

disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and

(6) damages."  Woods v Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (citing Aetna

Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005); see also Brass v.

Am. Film Techs., Inc., 987 F.2d 142, 150 (2d Cir. 1993) (New York recognizes a duty to disclose by a party to a business transaction in three situations:  "first, where the party has made a partial or ambiguous statement . . . second, when the parties stand in a fiduciary or confidential relationship with each other . . . and third, 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'") (citations omitted).

   With respect to the duty to disclose, "New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair."  Miele v. Am. Tobacco Co., 2 A.D.3d 799, 803 (2d Dep't 2003) (citations omitted); see also Abrams v. Gen. Motors Corp., 120 Misc. 2d 371, 374 (Sup. Ct. N.Y. Cty. 1983) ("If one party has superior knowledge or has means of knowledge not available to both parties, then he is under a legal obligation to speak and silence would constitute fraud.") (citations omitted); Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 295 (1942) ("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is of the same legal effect and significance as affirmative misrepresentations of fact.").

  **B.** **Analysis**

   The Howard Amended Complaint alleges that Hammer is liable for fraudulent concealment because he was effectively the beneficial owner and controlling member of Knoedler, had actual knowledge of the alleged fraud, and directed many of Knoedler's acts of fraud and concealment.  (Am. Cmplt. (Howard Dkt. 179) ¶ 325)

   Hammer argues that Howard's fraudulent concealment claim must be dismissed because Howard has not pled facts demonstrating that Hammer (1) made a "a partial or

ambiguous statement" to Howard; (2) "possessed superior knowledge" not readily available to

Howard; and (3) had a relationship with Howard or Frankfurt, and therefore had a duty to

disclose.  (Hammer Br. (Howard Dkt. No. 267) at 23)

Howard has offered no factual or legal argument in opposition to Hammer's

motion.  See Pltf. Br. (Howard Dkt. No. 292) at 50-125.  Under these circumstances, dismissal is

appropriate.  See, e.g., Brandon v. City of New York, No. 07 Civ. 8789 (LAP), 2010 WL

1375207, at *4 (S.D.N.Y. Mar. 30, 2010) (dismissing claims as abandoned where plaintiff "did

not raise any arguments opposing Defendants' motion regarding these . . . claims"); Bonilla v.

Smithfield Assoc. LLC, No. 09 Civ. 1549 (DC), 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4,

2009) (dismissing claims as abandoned where plaintiff "fail[ed] to respond" to defendants'

arguments).  Accordingly, Hammer's motion to dismiss Howard's fraudulent concealment claim

is granted.[19]

## V.    AIDING AND ABETTING FRAUD

Hammer has moved to dismiss the aiding and abetting fraud claims alleged by the

De Soles and Howard.  (Hammer Br. (De Sole Dkt. No. 214) at 4-9; Hammer Br. (Howard Dkt.

No. 267) at 4-9)

### A.    Applicable Law

Aiding and abetting fraud has three elements:  "'(1) that an independent wrong

exist[s]; (2) that the aider or abettor know[s] of that wrong's existence; and (3) that substantial

---

[19] Even if this claim had not been abandoned, dismissal would be appropriate.  Howard's
Amended Complaint does not allege that Hammer ever knew of, interacted with, or
communicated with Howard prior to Howard's purchase of the de Kooning.  See Am. Cmplt.
(Howard Dkt. No. 179) ¶¶ 138-211.  Accordingly, the Amended Complaint does not plead facts
demonstrating that Hammer made a "partial or ambiguous statement" to Howard, that Hammer
had a relationship with Howard that created a duty to disclose, or that Hammer knew that
Howard was "acting on the basis of mistaken knowledge."  See Brass, 987 F.2d at 150.

assistance be given in effecting that wrong.'" Adelphia Recovery Trust v. Bank of Am., N.A.,
624 F. Supp. 2d 292, 312 (S.D.N.Y. 2009) (quoting Landy v. Fed. Deposit Ins. Corp., 486 F.2d
139, 162-163 (3d Cir. 1973)).  To meet Rule 9(b) pleading requirements, '"a claim for aiding and
abetting fraud requires plaintiff to plead facts showing[] the existence of a fraud, defendant's
knowledge of the fraud, and that the defendant provided substantial assistance to advance the
fraud's commission.'"  Adelphia Recovery Trust, 624 F. Supp. 2d at 312 (quoting Wight v.
BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000)).

> **B.**     **Analysis**

> > **1.**     **The De Soles' Aiding and Abetting Fraud Claim**

Hammer argues that the De Sole Plaintiffs have not alleged "facts showing that
Mr. Hammer had actual knowledge of the purported fraud."  (Hammer Br. (De Sole Dkt. No.
214) at 4)  To survive a motion to dismiss, a complaint must allege "actual knowledge of fraud
with the particularity necessary to survive the heightened pleading requirements of Federal Rule
of Civil Procedure 9(b)."  Lerner, 459 F.3d at 292-93.  "[U]nder New York law, a complaint
adequately alleges the knowledge element of an aiding and abetting claim when it pleads 'not . . .
constructive knowledge, but actual knowledge of the fraud as discerned from the surrounding
circumstances.'"  Krys v. Pigott, 749 F.3d 117, 127 (2d Cir. 2014) (quoting Oster v. Kirschner,
77 A.D.3d 51, 56 (1st Dep't 2010)).

Here, the De Sole Plaintiffs have set forth numerous particularized allegations
supporting an inference that Hammer had actual knowledge of the purported fraud.  These
allegations are essentially the same as those discussed above in connection with Plaintiffs' RICO
claims.  The De Sole Plaintiffs have alleged, inter alia, that (1) Hammer regularly reviewed
detailed information concerning Knoedler's sales, expenses, and profits – most of which, during

the relevant period, flowed from the Rosales Paintings (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 12, 43, 46-47, 107-08, 135, 147); (2) Hammer knew that the Rosales Paintings were "newly discovered" and had unconfirmed provenances (<u>id.</u> ¶¶ 12(a), 47(a), 95); (3) Hammer read "very carefully" the IFAR report expressing severe skepticism regarding the authenticity of one of the Rosales Paintings and chose not to inform Rosales Painting buyers of it (<u>id.</u> ¶¶ 12(e), 61, 148); (4) Hammer was told of each sale of a Rosales Painting and knew that the mark-ups Knoedler was receiving were extraordinarily high compared to either Knoedler or industry norms (<u>id.</u> ¶¶ 12, 42-45, 211, 245, 257); and (5) Hammer fired Freedman after receiving a grand jury subpoena related to the Rosales Paintings, but told investors that she had decided to "resign."  (<u>Id.</u> ¶¶ 129-31, 277)

   These allegations demonstrate far more than unwitting oversight.  They suggest that Hammer knew a combination of facts from which the fraud would have been obvious. Hammer knew that the Rosales Paintings were of unconfirmed provenance, and that one of them had all but been deemed a forgery.  He also knew that the Rosales Paintings were being purchased by Knoedler at incredibly low prices compared to what the gallery ultimately sold them for.  Further strengthening the inference of his knowledge, Hammer allegedly directed the suppression of the IFAR report – which might have undermined sales of the remaining Rosales Paintings – and, after an investigation began, Hammer lied to investors about the reason Freedman – who had purchased the suspect art – had left Knoedler.  Taken together, these allegations strongly support an inference that Hammer knew of the fraud at Knoedler.

   Hammer argues, however, that the SAC does not plead facts demonstrating that he "provided 'substantial assistance' to the fraud."  (Hammer Br. (<u>De Sole</u> Dkt. No. 214) at 7) "'A defendant provides substantial assistance only if [he] affirmatively assists, helps conceal, or

by virtue of failing to act when required to do so enables [the fraud] to proceed.'"  JP Morgan
Chase Bank v. Winnick, 406 F. Supp. 2d 247, 256 (S.D.N.Y. 2005) (quoting Nigerian Nat'l
Petroleum Corp. v. Citibank, N.A., No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *8 (S.D.N.Y.
July 30, 1999)).  "Whether the assistance is substantial or not is measured, in turn, by whether
'the action of the aider and abettor proximately caused the harm on which the primary liability is
predicated.'"  Id. (quoting In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 560-61
(S.D.N.Y. 2005)).

   Here, the SAC alleges that Hammer provided substantial assistance by, inter alia,
(1) allowing Freedman to use the respected Knoedler name and platform to lure victims;
(2) incentivizing Freedman to sell more Rosales Paintings by repeatedly increasing her profit
sharing percentage; (3) taking action to conceal the fraud, including suppressing the IFAR
Report, firing Freedman, and misrepresenting the basis for her departure from Knoedler.  (SAC
(De Sole Dkt. No. 118) ¶¶ 131, 247)

   Hammer argues that the allegation that he "allowed" Freedman to use Knoedler is
inadequate to constitute substantial assistance because it alleges only mere inaction.  (Hammer
Br. (De Sole Dkt. No. 214) at 7-8 (citing Mazzaro de Abreu v. Bank of America Corp., 525 F.
Supp. 2d 381, 391 (S.D.N.Y. 2007) ("inaction is substantial assistance only when the defendant
owes a fiduciary duty directly to the plaintiff") (internal quotation marks and citations omitted)))
Hammer discussed every sale of a Rosales Painting with Freedman, however, and his decision to
permit Freedman to use the Knoedler platform to sell the Rosales Paintings was a critical aspect
of the alleged fraud scheme.  Knoedler's standing as the oldest and most prominent art dealer in
New York City facilitated the selling of paintings that lacked sufficient provenance.  (SAC (De
Sole Dkt. No. 118) ¶¶ 1-3, 73, 145)  The facts pleaded in the SAC also make clear that Hammer

was not a passive overseer of Knoedler.  The <u>De Sole</u> Plaintiffs allege that Hammer directly

managed Knoedler's operations, routinely reviewed its financial condition – including all sales,

expenses, and profits – and was responsible for determining the compensation of Knoedler's

officers, including Freedman.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 12, 39, 47-48)  In this regard, the

SAC alleges that Hammer repeatedly increased Freedman's profit share, thus incentivizing her to

sell more Rosales Paintings at the gallery, given that nearly all of the gallery's profits were

attributable to the Rosales Paintings.  (<u>Id.</u> ¶¶ 48, 123, 134-35, 146, 247)  Hammer also played a

critical role in determining Knoedler's response to the IFAR report, including the dissemination

of the report.  (<u>Id.</u> ¶¶ 12, 59-61, 148, 245)

       Hammer also argues that his alleged concealment of the fraud does not constitute

"substantial assistance," because the SAC alleges no more than mere inaction.  (Hammer Br. (<u>De</u>

<u>Sole</u> Dkt. No. 214) at 8)  The SAC alleges more than mere inaction, however.  With knowledge

that the provenance of one of the paintings that Rosales had brought to the gallery could not be

verified, Hammer decided that Knoedler would continue to sell Rosales Paintings, and that

buyers would not be told of the IFAR report's conclusions.  Hammer's firing of Freedman, and

alleged misrepresentations concerning the reasons for her departure from Knoedler, could also be

regarded as attempts to conceal the fraud.[20]

       Hammer's motion to dismiss the De Soles' aiding and abetting fraud claim is

denied.

---

[20]  Hammer's argument that his alleged acts are not plausibly linked to the De Soles' injury fails
for the same reasons discussed above in connection with Plaintiffs' substantive RICO claim.

2.      **Howard's Aiding and Abetting Fraud Claim**

Hammer has also moved to dismiss Howard's aiding and abetting fraud claim, arguing that Howard has not alleged "facts showing that Mr. Hammer had actual knowledge of the purported fraud."  (Hammer Br. (Howard Dkt. No. 267) at 4)  Howard's Amended Complaint contains essentially the same allegations concerning Hammer's knowledge as described above with respect to the De Sole Plaintiffs' aiding and abetting claim.  See Am. Cmplt. (Howard Dkt. 179) ¶¶ 27, 231 (Hammer regularly reviewed detailed financial reports); id. ¶¶ 27, 232, 240 (Hammer was aware of the unconfirmed provenances); id. ¶¶ 88-89, 91 (Hammer read the IFAR report); id. ¶¶ 27, 136 (Hammer knew the mark-ups were extraordinary); id. ¶¶ 121-24, 127, 237 (Hammer fired Freedman after the grand jury subpoena).  Accordingly, for the same reasons discussed above in connection with the De Soles' aiding and abetting claim, Howard's Amended Complaint pleads sufficient facts to create a strong inference of Hammer's actual knowledge that the Rosales Paintings were not authentic and that the sales of these paintings were fraudulent.

The Howard Amended Complaint also contains similar allegations to the De Soles' with respect to Hammer's "substantial assistance" to the fraud scheme.  Just as in the De Sole SAC, the Amended Complaint alleges that Hammer provided substantial assistance to the fraud by (1) allowing Freedman to use the Knoedler name and platform to lure victims (Am. Cmplt. (Howard Dkt. 179) ¶¶ 1-2, 25); (2) incentivizing Freedman to sell more Rosales Paintings by increasing her profit sharing percentage (id. ¶ 120); (3) taking action to conceal the fraud, including deciding not to share the IFAR report with Rosales Painting buyers, firing Freedman, and misrepresenting the basis for her departure from Knoedler.  (Id. ¶¶ 91, 121-24, 127, 237) Accordingly – for the same reasons as discussed above with respect to the De Sole SAC – the

Howard Amended Complaint contains sufficient allegations that Hammer provided substantial assistance to the fraud.

Hammer's motion to dismiss Howard's aiding and abetting fraud claim is denied.

## VI.   CONSPIRACY TO COMMIT FRAUD

Hammer has moved to dismiss the fraud conspiracy claims alleged by the De Soles and Howard.  (Hammer Br. (De Sole Dkt. No. 214) at 18-21; Hammer Br. (Howard Dkt. No. 267) at 20-22)

### A.   Applicable Law

"To make a prima facie factual showing of a conspiracy, 'a plaintiff must allege the primary tort[ – here, fraud – ]and four elements:  (a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the resulting damage or injury.'"  In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 339 (S.D.N.Y. 2000) (quoting Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y. 1991); see also Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986).

### B.   Analysis

Hammer argues that the fraud conspiracy claims brought by the De Soles and Howard must be dismissed because their complaints (1) do not allege any facts that suggest that Hammer entered into an agreement to defraud Plaintiffs; (2) allege that Hammer did not become aware of the fraud until years after the scheme began, and it is not plausible that he joined the conspiracy later; and (3) do not allege that Hammer actually knew that the information provided to the De Soles and Howard was false or misleading.  (Hammer Br. (De Sole Dkt. No. 214) at 18-21; Howard Br. (Howard Dkt. No. 267) at 20-22)

34

For the reasons discussed above, this Court finds that the De Soles' SAC and Howard's Amended Complaint allege facts that create a strong inference of Hammer's actual knowledge that the Rosales Paintings were not authentic, and that the sales of those paintings were fraudulent.[21]  In addition, both the De Soles' SAC and Howard's Amended Complaint adequately allege that Hammer intentionally entered into a corrupt agreement with Freedman to sell paintings that were not authentic.  See Eaves v. Designs for Fin., Inc., 785 F. Supp. 2d 229, 257-58 (S.D.N.Y. 2011) ("allegations of 'intimate business relationship between' defendant and third-party, '[defendant's] knowledge of [third party's] unlawful acts,' and fraudulent misrepresentations 'constitute sufficient facts from which a trier of fact could infer an agreement'") (quoting First Fed. Sav. & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co., 629 F. Supp. 427, 444 (S.D.N.Y. 1986)).  Finally, both the De Soles' SAC and Howard's Amended Complaint allege overt acts in furtherance of the conspiracy to sell forged paintings to the De Soles and Howard, and injuries suffered by these plaintiffs as a result of the fraud conspiracy.  See, e.g., SAC (De Sole Dkt. No. 118) ¶¶ 2-4; Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 2, 4-6, 16-17; see also Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260,

---

[21]  The De Soles' fraud conspiracy claim is based on allegations that Hammer had knowledge of the fraud by virtue of (1) the IFAR Report, which he reviewed and understood; (2) the documents demonstrating Knoedler's failed efforts to verify the provenance of the Rosales Paintings; (3) the outsized profits associated with sales of the Rosales Paintings, which were highly unusual for the art industry; (4) direct communications with Freedman about every sale of a Rosales Painting, about Rosales, and about Knoedler's "research" of the provenance of the Rosales Paintings.  (SAC (De Sole Dkt. No. 118) ¶ 257)

Howard's fraud conspiracy claim is based on allegations that Hammer had knowledge of the fraud by virtue of (1) the IFAR Report; (2) his contemporaneous awareness of the details of each transaction concerning the Rosales Paintings; (3) the documents demonstrating Knoedler's failed efforts to verify the provenance of the Rosales Paintings; and (4) the outsized profits Knoedler made on the sales of Rosales Paintings, which for years accounted for all of Knoedler's profits.  (Am. Cmplt. (Howard Dkt. No. 179) ¶ 350)

1267 (S.D.N.Y. 1991) (fraud conspiracy requires "at least one overt act by one of the conspirators in furtherance of the unlawful plan").  In short, the fraud conspiracy claims of the De Sole Plaintiffs and Howard are adequately pled.

Hammer argues that, according to the De Soles' SAC and Howard's Amended Complaint, he did not become aware of the purported fraud until years after the fraudulent scheme began, and it is not plausible that he joined the conspiracy later.  (Hammer Br. (De Sole Dkt. No. 214) at 19-20; Hammer Br. (Howard Dkt. No. 267) at 21)  Assuming arguendo that Hammer was not aware of the fraud scheme at the outset, Plaintiffs' complaints adequately plead that he became aware that the Rosales Paintings were not authentic, and that he nonetheless permitted Freedman to use Knoedler to market and sell these forged paintings.

Accordingly, Hammer's motions to dismiss Plaintiffs' fraud conspiracy claims is denied.

## VII.   **ALTER EGO**

Hammer has moved to dismiss Plaintiffs' claims to the extent those claims are based on the theory that he is the alter ego of Knoedler.  (Hammer Br. (De Sole Dkt. No. 214) at 21-22; Hammer Br. (Howard Dkt. No. 267) at 24-25)  Neither Howard nor the De Sole Plaintiffs have offered a factual or legal argument in opposition to Hammer's motion.  See Pltf. Br. (Howard Dkt. No. 292) at 177-98; Pltf. Br. (De Sole Dkt. No. 231) at 177-99.  Under these circumstances, dismissal is appropriate.  See, e.g., Brandon, 2010 WL 1375207, at *4 (dismissing claims as abandoned where plaintiff "did not raise any arguments opposing Defendants' motion regarding these . . . claims"); Bonilla, 2009 WL 4457304, at *4 (dismissing claims as abandoned where plaintiff "fail[ed] to respond" to defendants' arguments).

36

Even if Plaintiffs' alter ego claims against Hammer had not been abandoned, dismissal would be appropriate because Plaintiffs have not sufficiently alleged an alter ego claim against Hammer.  To establish Hammer's liability as an alter ego of Knoedler, Plaintiffs must allege that "(1) . . . [Hammer and Knoedler] operated as a single economic entity, and (2) . . . there was an overall element of injustice or unfairness" in Defendants' use of the corporate form. NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 177 (2d Cir. 2008).  Plaintiffs' alter ego allegations concern almost exclusively 8-31's relationship with Knoedler, however. See Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 241-58; SAC (De Sole Dkt. No. 118) ¶¶ 162-80. With respect to Hammer, Plaintiffs make only the conclusory allegations that Hammer "dominat[ed]" Knoedler and that Hammer "ignored the formal corporate distinctions" between himself and Knoedler.  (Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 241, 258; SAC (De Sole Dkt. No. 118) ¶¶ 162, 180)  Such vague and conclusory assertions are wholly insufficient to establish the prerequisites for veil piercing.  Iqbal, 556 U.S. at 678 (complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement'" (quoting Twombly, 550 U.S. at 557)).  Accordingly, dismissal is appropriate on these grounds as well.

Hammer's motion to dismiss Howard and the De Soles' alter ego claims is granted.

## VIII.   RESPONDEAT SUPERIOR

8-31 has moved to dismiss Plaintiffs' claims to the extent those claims are based on a theory of respondeat superior.  (8-31 Br. (De Sole Dkt. No. 216) at 6-8; 8-31 Br. (Howard Dkt. No. 265) at 6-8)

A.      **Applicable Law**

"Under the [New York] common law doctrine of respondeat superior, an

employer may be held liable for the tortious acts of an employee committed within the scope of

his employment." Abdelhamid v. Altria Grp., Inc., 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007);

see also Nerey v. Greenpoint Mortgage Funding, Inc., 116 A.D.3d 1015, 1016 (2d Dep't 2014)

("Pursuant to the doctrine of respondeat superior, an employer is vicariously liable for torts

committed by an employee within the scope of employment and in furtherance of the employer's

business."); Glidepath Holding B.V. v. Spherion Corp., 590 F. Supp. 2d 435, 453 (S.D.N.Y.

2007) ("It is black-letter agency law in New York that an employer is liable for the

representations of its agents when those representations are made within the scope of the agent's

employment.") (citing 2A N.Y. Jur.2d Agency & Indep. Contractors § 290 (2007)); Bektic-

Marrero v. Goldberg, 850 F. Supp. 2d 418, 434 (S.D.N.Y. 2012) ("'The doctrine of respondeat

superior renders a master vicariously liable for a tort committed by his servant while acting

within the scope of his employment.'") (quoting Dilworth v. Goldberg, No. 10 Civ. 2224 (RJH)

(GWG), 2011 WL 3501869, at *29 (S.D.N.Y. July 28, 2011) report and recommendation

adopted, No. 10 Civ. 2224 (RJH), 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011)) (internal

quotation marks and citation omitted).

"To state [a] claim for respondeat superior, a plaintiff must plead facts showing,

among other things, that the tortious conduct causing the injury was undertaken within the scope

of the employee's duties to the employer and was thus in furtherance of the employer's

interests." Doe v. Alsaud, 12 F. Supp. 3d 674, 677 (S.D.N.Y. 2014). "'An employee's actions

fall within the scope of employment where the purpose in performing such actions is to further

the employer's interest, or to carry out duties incumbent upon the employee in furthering the

employer's business.'"  Guzman v. United States, No. 11 Civ. 5834 (JPO), 2013 WL 543343, at

*9 (S.D.N.Y. Feb. 14, 2013) (quoting Beauchamp v. City of New York, 3 A.D.3d 465, 466 (2d

Dep't 2004)) (internal quotation marks omitted).  "'An employer will not be held liable under

[the doctrine of respondeat superior] for actions which were not taken in furtherance of the

employer's interest and which were undertaken by the employee for wholly personal motives.'"

Doe, 12 F. Supp. 3d at 677 (quoting Galvani v. Nassau Cty. Police Indemnification Review Bd.,

242 A.D.2d 64, 68 (2d Dep't 1998)) (alteration in original).

    **B.**    **Analysis**

        **1.**    **The De Soles' Claims Against 8-31**

The SAC asserts claims of fraud and fraudulent concealment against 8-31 on a

respondeat superior theory.  (SAC (De Sole Dkt. No. 118) ¶¶ 192, 202)  The SAC also alleges

that 8-31 is liable for

1. "Hammer's conduct in aiding and abetting [] fraud[,] because Hammer participated in the racketeering scheme in his capacity as the President of 8-31";

2. "Andrade's conduct in aiding and abetting [] fraud under the doctrine of respondeat superior"; and

3. Hammer's, Freedman's, and Andrade's conspiring to commit fraud under the doctrine of respondeat superior and as the alter ego of Knoedler.

(Id. ¶¶ 251-52, 262)  8-31 moves to dismiss these claims to the extent they are based on a theory

of respondeat superior.  (8-31 Br. (De Sole Dkt. No. 216) at 1, 3)

        As to the fraud and fraudulent concealment claims, the SAC does not specify

whether 8-31 is liable for Knoedler's conduct, Freedman's conduct, or both.  See SAC (De Sole

Dkt. No. 118) ¶¶ 192, 202 ("8-31 is liable as Knoedler's alter ego and under the doctrine of

respondeat superior.").  To the extent that the De Soles are claiming that 8-31 is liable for fraud

and fraudulent concealment as a result of the acts of Knoedler – on a theory of <u>respondeat</u> <u>superior</u> – those claims are not viable.  Knoedler is a subsidiary of 8-31 (<u>id.</u> ¶ 17), and the doctrine of <u>respondeat</u> <u>superior</u> "does not render a parent company liable for the conduct of a subsidiary."  <u>Abdelhamid</u>, 515 F. Supp. 2d at 394.  Accordingly, to the extent that the SAC's fraud and fraudulent concealment claims against 8-31 are premised on the notion that 8-31 is liable for Knoedler's actions under the doctrine of <u>respondeat</u> <u>superior</u>, those claims are dismissed.

    8-31 further argues that it cannot be held liable for the actions of Hammer, Andrade, or Freedman under the doctrine of <u>respondeat</u> <u>superior</u>.  (8-31 Br. (<u>De Sole</u> Dkt. No. 216) at 3, 5-7)  In this regard, 8-31 contends that it is not the employer of any Knoedler employee, and pays employment taxes for Knoedler employees merely because Knoedler is a disregarded entity for income tax purposes.[22]  (<u>Id.</u> at 5-6)

    "The key element of respondeat superior . . . is an employment relationship between the alleged tortfeasor and the party that the plaintiff is seeking to hold vicariously liable."  <u>Abdelhamid</u>, 515 F. Supp. 2d at 398.  "'The determination of whether an employer-employee relationship exists turns on whether the alleged employer exercises control over the results produced, or the means used to achieve the results.  Control over the means is the more important consideration.'"  <u>Chuchuca v. Chuchuca</u>, 67 A.D.3d 948, 950 (2nd Dep't 2009) (quoting <u>Abouzeid v. Grgas</u>, 295 A.D.2d 376, 377 (2nd Dep't 2002)).

---

[22]  8-31 asserts that Knoedler is a single-member LLC and is a disregarded entity for income tax purposes.  As a result, 8-31 files Knoedler's tax returns, pays Knoedler's taxes, and treats Knoedler's employees as its own for tax purposes.  (8-31 Br. (<u>De Sole</u> Dkt. No. 216) at 5)  In offering 8-31's alleged reasons for addressing Knoedler's tax obligations, 8-31 seeks to introduce material not pled in either the SAC or Howard's Amended Complaint.  Such factual allegations cannot be considered by this Court on a motion to dismiss.

Here, Hammer is the president and sole owner of 8-31 (SAC (De Sole Dkt. 118)

¶¶ 12, 16-17, 19, 147, 167)  He received a $400,000 salary from 8-31, and regularly attended

8-31 board meetings.  (Id. ¶ 147)  The SAC alleges that Hammer's actions – as described in the

SAC – "were taken in his capacity as the President of 8-31."  (Id. ¶ 19)  The SAC plausibly

alleges that Hammer is 8-31's employee.

The SAC further alleges that 8-31 employed Freedman, paid Freedman, and

provided her with W-2 forms.  (Id. ¶¶ 17, 20, 48)  All of Freedman's compensation, including

her incentive compensation, was paid by 8-31, and Freedman was a director of 8-31 between

2001 and October 2009.  (Id. ¶¶ 20, 48, 167)  Freedman and Knoedler – one of 8-31's principal

subsidiaries – sold the Rosales Paintings and, in doing so, reaped "tremendous profits" for

Freedman, Knoedler, Hammer, and 8-31.  (Id. ¶¶ 151, 162)

The SAC further alleges that Andrade was an employee of both Knoedler and

8-31, and that, at all relevant times, Andrade received paychecks and W-2 forms from 8-31.  (Id.

¶¶ 17, 23, 28)  The SAC alleges that Andrade introduced Rosales to Knoedler and Freedman,

participated in meetings relating to the alleged RICO art fraud scheme, and provided Freedman

with the name of David Herbert – Andrade's deceased friend and a major figure in the art

world – in furtherance of that fraudulent scheme.  (Id. ¶¶ 10, 213, 226, 244, 248)  The SAC

claims that Andrade's participation in the alleged racketeering scheme was within the scope of

his employment at 8-31.  (Id. ¶ 212)

8-31 contends that "'a strong presumption [exists] that a parent corporation is not

the employer of its subsidiary's employees,'" and that nothing in the SAC overcomes this

presumption.  (8-31 Br. (De Sole Dkt. No. 216) at 5 (quoting Lusk v. Foxmeyer Health Corp.,

129 F.3d 773, 778 (5th Cir. 1997))  It is not necessary to resolve this issue at this stage of the

case, however, because the SAC alleges both <u>respondeat superior</u> and <u>alter ego</u> theories of

liability against 8-31, and 8-31 has not contested the <u>alter ego</u> allegations in its motion to

dismiss.  The <u>alter ego</u> allegations and the other facts pled in the SAC are more than sufficient at

this stage for this Court to conclude that the SAC has plausibly alleged that Freedman and

Andrade were employees of 8-31.

        8-31 argues, however, that Freedman and Andrade's actions were not within the

scope of their employment at 8-31.[23]  (8-31 Br. (<u>De Sole</u> Dkt. No. 216) at 7)  Courts consider the

following factors in determining whether an employee's actions are within the scope of his

employment:

> "the connection between the time, place and occasion for the act; the history of
> the relationship between employer and employee as spelled out in actual practice;
> whether the act is one commonly done by such an employee; the extent of
> departure from normal methods of performance; and whether the specific act was
> one that the employer could reasonably have anticipated."

<u>Sgaliordich v. Lloyd's Asset Mgmt.</u>, No. 10 Civ. 03669 (ERK), 2011 WL 441705, at *3-4

(E.D.N.Y. Feb. 8, 2011) (quoting <u>Riviello v. Waldron</u>, 47 N.Y.2d 297, 303 (1979)).

        The acts that Freedman and Andrade are alleged to have engaged in were well

within the scope of their employment.  Freedman's primary function at Knoedler was to sell

paintings at a profit, and in allegedly selling numerous forged art works at Knoedler, Freedman

was acting within the scope of her responsibilities.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 2-3, 30)

Andrade was likewise acting within the scope of his responsibilities when he allegedly

(1) persuaded Rosales to bring the Rosales Paintings to Knoedler; (2) introduced Rosales to

---

[23] To the extent that 8-31 argues in this context that Plaintiffs have not pled facts demonstrating
Hammer's involvement in the alleged fraudulent scheme (<u>see</u> 8-31 Br. (<u>De Sole</u> Dkt. No. 216) at
7), that argument is rejected for the reasons stated above.  Moreover, the Court concludes that all
of Hammer's acts on behalf of 8-31 were within the scope of his employment.

Knoedler and Freedman; and (3) provided David Herbert's name to Freedman to use in furtherance of the fraudulent scheme.  (SAC (De Sole Dkt. No. 118) ¶¶ 10, 28, 117, 213, 244, 248)  These acts – selling paintings and bringing paintings to Knoedler for sale at the gallery – were central to Freedman and Andrade's job functions.

"An employer does not have to approve, or even be aware of, a representation made by an employee to be liable for that representation."  Glidepath Holding, 590 F. Supp. 2d at 453.  "An agent does not cease to act within his or her authority merely because the agent is engaged in a fraud upon a third person."  2A N.Y. Jur.2d Agency & Indep. Contractors § 290.  It is thus plausibly alleged that Freedman and Andrade's actions were "undertaken within the scope of the employee's duties to the employer and was thus in furtherance of the employer's interests."[24]  Doe, 12 F. Supp. 3d at 677; see also U.S. Commodity Futures Trading Comm'n v. Byrnes, 58 F. Supp. 3d 319, 329 (S.D.N.Y. 2014) ("Although the Employees' disclosures were inconsistent with their official duties and contrary to NYMEX policy, it is not unreasonable to infer from their alleged conduct that they thought they were advancing NYMEX's purposes.").

The De Sole Plaintiffs have plausibly alleged fraudulent concealment, aiding and abetting, and fraud conspiracy claims against 8-31.[25]  See Selechnik v. Law Office of Howard R.

---

[24] 8-31 contends that because Andrade was also an employee of Knoedler, his actions were "taken within the scope of his employment with Knoedler" and cannot be attributed to 8-31.  (8-31 Br. (De Sole Dkt. No. 216) at 7-8)  Given the unchallenged alter ego allegations here, Andrade's work for Knoedler was also performed for 8-31.

[25] Howard may not recover on his fraud conspiracy claim against 8-31 to the extent it alleges respondeat superior liability for Freedman's conduct in the fraud conspiracy, however.  The SAC does not allege a fraud conspiracy claim against Freedman.  Accordingly, the De Soles may not recover against 8-31 for fraud conspiracy on a respondeat superior basis to the extent that they are relying on Freedman's conduct.  See Shapiro v. Kronfeld, No. 00 Civ. 6286, 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004) (dismissing claims premised upon a theory of respondeat superior because "there can be no imposition of vicarious liability in the absence of underlying liability"); see also San Diego Cnty. Employees Ret. Ass'n v. Maounis, 749 F. Supp.

Birnbach, 82 A.D.3d 1077, 1080-81 (2d Dep't 2011).  8-31's motion to dismiss these claims is

denied.

### 2.      Howard's Claims Against 8-31

8-31 has moved to dismiss Howard's fraudulent concealment and aiding and

abetting claims[26] to the extent they (1) are based on a theory of respondeat superior; and

(2) "attempt[] to impose liability based on the fact that 8-31 is the controlling member of

Knoedler or [based on] allegations that fail to meet the particularity requirement of Rule 9(b)."

(8-31 Br. (Howard Dkt. No. 265) at 3)

### a.      Fraudulent Concealment

The Amended Complaint alleges that "8-31 is liable for fraudulent concealment

because it was effectively the beneficial owner and controlling member of Knoedler, was

Knoedler's alter ego, directed many of the fraudulent activities and concealment, and had actual

knowledge of the alleged fraud."  (Am. Cmplt. (Howard Dkt. No. 179) ¶ 326)

Knoedler is a Delaware limited liability corporation and 8-31 is its sole member.

(Id. ¶¶ 31, 32)  "[T]he Delaware Limited Liability Company Act permits a member in an LLC to

be an active participant in management and still to retain limited liability."  Great Lakes Chem.

Corp. v. Monsanto Co., 96 F. Supp. 2d 376, 391-92 (D. Del. 2000).  Indeed, Delaware law makes

clear that, except as otherwise provided elsewhere in the statute or by agreement, "no member or

manager of a limited liability company shall be obligated personally for any [] debt, obligation or

---

2d 104, 129 (S.D.N.Y. 2010) (same); Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372,
459 (S.D.N.Y. 2010) (same).

[26]  The Amended Complaint's fraud conspiracy claim contains no allegations concerning 8-31.
See Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 346-353.  Accordingly, 8-31's motion to dismiss is
granted as to this claim.

liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company."  6 Del. Code Ann. § 18-303(a).  Thus, to the extent the Amended Complaint asserts a fraudulent concealment claim against 8-31 on the grounds that 8-31 is the beneficial owner and controlling member of Knoedler, that claim will be dismissed.

8-31 has not disputed Howard's alter ego allegations, however, and those allegations are sufficient at this stage to preserve Howard's fraudulent concealment claim against 8-31.  8-31's motion to dismiss Howard's fraudulent concealment claim is denied.

### b.    Aiding and Abetting Fraud

The Amended Complaint alleges that "8-31 is liable for Andrade's conduct in aiding and abetting [] fraud under the doctrine of respondeat superior," and that "8-31 is liable for Hammer's conduct in aiding and abetting the fraud because Hammer participated in the racketeering scheme in his capacity as the President of 8-31."  (Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 344-45)  8-31 moves to dismiss this claim, arguing that it cannot be held liable for the actions of Andrade or Hammer under the doctrine of respondeat superior.  (8-31 Br. (Howard Dkt. No. 265) at 6-8)

As noted earlier, Howard has pled sufficient facts to demonstrate Hammer's knowing involvement in the fraud scheme.  Moreover, the Amended Complaint plausibly alleges that Hammer was 8-31's employee, as he was 8-31's president, received an annual salary of approximately $400,000 from 8-31, and received expense reimbursements for "travel and entertainment" from 8-31.  (Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 231, 246, 248, 255)  Moreover, Howard has plausibly alleged that Hammer's actions were taken in his capacity as president of 8-31 and within the scope of his employment.

As to Andrade, 8-31 again argues that it is not the employer of any Knoedler employee.  (8-31 Br. (Howard Dkt. No. 265) at 5)  It is not necessary for this Court to resolve the respondeat superior issue at this time, however, because 8-31 has not challenged Howard's allegations demonstrating that 8-31 is Knoedler's alter ego.  For reasons already discussed – based on the allegations of the Amended Complaint – there is no viable argument that Andrade was not acting within the scope of his employment at Knoedler.  See Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 269, 292, 338, 341.  8-31's motion to dismiss Howard's aiding and abetting fraud claim is denied.

## IX.   BREACH OF WARRANTY

Knoedler has moved to dismiss Plaintiffs' breach of warranty claims.  (Knoedler Br. (De Sole Dkt. No. 212) at 5-6, 10-12; Knoedler Br. (Howard Dkt. No. 269) at 5-12)

### A.   Howard's Breach of Warranty Claim Against Knoedler

In the Amended Complaint, Howard alleges that Knoedler and Freedman's representations to him and Frankfurt constitute an express warranty under N.Y. U.C.C. § 2-313(1)[27] and § 13.01 of the New York Arts and Cultural Affairs Law.  (Am. Cmplt. (Howard

---

[27] N.Y. U.C.C. § 2-313 provides:

   (1) Express warranties by the seller are created as follows:

      (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

      (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

      (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

   (2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty,

Dkt. No. 179) ¶¶ 358-59)  An express warranty is "[a]ny affirmation of fact or promise made by

the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."

N.Y. U.C.C. § 2-313(1)(a).  "In order to demonstrate that an express warranty was created under

New York law, a plaintiff 'must prove that the statement falls within the definition of warranty,

that she relied on it, and that it became part of the basis for the bargain.'"  Kraft v. Staten Island

Boat Sales, Inc., 715 F. Supp. 2d 464, 473 (S.D.N.Y. 2010) (quoting Daley v. McNeil Consumer

Prod., Co., 164 F. Supp. 2d 367, 377 (S.D.N.Y. 2001)).

> Howard alleges that Freedman and Knoedler made the following representations

to him and Frankfurt:

> (1) the [w]ork was created by Willem de Kooning in 1956-57; (2) the [w]ork was
> owned by the son of a Swiss private collector who obtained the [w]ork from de
> Kooning via David Herbert; (3) the [w]ork came directly to Knoedler from an
> individual, whom Knoedler and Freedman knew personally; and (4) the [w]ork
> was a "rare" and "distinctive" example of a de Kooning landscape and that it was
> of "impeccable" quality and provenance.

(Am. Cmplt. (Howard Dkt. No. 179) ¶ 355-57)  Howard also alleges that "the representations

concerning authenticity and provenance in the invoice by defendants (who are art merchants) to

Howard (who is not) constitute express warranties under § 13.01 of the New York Arts and

Cultural Affairs Law."  (Id. ¶ 359)

> Knoedler argues that Howard's breach of warranty claim must be dismissed

because (1) it is untimely; and (2) Frankfurt is an "art merchant" who advised Howard in

connection with this purchase, and therefore no warranty claim lies.  (Knoedler Br. (Howard Dkt.

No. 269) at 5-12; Knoedler Reply Br. (Howard Dkt. No. 303) at 3-15)

---

but an affirmation merely of the value of the goods or a statement purporting to be merely
the seller's opinion or commendation of the goods does not create a warranty.

N.Y. U.C.C. § 2-313.

Under Section 2-725(1) of New York's Uniform Commercial Code, an action for breach of warranty must be brought within four years of the date the cause of action accrues. N.Y. U.C.C. § 2-725(1). Section 2-725(2) provides that

> [a] breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.Y. U.C.C. § 2-725(2). The statute further provides that "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." Id. In sum, the plain language of the statute makes clear that the statute of limitations generally begins to run "on tender of delivery," and that lack of knowledge of a defect has no effect on the running of the limitations period. See Brady v. Lynes, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at *11 (S.D.N.Y. June 2, 2008) (argument that breach occurs upon discovery is "contrary to black letter law"); Morgan v. Abco Dealers, Inc., No. 01 Civ. 9564 (PKL), 2007 WL 4358392, at *6 (S.D.N.Y. Dec. 11, 2007); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 224 (S.D.N.Y. 2001).

In previously dismissing Howard's breach of warranty claim, this Court noted that it is undisputed that Howard purchased the de Kooning painting from Knoedler and Freedman on June 13, 2007, and filed this action on July 6, 2012. De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 318 (S.D.N.Y. 2013). Accordingly, Howard's breach of warranty claim is untimely unless the statute was extended for some reason. Id. Howard has not pointed to any provision in the New York U.C.C. that would have extended the limitations period.

Having concluded that the breach of warranty claim is untimely, the Court must consider whether any equitable principle should be applied to preserve the claim. Howard

argues that the statute of limitations was equitably tolled as a result of Knoedler's fraudulent

concealment.  (Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 361-63; Howard Opp. Br. (Howard Dkt.

No. 292) at 204-11)  The doctrine of equitable tolling applies where defendant's fraudulent

conduct results in plaintiff's lack of knowledge of a cause of action.[28]  Marshall v. Hyundai

Motor Am., 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014); see also Pearl v. City of Long Beach, 296

F.3d 76, 82 (2d Cir. 2002); Fertitta, 2015 WL 374968, at *8 ("The breach of warranty claim

arises under New York law and, therefore, this Court applies both New York's statute of

---

[28] "'Under New York law, the doctrines of equitable tolling or equitable estoppel may be
invoked to defeat a statute of limitations defense when the plaintiff was induced by fraud,
misrepresentations or deception to refrain from filing a timely action.'"  Marshall v. Hyundai
Motor Am., 51 F. Supp. 3d 451, 462 (S.D.N.Y. 2014) (quoting Abbas v. Dixon, 480 F.3d 636,
642 (2d Cir. 2007) (internal quotations marks omitted).  Howard argues that the doctrine of
equitable estoppel – rather than the doctrine of equitable tolling – applies here.  (Howard Opp.
Br. (Howard Dkt. No. 292) at 205 n. 57)  However, "the reported decisions of the federal and
state courts do not always mean the same thing by their use of these phrases, and phrases to
which some judges ascribe different meanings are used interchangeably by other judges."  Pearl
v. City of Long Beach, 296 F.3d 76, 81 (2d Cir. 2002).  It has been said that "New York appears
to use the label 'equitable estoppel' to cover both the circumstances 'where the defendant
conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware
of his cause of action, but the defendant induces him to forego suit until after the period of
limitations has expired.'"  Pearl, 296 F.3d at 82 (quoting Joseph M. McLaughlin, Practice
Commentaries, N.Y. C.P.L.R. C201:6, at 63 (McKinney 1990)).  However, some New York
courts distinguish between the two circumstances, and refer only to the latter circumstance as
equitable estoppel:

> Although both the doctrines of equitable estoppel and equitable tolling have a
> common origin, they are applied in different circumstances.  Equitable estoppel is
> applicable where the plaintiff knew of the existence of the cause of action, but the
> defendant's misconduct caused the plaintiff to delay in bringing suit.  Equitable
> tolling, on the other hand, is applicable where the defendant has wrongfully deceived
> or misled the plaintiff in order to conceal the existence of a cause of action.

Kotlyarsky v. New York Post, 195 Misc. 2d 150, 153 (Sup. Ct. Kings Cnty. 2003) (internal
citations omitted); see also Marshall, 51 F. Supp. 3d at 463; Statler, D.C., v. Dell, Inc., 775 F.
Supp. 2d 474, 482 (E.D.N.Y. 2011).  For the sake of clarity, and because Howard does not assert
that he knew of the existence of the cause of action long before filing suit, this Court will refer to
Howard's claim as one for equitable tolling.  See Howard Opp. Br. (Howard Dkt. No. 292) at
204-05; Shared Commc'ns Servs. of ESR, Inc. v. Goldman, Sachs & Co., 38 A.D.3d 325, 326
(1st Dep't 2007).

limitations and its equitable tolling doctrine.") (citing Statistical Phone Philly, 116 F. Supp. 2d at 482 (citation omitted)); Access Northern Sec. Corp. v. Linear Corp., No. 97 Civ. 2937 (KMW), at *4-6 (S.D.N.Y. Sept. 4, 1998) (applying equitable tolling to a breach of warranty claim under N.Y. U.C.C. § 2-725); Statler, D.C., v. Dell, Inc., 775 F. Supp. 2d 474, 482-83 (E.D.N.Y. 2011) (discussing equitable tolling in the context of a breach of warranty claim under N.Y. U.C.C. § 2-725); Jackson v. Eddy's LI RV Ctr., Inc., 845 F. Supp. 2d 523, 531-33 (E.D.N.Y. 2012) (same).

      "For equitable tolling to apply, plaintiff must show that the defendant wrongfully concealed its actions, such that plaintiff was unable, despite due diligence, to discover facts that would allow him to bring his claim in a timely manner, or that defendant's actions induced plaintiff to refrain from commencing a timely action." De Sole, 974 F. Supp. 2d at 318 (citing Statistical Phone Philly v. NYNEX Corp., 116 F. Supp. 2d 468, 482 (S.D.N.Y. 2000)); see also Marshall, 51 F. Supp. 3d at 462 (plaintiff must show that "'the defendant wrongfully concealed material facts,' which 'prevented plaintiff's discovery of the nature of the claim,' and that 'plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled'") (quoting Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012)); Abbas v. Dixon, 480 F.3d 636, 642 (2d Cir. 2007) ("'Due diligence on the part of the plaintiff in bringing [an] action,' . . . is an essential element of equitable relief.") (quoting Doe v. Holy See (State of Vatican City), 17 A.D.3d 793, 794 (3rd Dep't 2005)).

      "'When deciding whether to toll the running of the statute of limitations, the issue is not whether Plaintiff was in possession of all of the information necessary to prevail on his claims, but whether plaintiff had enough information to commence a lawsuit.'" De Sole, 974 F. Supp. 2d at 318 (quoting Statler, 775 F. Supp. 2d at 483). "To allege fraudulent concealment sufficient to justify equitable tolling, . . . a plaintiff must either plausibly allege 'that the

defendant took affirmative steps to prevent the plaintiff's discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." Id. at 318-19 (quoting State of New York v. Hendrickson Bros., 840 F.2d 1065, 1083 (2d Cir. 1988)).  In previously dismissing Howard's breach of warranty claim, this Court concluded that Howard had not pled facts demonstrating either that Knoedler "took affirmative steps to prevent [his] discovery of his claim or injury or that the wrong itself was of such a nature as to be self-concealing." Id. at 318-19.

Howard now alleges that (1) "Knoedler intentionally concealed all information that would place a purchaser on notice that there were serious concerns with the Rosales Collection works, including the FBI investigation and the Herrick Feinstein report that caused Knoedler to discontinue sales of [such] works"; and (2) Hammer directed "Knoedler employees not [to] divulge any information that would lead purchasers to believe that there were problems with the works they had purchased."  (Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 362, 364)

To benefit from the equitable tolling doctrine under New York law, a "'plaintiff[] [must] establish that subsequent and specific actions [were taken by defendants, separate from those that provide the factual basis for the underlying cause of action, and that these subsequent actions] by defendants somehow kept [plaintiff] from timely bringing suit.'"[29]  Corsello v.

---

[29]  Howard's allegations that "Freedman and Knoedler concealed . . . information [about authenticity and provenance] from Howard such that Howard was unable, despite due diligence, to bring his claims in a timely manner" are thus insufficient, because Howard relies on these same allegations in pleading his RICO and fraud claims.  (Am. Cmplt. (Howard Dkt. No. 179) ¶ 361)  Moreover, as this Court stated in its September 30, 2013 opinion and order, such "[g]eneralized or conclusory allegations of fraudulent concealment are not sufficient to toll a statute of limitations." De Sole, 974 F. Supp. 2d at 319 (citing Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983)).

Howard further alleges that "[t]he nature of the wrong was self-concealing," and that "there was no way for Howard or any other victim to ascertain the accuracy of Knoedler's warranties." (Am. Cmplt. (Howard Dkt. No. 179) ¶ 362)  The Second Circuit rejected this argument in a case involving a forged John Singer Sargent painting, however.  See Rosen v. Spanierman, 894 F.2d

Verizon New York, Inc., 18 N.Y.3d 777, 789 (2012) (quoting Zumpano v. Quinn, 6 N.Y.3d 666,

674 (2006)); see also Ross v. Louise Wise Services, Inc., 8 N.Y.3d 478, 491 (2007) (with respect

to negligence and emotional distress claims, stating that "[f]or the [equitable estoppel] doctrine

to apply, a plaintiff may not rely on the same act that forms the basis for the claim – the later

fraudulent misrepresentation must be for the purpose of concealing the former tort"); Keitt v.

New York City, 882 F. Supp. 2d 412, 439 (S.D.N.Y. 2011) ("New York law provides for

equitable tolling where a defendant 'wrongfully deceived or misled the plaintiff in order to

conceal the existence of a cause of action.'") (citation omitted); Kotlyarsky, 195 Misc. 2d at 153

("Equitable tolling . . . is applicable where the defendant has wrongfully deceived or misled the

plaintiff in order to conceal the existence of a cause of action.") (citations omitted).  "[W]here

the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they

had committed, [New York courts] have held that the defendants were not estopped from

pleading a statute of limitations defense."  Corsello, 18 N.Y.3d at 789.  Because "mere silence or

failure to disclose the wrongdoing is insufficient," De Sole, 974 F. Supp. 2d at 318, Howard's

allegations that Knoedler did not disclose the FBI investigation and its lawyers' internal

---

28, 32 (2d Cir. 1990) (discovery exception to statute of limitations set forth in N.Y. U.C.C. § 2-
725(2) did not apply where plaintiffs contended that they had been duped into purchasing a
forged painting).  The Rosen court found that the forged nature of the purported Sargent painting
was discoverable at the time of delivery through measures that were not "extraordinary."  Rosen,
894 F.2d at 32 ("While we would hesitate to deem the alleged defect here readily discoverable if
extraordinary measures were required to detect the flaw, a painting's lack of authenticity is
readily apparent to the trained eye of an art expert.").  Even assuming arguendo that the task of
determining the inauthenticity of Howard's alleged de Kooning was more challenging than
determining the legitimacy of the Sargent painting in Rosen, Howard has not pled facts sufficient
to demonstrate that "[t]he nature of the wrong was self-concealing," and that "there was no way
for Howard or any other victim to ascertain the accuracy of Knoedler's warranties."  See Am.
Cmplt. (Howard Dkt. No. 179) ¶ 362.

investigation – and instructed its employees not to disclose information about art works Knoedler had sold – are insufficient to justify equitable tolling.

In the Amended Complaint, however, Howard contends that Knoedler took affirmative steps to prevent Howard's discovery of his claim:  (1) Knoedler continued to sell certain purported Robert Motherwell paintings supplied by Rosales through 2009; and (2) on October 27, 2009, Hammer sent a letter to all Knoedler clients misrepresenting the circumstances surrounding Freedman's departure from Knoedler.[30]  (Id. ¶¶ 363-64)

In August 2009, Knoedler offered to sell a forged Motherwell painting to Howard. Knoedler shipped the painting to Frankfurt for delivery to Howard.  (Am. Cmplt. (Howard Dkt. No. 179) ¶ 221)  Freedman and Knoedler represented to Frankfurt and Howard that this painting had the same provenance as the de Kooning Howard had previously purchased.  (Id. ¶ 222)  The Amended Complaint alleges, however, that Freedman had "commissioned" Pei-Shen Qian – the creator of the Rosales Paintings – to create a forged Motherwell "for the purpose of inducing Howard to purchase it."  (Id. ¶¶ 43, 211, 215)  Accordingly, the purpose of creating the forged Motherwell was to make another sale to Howard, not to conceal Knoedler's prior fraud in selling

_____

[30]  Howard also cites a February 11, 2011 letter Knoedler sent to Pierre Lagrange, who had purchased a purported Pollock from Knoedler.  (Howard Am. Cmplt. ¶¶ 239, 363)  The Amended Complaint asserts that "when Pierre Lagrange expressed concerns about the 'Pollock' he had purchased from Knoedler, [Knoedler] responded by a faxed letter dated February 11, 2011 that . . . simply restated the misrepresentations Freedman had made to Lagrange in 2007 [when he purchased the painting]."   (Id. ¶ 239)

Howard has not plausibly alleged that Knoedler's alleged misrepresentations to Lagrange were made for the purpose of concealing Knoedler's fraud on Howard, however.  The apparent purpose of Knoedler's February 11, 2011 letter to Lagrange was to assuage Lagrange's concerns. Moreover, the Amended Complaint does not allege that Howard ever knew of, read, or relied on Knoedler's letter to Lagrange.  Accordingly, the Lagrange letter provides no basis for equitable tolling in connection with Howard's breach of warranty claim against Knoedler.

the alleged de Kooning to Howard.  Knoedler's attempted sale of a forged Motherwell to

Howard provides no basis for equitable tolling.

As to Hammer's October 27, 2009 letter announcing Freedman's "resignation,"

the Amended Complaint alleges the following:

> 121.    Upon information and belief, in or around 2009, a grand jury was empaneled to investigate Freedman, Rosales, Knoedler and the Rosales Collection works.  In September 2009, the grand jury issued subpoenas to Freedman and Knoedler seeking information [concerning the Rosales Paintings].

> 122.  Shortly after Knoedler received the grand jury subpoena, Hammer fired Freedman.

> 123.  Under Hammer's direction, Freedman's departure – which attracted significant press attention – was carefully managed to ensure that no connection could be drawn between Freedman's supposed "resignation" and the Rosales Collection works.

> 124.  Hammer, in his role as Chairman of Knoedler, also sent letters to every Knoedler customer and contact informing them of this personnel change without stating the truth, which as Freedman herself characterized it, was that she had been "kicked out."

> 125.  Even though press reports noted that Knoedler was losing important artist clients as a result of Hammer's deliberate decision to leave the issue "murky," Hammer kept the real reasons for Freedman's termination quiet so that no one, including plaintiff and the other victims, suspected that she had been "kicked out" in connection with the sales of questionable artworks from an undocumented source.

> . . . .

> 127.  On October 27, 2009, Hammer sent a letter by mail on Knoedler letterhead to all of Knoedler's clients.  It announced Freedman's "resignation," but was silent about the fact that she had been terminated, let alone the reason for her termination.  The purpose of the letter was to inform clients – falsely – that all was well with Knoedler, and concluded by stating that Hammer "very much look[ed] forward to the continuance of our much-valued relationship with you."

(Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 121-25, 127)

Hammer's alleged misrepresentations concerning the circumstances of, and reasons for, Freedman's departure can plausibly be read as an attempt to prevent discovery of the fraud scheme.  Howard has not alleged that he saw the letter, however, much less that he relied on it.  Reasonable reliance on a defendant's misrepresentations is a required element for invoking equitable tolling.  See Zumpano v. Quinn, 6 N.Y.3d 666, 674 (2006) ("the plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations"); Simcuski v. Saeli, 44 N.Y.2d 442, 449 (1978) (reliance is a necessary element for invoking doctrine of equitable estoppel); Dombroski v. Samaritan Hosp., 47 A.D.3d 80, 82-83 (3d Dep't 2007) ("Even where an intentional misrepresentation is thus established, to invoke the [equitable estoppel] doctrine a plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations and due diligence on the part of the plaintiff in bringing the action.") (internal citations and quotation marks omitted); Shared Commc'ns Servs. of ESR, Inc. v. Goldman, Sachs & Co., 38 A.D.3d 325, 326 (1st Dep't 2007) ("there is no basis for tolling the statute of limitations under New York's doctrine of equitable estoppel, since plaintiff failed to show that it was prevented from timely filing an action due to reasonable reliance by it on 'deception, fraud or misrepresentations' by defendant") (citation omitted); Pahlad v. Brustman, 33 A.D.3d 518, 519-520 (1st Dep't 2006) ("plaintiff must demonstrate reasonable reliance on the defendant's misrepresentations, . . . and due diligence on the part of the plaintiff in ascertaining the facts, and in commencing the action, is an essential element when plaintiff seeks the shelter of [the equitable estoppel] doctrine"), aff'd, 8 N.Y.3d 901 (2007); Twersky v. Yeshiva Univ., 993 F. Supp. 2d 429, 442-43 (S.D.N.Y. 2014) ("In order to invoke equitable estoppel, a plaintiff must also demonstrate reasonable reliance on the defendant's misrepresentations, and due diligence in bringing a claim when the conduct relied upon as a basis for equitable estoppel ceases to be

operational."), aff'd 579 F. App'x 7 (2d Cir. 2014); Corp. Trade, Inc. v. Golf Channel, No. 12
Civ. 8811 (PKC), 2013 WL 5375623, at *6 (S.D.N.Y. Sept. 24, 2013) ("'Equitable estoppel is
appropriate where the plaintiff is prevented from filing an action within the applicable statute of
limitations due to his or her reasonable reliance on deception, fraud or misrepresentations by the
defendant.'") (quoting Putter v. N. Shore. Univ. Hosp., 7 N.Y.3d 548, 552 (2006)).

Because Howard has not alleged that he saw Hammer's October 27, 2009 letter,
much less that he relied on it, there is no basis to apply equitable tolling.  Howard's breach of
warranty claim against Knoedler is dismissed.

### B.        The De Soles' Breach of Warranty Claim Against Knoedler

The De Soles allege that Knoedler and Freedman made the following
representations directly to them:

> (1) the [w]ork was created by Mark Rothko; (2) the [w]ork was owned by the son
> of a Swiss private collector who obtained the [w]ork from Rothko via David
> Herbert; (3) the [w]ork came directly to Knoedler from an individual, whom
> Knoedler and Freedman knew personally; and (4) the [w]ork had been
> authenticated by numerous experts, including David Anfam and Christopher
> Rothko.

(SAC (De Sole Dkt. No. 118) ¶ 267)  The De Soles also allege that in a December 11, 2004
letter, Knoedler and Freedman state:  "Knoedler warrants the authenticity and good title of [the
purported Rothko painting sold to the De Soles]."  (Id. ¶ 270)  The De Soles claim that these
representations constitute an express warranty under N.Y. U.C.C. § 2-313(1).  (Id. ¶ 269)

Knoedler argues that the De Soles' breach of warranty claim must be dismissed
because (1) it is untimely; and (2) the De Soles have not properly alleged a warranty.  (Knoedler
Br. (De Sole Dkt. No. 212) at 1, 5-12; Knoedler Reply Br. (De Sole Dkt. No. 241) at 3-15)

It is undisputed that the De Soles purchased the Rothko from Knoedler and
Freedman on December 17, 2004.  (SAC (De Sole Dkt. No. 118) ¶¶ 88, 217(e))  Accordingly,

the De Soles' breach of warranty cause of action accrued on that date, and the statute of

limitations expired on December 17, 2008. Given that the De Soles filed this action on March

28, 2012 (see Cmplt. (De Sole Dkt. No. 1)), their breach of warranty claim is untimely unless the

statute was extended for some reason. The De Soles have not pointed to any provision in the

New York U.C.C. that extended the limitations period. Instead, the De Soles assert that the

doctrine of equitable tolling applies to preserve their breach of warranty claim against Knoedler.

(SAC (De Sole Dkt. No. 118) ¶ 275)

The De Soles argue that a written appraisal Knoedler provided to them on January

19, 2008 – which states that "'the probable cost of replacing the [Rothko] with a similar work'"

is $9 million – constitutes a misrepresentation that triggers equitable tolling. (SAC (De Sole

Dkt. No. 118) ¶ 276) The De Soles further argue that Knoedler knew that the Rosales Paintings

were forgeries at the time it provided the appraisal, but provided the false valuation of the

"Rothko" in order to prevent the De Soles from becoming aware of a potential claim against

Knoedler. (Id. ¶ 276)[31]

---

[31] The De Soles also argue that the statute of limitations was tolled because "Knoedler's scheme was . . . inherently self-concealing. There was no way for the De Soles or any other victim to ascertain the accuracy of Knoedler's warranties, and Knoedler intentionally concealed all information that would place a purchaser on notice that there were serious concerns with the Rosales Collection works. . . ." (SAC (De Sole Dkt. No. 118) ¶ 278) This argument is rejected for the same reasons set forth above in connection with Howard's breach of warranty claim.

The De Soles further contend that equitable tolling is warranted based on Hammer's October 27, 2009 letter announcing Freedman's "resignation." (Id. ¶ 277) Given that the statute of limitations on Howard's breach of warranty claim expired in December 2008, however, Hammer's October 27, 2009 letter is irrelevant to the tolling inquiry. See Koch v. Christie's Int'l PLC, 699 F.3d 141, 157 (2d Cir. 2012) ("While [plaintiff] makes specific allegations with respect to [certain events in 2006], the District Court correctly found that those allegations were irrelevant because the statute of limitations had already run by that time."); Katopodis et al. v. Marvin Windows and Doors, 105 A.D.3d 633, 634 (1st Dep't 2013) (finding "no basis for the [lower] court to extend the statute of limitations based on a September 9, 2009 letter sent by defendant, which offered to provide certain replacement parts pursuant to the terms of the

Knoedler contends, however, that its January 19, 2008 appraisal was not an "affirmative act of concealment," but instead is part of "'the same act that forms the basis for [Plaintiffs' breach of warranty] claim,'" and thus does not provide a basis for equitable tolling. (Knoedler Br. (De Sole Dkt. No. 212) at 8 (quoting De Sole, 974 F.Supp. 2d at 319); see also Knoedler Reply Br. (De Sole Dkt. No. 241) at 10)  This argument is incorrect.  The appraisal was not part of the original sale of the purported Rothko.  Knoedler provided the appraisal to the De Soles more than three years after they had purchased the painting, so that the De Soles could obtain insurance coverage for the painting.  (SAC (De Sole Dkt. No. 118) ¶¶ 124, 276)  Under the circumstances, it is reasonable to infer that the De Soles relied on Knoedler's valuation.

In representing to the De Soles – more than three years after the sale of the purported Rothko – that the painting was worth $9 million, Knoedler was – in effect – reaffirming the authenticity of the Rothko and acting to conceal its prior fraudulent conduct.  The De Soles have thus plausibly alleged that Knoedler – by intentionally providing a false appraisal, "'took affirmative steps to prevent the plaintiff's discovery of his claim or injury. . . .'"  De Sole, 974 F. Supp. 2d at 318-19 (citing Armstrong v. McAlpin, 699 F.2d 79, 90 (2d Cir. 1983)).  Accordingly, this Court concludes that the De Soles have pled facts sufficient to make out an equitable tolling claim.  Knoedler's motion to dismiss the De Soles' breach of warranty claim is denied.

## X.   UNILATERAL AND MUTUAL MISTAKE

The De Soles assert claims for unilateral mistake and mutual mistake against Knoedler.  (SAC (De Sole Dkt. No. 118) ¶¶ 279-92)  Knoedler has moved to dismiss these

---

express limited warranty," because "the statute of limitations already had expired at the time the letter was sent").

claims, arguing that are time barred, and that the De Soles did not exercise ordinary care and were "consciously ignorant" about the purported Rothko they purchased.  (Knoedler Br. (De Sole Dkt. No. 212) at 6-10, 13-15)

### A.      Statute of Limitations

Mistake claims are governed by a six-year statute of limitations.  See N.Y. C.P.L.R. 213(6).  A cause of action for mistake accrues at the time of the alleged mistake.  Here, the De Soles purchased the alleged Rothko from Knoedler and Freedman on December 17, 2004; accordingly, the statute of limitations expired on December 17, 2010.  Because the De Soles filed this action on March 28, 2012 (see Cmplt. (De Sole Dkt. No. 1)), their mistake claims are untimely unless the statute was extended for some reason.  The De Soles do not argue that the limitations period was extended.  Instead, they contend that equitable tolling applies.  (SAC (De Sole Dkt. No. 118) ¶¶ 286, 292)

For the reasons stated above in connection with the De Soles' breach of warranty claim, this Court concludes that the January 19, 2008 appraisal Knoedler provided to the De Soles constitutes a sufficient factual basis – at the pleading stage – to make out a claim for equitable tolling.  See First Am. Title Ins. Co. of New York v. Fiserve Fulfillment Servs., Inc., No. 06 Civ. 7132, 2008 WL 282019, at *4 (S.D.N.Y. Jan. 25, 2008) (applying the doctrine of equitable tolling in the context of a breach of contract claim); Bridgeway Corp. v. Citibank, N.A., 132 F. Supp. 2d 297, 304 (S.D.N.Y. 2001) (same).

### B.      Applicable Law Concerning Mistake Claims

#### 1.      Unilateral Mistake

"A 'unilateral mistake' occurs when 'only one of the parties to a bilateral transaction is in error.'"  Healy v. Rich Prods. Corp., 981 F.2d 68, 73 (2d Cir. 1992) (quoting 21

59

N.Y. Jur. 2d Contracts § 121 (1982)).  "Under New York law, in order for a court to allow rescission of a contract on the basis of unilateral mistake, 'a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made.'"  Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 599 (quoting Ludwig v. NYNEX Serv. Co., 838 F. Supp. 769, 795 (S.D.N.Y. 1993)), supplemented, 458 F. Supp. 2d 178 (S.D.N.Y. 2006).

New York law does not permit reformation or rescission of a contract for unilateral mistake alone.  See Collins v. Harrison-Bode, 303 F.3d 429, 435 (2d Cir. 2002).  A unilateral mistake must be "coupled with some fraud." Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991); see also AMEX Assurance Co. v. Caripides, 316 F.3d 154, 161 (2d Cir. 2003) (holding that reformation requires "a mistake on one side, and fraud on the other").

### 2.    Mutual Mistake

"'A "mutual mistake" occurs when "both . . . parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent."'" Creative Waste Mgmt., Inc., 429 F. Supp. 2d at 608 (quoting Healy, 981 F.2d at 73 (quoting 21 N.Y. Jur.2d Contracts § 121 (1982))).  Under New York law, "[w]hile mutual mistake will justify rescission where the mistake exists at the time the contract is entered into and the mistake is substantial[,] . . . it may not be invoked by a party to avoid the consequences of its own negligence." P.K. Dev., Inc. v. Elvem Dev. Corp., 226 A.D.2d 200, 202 (1st Dep't 1996) (citing Da Silva v. Musso, 53 N.Y.2d 543, 552 (1981); Vandervort v. Higginbotham, 222 A.D.2d 831, 832 (3rd Dep't 1995)).

60

"Even where a party must go beyond its own efforts in order to ascertain relevant facts (such as obtaining experts' reports), courts have held that the party must bear the risk of mistake if it chooses to act on its otherwise limited knowledge."  Id. at 201-02.  Thus, a party "bears the risk of mistake when  . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient."  Restatement (Second) of Contracts § 154(b).

       **B.**    <u>**Analysis**</u>

The De Soles have adequately pled unilateral mistake and mutual mistake claims against Knoedler.  As to unilateral mistake, it is undisputed that the De Soles believed that the painting they purchased was a genuine Rothko.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 280)  Moreover, the SAC contains numerous allegations that Knoedler and Freedman acted with fraudulent intent.  (<u>Id.</u> ¶¶ 2, 8, 94, 96, 150)  As to mutual mistake, the De Soles allege – in the alternative – that both they and Knoedler mistakenly believed that the painting the De Soles purchased was a genuine Rothko.  (<u>Id.</u> ¶ 288)

While Knoedler argues that both mistake claims should be dismissed because the De Soles did not exercise ordinary care and were consciously ignorant of the painting they had purchased, these issues cannot be resolved as a matter of law at this stage of the proceedings.  The cases cited by Knoedler (Knoedler Br. (<u>De Sole</u> Dkt. No. 212) at 13-15) were decided at summary judgment, not on the pleadings.

Knoedler's motion to dismiss the De Soles' mistake claims is denied.

## CONCLUSION

Knoedler's motion to dismiss in <u>De Sole</u> (Dkt. No. 211) is denied, and Hammer and 8-31's motions to dismiss in <u>De Sole</u> (Dkt. Nos. 210, 213, 215) are granted in part and denied in part as set forth above.

Knoedler's motion to dismiss the breach of warranty claim in <u>Howard</u> (Dkt. No. 268) is granted, and Hammer and 8-31's motions to dismiss in <u>Howard</u> (Dkt. Nos. 264, 266) are granted in part and denied in part as set forth above.

The Clerk of the Court is directed to terminate the following motions:  <u>De Sole</u>, 12 Civ. 2313 (Dkt. Nos. 210, 211, 213, 215); <u>Howard</u>, 12 Civ. 5263 (Dkt. Nos. 264, 266, 268).

Dated: New York, New York
          September 30, 2015                SO ORDERED.

                                            _____
                                            Paul G. Gardephe
                                            United States District Judge