USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: October 9, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOMENICO DE SOLE, AND ELEANOR
DE SOLE, individually and as assignee of
LAURA DE SOLE,

                Plaintiffs,

        - against -

KNOEDLER GALLERY, LLC d/b/a
KNOEDLER & COMPANY, ANNE
FREEDMAN, GLAFIRA ROSALES,
MICHAEL HAMMER, and JAIME
ANDRADE, and 8-31 HOLDINGS, INC.
              Defendants.

**MEMORANDUM**
**OPINION & ORDER**

12 Civ. 2313 (PGG)

JOHN D. HOWARD, individually and as
assignee of Jaime Frankfurt, LLC,

              Plaintiff,

        - against -

ANN FREEDMAN, GLAFIRA ROSALES,
KNOEDLER GALLERY, LLC, d/b/a
KNOEDLER & COMPANY, MICHAEL
HAMMER, 8-31 HOLDINGS, INC., JOSE
CARLOS BERGANTINOS DIAZ, and
JAIME R. ANDRADE,

              Defendants.

12 Civ. 5263 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       These actions arise from the sale of forged paintings that Plaintiffs purchased

from Defendant Knoedler Gallery, LLC ("Knoedler"). In addition to Knoedler, the named

defendants include 8-31 Holdings, Inc., Knoedler's sole member; Michael Hammer, Knoedler's

managing member and the owner of 8-31 Holdings, Inc.; Ann Freedman, Knoedler's former

president; and Jaime Andrade, a former Knoedler employee ("Defendants").[1]  The operative

complaints assert claims under the Racketeer Influenced and Corrupt Organizations Act

("RICO"), and state law causes of action for fraud, fraudulent concealment, aiding and abetting

fraud, conspiracy to commit fraud, breach of warranty, and unilateral and mutual mistake.

(Second Amended Complaint ("SAC") (De Sole Dkt. No. 118) ¶¶ 181-292; Am. Cmplt.

(Howard Dkt. No. 179) ¶¶ 259-391)).

        Between 1994 and 2008 Knoedler sold thirty-two paintings it acquired from

Glafira Rosales, a Long Island art dealer, all of which were represented to be works created by

well-known Abstract Expressionist artists, such as Mark Rothko, Willem de Kooning, and

Jackson Pollock (the "Rosales Paintings").  (Plaintiff's Rule 56.1 Statement of Additional

Material Facts ("Pltf. R. 56.1 Add. Stmt.") (De Sole Dkt. No. 236) ¶ 1983; List of Rosales

Paintings (De Sole Dkt. No. 236), Ex. 53)[2]  It is undisputed that all of the paintings Rosales

brought to Knoedler – including the two paintings purchased by Plaintiffs – are forgeries.  (Pltf.

R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1025; Defendants' Responses to Requests for

Admission (De Sole Dkt. No. 236), Exs. 43, 44, 45)  Plaintiffs allege that – as early as October

---

[1]  Plaintiffs also named as defendants Glafira Rosales and Jose Carlos Bergantinos Diaz, who
supplied the forged paintings to Knoedler.  Default judgments have been entered against Rosales
and Bergantinos Diaz.  (De Sole Dkt. Nos. 157, 164; Howard Dkt. Nos. 224, 228)

[2]  To the extent that this Court relies on facts drawn from the parties' Local Rule 56.1 statements,
it has done so because the opposing party has either not disputed those facts or has not done so
with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140
(2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving
party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).  Where
Plaintiffs disagree with Defendants' characterizations of the cited evidence, and have presented
an evidentiary basis for doing so, the Court relies on Plaintiffs' characterization of the evidence.
See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational
factual inferences in non-movant's favor in deciding summary judgment motion).

2003 – Defendants had reason to doubt the authenticity of the Rosales Paintings.  Defendants

nonetheless continued to sell the Rosales Paintings at Knoedler until 2008.

Defendants have moved for summary judgment on all of Plaintiffs' claims.  In an

Order dated September 30, 2015, this Court granted in part and denied in part Defendants'

motions.  (De Sole Dkt. No. 261; Howard Dkt. No. 320)  The purpose of this opinion is to

explain the Court's reasoning.

## BACKGROUND[3]

### I.   FACTS

#### A.   The Knoedler Gallery, Ann Freedman, and Glafira Rosales

The Knoedler Gallery was founded by Michael Knoedler in 1846 and operated

continuously for the next 165 years.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1026,

1979; Hammer Decl. in Opp. to TRO (De Sole Dkt. No. 236), Ex. 46 ¶ 2) Until it closed in 2011,

the Knoedler Gallery was one of New York City's most venerable and respected art galleries.

(Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1028)

In 1971, the gallery was purchased by Armand Hammer, the grandfather of

Defendant Michael Hammer, and since that time the Hammer family has been directly

responsible for the operations of the Knoedler Gallery.  (Hammer Decl. in Opp. to TRO (De Sole

Dkt. No. 236), Ex. 46 ¶ 2)  Knoedler Gallery LLC, the current legal entity, is a Delaware limited

liability company that was formed in 2001.  (Def. R. 56.1 Stmt. (De Sole Dkt. Nos. 219, 220)

¶ 746; Def. Reply to Pltf. 56.1 Add. Stmt. (De Sole Dkt. No. 248) ¶ 1026; Def. Ex. 411

(Certificate of Formation)).  Defendant 8-31 Holdings, Inc., a Delaware corporation also formed

---

[3]  Familiarity with this Court's prior orders is assumed.

in 2001, is the sole member of Knoedler.  (Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. Nos. 219, 220) ¶¶ 743, 745; SAC (<u>De Sole</u> Dkt. No. 118) ¶ 17; Am. Cmplt. (<u>Howard</u> Dkt. No. 179) ¶ 32)

        Defendant Michael Hammer is the president, chief executive officer, chairman, and sole owner of 8-31 Holdings, Inc. ("8-31"), and became the sole manager of Knoedler in 2011.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 1033, 1995, 2003; Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 57)

        Defendant Ann Freedman joined Knoedler's corporate predecessor in 1977 as the director of contemporary art.  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1032; Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 21; Freedman Lagrange Tr. (<u>De Sole</u> Dkt. No. 236), Ex. 51 at 138)  In 1994, she became president of M. Knoedler & Co, the gallery's corporate entity at that time.[4]  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1034; Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 21)  Between 2001 and October 2009, Freedman was Knoedler's sole manager and a director of 8-31.[5]  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 2002, 2004)

        In the mid-1990s, Jaime Andrade, a longtime Knoedler employee, introduced Glafira Rosales to Freedman.  (Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. Nos. 208, 228) ¶¶ 1, 1006; (<u>De Sole</u> Dkt. No. 236), Ex. 169 at 2)  Rosales was a Long Island art dealer who claimed to have access to a collection of previously undiscovered works by certain well-known Abstract Expressionist artists.  (Weissman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 40 at 33; Freedman Tr. (<u>De</u>

---

[4]  In January 1995, Freedman "assume[d] leadership of the gallery" and began reporting directly to "the owner of the gallery, Michael Hammer."  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1035; Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 42-43)

[5]  During the entire time Freedman was president of Knoedler, she was also a director of 8-31.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 2004)  Knoedler does not maintain its own board of directors, but instead is managed by a sole manager.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 2001)

Sole Dkt. No. 236), Ex. 18 at 338; Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at

138)  Andrade had met Rosales at an art gallery in the early 1990s.[6]  (Def. R. 56.1 Stmt. (De Sole

Dkt. Nos. 208, 228) ¶¶ 2, 1003)  Rosales told Andrade that she had a Mexican client who wanted

to sell a collection of Abstract Expressionist artworks, but to do so anonymously.  (Def. R. 56.1

Stmt. (De Sole Dkt. No. 228) ¶ 1004)  Andrade reported to Freedman that Rosales had Abstract

Expressionist artworks that she wanted to sell.  (Id. ¶ 1005)  Andrade then introduced Rosales to

Freedman.[7]  (Id. ¶ 1006; Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at 138, 193-94)

   Over the next fifteen years, Rosales provided Knoedler with dozens of previously

unknown "masterworks" by well-known Abstract Expressionist artists, and Knoedler sold these

paintings to its customers.  All of these paintings are forgeries.  (Pltf. R. 56.1 Add. Stmt. (De

Sole Dkt. No. 236) ¶ 1025)

   In early 1994, Rosales consigned to Knoedler what she represented to be five

paintings by Richard Diebenkorn.  (Id. ¶¶ 1049-50, List of Rosales Paintings (De Sole Dkt. No.

236), Ex. 53 at KG-11152)  Rosales represented that these works were from the collection of

Cesareo Fontenla and came from the Vijande Gallery in Madrid, Spain. (Pltf. R. 56.1 Add. Stmt.

(De Sole Dkt. No. 236) ¶ 1051; (De Sole Dkt. No. 236), Exs. 52, 53 at KG-11152, 60)  Knoedler

---

[6]  An internal Knoedler memo dated December 3, 2005, states that Andrade met Rosales "probably in 1993" and that it "took some time [for Andrade to] persuad[e] her to come to Knoedler with the collection."  (December 3, 2005 Memo (De Sole Dkt. No. 236), Ex. 50)

[7]  Freedman "do[es] not recall making inquiries, [or] asking others about [Rosales]" and did not "look[] into her background."  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 194; Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at 139)  Freedman testified that she "didn't think there was any reason" to investigate Rosales because Rosales "was, after all, introduced to me by somebody I knew very, very well."  (Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at 195)

sold these paintings to its customers at large mark-ups[8] without submitting them to the

Diebenkorn catalogue raisonné committee for authentication.[9]  (Pltf. R. 56.1 Add. Stmt. (De Sole

Dkt. No. 236) ¶¶ 1053, 1055, 1075-76)  During a series of meetings in 1994 and 1995, members

of the Diebenkorn family informed Freedman that at least two of the five purported Diebenkorns

Rosales had provided did not appear to be authentic.  (Id. ¶¶ 1057, 1060-61)  The Diebenkorn

family also expressed concern about the lack of documentation for one of the paintings – which

the family viewed as highly suspicious – given that the artist and his family kept meticulous

records of his work.  (Id. ¶¶ 1065-67)  All of the Diebenkorn paintings were later discovered to

be forgeries.  (Id. ¶ 1025)

Between 1995 and the spring of 1998, Knoedler sold three other works that

Rosales had supplied, including a purported Franz Kline and a purported Mark Rothko.  These

paintings – all of which were forgeries – were allegedly from the collection of a man whom

---

[8]  Knoedler sold the first purported Diebenkorn on February 1, 1994.  Knoedler paid Rosales $50,000 for the painting and sold it for $95,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1053; (De Sole Dkt. No. 236), Exs. 52, 53 at KG-11152)  Knoedler sold a second Diebenkorn on November 9, 1994 for $82,500.  It paid $47,500 to Rosales.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1055; (De Sole Dkt. No. 236), Exs. 53 at KG-11152, 59, 62, 63)  On July 3, 1997, Knoedler sold a third Diebenkorn for $110,000, and paid Rosales $31,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1076.a; (De Sole Dkt. No. 236), Exs. 53 at KG-11152, 57, 61, 67, 68)  On December 6, 1997, Knoedler sold a fourth Diebenkorn for $94,000, and paid Rosales $54,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1076.b; (De Sole Dkt. No. 236), Ex. 53 at KG-11152, 69, 70)  On February 17, 1998, Knoedler sold the last purported Diebenkorn for $148,500, and paid Rosales $54,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1076.c; (De Sole Dkt. No. 236), Ex. 53 at KG-11152, 56, 71, 72, 73, 74)  Most of these paintings were on consignment at Knoedler for short periods of time – in some instances, only a week or two – before being sold.  See, e.g., id.; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1076.b; (De Sole Dkt. No. 236), Ex. 53 at KG-11152, 69, 70; (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1049, 1053; (De Sole Dkt. No. 236), Ex. 52, 53 at KG-11152)

[9]  "'A catalogue raisonné is a definitive catalogue of the works of a particular artist; inclusion of a painting in a catalogue raisonné serves to authenticate the work, while non-inclusion suggests that the work is not genuine.'" Thome v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 94 (1st Dep't 2009) (quoting Kirby v. Wildenstein, 784 F. Supp. 1112, 1113 (S.D.N.Y. 1992)).

Rosales, Freedman, and others at Knoedler referred to as "Mr. X."  Each painting was sold at a large mark-up.[10]  (Id. ¶¶ 1025, 1128, 1137; Knoedler Invoices (De Sole Dkt. No. 236), Exs. 84, 85, 86, 87)

Freedman testified that Rosales initially told her that these paintings belonged to a friend.  (Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at 197)  The record is not clear as to what else Freedman had been told about these paintings before Knoedler sold them.  The Knoedler invoices for two of these works state that they were initially acquired directly from the artist, and all three invoices state that the works were from a private collection in Mexico.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1129-30; Knoedler Invoices (De Sole Dkt. No. 236), Exs. 84, 85, 86)  Knoedler's invoice for the purported Rothko states that the work is "[t]o be published in the forthcoming catalogue raisonné:  Mark Rothko: Works on Paper, by David Anfam, (London: Yale University Press)."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1131; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 85)

In May 1998, Hammer increased Freedman's base salary from $278,460 to $300,000 and her profit sharing percentage from 10% to 15%.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1134; Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 347-48; Internal Memos (De Sole Dkt. No. 236), Ex. 88)

---

[10]  On June 2, 1997, Knoedler sold a purported Franz Kline for $535,000, and paid $300,000 to Rosales.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1128.a; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 84)  On October 16, 1997, Knoedler sold a purported Mark Rothko for $360,000; Knoedler had purchased the work from Rosales six months earlier for $150,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1128.b; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 85)  On March 13, 1998, Knoedler sold a purported Clyfford Still for $600,000; Knoedler had purchased the work from Rosales three weeks earlier for $250,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1128.c; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 86)  As to the Rothko and Kline, Freedman represented that "[t]he authenticity of these paintings has been positively confirmed. . . ."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1121; March 13, 1998 letter (De Sole Dkt. No. 236), Ex. 83)

At a June 18, 1998 meeting with Rosales, Freedman and Knoedler's head of research "ask[ed] [Rosales for] more details about the . . . the collector and his family."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1135-36; de Medeiros Dep. (De Sole Dkt. No. 236), Ex. 9 at 23-25, 98-99)  At this meeting, Rosales told Freedman that – as a child in Mexico – she had met a couple who were Jewish émigrés from Europe.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.a; Internal Memo (De Sole Dkt. No. 236), Ex. 89).  The husband – "Mr. X" – made frequent business trips to the United States between the late 1940's and 1970's.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.b; Internal Memo (De Sole Dkt. No. 236), Ex. 89).  During his visits to the United States, Mr. X purchased artworks directly from American painters.  (Id.).  The couple died in the early 1990s, leaving these paintings to their children. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.d; Internal Memo (De Sole Dkt. No. 236), Ex. 89).

According to Rosales, the current owner of the collection – Mr. X's son – lived in Mexico City and Zurich.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.e; Internal Memo (De Sole Dkt. No. 236), Ex. 89).  He and his sister both had paintings from their father's collection, but neither was interested in art, and they had been selling the works gradually.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.f; Internal Memo (De Sole Dkt. No. 236), Ex. 89).  Rosales reported that the collector's son "remembers seeing artists in his father's home." (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1138.c; Internal Memo (De Sole Dkt. No. 236), Ex. 89)  Rosales also told Freedman that the deceased collector had corresponded with various artists, but that these letters had been "disposed of" after his death.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1139; Internal Memo (De Sole Dkt. No. 236), Ex. 89)

Accordingly, there was no documentation for Mr. X's paintings.  (Def. R. 56.1 Stmt. (De Sole

Dkt. No. 208) ¶ 8)

   Rosales stated that Mr. X's collection included "another Still, a Gottlieb, two de

Koonings (a painting and a work on paper), a Motherwell Elegy, a Newman, [and] one or two

Calders."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1146; Internal Memo (De Sole Dkt.

No. 236), Ex. 89)  Freedman asked Rosales whether there was a Pollock or a David Smith in the

collection.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1148; (De Sole Dkt. No. 236), Ex.

89)

   Within two weeks of the June 18, 1998 meeting, Knoedler sold two purported

Rothkos supplied by Rosales, both allegedly from Mr. X's collection.[11]  (Pltf. R. 56.1 Add. Stmt.

(De Sole Dkt. No. 236) ¶ 1142)  The invoice for each painting describes its provenance[12] as

follows:

> **Provenance & Exhibition History**
> Acquired directly from the Artist in the early 1960's.
> Private Collection, Mexico and Switzerland.

(Id. ¶ 1144; Knoedler Invoices (De Sole Dkt. No. 236), Exs. 90, 91, 93)  One of the invoices

states that the Rothko is "[t]o be included in the forthcoming catalogue raisonne:  Mark Rothko:

Works on Paper, by David Anfam, (London: Yale University Press)."  (Pltf. R. 56.1 Add. Stmt.

(De Sole Dkt. No. 236) ¶ 1145; Knoedler Invoice (De Sole Dkt. No. 236), Exs. 91, 93)

---

[11]  On June 23, 1998, Knoedler sold a purported Rothko for $320,000; Knoedler paid Rosales
$155,000 for the painting.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1142.a; (De Sole
Dkt. No. 236), Ex. 90)  On July 1, 1998, Knoedler sold another purported Rothko for $325,000;
Knoedler paid Rosales $155,000 for the painting.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No.
236) ¶ 1142.b; (De Sole Dkt. No. 236), Exs. 91, 92, 93)
[12]  The Merriam-Webster dictionary defines "provenance" as "the history of ownership of a
valued object or work of art or literature."  Merriam Webster, http://www.merriam-
webster.com/dictionary/provenance (last visited October 6, 2015).

On August 5, 1998, Freedman told Knoedler's head of research that Rosales had reported that Mr. X's collection included a Pollock.  (Pltf. R. 56.1 Resp. (<u>De Sole</u> Dkt. No. 236) ¶¶ 1149, 1154)  In a telephone conversation that day, Rosales told Freedman that Mr. X's collection included two Stills, a Motherwell Elegy, a Gottlieb, a Pollock, two Newmans, and an Avery.  (<u>Id.</u> ¶ 1154; August 5, 1998 Memo (<u>De Sole</u> Dkt. No. 236), Ex. 94)

Over the next eighteen months, Rosales brought three more Mr. X paintings to Knoedler, and Knoedler sold these paintings to its customers.[13]  (Pltf. R. 56.1 Resp. (<u>De Sole</u> Dkt. No. 236) ¶ 1150.a)  The invoice for one of these paintings – a purported Rothko – described its provenance as follows:

> **Provenance & Exhibition History**
> Acquired from the Artist
> Private Collection, Switzerland

(<u>Id.</u> ¶ 1152; (<u>De Sole</u> Dkt. No. 236), Ex. 105)  The invoice also states that the work is "[t]o be included in the forthcoming catalogue raisonne of Mark Rothko's works on paper, currently in preparation by the National Gallery of Art, Washington, D.C."  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1153; (<u>De Sole</u> Dkt. No. 236), Ex. 105)  Freedman began referring to Mr. X as "Secret Santa."  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1094; Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 449-50; de Medeiros Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 9 at 90)

---

[13]  On January 18, 1999, Knoedler sold a purported Franz Kline for $560,000; Knoedler paid Rosales $315,000 for this work.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1150.a.i; (<u>De Sole</u> Dkt. No. 236), Exs. 95, 96)  On August 24, 1999, Knoedler sold another purported Franz Kline for $475,000; Knoedler had purchased the work seventeen months earlier from Rosales for $250,000. (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1150.a.ii; (<u>De Sole</u> Dkt. No. 236), Exs. 53 at KG-11147, 98)  On October 19, 1999, Knoedler sold a purported Rothko for $615,000; Knoedler paid Rosales $155,000 for the work.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1150.a.iii; (<u>De Sole</u> Dkt. No. 236), Exs. 99 at KG-5362, 100, 105)

At some point between June 1998 and January 2000, the name of Alfonso Ossorio – an Abstract Expressionist artist with close ties to many other Abstract Expressionist artists – began to be associated with the Rosales Paintings.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 1158, 1181; January 10, 2000 Memo (<u>De Sole</u> Dkt. No. 236), Ex. 106)  Freedman initially testified that it was Rosales who had first associated Ossorio with Mr. X's collection.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1159)  Freedman later stated, however, that it was Freedman and Knoedler who first "surmised" that Ossorio had assisted Mr. X in purchasing the works in Mr. X's collection.  (<u>Id.</u> ¶ 1160)

During a January 10, 2000 meeting with Freedman, Rosales "confirm[ed] that the family knew Ossorio well.  There may be correspondence.  [Mr. X's son] confirmed that [Mr. X] purchased through Ossorio."  (<u>Id.</u> ¶ 1161; January 10, 2000 Memo (<u>De Sole</u> Dkt. No. 236), Ex. 106)  Knoedler began conducting research on Ossorio in or around 2001 (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1171), but was not able to find evidence of a link between Ossorio and the paintings from Mr. X's collection.  (<u>Id.</u> ¶ 1174)

At a May 26, 2001 meeting, Rosales told Freedman that:

1.   the works were "acquired in the 1950s from Pollock, Rothko, Still, Kline, Motherwell, etc.  At that time [the artists] did not have contracts with dealers . . .";

2.   "It's not clear if the works were purchased from Ossorio (who purchased them directly from the artists) or, with Ossorio's direction and advise, from the artists themselves"; and

3.   "All purchases were paid for in cash.  The son of the collector remembered seeing his parents pay in cash to one of the artists. . . . Correspondence was probably lost or thrown out by the daughter after the deaths of her parents.  She had much of the paperwork."

(<u>Id.</u> ¶ 1168; May 26, 2001 Memo (<u>De Sole</u> Dkt. No. 236), Ex. 108)

In December 2001, Rosales told Freedman that "Gerzso" was a "family name" connected to Mr. X, but was not his name.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1169; December 11, 2001 Memo (De Sole Dkt. No. 236), Ex. 109)  Knoedler then researched – without success – whether there was a connection between Mr. X and Gunther Gerzso, a well-known Mexican artist.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1170; de Medeiros Dep. (De Sole Dkt. No. 236), Ex. 9 at 121-22)  Knoedler's research never uncovered a name for Mr. X.  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 248) ¶ 1095; Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 13, 20-21)

### B.    The 2001 Sale of the "Green Pollock"

In late 2001, Freedman and Knoedler sold a purported Jackson Pollock – Untitled 1949 (the "Green Pollock") – to Jack Levy for $2 million.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶ 712; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1182.f; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 118)  Knoedler had purchased this work from Rosales in March 2001 for $750,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1182.f)  Knoedler included in the provenance of the painting a reference to Ossorio.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1226; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 118

In 2002, Hammer approved an increase in Freedman's profit sharing percentage from 16% to 25%; that year, Knoedler paid Freedman $673,375.42.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1191-92))

The sale of the Green Pollock was conditioned on a favorable review of the work's provenance and authenticity by the International Foundation for Art Research ("IFAR").  (Id. ¶ 1201)  On October 9, 2003, IFAR issued its report on the Green Pollock (the "IFAR Report").  (Id. ¶¶ 1225, 1235)  The IFAR report rejects Knoedler and Rosales' claim that Ossorio

had been involved in the acquisition of the Green Pollock, and notes that there are "disturbing"

differences between the materials used to create the Green Pollock and the materials used to

create a known Pollock from the same year.[14]  (IFAR Report (De Sole Dkt. No. 236), Ex. 140 at

4-7, 8, 10)  The report also states that "IFAR's own extensive archival and other research has

turned up no documentary material of any kind linking the painting to Pollock, or Ossorio."  (Id.

at 1)  The conclusion of the IFAR report reads:  "given the several strongly negative opinions

[from Pollock experts about the authenticity of the work] and the lack of information as to prior

ownership, and with no documentation or other evidence to override the concerns of those who

do not accept it as a work by Pollock, we cannot currently support its addition to the artist's

oeuvre."  (Id. at 10)  Based on the IFAR Report, Levy returned the Green Pollock to Knoedler in

late 2003, and the Gallery refunded his full purchase price of $2 million.  (Pltf. R. 56.1 Add.

Stmt. (De Sole Dkt. No. 236) ¶ 1256)

       In December 2003, Freedman informed Hammer that – based on the IFAR Report

– Levy wanted to return the Green Pollock and obtain a refund of the $2 million purchase price.

(Def. R. 56.1 Stmt. (De Sole Dkt. Nos. 219, 220) ¶¶ 787, 790-91)  Hammer read the IFAR report

and discussed it with Freedman and other Knoedler executives. [15]  (Pltf. R. 56.1 Add. Stmt. (De

---

[14]  In addition to the difference in materials, experts challenged the authenticity of Pollock's
signature:  "serious enough disagreements [among the experts] arose concerning [the signature's]
authenticity to make it suspect."  (IFAR Report (De Sole Dkt. No. 236), Ex. 140 at 8)  The IFAR
report also states that the painting's "technique and style provoked the most negative comments
by IFAR's team of specialists. . . . and those who were negative were strongly so.  The fact that
the same concerns were voiced by so many of the experts even, in certain cases, by those who
accepted the painting, was troubling."  (Id. at 8-9)

[15]  In the wake of the IFAR report, Freedman asked a researcher to "check Ossorio out."  (Pltf. R.
56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1243, 1245, 1552; Polcari Dep. (De Sole Dkt. No.
236), Ex. 28 at 6, 58)  The researcher went to the Ossorio archives on Long Island, conducted his
research, and concluded that Mr. X's adviser "wasn't Ossorio."  (Pltf. R. 56.1 Add. Stmt. (De
Sole Dkt. No. 236) ¶¶ 1244, 1247-48; Polcari Dep. (De Sole Dkt. No. 236), Ex. 28 at 55, 58,

<u>Sole</u> Dkt. No. 236) ¶¶ 1262-63; Defendants' Responses to Requests for Admission (<u>De Sole</u> Dkt. No. 236), Ex. 169 at 15; Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. Nos. 219, 220) ¶¶ 793-94)

### C.   Substitution of David Herbert for Ossorio in <u>Knoedler's Provenance for the Rosales Paintings</u>

Freedman testified that, "after the IFAR report, I pressed Glafira Rosales for more information, and she went back to Mr. X and called me, I believe it was the following month [November 2003] . . . and she said, I have information.  The advisor was David Herbert."  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1307; Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 381)

Knoedler never informed IFAR that Knoedler had concluded that David Herbert – and not Ossorio – had acted as Mr. X's advisor.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1365)  Moreover, Knoedler's search of archives relating to Herbert revealed no evidence of a connection between Herbert and any of the Rosales Paintings.  (<u>Id.</u> ¶¶ 1341-42, 1353, 1358-59); Defendants' Responses to Requests for Admission (<u>De Sole</u> Dkt. No. 236), Ex. 169 at 13)

### D.   <u>The De Soles' December 2004 Purchase of a "Rothko"</u>

In the fall of 2004, the De Soles called Freedman and Knoedler to arrange a meeting to discuss the possible purchase of a painting by Sean Scully.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1370)  The De Soles were aware of Knoedler and Freedman's excellent reputation, having been referred to Knoedler by a friend who collected art.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶¶ 1368-69, Domenico De Sole Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 10 at 103-04)  During the meeting at Knoedler, Freedman told the De Soles that she did not have

---

110-12)  The researcher found no evidence of a connection between Ossorio and a family that had acquired a Pollock directly from the artist, and no evidence of a connection between Ossorio and the Rosales Paintings.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1244; Polcari Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 28 at 55-56, 111-12)

any Scully works available, and she instead showed them works purportedly created by Rothko and Pollock.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 208) ¶ 447; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1371-72)  Rosales had brought both of these paintings to Knoedler.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 208) ¶ 447)

Freedman told the De Soles that both works "were owned by a Swiss collector that was a client of Knoedler and he had died and his son had decided to sell the paintings." (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1374.a; De Sole Dep. (De Sole Dkt. No. 236), Ex. 10 at 136)  Freedman also stated that the Rothko had been authenticated by Christopher Rothko and David Anfam, the author of the Rothko catalogue raisonné.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 208) ¶ 460; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1374.g)

The De Soles decided to purchase the "Rothko."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1392)  On November 30, 2004, Knoedler sent the De Soles' agent an invoice – either by Federal Express or by U.S. Mail – for the sale of the work, seeking a payment of $8.3 million.[16]  (Id. ¶ 1393)  The invoice states:

> **Mark Rothko (1903-1970)**
> *Untitled*
> 1956
> Oil on canvas
> 50 1/8 x 40 1/4 inches
> Signed and dated on verso
> A 12322
>
> **Provenance**
> The Artist
> Private Collection Switzerland
> By descent to present owner

---

[16]  Knoedler had purchased the "Rothko" from Rosales sixteen months earlier for $950,000. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1366; Purchase Agreement (De Sole Dkt. No. 236), Ex. 171)  Accordingly, Knoedler realized a profit of more than eight times the purchase price on the sale of this painting.

**Literature**
To be included in the forthcoming supplement to the 1998
Rothko catalogue raisonné under preparation by the National
Gallery of Art, Washington, D.C.

(Id. ¶ 1393-94; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 173)  An earlier draft of the

invoice states that the Rothko is from a private collection in "Mexico and Switzerland."[17]  (Pltf.

R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1395)  The Rothko had been consigned to Knoedler

in December 2002.  (Id. ¶ 1188)

       Domenico De Sole asked Freedman to put in writing everything she had told the

De Soles about the painting.  (Id. ¶ 1404)  On December 11, 2004, Freedman sent a letter to

Laura De Sole that contains the following statements:

1.    "This classic Rothko painting was acquired from the artist through the advice and counsel of David Herbert."

2.    "The original owners of the Rothko, a couple whose residences included Switzerland, are now deceased and [the work] was inherited by their son."

3.    Knoedler was "anticipating a loan request from Oliver Wick of the Fondation Beyeler."

4.    "The painting has been viewed by a number of eminent scholars on Rothko as well as specialists on the Abstract Expressionist movement," including David Anfam, E.A. Carmean, Jr., Jack Flam, Laili Nasr, Stephen Polcari, Christopher Rothko, Irving Sandler, Bonnie Clearwater, Earl A. Powell III, Oliver Wick, and Dana Cranmer.

5.    "Importantly, Laili Nasr, manager of the Rothko catalogue raisonné project for the National Gallery of Art in Washington, D.C., has written to us about her inten[t]ion to include the Rothko in the forthcoming catalogue raisonné supplement."

6.    "Knoedler warrants the authenticity and good title of the painting, Untitled, 1956, and confirms its 'remarkably good condition.'"

---

[17]  Moreover, Knoedler had previously listed Ossorio in its provenance for this painting.  (Def. Reply to Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 248) ¶ 1189)

(Id. ¶ 1419; Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶¶ 614-21, 624; December 11, 2004 letter (De Sole Dkt. No. 236), Exs. 179, 206)

   With respect to the Rothko experts cited by Freedman, Eleanore De Sole believed that Freedman was indicating that "these people had said that [the] painting was real." (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1602) After the De Soles received Freedman's letter, they instructed their agent to make payment to Knoedler. (Id. ¶ 1603) On December 17, 2004, the De Soles' agent wired Knoedler the purchase price of $8.3 million.[18] (Id. ¶ 1605)

  **E.**  **Rosales' May 2005 Refusal to Attest to**
     **the Authenticity of the Rosales Paintings**

   In early May 2005, Freedman and Knoedler asked Rosales to sign an "authorization form" that reads as follows:

> May 10, 2005
>
> Ann Freedman, President
> Knoedler & Company
> 19 East 70th St.
> New York, NY 10021
>
> Dear Ann Freedman,
>
> I the undersigned, Mrs. Glafira Rosales, attest that I am the authorized agent, as well as a close family friend, of a private collector residing in Mexico and Switzerland. The owner requests that the family name remain private. The works of art described on the attached list were acquired by the current owner's father from the artists, with David Herbert as his advisor and agent. The works of art were passed by inheritance to his immediate heirs (son and daughter).

---

[18] On January 15, 2008, Eleanore De Sole asked Freedman to issue an updated appraisal of the Rothko that the De Soles had purchased. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1825; January 15, 2008 email (De Sole Dkt. No. 236), Ex. 276) On January 19, 2008, Freedman mailed a letter to the De Soles in which she stated that Knoedler's "estimate of the probable cost of replacing" the purported Rothko was $9 million. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1830; January 19, 2008 letter (De Sole Dkt. No. 236), Ex. 278)

I further attest that the owner has had absolute clear title to, the attached list of works of art, and that he has guaranteed their authenticity.  I also affirm that I have had authorization to act as his agent in the handling of their consignments and/or sales to Knoedler & Company.

I assume all legal responsibility for these statements.

(Authorization Form (<u>De Sole</u> Dkt. No. 236), Ex. 203; <u>see also</u> Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1627)

Rosales refused to sign the form, stating that she was "not comfortable about including the authenticity clause."  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1628) Rosales explained that the purported owner "has been extremely clear that if we want to continue to do business, these are his terms, so [Rosales] does not want to jeopardize the relationship by pressing him," and the request would "raise his hackles."  (<u>Id.</u>; May 26, 2005 Memo (<u>De Sole</u> Dkt. No. 236), Ex. 204)  Accordingly, Knoedler revised the authorization form to omit the authenticity clause.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1629; Revised Authorization Form (<u>De Sole</u> Dkt. No. 236), Ex. 205)  Rosales did not identify the collector and his son.

### F.   <u>Howard's June 2007 Purchase of a "de Kooning"</u>

Howard saw a purported de Kooning at the Art Dealers Association of America art fair in 2007.  (Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. No. 208) ¶ 535; Pltf. R. 56.1 Counter Stmt. (<u>De Sole</u> Dkt. No. 232) ¶ 322)  Freedman told him "that it was 'rare' and rare in the context . . . that de Kooning had done very few landscapes, 'maybe only two or three,' she'd said, so it had particular value because of its rarity."  (Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. No. 223) ¶ 658) Freedman told Howard that the painting had "impeccable" quality and provenance (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1714.b), and that the work was owned by a man Freedman

knew directly who had acquired the painting through an inheritance from his father, a prominent Swiss collector.  (Id. ¶ 1714.c-d, f).  Freedman also told Howard that the owner "want[ed] anonymity" and "so [Freedman] couldn't disclose [his identity]."  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶ 661)  Freedman informed Howard that she had "personally" purchased a painting from the same owner.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1714.g)

Freedman did not disclose to Howard, inter alia, that the work had been delivered to Knoedler by Rosales, that it lacked any supporting documentation, that it was one of approximately 30 paintings delivered from Rosales, and that Freedman had never met and did not know the name of the owner or his father.  (Id. ¶ 1716.a-f)

Howard decided to purchase the painting.  (Id. ¶ 1722)  Knoedler's June 13, 2007 invoice for the "de Kooning" states:

> **Willem de Kooning (1904-1977)**
> *Untitled*
> ca. 1956-57
> Oil on paper mounted on masonite
> 20 ½ x 29 inches
> Signed at upper right corner: "de Kooning"
> A 12537
> CA 26933
>
> **Provenance**
> The artist (via David Herbert*)
> Private Collection
> By descent to present owner
>
> *David Herbert often acted both as agent for the artist and as advisor to the collector

(Id. ¶ 1718; Knoedler Invoice (De Sole Dkt. No. 236), Ex. 233)

### G.   Lagrange's November 2007 Purchase of the "Lagrange Pollock"

In November 2007, Knoedler sold Pierre Lagrange a purported work by Jackson Pollock for $15.3 million (the "Lagrange Pollock").  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No.

236) ¶ 1795; Knoedler Invoice (<u>De Sole</u> Dkt. No. 236), Ex. 146)  Knoedler paid Rosales $950,000 for this work, which it obtained from her on June 3, 2002.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1796)

        Prior to the sale of the alleged Pollock, Freedman and Knoedler represented to Lagrange's agent that the Pollock was genuine and had been deemed authentic by numerous Pollock experts.  (Frankfurt Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 17 at 117-18)  Freedman and Knoedler further represented that the work would be included in a forthcoming supplement to the Pollock catalogue raisonné then being prepared by the Pollock-Krasner Foundation.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1793; Frankfurt Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 17 at 78, 93-94, 101-02, 104-05)  Freedman and Knoedler also told Lagrange and his agent that the Pollock had been acquired by a private collector through David Herbert, and was being sold by the collector's son.  (Frankfurt Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 17 at 92, 101, 105, 126)

        In 2007, Freedman was paid more than $1.3 million.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1799)  On April 24, 2008, Hammer increased Freedman's profit sharing percentage from 25% to 30% of Knoedler's operating income.  (<u>Id.</u> ¶ 1842)

    **H.**    **The Dedalus Foundation's December 2007
          Claim that the "Motherwells" Rosales had
          <u>Brought to the Knoedler Gallery Were Forged</u>**

        The Dedalus Foundation, Inc. is responsible for the Robert Motherwell catalogue raisonné.  In three meetings with Freedman in December 2007 and January 2008, Foundation representatives told Freedman that they believed seven purported Motherwell works that Rosales had brought to Knoedler and the Weissman Gallery – owned by a former Knoedler employee – were forged.  (<u>Id.</u> ¶ 1800-16)  In January 2008, Freedman told Rosales about the Foundation's

claims and the need to prepare a "bona[]fide defense" to these allegations.  (Id. ¶ 1828; January 18, 2008 letter (De Sole Dkt. No. 236), Ex. 277)

As part of that effort, Freedman and Knoedler asked Rosales to complete a form in which she would disclose the identity of the original collector and his son.  Freedman also gave Rosales (1) a confidentiality agreement requiring Knoedler not to disclose any information about the purported owner, and (2) a letter Rosales was to provide to the owner requesting an "emergency meeting," and informing him that the Dedalus Foundation had "strongly questioned the authenticity and legality of [the Motherwells]" that Rosales had brought to Knoedler, and "suggest[ed] that [Knoedler was] selling and trading in art that is counterfeit."  (January 2008 letters (De Sole Dkt. No. 236), Exs. 274, 277)  Rosales did not identify the original collector or his son.

In March 2008, Knoedler retained James Martin of Orion Analytical, LLP, to conduct forensic tests of two of the alleged Motherwells Rosales had brought to Knoedler.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1837; (De Sole Dkt. No. 236), Exs. 281, 282)  In October 2008, Orion submitted a draft report indicating that the works were not authentic.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1864-69; Orion Report (De Sole Dkt. No. 236), Ex. 292)  Although the two paintings had allegedly been created in 1953 and 1955, the pigments used in the paintings did not exist until ten years later.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1866; Orion Report (De Sole Dkt. No. 236), Ex. 292 at KG-2614)  Moreover, the same acrylic polymer emulsion paint had been used to create both works, and the use of such paint was "'remarkably inconsistent with what is known about Motherwell's use of acrylic paints,'" "'rais[ing] questions about when the works were actually painted.'"  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1867-68; Orion Report (De Sole Dkt. No. 236), Ex. 292 at KG-

2614-15)  Finally, "'both paintings display[ed] patterns of circular abrasions, visible only with magnification, that point . . . to the use of an electric sander.'"  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1869; Orion Report (De Sole Dkt. No. 236), Ex. 292 at KG-2614-15)

   On November 7, 2008, Freedman, Andrade, and a Knoedler researcher met with Rosales.  During that meeting, Rosales stated "that the transactions between Mr. X and the artists continued from the late 1940s through 1964."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1883; November 7, 2008 Memo (De Sole Dkt. No. 236), Ex. 300)  Rosales also stated that the current owner "remembers" travelling with his father to artists' studios and "remembers this ending in 1964."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1884; November 7, 2008 Memo (De Sole Dkt. No. 236), Ex. 300)  At the meeting, Andrade commented that "David Herbert and Ossorio were close friends," and both Andrade and Rosales then suggested that "Mr. X may have met David [Herbert] through Ossorio."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1885; November 7, 2008 Memo (De Sole Dkt. No. 236), Ex. 300)

   The next day – November 8, 2008 – Rosales signed the following statement:

> I am a close friend (for over thirty years) to the family of and a liaison on behalf of a gentleman, currently residing in Mexico, with family homes in Switzerland.  He prefers information about himself and his family to remain private and confidential.  The artworks were acquired by the current owner's father directly from the various artists, and were passed by inheritance to his immediate heirs (son and daughter).
>
> It has recently been explained and clarified, in discussion with the owner, that his father, the original owner, was active in acquiring the works between the late 1940s and 1964.  The works were acquired "off the record," directly from the artist's studios during trips made to New York related to the family business.  It is interesting to note that the family had business in common with Alfonso Ossorio's family (the sugar business).  In the early years of collecting activity Alfonso Ossorio was his primary advisor.
>
> Later (after 1951, during the Parsons and Janis years), David Herbert (a close friend of Ossorio's) gradually became the collector's primary advisor, in his role

as dealer to the artists both in and outside of the gallery system, and he continued in that role through 1964.  This was of significant financial support to the artists.

The owner stopped travelling to New York due to a change in the family's business activities, and at the same time ceased purchasing works of art.

The above information is accurate and true to the best of my knowledge.

(Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1886; November 8, 2008 Statement (De Sole Dkt. No. 236), Ex. 301)

> ### I.   The September 2009 Grand Jury Subpoena, the Termination of Freedman's Employment, and Hammer's Direction that No Additional Rosales Paintings be Sold

On August 31, 2009, 8-31's board of directors passed a resolution forming a Special Committee to investigate the purchases of artwork by Knoedler from Rosales and subsequent sales and attempted sales of this artwork.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1928; 8-31 Board Resolution (De Sole Dkt. No. 236), Ex. 312)  By August 2009, all Rosales Paintings in Knoedler's inventory were placed on a "not for sale" list.  (Def. R. 56.1 Stmt. (De Sole Dkt. Nos. 219, 220) ¶¶ 888, 893)  Knoedler had six unsold Rosales Paintings at that time.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1984)  On September 17, 2009, Hammer requested and obtained a "complete list of the Rosales paintings with date acquired, cost, date sold, selling price, etc."  (Id. ¶ 1930; September 17, 2009 email and List of Rosales Paintings (De Sole Dkt. No. 236), Ex. 53)

On September 22, 2009, Knoedler was served with a grand jury subpoena.  See September 24, 2009 email (De Sole Dkt. No. 236), Ex. 315.  The subpoena related to the Rosales Paintings.  (Freedman Lagrange Tr. (De Sole Dkt. No. 236), Ex. 51 at 136; October 29, 2009 letter (De Sole Dkt. No. 236), Ex. 316; Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 297)  The following month, Hammer decided to put Freedman on administrative leave, a decision

Freedman opposed.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1936, 1938-39)  At an

October 16, 2009 meeting, Hammer told Freedman that the leave of absence was prompted by

the grand jury subpoena.[19]  (Id. ¶¶ 1938, 1941)  Within weeks of being put on administrative

leave, Freedman resigned her position at Knoedler.  (Id. ¶ 1947)

On October 27, 2009, Hammer sent a letter to Knoedler clients stating, with no

explanation, that Freedman had "resigned."  (Id. ¶ 1954)  The letter also states:  "I wish . . . to let

you know that I have every confidence in a vibrant and vital future for the gallery."  (Id. ¶ 1955;

October 27, 2009 letter (De Sole Dkt. No. 236), Ex. 308)

In 2009, Knoedler incurred an operating loss of approximately $2.3 million, and

in 2010 it suffered a $1.6 million loss.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1960;

Hammer Decl. in Opp. to TRO (De Sole Dkt. No. 236), Ex. 46 ¶ 3)

**J.      The Knoedler Gallery Closes**

By July 2011, Knoedler was receiving numerous calls from customers expressing

concerns about the authenticity of works they had purchased from Knoedler.  (Knoedler call log

(De Sole Dkt. No. 236), Ex. 78)  Hammer decided to close Knoedler on November 30, 2011, and

announced the closing that same day.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1979;

Def. R. 56.1 Stmt. (De Sole Dkt. No. 228) ¶ 1000; Knoedler Resolution (De Sole Dkt. No. 236),

Ex. 325)  In connection with the closing, 8-31 and Hammer adopted and approved a "liquidation

plan" for Knoedler, which Hammer signed on behalf of both 8-31 and Knoedler.  (Pltf. R. 56.1

Add. Stmt. (De Sole Dkt. No. 236) ¶ 2039; Liquidation Plan (De Sole Dkt. No. 236), Ex. 325 at

KG-11112)

---

[19]  Freedman testified that she was not told at that meeting why she was being put on
administrative leave. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1940)

Knoedler's 2011/2012 financial statements show that it issued $23.9 million in distributions to 8-31 at this time.  These monies had previously been classified as interdivisional receivables.  (8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Exs. 342-344; Def. R. 56.1 Stmt. (De Sole Dkt. No. 219) ¶¶ 971, 973-74)

On December 1, 2011, Pierre Lagrange filed a lawsuit in the Southern District of New York alleging that the purported Pollock he had purchased was a forgery.  (Lagrange Cmplt. (De Sole Dkt. No. 236), Ex. 326)  On December 2, 2011, a New York Times article reported on the F.B.I.'s investigation of Knoedler and the abrupt closing of the Gallery. ("Possible Forging of Modern Art is Investigated," New York Times (De Sole Dkt. No. 236), Ex. 327)

Rosales has since admitted that all of the works she sold to Knoedler were "fakes created by an individual residing in Queens."[20]  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1023-24; Rosales guilty plea allocution (De Sole Dkt. No. 236), Ex. 42 at 26-27)  Rosales has

---

[20]  Rosales was charged with conspiracy to commit wire fraud, wire fraud, conspiracy to commit money laundering, money laundering, subscribing to false tax returns, and failing to file reports of foreign bank and financial accounts.  United States v. Rosales, 13 Cr. 518 (KPF) (S.D.N.Y.) (Dkt. No. 14).

On September 16, 2013, Rosales pled guilty to these charges.  At the plea hearing, Rosales made the following statement:

> From in or around the 1990s through 2009, I was engaged in the business of dealing fine arts personally and through Glafira Rosales Fine Arts, LLC.  This entity was formed under the laws of the State of New York and conducted business within the Southern District of New York.  During that period, I agreed with others to sell works of art claimed to be created by various expressionist artists, including Mark Rothko, Jackson Pollock, and Robert Motherwell, and to make false representations as to the authenticity and provenance of those works. These works of art were actually fakes created by an individual residing in Queens.

(Rosales guilty plea allocution (De Sole Dkt. No. 236), Ex. 42 at 26)

25

also admitted that she "agreed with others" to sell the forged works and "to make false representations as to the authenticity and provenance of those works."  (Rosales guilty plea allocution (De Sole Dkt. No. 236), Ex. 42 at 26)

## II.   PROCEDURAL HISTORY

The De Sole action was filed on March 28, 2012, and the Howard action was filed on July 6, 2012.  (Cmplt. (De Sole Dkt. No. 1); Cmplt. (Howard Dkt. No. 1))  Defendants filed motions to dismiss (De Sole Dkt. Nos. 24, 27, 63, 71, 75; Howard Dkt. Nos. 35, 39, 45, 48, 74, 76), and on September 30, 2013, this Court granted in part and denied in part Defendants' motions.  De Sole v. Knoedler Gallery, LLC, 974 F. Supp. 2d 274, 285-321 (S.D.N.Y. 2013).

On November 4, 2013, the De Sole Plaintiffs filed a Second Amended Complaint ("SAC") (De Sole Dkt. No. 118) and Howard filed an Amended Complaint (Howard Dkt. No. 179).  The De Sole SAC pleads the following causes of action:

(1) substantive RICO and RICO conspiracy claims against all Defendants;

(2) fraud and fraudulent concealment claims against Knoedler, Freedman, and 8-31;

(3) a fraud conspiracy claim against Hammer, 8-31, and Andrade, among others;

(4) an aiding and abetting fraud claim against Hammer, 8-31, and Andrade, among others;

(5) a breach of warranty claim against Knoedler; and

(6) claims of unilateral mistake and mutual mistake against Knoedler.

(SAC (De Sole Dkt. No. 118) ¶¶ 181-292)

The Howard Amended Complaint pleads the following causes of action:

(1) substantive RICO and RICO conspiracy claims against all Defendants;

(2) a fraud claim against Knoedler and Freedman;

(3) a fraudulent concealment claim against Hammer, 8-31, Knoedler, and Freedman;

(4) a fraud conspiracy claim against all Defendants;[21]

(5) an aiding and abetting fraud claim against Hammer, 8-31, and Andrade, among others;

(6) a breach of warranty claim against Knoedler; and

(7) claims of unilateral mistake and mutual mistake against Knoedler.

(Am. Cmplt. (Howard Dkt. No. 179) ¶¶ 259-391)

Defendants 8-31, Hammer, and Knoedler filed motions to dismiss the De Soles' Second Amended Complaint and Howard's Amended Complaint.  (De Sole Dkt. Nos. 210, 211, 213, 215; Howard Dkt. Nos. 264, 266, 268)  On September 30, 2015, this Court granted in part and denied in part Defendants' motions to dismiss.  (De Sole Dkt. No. 260; Howard Dkt. No. 319)  In De Sole, this Court dismissed Plaintiffs' fraud and fraudulent concealment claims against 8-31 to the extent that those claims are premised on the notion that 8-31 is liable for Knoedler's actions under the doctrine of respondeat superior.  In Howard, this Court dismissed Plaintiff's (1) fraudulent concealment claim against Hammer; (2) breach of warranty claim against Knoedler; and (3) fraud conspiracy claim against 8-31.  Defendants' motions to dismiss were otherwise denied.

All Defendants have moved for summary judgment on the remaining claims against them.  See De Sole Dkt. Nos. 206, 217, 221, 226, 238; Howard Dkt. Nos. 270, 277, 281, 284, 288.

---

[21]  Howard has voluntarily dismissed this claim as to Knoedler.  (Howard Br. (Howard Dkt. No. 292) at 140 n. 35)

## DISCUSSION

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment is warranted when a moving party shows that "there is no genuine dispute as to any material fact" and that that party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  "'[W]here the non[-]moving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence to support an essential element of the non[-]moving party's claim.'"  Lesavoy v. Lane, No. 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008) (quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'"  Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)).  However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'"  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alteration in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Eviner v. Eng, No.

28

13 Civ. 6940 (ERK), 2015 WL 4600541, at *6 (E.D.N.Y. July 29, 2015) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996)).

*       *       *       *

Because Freedman's scienter or lack of scienter is at the heart of this case, the Court's analysis of Defendants' summary judgment motions begins with Freedman and Knoedler's motions directed at Plaintiffs' fraud and fraudulent concealment claims.

## II.    FRAUD AND FRAUDULENT CONCEALMENT

Freedman and Knoedler argue that they are entitled to summary judgment on Plaintiffs' fraud and fraudulent concealment claims because (1) there is no evidence that Freedman acted with scienter, and (2) Plaintiffs have not demonstrated that their reliance was justifiable.[22]   (Freedman Br. (De Sole Dkt. No. 207) at 17-18, 23; Freedman Reply Br. (De Sole Dkt. No. 245) at 3; Freedman Br. (Howard Dkt. No. 278) at 1, 18, 23; Freedman Reply Br. (Howard Dkt. No. 308) at 3)

### A.    Applicable Law

To prevail on a fraud claim under New York law, plaintiff must establish,

by clear and convincing evidence:  (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff.

Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006) (citing Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 98 (2d Cir. 1997)).

"The elements of a fraudulent concealment claim under New York law are:  (1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such

---

[22] Knoedler's briefs in both actions incorporate by reference Freedman's arguments as to the fraud and fraudulent concealment claims.  (Knoedler Br. (De Sole Dkt. No. 222) at 33; Knoedler Br. (Howard Dkt. No. 285) at 34-35)

disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and

[(6)] damages." Woods v Maytag Co., 807 F. Supp. 2d 112, 124 (E.D.N.Y. 2011) (citing Aetna

Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 582 (2d Cir. 2005).  With respect to

the duty to disclose, "New York recognizes a cause of action to recover damages for fraud based

on concealment, where the party to be charged has superior knowledge or means of knowledge,

such that the transaction without disclosure is rendered inherently unfair." Miele v. Am.

Tobacco Co., 2 A.D.3d 799, 803 (2d Dept. 2003); see also Abrams v. Gen. Motors Corp., 120

Misc.2d 371, 374 (N.Y. Sup. Ct. 1983) ("If one party has superior knowledge or has a means of

knowledge not available to both parties, then he is under a legal obligation to speak and silence

would constitute fraud."); Nasaba Corp. v. Harfred Realty Corp., 287 N.Y. 290, 293 (1942)

("Concealment with intent to defraud of facts which one is duty-bound in honesty to disclose is

of the same legal effect and significance as affirmative misrepresentations of fact.").

            "'Clear and convincing evidence is evidence that makes the fact to be proved

"highly probable."'" Century Pac., Inc. v. Hilton Hotels Corp., 528 F. Supp. 2d 206, 219

(S.D.N.Y. 2007), aff'd, 354 F. App'x 496 (2d Cir. 2009) (quoting Abernathy-Thomas Eng'g Co.

v. Pall Corp., 103 F.Supp.2d 582, 595-96 (E.D.N.Y. 2000) (quoting 1A New York Pattern Jury

Instructions-Civil § 1:64 (3d ed. 1999)).  "Clear and convincing evidence may, however, be

circumstantial, even on summary judgment." Id.  "As the moving party, Defendants have the

burden of demonstrating an absence of clear and convincing evidence substantiating Plaintiffs'

claims." Id.  "'If, as to the issue on which summary judgment is sought, there is any evidence in

the record from any source from which a reasonable inference could be drawn in favor of the

nonmoving party, summary judgment is improper.'" Id. (quoting Chambers v. TRM Copy Ctrs.

Corp., 43 F.3d 29, 37 (2d Cir. 1994)).

1.      <u>Scienter</u>

"The scienter element for [New York common law fraud] claims is essentially the same as that under federal securities laws." <u>Saltz v. First Frontier, LP</u>, 782 F. Supp. 2d 61, 75 (S.D.N.Y. 2010), <u>aff'd sub nom.</u> <u>Saltz v. First Frontier, L.P.</u>, 485 F. App'x 461 (2d Cir. 2012); <u>see</u> <u>also</u> <u>Dodona I, LLC v. Goldman, Sachs & Co.</u>, 847 F. Supp. 2d 624, 639 (S.D.N.Y. 2012) ("'Because the elements of common-law fraud in New York are substantially identical to those governing § 10(b), the identical analysis applies.'") (quoting <u>In re Optimal U.S. Litig.</u>, 837 F.Supp.2d 244, 252 (S.D.N.Y. 2011)).  Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 319 (2007) (quotation marks and citations omitted).

"Plaintiffs may satisfy the scienter requirement by producing 'evidence of conscious misbehavior or recklessness.'" <u>Gould v. Winstar Commc'ns, Inc.</u>, 692 F.3d 148, 158 (2d Cir. 2012) (quoting <u>ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009)); <u>see</u> <u>also</u> <u>Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.</u>, 531 F.3d 190, 194 (2d Cir. 2008) ("[R]ecklessness is a sufficiently culpable mental state in the securities fraud context.")  "Scienter based on conscious misbehavior . . . requires a showing of 'deliberate illegal behavior,' a standard met 'when it is clear that a scheme, viewed broadly, is necessarily going to injure.'" <u>Gould</u>, 692 F.3d at 158 (quoting <u>Novak v. Kasaks</u>, 216 F.3d 300, 308 (2d Cir. 2000); <u>AUSA Life Ins. Co. v. Ernst & Young</u>, 206 F.3d 202, 221 (2d Cir. 2000)).

"Scienter based on recklessness may be demonstrated where a defendant has engaged in conduct that was 'highly unreasonable, representing an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it.'" Gould, 692 F.3d at 158-59 (quoting Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000)); Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (recklessness is "conduct [that] is, at the least, . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.") (internal citation and quotation marks omitted). "Recklessness may be established where a defendant 'failed to review or check information that [it] had a duty to monitor, or ignored obvious signs of fraud.'" Gould, 692 F.3d at 159 (quoting Novak, 216 F.3d at 308). "'An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.'" Chill, 101 F.3d at 269 (quoting Goldman v. McMahan, Brafman, Morgan & Co., 706 F.Supp. 256, 259 (S.D.N.Y. 1989))

The Second Circuit is "'lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences,' because such issues are 'appropriate for resolution by the trier of fact.'" In re DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 693 (2d Cir. 2009) (quoting Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir.1999)). "In a [Section] 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." Wechsler v. Steinberg, 733 F.2d 1054, 1059 (2d Cir. 1984). "'Whether a given intent existed is generally a question of fact,' appropriate for resolution by the trier of fact." Press, 166 F.3d at 538 (quoting Grandon v. Merrill Lynch & Co., 147 F.3d 184, 194 (2d Cir. 1998)); see also S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) ("Whether or not a given intent existed, is, of course, a question of fact.") Nevertheless, "even where state of mind is at issue, summary judgment may

be proper 'where a plaintiff has failed to make a showing of wrongful intent on the part of the

defendant sufficient for a reasonable jury to find for plaintiff on that issue.'" Cramer v. Devon

Grp., Inc., 774 F. Supp. 176, 182 (S.D.N.Y. 1991) (quoting Lawford v. New York Life Ins. Co.,

739 F. Supp. 906, 913 (S.D.N.Y. 1990)).

## 2. **Reliance**

"In assessing whether reliance on allegedly fraudulent misrepresentations is

reasonable or justifiable, New York takes a contextual view, focusing on the level of

sophistication of the parties, the relationship between them, and the information available at the

time of the operative decision." JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 406

(S.D.N.Y. 2004). "'Where a party has the means to discover the true nature of the transaction by

the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim

justifiable reliance on defendant's misrepresentations.'" Brunner v. Estate of Lax, 47 Misc. 3d

1206(A), 2015 WL 1509815 at*10 (N.Y. Sup. Ct. 2015) (quoting Stuart Silver Assoc. v. Baco

Dev. Corp., 245 A.D.2d 96, 98-99 (1st Dept. 1997)).

Stated differently,

> "'if the facts represented are not matters peculiarly within the [defendant's] knowledge, and the [plaintiff] has the means available to [it] of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, [the plaintiff] must make use of those means, or [it] will not be heard to complain that [it] was induced to enter into the transaction by misrepresentations.'"

ACA Fin. Guar. Corp. v. Goldman, Sachs & Co., 25 N.Y.3d 1043, 1044 (2015) (quoting

Schumaker v. Mather, 133 N.Y. 590, 596 (1892)); see also Estate of Warhol, 119 F.3d at 98

("[I]f the plaintiff 'has the means of knowing, by the exercise of ordinary intelligence, the truth,

or the real quality of the subject of the representation, he must make use of those means, or he

will not be heard to complain that he was induced to enter into the transaction by

misrepresentations.'") (quoting Mallis v. Bankers Trust Co., 615 F.2d 68, 80-81 (2d Cir. 1980)

(applying New York law), abrogated in part on other grounds by Peltz v. SHB Commodities, 115

F.3d 1082, 1090 (2d Cir.1997)).  Notably, "the obligation to [make use of the means of

verification] must be understood as contingent on either 'indisputable access to truth-revealing

information,' . . . or some suspicious event or information triggering the duty to inquire."

Winnick, 350 F. Supp. 2d at 410 (quoting Doehla v. Wathne Ltd., Inc., No. 98 Civ. 6087 (CSH),

1999 WL 566311, at *11 (S.D.N.Y. Aug. 3, 1999) (emphasis in Doehla)).

       Moreover, "'New York cases recognize that the peculiar knowledge exception

applies not only where the facts allegedly misrepresented literally were within the exclusive

knowledge of the defendant, but also where the truth theoretically might have been discovered,

though only with extraordinary effort or great difficulty.'"  Id. (quoting DIMON Inc. v. Folium,

Inc., 48 F. Supp. 2d 359, 368 (S.D.N.Y. 1999) and citing Lazard Freres & Co. v. Protective Life

Insurance Co., 108 F.3d 1531, 1542 n.9 (2d Cir. 1997) (noting that New York law does not

require that the information be "available only to the defendant and absolutely unknowable by

the plaintiff before reliance can be deemed justified")); Mallis, 615 F.2d at 80 ("[I]ndeed some

cases have imposed liability in situations in which plaintiff could have determined the truth with

relatively modest investigation.").

       Courts consider multiple factors in evaluating the reasonableness of a plaintiff's

reliance, including the following:

> whether the [plaintiff] received any "clear and direct" signs of falsity, see
> Winnick, 350 F.Supp.2d at 408; whether the [plaintiff] had access to relevant
> information, see Sawabeh Info. Servs. Co. v. Brody, 832 F.Supp.2d 280, 297-98
> (S.D.N.Y. 2011); whether the [plaintiff] received a written (purported)
> confirmation of the truthfulness of the representations at issue, see DDJ Mgmt.,

34

LLC v. Rhone Grp. L.L.C., 15 N.Y.3d 147, 154-55 (2010), and whether the [plaintiff] is "sophisticated," see Crigger v. Fahnestock & Co., 443 F.3d 230, 235 (2d Cir. 2006).

Coraud LLC v. Kidville Franchise Co., No. 14 Civ. 9105 (JSR), 2015 WL 4930990, at *4 (S.D.N.Y. Aug. 15, 2015); see also Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003) ("In assessing the reasonableness of a plaintiff's alleged reliance, we consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them.") (citation omitted).

"[T]he greater the sophistication of the investor, the more inquiry that is required." Crigger, 443 F.3d at 235; see also Winnick, 350 F. Supp. 2d at 406 ("[S]ophisticated business entities are held to a higher standard."). "As a matter of law, 'a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it.'" ACA Galleries, Inc. v. Kinney, 928 F. Supp. 2d 699, 703 (S.D.N.Y. 2013) (quoting HSH Nordbank AG v. UBS AG, 95 A.D.3d 185, 194-95 (1st Dept. 2012) (internal quotation marks omitted)), aff'd, 552 F. App'x 24 (2d Cir. 2014); see also Crigger, 443 F.3d at 235 ("'Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance.'") (quoting Grumman Allied Indus. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984)).

"Moreover, 'when the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy.'" ACA Fin.

35

Guar. Corp., 25 N.Y.3d at 1044-45 (quoting Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V., 17 N.Y.3d 269, 279 (2011)).  "This rule applies where the '[c]ircumstances [are] so suspicious as to suggest to a reasonably prudent plaintiff that the defendants' representations may be false'; in such cases, a plaintiff 'cannot reasonably rely on those representations, but rather must "make additional inquiry to determine their accuracy."'" Winnick, 350 F. Supp. 2d at 406 (alterations in original) (quoting Estate of Warhol, 119 F.3d at 98 (quoting Keywell Corp. v. Weinstein, 33 F.3d 159, 164 (2d Cir. 1994))).

Under New York's contextual approach, "'[t]he question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive.'" DDJ Mgmt., LLC, 15 N.Y.3d 147, 155 (2010) (quoting Estate of Warhol, 119 F.3d at 98)  "[R]easonable reliance is therefore a question normally reserved for the finder of fact and not usually amenable to summary judgment." Coraud, 2015 WL 4930990, at *4.

**B.   Analysis**

Freedman and Knoedler do not dispute that material misrepresentations and omissions were made and that Plaintiffs suffered damages.  They contend, however, that Plaintiffs' fraud and fraudulent concealment claims fail because Plaintiffs have not put forth evidence demonstrating that (1) Freedman acted with scienter (i.e., that her statements were made recklessly or with intent to deceive),[23] and (2) that Plaintiffs' reliance was justifiable.

---

[23] The De Soles allege that Freedman and Knoedler made a series of knowing misrepresentations, including that (1) the work was authentic; (2) that the work came directly to Knoedler from an individual whom Knoedler and Freedman knew personally, who inherited the work from a private collector who had obtained it directly from the artist, with the assistance of David Herbert; (3) that the work was one of only two "previously undiscovered" works by Rothko and Pollock that Knoedler's client had obtained from the artists with Herbert's assistance; (4) that the work had been examined by eleven experts who had all expressed the opinion that it was authentic; and (5) that the National Gallery of Art would publish a

(Freedman Br. (<u>De Sole</u> Dkt. No. 207) at 17-18, 23; Freedman Reply Br. (<u>De Sole</u> Dkt. No. 245) at 3; Freedman Br. (<u>Howard</u> Dkt. No. 278) at 1, 17-18, 23-24; Freedman Reply Br. (<u>Howard</u> Dkt. No. 308) at 3)

### 1. **Scienter**

Freedman argues that no reasonable jury could find by clear and convincing evidence that she acted with scienter.  (Freedman Br. (<u>De Sole</u> Dkt. No. 207) at 17; Freedman Br. (<u>Howard</u> Dkt. No. 278) at 17)  In this regard, Freedman cites her efforts to (1) exhibit the works "all over the world"; (2) hire a "celebrated art historian" to investigate the works' provenance; and (3) have the Rosales Paintings "validated by esteemed art experts of Abstract Expressionism."  (Freedman Br. (<u>De Sole</u> Dkt. No. 207) at 17; Freedman Br. (<u>Howard</u> Dkt. No. 278) at 17-18)  Freedman notes that she herself purchased several Rosales Paintings, and argues that all of her conduct is inconsistent with fraudulent intent.  (Freedman Br. (<u>De Sole</u> Dkt. No. 207) at 17-20; Freedman Br. (<u>Howard</u> Dkt. No. 278) at 17-20)  This Court disagrees.

Plaintiffs have offered ample circumstantial evidence demonstrating that Freedman acted with fraudulent intent and understood that the Rosales Paintings were not authentic.  This evidence includes, <u>inter alia</u>, the fabricated stories of provenance, which shifted

---

supplement to the Rothko catalogue raisonné that would include the work.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 182-86)  The De Soles also allege that Freedman and Knoedler fraudulently concealed numerous material facts about the work.  (<u>Id.</u> ¶ 199)

Howard likewise alleges that Freedman and Knoedler made a series of knowing misrepresentations, including that (1) the work was authentic; (2) that the work came directly to Knoedler from an individual whom Knoedler and Freedman knew personally (and from whom Freedman had purchased a work), who inherited the work from his father (a wealthy Swiss collector), and who obtained it directly from the artist, with the assistance of David Herbert; and (3) that the work had "singular value because it is a distinctive and rare" de Kooning landscape and of "impeccable quality" and provenance.  (Am. Cmplt. (<u>Howard</u> Dkt. No. 179) ¶¶ 308-11)  Howard also alleges that Freedman and Knoedler fraudulently concealed numerous material facts about the work.  (<u>Id.</u> ¶ 322)

dramatically over time; the efforts to concoct a "cover story" with Rosales; Rosales' willingness
to repeatedly sell purported "masterworks" to Knoedler for a fraction of their value on the open
market; Rosales' refusal to share any meaningful information about the purported source of the
paintings, and her unwillingness to sign a statement representing that the paintings were
authentic; Rosales' inconsistent accounts of the size and scope of Mr. X's collection, which grew
over time to include more than thirty hitherto undiscovered "masterworks"; the absence of any
documentation concerning the paintings; the issues raised about the Diebenkorns Rosales
brought to Knoedler early on; and the October 2003 IFAR Report – which Freedman reviewed –
and which rejected the concocted provenance tale concerning Ossorio and raised serious
concerns about the authenticity of the "Green Pollock" purchased by Jack Levy.

             Moreover, in arguing that "many experts and scholars" "unambiguously conveyed
that the [Rosales Paintings] were genuine," <u>see</u> Freedman Br. (<u>De Sole</u> Dkt. No. 207) at 1-2, 6-8
& n.3; Freedman Br. (<u>Howard</u> Dkt. No. 278) at 1, 5-9 & n.3), Freedman exaggerates the
significance of these witnesses' testimony.  For example, nearly all of the Rothko experts
Freedman cited to the De Soles testified that they do not authenticate works of art.  <u>See</u> Carmean
Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 5 at 141; Clearwater Dep. (<u>Id.</u>), Ex. 6 at 15, 17, 42-43;
Cranmer Dep. (<u>Id.</u>), Ex. 8 at 42-43; Nasr Dep. (<u>Id.</u>), Ex. 26, at 68-69; Polcari Dep. (<u>Id.</u>), Ex. 28 at
125; Powell Dep. (<u>Id.</u>), Ex. 29 at 14; Rothko Dep. (<u>Id.</u>), Ex. 32 at 14, 51; Sandler Dep. (<u>Id.</u>), Ex.
33 at 10-11; Flam Dep. (<u>Id.</u>), Ex. 15 at 347-48 (testifying that he has never authenticated a
Rothko).  Moreover, many of the experts Freedman relies on testified that they were never asked
by Freedman to authenticate works of art, and that they did not make a statement as to any
work's authenticity.  <u>See</u> Anfam Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 6 at 162, 405-06; Cranmer
Dep. (<u>Id.</u>), Ex. 8 at 207-08; Clearwater Dep. (<u>Id.</u>), Ex. 6 at 42-43, 49; Flam Dep. (<u>Id.</u>), Ex. 15 at

348; Polcari Dep. (Id.), Ex. 28 at 125; Powell Dep. (Id.), Ex. 29 at 14; Rothko Dep. (Id.), Ex. 32 at 51-52; Sandler Dep. (Id.), Ex. 33 at 10, 12.  Plaintiffs have offered evidence that creates material issues of fact about (1) the amount and accuracy of information Freedman provided to the experts and galleries in which the Rosales Paintings were exhibited; (2) whether any of the experts were asked to authenticate the works; (3) the nature of the experts' reactions to and comments about the works they viewed; and (4) the impartiality and qualifications of certain experts.

The evidence concerning Freedman's efforts to show the Rosales Paintings at art exhibits likewise does not negate fraudulent intent.  The public exhibitions had the effect of building a façade of credibility for the Rosales Paintings.[24]  Because Freedman and Knoedler had no documented provenance for any of the Rosales Paintings, the "viewing list" and exhibit history – together with Knoedler's endorsement – was the documentation Freedman and Knoedler used to sell these paintings.

Freedman's purchase of several Rosales Paintings likewise does not negate Defendants' evidence of fraudulent intent.  In April 1997, Freedman swapped a Diebenkorn from her own collection for a Rosales "Rothko."  No money changed hands.[25]  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1111; (De Sole Dkt. No. 236), Ex. 80)  On August 1, 2000, Freedman and her husband purchased a "Motherwell" Spanish Elegy directly from Rosales for approximately $15,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1163; (De Sole Dkt. No. 236), Ex. 107)  Finally, on September 1, 2000, Freedman and her husband purchased a

---

[24]  For example, David Anfam – a Rothko expert – commented that "it would come as a surprise if the Foundation Beyeler would have chosen to exhibit – as they did last summer – [a Rosales Newman] painting if they had doubts."  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 208) ¶ 53).
[25]  Plaintiffs dispute both the value and the authenticity of the Diebenkorn Freedman swapped for the Rosales "Rothko."  See Pltf. R. 56.1 Count. Stmt. (De Sole Dkt. No. 232) ¶ 328.

"Pollock" directly from Rosales for $280,000.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236)
¶ 1165)

Freedman's motives in swapping for and purchasing these Rosales Paintings will
be determined by a jury.  It is undisputed that she used the fact that she owned Rosales Paintings
as a promotional device.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 208) ¶ 540)  Moreover, by
September 2000 – when Freedman purchased a Rosales "Pollock" for $280,000 – Knoedler was
regularly doubling its money in purchasing and selling Rosales Paintings.  See Pltf. R. 56.1 Add.
Stmt. (De Sole Dkt. No. 236) ¶ 1142(a); (De Sole Dkt. No. 236), Ex. 90 (reflecting June 23,
1998 transaction in which Knoedler sold a purported Rothko for $320,000 and paid Rosales
$155,000); Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1142(b); (De Sole Dkt. No. 236),
Exs. 91, 92 (reflecting July 1, 1998 transaction in which Knoedler sold a purported Rothko for
$325,000 and paid Rosales $155,000).  Freedman – who was well aware of this fact – might well
have concluded that the purchase of the "Pollock" was a wise investment based on prior sales of
Rosales Paintings.[26]

"'[I]ssues of motive and intent are usually inappropriate for disposition on
summary judgment'" – and such is the case here.  Litton Indus., Inc. v. Lehman Bros. Kuhn
Loeb Inc., 967 F.2d 742, 751 (2d Cir. 1992), as amended (Sept. 23, 1992) (quoting Wechsler,

---

[26]  Freedman also contends that several of the alleged misrepresentations are not actionable
and/or were never made by her.  (Freedman Br. (De Sole Dkt. No. 207) at 32-34; Freedman Br.
(Howard Dkt. No. 278) at 31-33)  However, the parties dispute what Freedman said, see, e.g.,
Pltf. R. 56.1 Count. Stmt. (De Sole Dkt. No. 232) ¶¶ 456, 458, 538, 545; Def. Reply to Pltf. R.
56.1 Add. Stmt. (De Sole Dkt. No. 248) ¶¶ 1374-75, 1386-87, 1714-17, and these factual issues –
which require credibility assessments and determinations regarding conflicting versions of events
– cannot be resolved at summary judgment.  See Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.
1996) ("Assessments of credibility and choices between conflicting versions of the events are
matters for the jury, not for the court on summary judgment."); Fincher v. Depository Trust &
Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (summary judgment is inappropriate in a "he
said, she said" scenario).

733 F.2d at 1058-59; see also Sound Video Unlimited, Inc. v. Video Shack Inc., 700 F. Supp.

127, 135 (S.D.N.Y. 1988) (summary judgment denied where "fraud issue largely hinges upon the

credibility of the various parties to the alleged fraud and the believability of their testimony as to

what statements were made and with what intention").

 This Court concludes that there are material issues of fact as to whether Freedman

and Knoedler acted with fraudulent intent in selling Rosales Paintings to Plaintiffs.

 2. **Reliance**

 Freedman contends that Plaintiffs are sophisticated art collectors who had the

opportunity to investigate her alleged misrepresentations before purchasing the works.

Freedman contends that had Plaintiffs performed "even minimal [due] diligence," they would

have learned the facts that provide the basis for their fraud claims.  (Freedman Br. (De Sole Dkt.

No. 207) at 5, 24, 27, 31-32; Freedman Br. (Howard Dkt. No. 278) at 5, 23 n.6, 24, 28, 31)

Although it is true that Plaintiffs had purchased works of art before, this Court cannot conclude

– as a matter of law – that Plaintiffs' alleged sophistication and experience rendered them

unreasonable in relying on Freedman and Knoedler's representations concerning the paintings.

An analysis of the factors cited in Winnick and other cases confirms this conclusion.

 As an initial matter, both the De Soles and Howard received "written

confirmation of the truthfulness of the representations at issue."  See Coraud, 2015 WL 4930990,

at *4 (citing DDJ Mgmt., LLC, 15 N.Y.3d at 154-55).  The De Soles requested and received a

December 11, 2004 letter from Freedman in which she confirmed all of her earlier oral

representations about the painting they later purchased, including its authenticity and

provenance.  See Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1404, 1411; see also DDJ

Mgmt., LLC, 15 N.Y.3d at 154 ("[W]here a plaintiff has gone to the trouble to insist on a written

representation that certain facts are true, it will often be justified in accepting that representation rather than making its own inquiry.").  Howard was also provided with an invoice that set forth in writing the authenticity and provenance of the purported de Kooning he had purchased.  See Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶1718; (De Sole Dkt. No. 236), Ex. 233.

The representations made by Freedman and Knoedler likewise contained no "hints of [] falsity"; to the contrary, Knoedler's sterling reputation lent credibility to Freedman's assertions.  See ACA Fin. Guar. Corp., 25 N.Y.3d at 1044.

Moreover, even assuming that "the truth theoretically might have been discovered," there is evidence in the record suggesting that any such discovery would be possible "only with extraordinary effort or great difficulty.'"  Winnick, 350 F. Supp. 2d at 410.  The IFAR Report demonstrates the complexity of the task of ascertaining the authenticity and provenance of a work of art, particularly in the absence of any documentation concerning the painting.  In preparing its report over a number of months, IFAR showed the "Green Pollock" to numerous Pollock experts; conducted "extensive archival and other research"; conducted materials and technical analysis; and closely examined the paint handling and style of the work, and the legitimacy of the purported Pollock signature.  (IFAR Report (De Sole Dkt. No. 236), Ex. 140)  In sum, assuming that the forged nature of the paintings sold to Plaintiffs could have been discovered, there is evidence in the record suggesting that that discovery would have come "only with extraordinary effort or great difficulty."

As noted above, "reasonable reliance is . . . a question normally reserved for the finder of fact and [is] not usually amenable to summary judgment." Coraud, 2015 WL 4930990, at *4. Such is the case here.[27]

---

[27] ACA Galleries, Inc. v. Kinney, 928 F. Supp. 2d 699, 703-04 (S.D.N.Y. 2013), aff'd, 552 F. App'x 24 (2d Cir. 2014), cited by Knoedler (Freedman Br. (De Sole Dkt. No. 222) at 25-26, 31-32; Freedman Br. (Howard Dkt. No. 278) at 25-26, 28-30), is not to the contrary. In ACA Galleries, the plaintiff art gallery sued Kinney, an individual seller, for fraud and mistake, in connection with the gallery's purchase of a forged Milton Avery painting. The district court granted summary judgment in favor of the seller because ACA "had the opportunity to fully investigate the authenticity of the painting but failed to do so." ACA Galleries, 928 F. Supp. 2d at 703. In affirming, the Second Circuit noted that the Avery Foundation was available to authenticate the painting prior to the sale, but ACA had declined to have such an inspection performed until after the sale. ACA Galleries, Inc., 552 F. App'x at 25. When shown the painting, the Avery Foundation concluded that it was not authentic. ACA Galleries, 928 F. Supp. 2d at 701, 703. As the district court explained, "[t]hat ACA failed to avail itself of the opportunity to have the painting inspected by the Avery Foundation or another expert prior to purchase, and instead relied only on [it's president's] inspection, was not reasonable. ACA is in the business of buying and selling art. Such a business must be cognizant of forgery of the works of well-known artists like Avery." Id. at 703. The Second Circuit agreed, explaining that "ACA was aware that an authentication by the Foundation 'would make the painting more saleable at a higher price.' ACA could have accepted the higher price that accompanies certainty of authenticity, but chose instead to accept the risk that the painting was a forgery." ACA Galleries, Inc., 552 F. App'x at 25 (citation omitted).

The facts here are not comparable. Plaintiffs do not operate art galleries, and they are not in the business of buying and selling works of art. Instead, they are consumers who relied on representations made by one of the most reputable and most established art galleries in New York City. There is also no evidence that Plaintiffs made a strategic decision not to seek an expert opinion.

MAFG Art Fund, LLC v. Gagosian, 123 A.D.3d 458 (1st Dept. 2014) leave to appeal denied, 25 N.Y.3d 901 (2015), cited by Defendants (December 22, 2014 letter (De Sole Dkt. No. 250; Howard Dkt. No. 312)), is also distinguishable. In MAFG Art Fund, the First Department affirmed the dismissal of a fraud claim which "allege[d] that defendants misrepresented the value of certain works of art and that the values were supported by market data, when they were not," because plaintiffs had not adequately pled justifiable reliance. MAFG Art Fund, LLC, 123 A.D.3d at 459. The court reasoned that "[a]s a matter of law, these sophisticated plaintiffs cannot demonstrate reasonable reliance because they conducted no due diligence; for example, they did not ask defendants, 'Show us your market data.'" Id. The plaintiffs in MAFG Art Fund, however, were "business entities admittedly engaged in the business of art investments," with "20 years of experience making art investment decisions, having purchased and sold 'nearly

Crediting Plaintiffs' evidence on this point, a reasonable jury could conclude that Plaintiffs justifiably relied on Freedman and Knoedler's representations.  Accordingly, Freedman and Knoedler are not entitled to summary judgment on Plaintiffs' fraud and fraudulent concealment claims.

## III.   RICO CLAIMS

Knoedler, Freedman, Hammer, and Andrade move for summary judgment on Plaintiffs' substantive RICO and RICO conspiracy claims in the De Sole and Howard actions.[28] (Knoedler Br. (Howard Dk. No. 285) at 20-34; Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 15-23; Andrade Br. (De Sole Dkt. No. 227; Howard Dkt. No. 289) at 11-18) Defendants contend that Plaintiffs have failed to adduce evidence sufficient to establish certain elements of their RICO claims.  Defendants do not dispute the existence of an enterprise engaged in a pattern of racketeering activity, in which two or more predicate acts were committed that affected interstate commerce.  Defendants argue, however, that they did not participate in the alleged fraudulent enterprise and did not commit predicate acts in furtherance of the racketeering enterprise.  In addition, Hammer and Andrade argue that they did not conspire to violate the RICO statute, and Hammer argues that he caused Plaintiffs no injury.

---

200 works' of art through defendants alone," and who "'bought, sold and exchanged pieces frequently' with an express 'art investment strategy.'"  MAFG Art Fund, LLC v. Gagosian, No. 653189/12, 2014 WL 359341, at  1 (N.Y. Sup. Ct. Jan. 31, 2014).

[28]  In her reply briefs, Freedman states that she "joins Knoedler's reply brief" with respect to the RICO claims.  (Freedman Reply Br. (De Sole Dkt. No. 245) at 15; Freedman Reply Br. (Howard Dkt. No. 308) at 15)  Knoedler's brief in the De Sole action incorporates by reference Knoedler's arguments in its motion for summary judgment in Howard.  (Knoedler Br. (De Sole Dkt. No. 222) at 33)

A.      **Applicable Law**

To sustain a private cause of action under RICO, a plaintiff must establish: "(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation."  Lerner v. Fleet Bank, N.A., 459 F.3d 273, 283 (2d Cir. 2006) (internal quotation marks and alteration omitted); see also 18 U.S.C. § 1964(c) (providing a cause of action for "[a]ny person injured in his business or property by reason of a violation" of Section 1962).

18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  Thus, in addition to injury and causation, "[t]o establish a civil RICO claim pursuant to § 1962(c), 'a plaintiff must establish: (1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly . . . participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce.'"  Valenti v. Penn Mut. Life Ins. Co., 850 F. Supp. 2d 445, 450 (S.D.N.Y. 2012) (quoting Weizmann Institute of Science v. Neschis, 229 F.Supp. 2d 234, 254-55 (S.D.N.Y. 2002) (citation omitted)), aff'd, 511 F. App'x 57 (2d Cir. 2013); see also Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 487 (2d Cir. 2014) ("To establish a violation of § 1962(c), a plaintiff must show that the defendant conducted, or participated in the conduct, of a RICO enterprise's affairs through a pattern of racketeering activity.")

"To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. § 1962(d) . . . plaintiff must prove (1) that there existed a conspiracy to commit acts that, if

successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join

in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of

the conspiracy in some manner (although not necessarily by the commission of any RICO

predicate acts himself)." City of New York v. Chavez, 944 F. Supp. 2d 260, 268-69 (S.D.N.Y.

2013) (emphasis in original) (citing Valenti, 850 F.Supp.2d at 450-51); see also Crawford, 758

F.3d at 487 ("To establish a violation of § 1962(d), a plaintiff must show that the defendant

agreed with at least one other entity to commit a substantive RICO offense.")

      **B.**      **Analysis**

            **1.**      **Defendants' Participation in the RICO Enterprise**

      As discussed above, a RICO plaintiff must establish that the defendants

"conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs

through a pattern of racketeering activity." 18 U.S.C. § 1962(c); see Reves v. Ernst & Young,

507 U.S. 170, 177-79 (1993).  Accordingly, the defendant must have had "some part in directing

[the enterprise's] affairs." Reves, 507 U.S. at 179.  "Of course, the word 'participate' makes

clear that RICO liability is not limited to those with primary responsibility for the enterprise's

affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to

those with a formal position in the enterprise[;] but some part in directing the enterprise's affairs

is required." Id. (footnote omitted) (emphasis in original).  "The [Supreme] Court acknowledged

. . . that those who 'operate' or 'direct' a RICO enterprise sufficiently to 'conduct' its affairs

within the meaning of RICO need not be 'upper management,' but might also be 'lower rung

participants in the enterprise who are under the direction of upper management.'" United States

v. Allen, 155 F.3d 35, 42-43 (2d Cir. 1998) (quoting Reves, 507 U.S. at 184).

In <u>Reves</u>, the Supreme Court ruled that "[t]he 'operation or management' test [employed by the Eighth and D.C. Circuits] expresses [RICO's] requirement[s] in a formulation that is easy to apply." <u>Reves</u>, 507 U.S. at 179. Simply put, "one is liable under RICO only if he 'participated in the operation or management of the enterprise itself.'" <u>Azrielli v. Cohen Law Offices</u>, 21 F.3d 512, 521 (2d Cir. 1994) (quoting <u>Reves</u>, 507 U.S. at 183).

With these precedents in mind, the Court will analyze the arguments and evidence concerning each defendant and their respective roles in the conduct of the affairs of the alleged racketeering enterprise.

         **a.**       **Freedman and Knoedler**

Freedman and Knoedler argue that they "did not know the Rosales Collection works were inauthentic [and thus] they [did] not 'share a common purpose to engage in [the] particular fraudulent course of conduct' of selling forged works." (Knoedler Br. (<u>Howard</u> Dkt. No. 285) at 22 (quoting <u>First Cap. Asset Mgmt., Inc., v. Satinwood, Inc.</u>, 385 F.3d 159, 174 (2d Cir. 2004))) Accordingly, "as a matter of law, [they cannot] 'be considered part of [the] RICO enterprise.'" (Knoedler Br. (<u>Howard</u> Dkt. No. 285) at 22 (quoting <u>Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.</u>, 745 F. Supp. 2d 343, 351 (S.D.N.Y. 2010))); <u>see</u> <u>also</u> <u>id.</u> at 30 ("Knoedler and Freedman believed the Rosales Collection works were authentic, [and therefore] Knoedler and Freedman could not have shared a common purpose with other members of an association-in-fact enterprise to 'sell forged paintings.'")

As discussed above in connection with Plaintiffs' fraud and fraudulent concealment claims, however, Plaintiffs have offered ample circumstantial evidence demonstrating that Freedman acted with fraudulent intent and understood that the Rosales Paintings were not authentic. As noted earlier, this evidence includes, <u>inter alia</u>, Freedman and

Rosales' fabricated stories of provenance, which shifted dramatically over time; Freedman's
efforts to concoct a "cover story" with Rosales; Rosales' willingness to repeatedly sell purported
"masterworks" to Knoedler for a fraction of their value on the open market; Rosales' refusal to
share any meaningful information about the purported source of the paintings, and her
unwillingness to sign a statement representing that the paintings were authentic; Rosales'
inconsistent accounts of the size and scope of Mr. X's collection, which grew over time to
include more than thirty hitherto undiscovered "masterworks"; the absence of any documentation
concerning the paintings; the issues raised about the Diebenkorns Rosales brought to Knoedler
early on; and the October 2003 IFAR Report – which Freedman reviewed – and which rejected
the concocted provenance tale concerning Ossorio and raised serious concerns about the
authenticity of the "Green Pollock" purchased by Jack Levy.  Accordingly, Plaintiffs have
introduced sufficient evidence to demonstrate that Freedman knew that the representations she
was making to Plaintiffs about the paintings they purchased were false.

    Moreover, Freedman's state of mind, her knowledge, and her intent present
classic jury questions.  The Second Circuit "has consistently held [that] where subjective issues
regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated,
summary judgment would appear to be inappropriate and a trial indispensable.  The need for a
full exposition of facts is profound under such circumstances since determining a man's [or a
woman's] state of mind is 'an awesome problem,' capable of resolution only by reference to a
panoply of subjective factors."  Patrick v. LeFevre, 745 F.2d 153, 159 (2d Cir. 1984) (internal
citations omitted); see also Redd v. New York Div. of Parole, 678 F.3d 166, 178 (2d Cir. 2012)
("Issues of causation, intent, and motivation are questions of fact."); Gelb v. Bd. of Elections of
City of New York, 224 F.3d 149, 157 (2d Cir.) certified question accepted, 95 N.Y.2d 879

(2000) ("[S]ummary judgment is generally inappropriate where questions of intent and state of mind are implicated."); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (same).

      Freedman and Knoedler are not entitled to summary judgment on Plaintiffs' RICO claims on the grounds that there is no evidence that they shared the enterprise's illegal purpose. Plaintiffs have proffered evidence that creates material issues of fact concerning this issue.

### b.    <u>Hammer</u>

      Hammer contends that he is entitled to summary judgment on Plaintiffs' RICO claims because there is no evidence that he had "some part in directing [the enterprise's] affairs." See Reves, 507 U.S. at 179; Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 18-19. Hammer argues that the undisputed evidence shows that "did not make any . . . request or recommendation or coordinate anyone's efforts to commit fraud related to the sale of any painting acquired from Rosales." (Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 19) Hammer further maintains that he "did not play any part in the marketing or selling of any of the paintings sold by Knoedler," and "did not direct or encourage anyone to purchase, sell, or paint a forged painting." (Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 18) In sum, Hammer argues that the undisputed evidence shows that he did nothing to direct the alleged enterprise's affairs. (Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 19)

      Hammer has stated that his family has been "directly responsible for the operations of Knoedler" since the 1970s. (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1031; Hammer Decl. in Opp. to TRO (De Sole Dkt. No. 236), Ex. 46 ¶ 2) Moreover, as president, CEO, chairman, and sole owner of 8-31 Holdings, Inc. – the sole member of Knoedler – Hammer had the right to exercise complete control over Knoedler's operations. (Pltf. R. 56.1

Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1033, 1995, 2003; Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 57)

The evidence demonstrates, however, that Hammer's contact with Knoedler was sporadic. Hammer lived in California (Def. R. 56.1 Stmt. (Dkt. Nos. 219 220) ¶ 761), and rarely visited Knoedler. (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 37; see also Del Deo Dep. (De Sole Dkt. No. 236), Ex. 13 at 40-41 (Hammer visited the gallery "very infrequently")) Hammer typically spoke by telephone with Freedman "every three or four weeks." (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 35-36) There is no evidence that Hammer was the day-to-day manager of Knoedler,[29] and his testimony that he played no role in the selling of paintings at Knoedler is unrebutted.[30] (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21at 195-96, 214, 215, 216-17, 371-72) Indeed, there is no evidence that Hammer ever had any contact with a Knoedler customer who bought a Rosales Painting.[31]

---

[29] Hammer did not have a title or position at Knoedler until October 2009. (Def. R. 56.1 Stmt. (Dkt. Nos. 219, 220) ¶ 755) As to 8-31, Hammer testified that he was responsible for oversight of the holding company, which entailed "review[ing] with the board the information on the individual LLCs that are underneath that holding company" and "look[ing] at other things that 8-31 Holdings might be able to do or become involved in, . . . [such as philanthropic activities]." (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 55-57) Freedman testified that she was responsible for leading Knoedler (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 43, 171), and Hammer confirmed that Freedman was "the head of the company, responsible for all the operations, activities, purchases, sales, et cetera." (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 199-200)

[30] Hammer's testimony on this point is corroborated by that of Frank Del Deo, who served as Knoedler's associate director between 1999 and 2009, and as president and director between 2009 and 2011. (Del Deo Dep. (De Sole Dkt. No. 236), Ex. 13 at 10) Del Deo testified that he never had discussions with Hammer about the pricing of works, and that "[Hammer] would leave that to us. It wasn't his sort of knowledge." (Id. at 144) Del Deo also testified that he never spoke with Hammer about any of the Rosales Paintings. (Id. at 145)

[31] Eleanore De Sole testified that she does not know who Michael Hammer is. (E. De Sole Dep. (De Sole Dkt. No. 236), Ex. 11 at 64)

There is also no evidence that Hammer was aware of the outlandish profits Knoedler made on each Rosales Painting. Hammer testified that, on an annual basis, he saw "a summary of the 'numbers' [for Knoedler,] which would include sales, expenses, et cetera."[32] (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 58)  There is no evidence that Hammer was ever shown the profit margin for any sale of a Rosales Painting or any collection of Rosales Paintings, however, nor is there any evidence that he was made aware that all of Knoedler's profits were derived from sales of Rosales Paintings.

While Freedman testified that she had a "general recollection" that she informed Hammer of each sale of a Rosales Painting (Pltf. R. 56.1 Count. Stmt. (De Sole Dkt. No. 232) ¶¶ 777-81; Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 432, 613; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1036-37) – because she deemed "every sale" of a Rosales Painting to be a sale of an "important [A]bstract [E]xpression[ist] work[]" (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 613) – she did not testify that she told Hammer what the profit margin was on any Rosales Painting, or on any collection of Rosales Paintings.[33]  Freedman's testimony that "Hammer was interested to know what was transacted" (id. at 137), was "aware of sales in

---

[32]  At annual 8-31 board meetings, Hammer was provided "[s]ummary financials," consisting of "the general numbers, total numbers, without specifics of sales, cost of sales, expenses, for each of the individual LLCs." (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 131)  "It was not a package, but there were . . . just summary sheets of what was going on.  There weren't very many."  (Id. at 131)  For Knoedler, the summary would contain "sales, cost of sales, expenses, that stuff.  Simple summary information."  (Id. at 132-33)

[33] Freedman testified that she spoke with Hammer "as needed," and told him about sales "on occasion."  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 35, 38)  When asked about the sales she had discussed with Hammer, Freedman testified that Hammer "might have called" on a given day and "I might tell him about something I had just consummated, in terms of a sale.  It was, you know, according to when we spoke and what might have happened on that given day." (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 39)  Freedman testified that she did not "recall calling Michael Hammer only for the specific reason to talk about [a] sale."  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 40)

general," and "oftentimes [saw] paperwork regarding sales" (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 137, 334) does not demonstrate that Hammer was aware of the outlandish profits Knoedler made on the sale of Rosales Paintings.  Similarly, Freedman's testimony that Hammer spoke with Knoedler's chief financial officer about financial matters at the gallery (id. at 136-37) does not demonstrate that Hammer was informed of the profit margins associated with sales of Rosales Paintings.[34]

Hammer denies any knowledge of Knoedler's profit margin on Rosales Paintings. (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 131-34, 214, 218)  Hammer testified that the financial information he received about Knoedler was never broken down into individual sales, but instead "would be one number for sales, one number for cost of sales, gross profit and then all of these expenses.  It was just a summary. . . . [W]e never had serious detailed information." (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 133-34)  In sum, there is no evidence that Hammer was aware of Knoedler's profit margins on the sale of any particular Rosales Painting, or on any collection of Rosales Paintings.[35]  Accordingly, Hammer's knowledge of the

---

[34]  Freedman also testified that "[t]here were many sales and many transactions that Michael Hammer would know about" (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 148), but the fact that Hammer knew that Knoedler was selling paintings does not demonstrate that he was aware that a fraud was taking place at Knoedler.  Freedman also testified that "[g]enerally speaking, it is [her] belief that . . . if Michael wanted to see the monthly[ report of sales at Knoedler], he would see it."  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 148)  This testimony does not establish that Hammer ever actually saw a monthly sales report, however, much less that he knew of the profits realized on sales of Rosales Paintings.  For his part, Hammer testified that he is not familiar with a monthly sales report that Knoedler Gallery generates, and could not recall ever seeing a monthly sales report from Knoedler Gallery. (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 139)

[35]  Peter Shaw's testimony that "Richard [Lynch] said that Michael [Hammer] was aware of [the profit margins on Rosales Paintings]" (Shaw Dep. (De Sole Dkt. No. 236), Ex. 35 at 44) is inadmissible hearsay.

underlying fraud scheme cannot be premised on an awareness that Knoedler was making outlandish profits on the sale of Rosales Paintings.

As to Hammer's knowledge concerning the source and provenance of the Rosales Paintings, Freedman testified that Hammer knew that Rosales was the source of the works, that the works were "newly discovered," that Knoedler was researching the provenance of the works, and that Knoedler did not know the identity of the owner.  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 334-39)  There is no evidence, however, that Hammer was aware of (1) Rosales' shifting provenance stories; (2) Rosales' inconsistent accounts of the size and scope of Mr. X's collection; (3) Rosales' unwillingness to sign forms confirming the authenticity of the Rosales Paintings; or (4) the issues raised concerning the Diebenkorns Rosales brought to Knoedler early on. [36]  There is likewise no evidence that Hammer ever met Rosales or ever discussed the Rosales Paintings with her.  Finally, to the extent that Freedman was making misrepresentations to Knoedler customers about the provenance of the Rosales Paintings, there is no evidence that Hammer knew that she was making those misrepresentations.

There is likewise no evidence that Freedman ever told Hammer that there was reason to question the authenticity or provenance of the Rosales Paintings.  Freedman's conclusory testimony that she "would have told Michael Hammer what [she] knew [about how the Mexican collector came to own the Rosales Paintings]" (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 338-39) is not sufficient to create a material issue of fact as to whether Hammer understood that the paintings were forgeries.

---

[36]  Freedman testified that she "[g]enerally . . . believe[s] [that she] discussed the [Rosales Paintings] . . . with Hammer" but does "not remember, specifically, a personal discussion [with Hammer]" about the connection between David Herbert and the paintings owned by Mr. X and has no knowledge of whether Knoedler's research on Herbert was provided to Hammer. (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 430-32)

Hammer testified that he never discussed with Freedman or any other Knoedler employee a connection between David Herbert and Mr. X, and that he doesn't know who David Herbert is.  (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 201)  Hammer "never got involved in the purchases and sales, so [he] didn't even know who most of the artists were."  (<u>Id.</u> at 215)  Although Freedman testified that "it was explained [to Hammer] that there was an owner and that we did not know the identity and that the owner owned works of art"[37] (Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 339), this testimony does not demonstrate that Hammer understood that the Rosales Paintings were not authentic.

Hammer did review "very carefully" the IFAR Report concerning the "Green Pollock" purchased by Jack Levy.  (Hammer Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 21 at 170-71)  As discussed above, the IFAR report rejects Knoedler and Rosales' claim that Ossorio had been involved in the acquisition of the Green Pollock, and notes that there are "disturbing differences" between the materials used to create the Green Pollock and the materials used to create a known Pollock from the same year.  (IFAR Report (<u>De Sole</u> Dkt. No. 236), Ex. 140 at 8, 14)  The report also states that "IFAR's own extensive archival and other research has turned up no documentary material of any kind linking the painting to Pollock, or Ossorio."  (<u>Id.</u> at 1)  The conclusion of the IFAR report reads:  "given the several strongly negative opinions [from Pollock experts about the authenticity of the work] and the lack of information as to prior ownership, and with no documentation or other evidence to override the concerns of those who do not accept it as a work by Pollock, we cannot currently support its addition to the artist's oeuvre."  (Id. at 10)  Based on the IFAR Report, Levy returned the Green Pollock to Knoedler in late 2003, and the Gallery

---

[37]  Freedman also testified that "it is [her] belief and recollection that Michael Hammer would have known about the information on David Herbert, related to Mr. X," but Freedman could not provide a basis for her belief.  (Freedman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 18 at 430-31)

refunded his full purchase price of $2 million.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1256)

Hammer discussed the IFAR Report with Freedman, directed her to refund Levy's purchase price, and to "do whatever research she needed to do to answer the[] questions [raised in the report]."  (Hammer Dep. (De Sole Dkt. No. 236), Ex. 21 at 187-90)  Hammer testified that Freedman told him that the IFAR report was "inconclusive" and "not right" and that she "didn't believe in [it]."  (Id. at 186)  Hammer and Freedman did not discuss Mr. X, Alfonso Ossorio, or anything else related to the provenance of the Green Pollock.  (Id. at 168, 186)  Moreover, Freedman did not tell Hammer that Knoedler had sold other paintings from the same source that had bought the Green Pollock to Knoedler.  (Id. at 188)  When Hammer asked Freedman if there was any problem with the Green Pollock, she told him "absolutely not."  (Id. at 188)  Hammer nonetheless directed Freedman to share the IFAR Report with an individual who was preparing to invest in the Green Pollock.  (Id. at 193-94)  Hammer did not direct Freedman to share the IFAR Report with any customer preparing to purchase a Rosales Painting, however.

The IFAR Report – standing alone – is not sufficient to demonstrate that Hammer knew that all of the Rosales Paintings – including those purchased by Plaintiffs – were forgeries. Plaintiffs have not shown that Hammer should have realized that the IFAR Report cast doubt on the authenticity and provenance of all of the Rosales Paintings.  Moreover, Plaintiffs have not cited evidence demonstrating that – over the more than ten years that Rosales Paintings were sold at Knoedler – any other issue concerning the authenticity of a Rosales Painting was brought to Hammer's attention.

Because a reasonable jury could not conclude that Hammer was aware of an ongoing fraud scheme at Knoedler, the actions of Hammer cited by Plaintiffs – such as regularly

increasing Freedman's compensation – cannot be viewed as acts in furtherance of the racketeering enterprise.  Moreover, the fact that Hammer received a share of Knoedler's profits does not demonstrate that he was a knowing participant in a fraud scheme at Knoedler.

Hammer is entitled to summary judgment on Plaintiffs' substantive RICO and RICO conspiracy claims.

### c.      <u>Andrade</u>

Andrade contends that the evidence is "insufficient to demonstrate that he participated in a scheme to defraud."  (Andrade Br. (<u>De Sole</u> Dkt. No. 227; <u>Howard</u> Dkt. No. 289) at 12, 15; Andrade Reply Br. (<u>De Sole</u> Dkt. No. 242; <u>Howard</u> Dkt. No. 304) at 9)

Andrade was born in Ecuador and worked at the Knoedler Gallery for more than forty years.  (Pltf. R. 56.1 Count. Stmt. (<u>De Sole</u> Dkt. No. 232) ¶¶ 989, 993)  At Knoedler, Andrade acted as an assistant, hung paintings, greeted visitors, ran errands, and made bank deposits for the accounting department.  (<u>Id</u>. ¶¶ 995-96)  In his last year at the gallery, he made $41,000.  (<u>Id</u>. ¶ 994)  It is apparent from Andrade's deposition, and it is undisputed, that Andrade's native language is Spanish and that he has an uncertain command of the English language.  (<u>Id</u>. ¶ 1022)

There is evidence that Andrade and Rosales were close friends, that he persuaded her to bring the Mr. X paintings to Knoedler, that he introduced Rosales to Freedman and Knoedler, and that he also introduced her to Julian Weissman, a former Knoedler employee who had his own gallery.  (<u>Id</u>. ¶ 1017; December 3, 2005 notes (<u>De Sole</u> Dkt. No. 236), Ex. 50; Def. Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶ 1196; Weissman Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 40 at 27-29)  There is no evidence, however, that Rosales told Andrade that Mr. X was fictional and that the Rosales Paintings were forgeries.  Moreover, Andrade never

represented to anyone that he knew Mr. X or Mr. X's son.  While Andrade was a close friend of

David Herbert (Pltf. R. 56.1 Count. Stmt. (<u>De Sole</u> Dkt. No. 232) ¶ 1020), there is no evidence

that he ever represented to anyone that Herbert had told him about a Mexican collector Herbert

had advised about purchasing Abstract Expressionist paintings.

        Plaintiffs likewise have not demonstrated that Andrade was aware of (1) the

prices at which the Rosales Paintings sold, much less the outlandish profits Knoedler earned on

the sale of the Rosales Paintings; (2) Rosales' inconsistent accounts of the size and scope of Mr.

X's collection; (3) Rosales' unwillingness to sign forms confirming the authenticity of the

Rosales Paintings; (4) the issues raised concerning the Diebenkorns Rosales brought to Knoedler

early on; and (5) the IFAR Report.  Moreover, to the extent that Freedman was making

misrepresentations to Knoedler customers about the authenticity and provenance of the Rosales

Paintings, there is no evidence that Andrade knew that she was making such misrepresentations.

Plaintiffs have likewise not shown that Andrade participated in making misrepresentations to

Knoedler customers about Rosales Paintings.

        Plaintiffs assert that in late 2002 "it was Andrade who first brought [David]

Herbert to Freedman's attention" (Pltf. Br. (<u>De Sole</u> Dkt. No. 231) at 113; Pltf. Br. (<u>Howard</u> Dkt.

No. 292) at 144), but it is undisputed that Andrade's statements to Freedman at that time had

nothing to do with the Rosales Paintings.  Instead, Andrade spoke to Freedman about a

connection between David Herbert and an art collector and patron named Lois Orswell.  (Def.

Reply to Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 248) ¶¶ 1291-95; Freedman Dep. (<u>De Sole</u>

Dkt. No. 236), Ex. 18 at 250-51, 254-56)  Andrade's comments about Herbert spurred

Freedman's interest in him, and subsequent research directed by Freedman indicated to her that

Herbert was "a significant and largely unsung hero of the art world."  (Def. Reply to Pltf. R. 56.1

Add. Stmt. (De Sole Dkt. No. 248) ¶¶ 1295, 1301; October 1, 2009 letter (De Sole Dkt. No. 236),

Ex. 159)  While Plaintiffs strain mightily to suggest that Andrade mentioned David Herbert to

Freedman as part of a scheme to develop an alternative provenance for the Rosales Paintings

(Pltf. Br. (De Sole Dkt. No. 231) at 113), the evidence will not bear this inference.

      Plaintiffs also point to a November 7, 2008 meeting Andrade attended with

Freedman, Rosales, and a Knoedler researcher.  (Pltf. Br. (De Sole Dkt. No. 231) at 113; Pltf. Br.

(Howard Dkt. No. 292) at 144)  At that meeting, the group discussed the provenance of the Mr.

X paintings.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1883; November 7, 2008 Memo

(De Sole Dkt. No. 236), Ex. 300)  Andrade mentioned that "David Herbert and Ossorio were

close friends," and both Andrade and Rosales then stated that "Mr. X may have met David

[Herbert] through Ossorio."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1885; November

7, 2008 memo (De Sole Dkt. No. 236), Ex. 300; de Medeiros Dep. (De Sole Dkt. No. 236), Ex. 9

at 213-14 )  The day after this meeting, Rosales signed a statement indicating that she had

"recently" spoken with Mr. X's son and that he had confirmed that "[i]n the early years of

collecting activity Alfonso Ossorio was his primary advisor.  Later (after 1951. . .), David

Herbert (a close friend of Ossorio's) gradually became the [Mexican] collector's primary

advisor, in his role as dealer to the artists both in and outside of the gallery system, and he

continued in that role through 1964."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1886;

November 8, 2008 Statement (De Sole Dkt. No. 236), Ex. 301)

      Missing from Plaintiffs' account, however, is evidence that Andrade knew that

Rosales had previously represented to Freedman and Knoedler, and that Freedman and Knoedler

had represented to customers, that Ossorio alone was Mr. X's intermediary with the Abstract

Expressionist artists.  Plaintiffs have not cited sufficient evidence to this Court to demonstrate

that Andrade knew that Rosales had given shifting accounts of the provenance of the Rosales Paintings, and that varying accounts of provenance had been provided to Knoedler customers who purchased Rosales Paintings.

Moreover, there is no evidence that Andrade's comments at the November 7, 2008 meeting were anything more than idle musing based on the fact that Herbert was a close friend of Ossorio.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1885)  Given that Andrade never represented that he knew Mr. X or Mr. X's son, and that he never represented that David Herbert had told him about a Mexican art collector that Herbert had advised, his statements at this meeting can only be viewed as speculation, and cannot reasonably be viewed as statements that his alleged co-conspirators relied on in connection with advancing the goals of the alleged fraud conspiracy.  Nor is there any evidence that Andrade mentioned the connection between Herbert and Ossorio as part of a knowing and intentional effort to assist Rosales and Freedman in perpetrating a fraud on Knoedler's customers.  While Rosales and Freedman might have had a vested interest in developing a provenance story that included David Herbert – in order to address authenticity issues that had recently emerged concerning Motherwells that Rosales had brought to Knoedler (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 1800-16) – Andrade had no such interest, because he had no stake in the Rosales Paintings.

Plaintiffs have not proffered evidence demonstrating that Andrade was ever told that the Rosales Paintings were forgeries or that Mr. X was fictional; that he ever had a financial interest in the Rosales Paintings; that he knew about the outlandish profits Knoedler realized on the sale of Rosales Paintings; that he knew that Rosales had given shifting accounts concerning the provenance of the Rosales Paintings, and that varying accounts of provenance had been

transmitted to Knoedler customers; or that he ever said or did anything that could reasonably be viewed as knowingly facilitating or furthering Rosales' fraud.[38]

In the end, Plaintiffs' arguments concerning Andrade amount to nothing more than guilt by association:  Andrade and Rosales were close friends, he introduced her to the Gallery, and therefore he must have known that there was no Mr. X and that all of the Rosales Paintings were forgeries.  Having had full discovery, Plaintiffs must now offer more than speculation and innuendo.  They have not done so.

Andrade is entitled to summary judgment on Plaintiffs' substantive RICO and RICO conspiracy claims.

## 2.  <u>Predicate Acts</u>

Plaintiffs have alleged predicate acts consisting of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343.  In addition, Howard alleges false labeling of visual art, in violation of 18 U.S.C. § 2318, as a predicate act.  All of these offenses are racketeering acts for purposes of the RICO statutes.  <u>See</u> 18 U.S.C. § 1961(1); <u>Anza v. Ideal Steel Supply Corp.</u>, 547 U.S. 451, 454 (2006).

Freedman and Knoedler argue that Plaintiffs have not proffered evidence demonstrating that they knowingly used the mail or wires to further the alleged racketeering scheme, because the evidence establishes that they were not aware of any ongoing fraud scheme

---

[38]  De Medeiros's testimony that it was her "understanding" that Andrade believed that it was plausible that David Herbert had advised Mr. X (de Medeiros Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 9 at 216-18) amounts to nothing more than a statement that Andrade engaged in speculation with her as to whether Herbert might have advised Mr. X.  Andrade never purported to have any personal knowledge of either side of the equation, however.  He never purported to know Mr. X, and he never represented that David Herbert had mentioned advising a Mexican collector.

at Knoedler.[39]  (Knoedler Br. (Howard Dkt. No. 285) at 31-33)  Knoedler and Freedman likewise

argue that they did not violate the trafficking in counterfeit labels statute, because they lacked the

requisite knowledge.  (Knoedler Br. (Howard Dkt. No. 285) at 34 (citing 18 U.S.C. § 2318))

        As discussed above, the issue of whether Freedman and Knoedler acted with

fraudulent intent cannot be resolved at summary judgment.  Accordingly, Freedman and

Knoedler are not entitled to summary judgment on Plaintiffs substantive RICO and RICO

conspiracy claims.

## IV.   AIDING AND ABETTING FRAUD

        Hammer and Andrade seek summary judgment on Plaintiffs' aiding and abetting

fraud claims, arguing that Plaintiffs have not put forth evidence demonstrating that they had

actual knowledge of the fraud scheme and provided substantial assistance to those defrauding

Knoedler's customers.  (Hammer Br. (De Sole Dkt. No. 239; Howard Dkt. No. 282) at 8-9;

Andrade Br. (De Sole Dkt. No. 227; Howard Dkt. No. 289) at 19; Andrade Reply Br. (De Sole

Dkt. No. 242; Howard Dkt. No. 304) at 2, 12, 14)

### A.   Applicable Law

        "To establish liability under New York law for aiding and abetting fraud, the

[Plaintiffs] must prove:  '(1) the existence of a fraud; (2) [the] defendant's knowledge of the

fraud; and (3) that the defendant provided substantial assistance to advance the fraud's

commission.'"  Winnick, 406 F. Supp. 2d at 252 (quoting Filler v. Hanvit Bank, No. 01 Civ. 9510

(MGC), 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003)); Lerner, 459 F.3d at 292 (same).

---

[39]  Freedman and Knoedler contend that "no evidence exists that [they] believed that the Rosales
Collection was inauthentic, so the wires and mailings could not be predicate acts of wire and
mail fraud."  (Knoedler Br. (Howard Dkt. No. 285) at 34)  "The mails and wires allegedly sent
by Knoedler and Freedman were not for the purpose of selling forged paintings and thus do not
constitute predicate acts."  (Knoedler Br. (Howard Dkt. No. 285) at 33)

"'A claim for aiding and abetting fraud must be proven by clear and convincing evidence.'" de Abreu v. Bank of Am. Corp., 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (quoting Primavera Familienstifung v. Askin, 130 F.Supp.2d 450, 488 (S.D.N.Y. 2001)).

"A showing of actual knowledge of the alleged fraud is required to support a claim for aiding and abetting fraud; constructive knowledge – the possession of information that would cause a person exercising reasonable care and diligence to become aware of the fraud – is insufficient." de Abreu, 812 F. Supp. 2d at 322 (emphasis in original). "'The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one.'" Id. (quoting Chemtex, LLC v. St. Anthony Enters., Inc., 490 F.Supp.2d 536, 546 (S.D.N.Y. 2007)).

"'Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur.'" 2006 Frank Calandra, Jr. Irrevocable Trust v. Signature Bank Corp., 816 F. Supp. 2d 222, 237 (S.D.N.Y. 2011) (quoting Lerner, 459 F.3d at 295), aff'd, 503 F. App'x 51 (2d Cir. 2012). "'However, . . . mere inaction . . . constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.'" Id. (quoting Lerner, 459 F.3d at 295). "Whether the assistance is substantial or not is measured, in turn, by whether 'the action of the aider and abettor proximately caused the harm on which the primary liability is predicated.'" Winnick, 406 F. Supp. 2d at 256 (quoting In re WorldCom, Inc. Sec. Litig., 382 F. Supp. 2d 549, 560-61 (S.D.N.Y. 2005)). "Aider and abettor liability will not attach where the injury was not a direct or reasonably foreseeable result of the defendant's conduct." Filler, 2003 WL 22110773, at *2. "'Awareness and approval, standing alone, do not constitute substantial assistance.'" Fid. Funding of California, Inc. v. Reinhold, 79 F. Supp. 2d 110, 122 (E.D.N.Y. 1997) (quoting Armstrong v. McAlpin, 699 F.2d 79, 92 (2d Cir. 1983)).

62

B.      **Analysis**

For the reasons set forth above in connection with Plaintiffs' substantive RICO and RICO conspiracy claims, Hammer and Andrade are entitled to summary judgment on Plaintiffs' aiding and abetting fraud claims.  Plaintiffs have not demonstrated that Hammer and Andrade had actual knowledge of an ongoing fraud scheme at Knoedler, nor have Plaintiffs demonstrated that Hammer and Andrade knowingly and intentionally provided substantial assistance to those allegedly defrauding Knoedler's customers through the sale of Rosales Paintings.

V.      **CONSPIRACY TO COMMIT FRAUD**

Hammer and Andrade have moved for summary judgment on Plaintiffs' conspiracy to commit fraud claims.  (Hammer Br. (De Sole Dkt. No. 239) at 13-14; Hammer Br. (Howard Dkt. No. 282) 13-14; Andrade Br. (De Sole Dkt. No. 227) at 1-2, 23; Andrade Br. (Howard Dkt. No. 289) at 1-2, 23)

"To establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort [ – here, fraud – ], plus the following four elements:  (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a common purpose or plan; and, (4) resulting damage or injury."  IMG Fragrance Brands, LLC v. Houbigant, Inc., 759 F. Supp. 2d 363, 386 (S.D.N.Y. 2010); see also Kashi v. Gratsos, 790 F.2d 1050, 1055 (2d Cir. 1986).

Here, for the reasons discussed in connection with Plaintiffs' RICO claims, Plaintiffs have not proffered evidence sufficient to demonstrate that Hammer and Andrade agreed with someone else to commit fraud at the Knoedler Gallery through the sale of forged

paintings brought to the gallery by Rosales.  Accordingly, Hammer and Andrade are entitled to summary judgment on Plaintiffs' conspiracy to commit fraud claims.

## VI.   <u>BREACH OF WARRANTY</u>

Knoedler has moved for summary judgment on the De Soles' breach of warranty claim.[40]  (Knoedler Br. (<u>De Sole</u> Dkt. No. 222) at 19-25)  The De Soles allege that Knoedler and Freedman made the following representations directly to them:

(1) the Work was created by Mark Rothko;

(2) the Work was owned by the son of a Swiss private collector who obtained the Work from Rothko via David Herbert;

(3) the Work came directly to Knoedler from an individual, whom Knoedler and Freedman knew personally; and

(4) the Work had been authenticated by numerous experts, including David Anfam and Christopher Rothko.

(SAC (<u>De Sole</u> Dkt. No. 118) ¶ 267; <u>see also</u> Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶¶ 614-21; (<u>De Sole</u> Dkt. No. 236), Ex. 178)

The De Soles also allege that in a December 11, 2004 letter – provided at the request of the De Soles – Knoedler and Freedman state:  "Knoedler warrants the authenticity and good title of [the purported Rothko painting sold to the De Soles]."  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 270; <u>see also</u> Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶ 624; (<u>De Sole</u> Dkt. No. 236), Ex. 178)

The De Soles claim that each of these representations constitutes an express warranty under N.Y. U.C.C. § 2-313(1).[41]  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 269)

---

[40]  Howard's breach of warranty claim was previously dismissed as untimely.  <u>See</u> <u>De Sole</u>, 974 F. Supp. 2d at 318-19.

[41]  N.Y.U.C.C. § 2-313 provides:

A.    **Applicable Law**

"An express warranty is "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." N.Y.U.C.C. § 2-313(1)(a). "In order to demonstrate that an express warranty was created under New York law, a plaintiff 'must prove that the statement falls within the definition of a warranty, that she relied on it, and that it became part of the basis for the bargain.'" Kraft v. Staten Island Boat Sales, Inc., 715 F. Supp. 2d 464, 473 (S.D.N.Y. 2010) (quoting Daley v. McNeil Consumer Prod., Co., 164 F. Supp. 2d 367, 377 (S.D.N.Y. 2001).

B.    **Analysis**

As an initial matter, Knoedler argues that neither Freedman's oral statements to the De Soles about the provenance and authenticity of the Rothko they purchased, nor Freedman's December 11, 2004 letter confirming her oral statements, are actionable warranties. According to Knoedler, any "'expressed opinion or judgment of the seller'" regarding the artist who created a piece of art is an opinion and does not create a warranty. (Knoedler Br. (De Sole

---

(1) Express warranties by the seller are created as follows:

    (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

    (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

    (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

Dkt. No. 222) at 23 (quoting <u>Weisz v. Parke-Bernet Galleries, Inc.</u>, 351 N.Y.S.2d 911, 912 (1st

Dept. 1974)).

        Knoedler's invoice for the Rothko definitively attributes the work to Rothko,

however.  Moreover, in Freedman's December 11, 2004 letter, she explicitly states that

"Knoedler warrants the authenticity and good title of the painting, <u>Untitled, 1956</u>, and confirms

its 'remarkably good condition.'"  (Def. R. 56.1 Stmt. (<u>De Sole</u> Dkt. No. 223) ¶¶ 614-15, 624;

December 11, 2004 Freedman letter (<u>De Sole</u> Dkt. No. 236), Ex. 179)  Freedman and Knoedler's

statements go well beyond the expression of an opinion; they are statements of fact and clearly

warrant the painting's authenticity.  <u>See</u> <u>Weber v. Peck</u>, No. 97 Civ. 7625 (JSM), 1999 WL

493383, at *3 (S.D.N.Y. July 9, 1999); <u>Levin v. Dalva Bros.</u>, 459 F.3d 68, 77 (1st Cir. 2006)

("where an art merchant states to a lay person that a piece is by a specific author or can be

attributed to a specific period," that representation is a statement of fact and not of opinion)

(citing N.Y. Cult. Arts Law, § 13.01 (McKinney's 2004)).

        Knoedler argues that the De Soles did not rely on Freedman's December 11, 2004

letter as the basis of the bargain they struck with Knoedler.  (Knoedler Br. (<u>De Sole</u> Dkt. No.

222) at 24-25; Knoedler Rep. Br. (<u>De Sole</u> Dkt. No. 241) at 27-28)  At the time of the sale,

however, the De Soles requested that Freedman put in writing her oral representations about the

authenticity and provenance of the alleged Rothko.  (Def. R. 56.1. Stmt. (<u>De Sole</u> Dkt. No. 208)

¶ 614)  Moreover, Domenico De Sole testified that he "would not have sent the 8.4 million [on

December 17, 2004] without a document that [Freedman] promised to me and was sent to me [on

December 11, 2004]."  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1603)  In any event,

the reliance element in a breach of warranty claim is not onerous:  "the only reliance that is

necessary is the buyer's belief that it was purchasing the seller's promise as to the truth of the

matters stated in the warranty. . . . [i.e.,] reliance is established if 'the express warranties are bargained-for terms of the seller.'" Metromedia Co. v. Fugazy, 753 F. Supp. 93, 99 (S.D.N.Y. 1990) (quoting CBS Inc. v. Ziff-Davis Publishing Co., 554 N.Y.S.2d 449, 506 n.5 (1990)), aff'd as amended, 983 F.2d 350 (2d Cir. 1992).  The evidence here is sufficient to demonstrate that the De Soles bargained for Freedman and Knoedler's warranties as to the authenticity and provenance of the alleged Rothko.

    As to timeliness of the breach of warranty claim, it is undisputed that the De Soles purchased the Rothko from Knoedler and Freedman on December 17, 2004.  (SAC (De Sole Dkt. No. 118) ¶¶ 88, 217(e))  Accordingly, the De Soles' breach of warranty cause of action accrued on that date, and the statute of limitations expired on December 17, 2008.  Given that the De Soles filed this action on March 28, 2012, see Cmplt. (De Sole Dkt. No. 1), their breach of warranty claim is untimely unless the statute was extended for some reason.  The De Soles have not pointed to any provision in the New York U.C.C. that extends the limitations period. Instead, the De Soles assert that the doctrine of equitable tolling applies to preserve their breach of warranty claim against Knoedler.  (SAC (De Sole Dkt. No. 118) ¶ 275)

    The factual premise for the De Soles' equitable tolling argument is a January 19, 2008 letter Freedman sent to the De Soles.  (January 19, 2008 Freedman letter (De Sole Dkt. No. 236), Ex. 278)  In connection with arranging for insurance coverage for the alleged Rothko, the De Soles requested a written appraisal from Knoedler.  (Def. R. 56.1 Stmt. (De Sole Dkt. No. 223) ¶ 609; Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1825; id., Ex. 276)  In a January 19, 2008 letter, Freedman and Knoedler represent that "'the probable cost of replacing the [Rothko] with a similar work'" is $9 million.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1830; id., Ex. 278)  The De Soles contend that Freedman's January 19, 2008 letter constitutes an

affirmative misrepresentation that triggers equitable tolling.  (Pltf. Br. (De Sole Dkt. No. 231) at 170-71; see also SAC (De Sole Dkt. No. 118) ¶ 276)  The De Soles further argue that Knoedler and Freedman knew that the Rosales Paintings were forgeries at the time they provided the appraisal, but transmitted the false valuation of the "Rothko" in order to prevent the De Soles from becoming aware of a potential claim against Knoedler.   Pltf. Br. (De Sole Dkt. No. 231) at 170-71; see also SAC (De Sole Dkt. No. 118) ¶ 276)

Knoedler contends that the January 19, 2008 letter provides no basis for applying equitable tolling, because it was provided "solely for insurance purposes."  (Knoedler Br. (De Sole Dkt. No. 222) at 21)  While the De Soles requested the letter for insurance purposes, there is a material issue of fact as to whether Freedman and Knoedler provided this letter solely for purposes of the De Soles' insurance needs.  For the reasons discussed above, Plaintiffs have offered evidence demonstrating that well before January 2008 Freedman and Knoedler knew that the Rosales Paintings were forgeries.  In representing to the De Soles – more than three years after the sale of the purported Rothko – that the painting was worth $9 million, Knoedler was – in effect – reaffirming the authenticity of the Rothko and acting to conceal its prior fraudulent conduct.  See De Sole, 974 F. Supp. 2d at 319 ("For equitable tolling to apply, . . . . the later fraudulent misrepresentation must be for the purpose of concealing the former tort.").  Finally, there is evidence that Eleanore De Sole[42] read Freedman's letter at the time it was sent, thus

---

[42]  There are issues of facts as to the true owner of the De Soles' painting.  Knoedler contends that Laura De Sole purchased the "Rothko," and thus any warranties made by Knoedler ran to Laura, rather than to her parents, Domenico and Eleanore De Sole.  (Knoedler Br. (De Sole Dkt. No. 222) at 25)  However, Freedman, Domenico De Sole, and Eleanore De Sole all testified that Domenico and Eleanore purchased the "Rothko."  (Freedman Dep. (De Sole Dkt. No. 236), Ex. 18 at 487; Domenico De Sole Dep. (De Sole Dkt. No. 236), Ex. 10 at 215-16); Eleanore De Sole Dep. (De Sole Dkt. No. 236), Ex. 11 at 157-58)).

providing a basis for reliance.  (Pltf. R. 56.1 Add. Stmt. (<u>De Sole</u> Dkt. No. 236) ¶ 1831; Eleanore

De Sole Dep. (<u>De Sole</u> Dkt. No. 236), Ex. 11 at 230-31)[43]

        In sum, there are genuine issues of material fact concerning the De Soles' breach

of warranty claim.  Accordingly, Knoedler is not entitled to summary judgment on the De Soles'

breach of warranty claim.

## VII.   <u>UNILATERAL AND MUTUAL MISTAKE</u>

        Pleading in the alternative, Plaintiffs seek to rescind their purchases on the

grounds of unilateral and mutual mistake.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶¶ 279-92; Am. Cmplt.

(<u>Howard</u> Dkt. No. 179) ¶¶ 366-91)  As to unilateral mistake, Plaintiffs allege that they were each

under the mistaken believe that, as to the painting each Plaintiff purchased, (1) the work was

owned by a Swiss private collector who obtained the work through David Herbert and passed

title "by descent" to his son, (2) there were no questions as to the work's authenticity, and (3) the

work was fully marketable.  (SAC (<u>De Sole</u> Dkt. No. 118) ¶ 280; Am. Cmplt. (<u>Howard</u> Dkt. No.

179) ¶ 367)[44]  As to mutual mistake, the De Soles allege that both they and Knoedler were

mistaken as to whether the painting the De Soles purchased was an authentic Rothko.  (SAC (<u>De

Sole</u> Dkt. No. 118) ¶ 288)  Howard alleges that both he and Knoedler were mistaken as to

whether the painting Howard purchased was an authentic de Kooning.  (Am. Cmplt. (<u>Howard</u>

Dkt. No. 179) ¶ 382)

        Knoedler argues that it is entitled to summary judgment on Plaintiffs' mistake

claims, because Plaintiffs should have investigated the provenance and authenticity of the works

---

[43]  Knoedler correctly argues that Hammer's October 27, 2009 letter announcing Freedman's resignation – issued after the statute of limitations expired – provides no basis for the application of equitable tolling.

[44]  Howard asserts his mistake claims directly and, in the alternative, as an assignee of Jamie Frankfurt.

they purchased and – having not done so – they assumed the risk that the paintings were

forged.[45]  (Knoedler Br. (<u>De Sole</u> Dkt. No. 222) at 26-31; Knoedler Br. (<u>Howard</u> Dkt. No. 285)

at 14-19)

### A.   <u>Applicable Law</u>

#### 1.   <u>Unilateral Mistake</u>

A "unilateral mistake" occurs when "only one of the parties to a bilateral

transaction is in error."  <u>Healy v. Rich Prods. Corp.</u>, 981 F.2d 68, 73 (2d Cir. 1992) (quoting 21

N.Y. Jur.2d Contracts § 121 (1982)).  "New York law requires that the party seeking rescission

on this basis establish that '(i) he entered into a contract based upon a mistake as to a material

fact, and (ii) the other contracting party either knew or should have known that such a mistake

was being made.'"  <u>Summit Health, Inc. v. APS Healthcare Bethesda, Inc.</u>, 993 F. Supp. 2d 379,

404 (S.D.N.Y. 2014) (quoting <u>VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.</u>,

594 F. Supp. 2d 334, 343 (S.D.N.Y. 2008)).  "[A] party's unilateral mistake will not provide a

basis for rescission unless it is accompanied by some fraud committed by the other contracting

party."  <u>Aetna Cas. & Sur. Co.</u>, 404 F.3d at 585.  "To rescind a contract because of unilateral

mistake, therefore, the plaintiff must show 'misrepresentation, concealment or nondisclosure of a

material fact; an intent to deceive; and an injury resulting from justifiable reliance by the

aggrieved party.'"  <u>Id.</u> (quoting <u>Allen v. WestPoint-Pepperell, Inc.</u>, 945 F.2d 40, 44 (2d Cir.

1991)).

---

[45]  Knoedler also argues that the De Soles' mistake claims are time-barred.  (Knoedler Br. (<u>De Sole</u> Dkt. No. 222) at 25)  The doctrine of equitable tolling applies to mistake claims, however, <u>see</u> <u>First Am. Title Ins. Co. of New York v. Fiserve Fulfillment Servs., Inc.</u>, No. 06 Civ. 7132, 2008 WL 282019, at *4 (S.D.N.Y. Jan. 25, 2008) (breach of contract claim), and this court has concluded – in connection with the De Soles' breach of warranty claim – that summary judgment is not appropriate as to the De Soles' equitable tolling argument.  The same logic applies to the De Soles' mistake claims.

2.      **Mutual Mistake**

"A 'mutual mistake' occurs when 'both . . . parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent.'" Creative Waste Mgmt., Inc. v. Capitol Envtl. Servs., Inc., 429 F. Supp. 2d 582, 608, supplemented, 458 F. Supp. 2d 178 (S.D.N.Y. 2006) (quoting Healy, 981 F.2d at 73 (quoting 21 N.Y. Jur.2d Contracts § 121 (1982)).  Under New York law, "[w]hile mutual mistake will justify rescission where the mistake exists at the time the contract is entered into and the mistake is substantial[,] . . . it may not be invoked by a party to avoid the consequences of its own negligence." P.K. Dev., Inc. v. Elvem Dev. Corp., 226 A.D.2d 200, 201 (1st Dept. 1996).

"Even where a party must go beyond its own efforts in order to ascertain relevant facts (such as obtaining experts' reports), courts have held that the party must bear the risk of mistake if it chooses to act on its otherwise limited knowledge." Id. at 202.  Thus, a party "bears the risk of mistake when  . . . he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient."  Restatement (Second) of Contracts § 154(b).

B.    **Analysis**

As to unilateral mistake, Plaintiffs have offered sufficient evidence that they purchased their paintings in the mistaken belief that they were authentic, and that Knoedler "knew or should have known" that Plaintiffs had this mistaken belief.  Moreover, for the reasons discussed above, Plaintiffs have offered sufficient evidence that their unilateral mistake was "accompanied by some fraud committed by [Knoedler and Freedman]." Aetna Cas. & Sur. Co., 404 F.3d at 585.

As to mutual mistake, Knoedler argues that Plaintiffs were negligent in not investigating the provenance and authenticity of the works they purchased.  (Knoedler Br. (<u>De Sole</u> Dkt. No. 222) at 26-31; Knoedler Br. (<u>Howard</u> Dkt. No. 285) at 14-18)  Based on the evidence discussed above, however, this Court cannot rule as a matter of law that Plaintiffs "consciously accepted risk" in purchasing the works, or that they were negligent in relying on Freedman and Knoedler's representations about the works.[46]  Knoedler has not pointed to any evidence supporting its assertion that the De Soles and Howard were aware that they were operating on limited knowledge, and deliberately chose to act on that limited knowledge. Moreover, material issues of fact exist as to the reasonableness of the Plaintiffs' reliance on Freedman and Knoedler's representations.

Knoedler is not entitled to summary judgment on Plaintiffs' mistake claims.

## VIII.   <u>ALTER EGO LIABILITY</u>

The De Soles SAC alleges, as against 8-31 Holdings, Inc., a substantive RICO violation, RICO conspiracy, fraud, fraudulent concealment, aiding and abetting fraud, and fraud conspiracy.  (SAC (<u>De Sole</u> Dkt. No. 118) at 192, 202, 227, 235-36, 251-52, 261-62)  The De Soles' theories of liability are as follows:

| | |
|---|---|
| substantive RICO claim: | 8-31 is liable as Knoedler's <u>alter</u> <u>ego</u> and under <u>respondeat</u> <u>superior</u> |
| RICO conspiracy: | 8-31 is liable as Knoedler's <u>alter</u> <u>ego</u> and is liable for Hammer, Freedman, and Andrade's conduct under <u>respondeat</u> <u>superior</u> |
| fraud: | 8-31 is liable as Knoedler's <u>alter</u> <u>ego</u> and is liable for Freedman's conduct under <u>respondeat</u> <u>superior</u> |

---

[46]  <u>ACA Galleries, Inc. v. Kinney</u>, 928 F. Supp. 2d 699, 702 (S.D.N.Y. 2013), <u>aff'd</u>, 552 F. App'x 24 (2d Cir. 2014), is not on point for the same reasons discussed above in connection with Plaintiffs' fraud and fraudulent concealment claims.

| | |
|---|---|
| fraudulent concealment: | 8-31 is liable as Knoedler's <u>alter ego</u> and is liable for Freedman's conduct under <u>respondeat superior</u> |
| aiding & abetting fraud: | 8-31 is liable for Hammer and Andrade's conduct under <u>respondeat superior</u> |
| fraud conspiracy: | 8-31 is liable for Hammer and Andrade's conduct under <u>respondeat superior</u>. |

Howard's Amended Complaint alleges, as against 8-31 Holdings, Inc., a substantive RICO violation, RICO conspiracy, fraudulent concealment, and aiding and abetting fraud. (Am. Cmplt. (<u>Howard</u> Dkt. No. 179) at 293, 301-02, 326, 344-45) Howard's theories of liability are as follows:

| | |
|---|---|
| substantive RICO claim: | 8-31 is liable as Knoedler's <u>alter ego</u> and under <u>respondeat superior</u> |
| RICO conspiracy: | 8-31 is liable as Knoedler's <u>alter ego</u> and is liable for Hammer's conduct under <u>respondeat superior</u> |
| fraudulent concealment: | 8-31 is liable as Knoedler's <u>alter ego</u> |
| aiding & abetting fraud: | 8-31 is liable for Hammer and Andrade's conduct under <u>respondeat superior</u>. |

8-31 Holdings, Inc. has moved for summary judgment as to all of Plaintiffs' claims, arguing that it has no liability to Plaintiffs under either an <u>alter ego</u> or a <u>respondeat superior</u> theory of liability. (8-31 Br. (<u>De Sole</u> Dkt. No. 218; <u>Howard</u> Dkt. No. 273) at 1-2, 7, 20, 23)

Because this Court has granted summary judgment to Hammer and Andrade as to all claims against them, and because Plaintiffs' aiding and abetting and fraud conspiracy claims against 8-31 are predicated on Hammer's and Andrade's conduct, 8-31 is entitled to summary judgment on Plaintiffs' aiding and abetting fraud and fraud conspiracy claims. 8-31's motion is

also granted to the extent that Plaintiffs' RICO claims are based on Hammer's and Andrade's

conduct and a theory of respondeat superior.

This Court considers the remaining claims against 8-31 Holdings, Inc. below.[47]

A.     **Applicable Law**

Under Delaware law,[48] "[a] limited liability company (or 'LLC'), formed by one

or more entities and/or individuals as its 'members,' . . . provides '. . . limited liability akin to the

corporate form.'"  NetJets Aviation, Inc. v. LHC Commc'ns, LLC, 537 F.3d 168, 176 (2d Cir.

2008) (quoting Elf Atochem North Am., Inc. v. Jaffari, 727 A.2d 286, 287 (Del. 1999)).  "The

shareholders of a corporation and the members of an LLC generally are not liable for the debts of

the entity."  Id.  However, "Delaware law permits a court to pierce the corporate veil 'where

there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its

owner.'"  Id. (quoting Geyer v. Ingersoll Publications Co., 621 A.2d 784, 793 (Del.Ch. 1992)).

Under the alter ego theory of piercing the corporate veil, a plaintiff must demonstrate "a

mingling of the operations of the entity and its owner plus an 'overall element of injustice or

unfairness.'"  Id. (quoting Harco Nat. Ins. Co. v. Green Farms Inc., No. Civ. A. 1131, 1989 WL

110537, at *5 (Del. Ch. Sept. 19, 1989)).  The Second Circuit "has stated this as a two-pronged

---

[47]  Hammer has also moved for summary judgment on Plaintiffs' claims to the extent those
claims are based on the theory that he is the alter ego of Knoedler.  (Hammer Br. (De Sole Dkt.
No. 214) at 21; Hammer Br. (Howard Dkt. No. 282) at 23-25)  However, Plaintiffs' alter ego
claims against Hammer have already been dismissed.  (Memorandum Opinion & Order (De Sole
Dkt. No. 260; Howard Dkt. No. 319) at 37)

[48]  "It is well-settled that New York's choice-of-law rules dictate that 'the law of the state of
incorporation determines when the corporate form will be disregarded.'"  Jonas v. Estate of
Leven, No. 14 Civ. 3369 (SHS), 2015 WL 4522763, at *13 (S.D.N.Y. July 27, 2015) (quoting
Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).  "This principle applies to LLCs as
well as corporations."  Allison v. Clos-ette Too, LLC, No. 14 Civ. 1618 (LAK) (JCF), 2014 WL
4996358, at *4 (S.D.N.Y. Sept. 15, 2014), report and recommendation adopted sub nom. Ellison
v. Clos-ette Too, LLC, No. 14 Civ. 1618 (LAK), 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014).
Here, Knoedler is a Delaware LLC and 8-31 is a Delaware corporation.

74

test focusing on (1) whether the entities in question operated as a single economic entity, and (2) whether there was an overall element of injustice or unfairness." Id. at 177 (citing Atex, 68 F.3d at 1457).

Courts consider the following factors in determining whether a subsidiary and parent operate as a "single economic entity":

> "[W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder."

Atex, 68 F.3d at 1458 (quoting Harco, 1989 WL 110537, at *4).

In addition, "a plaintiff must allege injustice or unfairness that is a result of an abuse of the corporate form. In other words, the corporation effectively must exist as a sham or shell through which the parent company perpetrates injustice." Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC, 975 F. Supp. 2d 392, 406 (S.D.N.Y. 2013); see also TradeWinds Airlines, Inc. v. Soros, No. 08 Civ. 5901 (JFK), 2012 WL 983575, at *6 (S.D.N.Y. Mar. 22, 2012) ("This 'injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit.'") (quoting NetJets Aviation, Inc., 537 F.3d at 183). "These principles are generally applicable [when] one of the entities in question is an LLC," but "[i]n the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required." NetJets Aviation, Inc., 537 F.3d at 178.

B.   **Analysis**

1.   **Operation as a Single Entity**

a.   **Mingling of Operations and
Observance of Corporate Formalities**

Here, there is substantial evidence of (1) a mingling of Knoedler and 8-31's

operations, and (2) a disregard of corporate formalities in Knoedler and 8-31's interactions.

Ruth Blankschen – the chief financial officer of both Knoedler and 8-31 –

testified that 8-31 and Knoedler use the same corporate address.  (Pltf. R. 56.1 Add. Stmt. (De

Sole Dkt. No. 236) ¶ 1996 (citing Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 57))

Blankschen also testified that she was "[n]ot . . . aware of" any space within the Knoedler

building specifically designated as 8-31's offices.  (Blankschen Dep. (De Sole Dkt. No. 236), Ex.

4 at 66)  Moreover, 8-31 did not pay rent to Knoedler.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt.

No. 236) ¶ 1997)

It is undisputed that the two entities share a telephone system, and Blankschen

testified that no 8-31 employees have 8-31 email addresses.  (Id. ¶¶ 1999-2000 (citing

Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 232-33; Knoedler Answer (De Sole Dkt. No.

236), Ex. 47 ¶ 165))  Blankschen uses the email address "ruth@knoedlerllc.com," although the

signature block in her emails states that she is employed by 8-31.  (Blankschen Dep. (De Sole

Dkt. No. 236), Ex. 4 at 232)  This significant mingling of office space and infrastructure weighs

in favor of finding that Knoedler and 8-31 operate as a single economic entity.  See Soroof

Trading Dev. Co. v. GE Fuel Cell Systems, 842 F. Supp. 2d 502, 522 (S.D.N.Y. 2012) (denying

summary judgment on alter ego claim under Delaware law where, inter alia, two entities shared

office space, one of the entities "did not lease its office space," "office space did not have a

plaque or other sign indicating the presence" of more than one entity; and there was evidence of

significant "mingling of the operations").

There is also evidence that 8-31 and Knoedler have a significant overlap in

personnel.  Freedman served as both the sole manager of Knoedler and a director of 8-31.  (Pltf.

R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶¶ 2002-04)  Blankschen served as CFO and Vice

President of both entities, and testified that she "may have been Secretary and Treasurer" of

these entities as well.  (Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 96-97)  The two

entities also shared an accounting department.  (8-31 R. 56.1 Stmt. (De Sole Dkt. No. 219)

¶¶ 927, 930)  Moreover, Hammer has stated that – although he was employed solely by 8-31

until 2009 – he and his family have been "directly responsible for the operations of Knoedler"

since the 1970s.  (Pltf. R. 56.1 Add. Stmt. (De Sole Dkt. No. 236) ¶ 1031; Hammer Decl. in Opp.

to TRO (De Sole Dkt. No. 236), Ex. 46 ¶ 2)

8-31 also regularly transferred money from Knoedler's accounts to 8-31's

accounts, and recorded these transactions on Knoedler's balance sheet as "interdivisional

receivables."  (Blankschen Dep. (De Sole Dkt. No. 236) at 131-32)  Blankschen testified that

"interdivisional receivables" were monies that Knoedler had loaned to 8-31.  (Id. at 303-04)

These loans were regularly issued without written agreements (id. at 134-35),[49] and 8-31 was not

required to pay interest to Knoedler on these loans.  (Id. at 324)  Indeed, Blankschen testified that

8-31 generally did not pay the debts it owed to Knoedler, except to the extent that 8-31 paid

---

[49]  While 8-31 provided certain services to Knoedler pursuant to written agreements (see
Management Agreement (De Sole Dkt. No. 236), Ex. 345 (providing that 8-31 will provide
certain services to Knoedler for a fee)), there is evidence that these agreements were not
followed.  See Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 67-68 ("I don't think [the
Management Agreement] was actually, from what I can tell, in use."); id. at 74-75 (Blankschen
did not refer to the Management Agreement at any time during her work as CFO).

expenses on Knoedler's behalf and set-off those amounts in the form of a "payable."  (Id. at 132-34; 150-51)  The consolidated financial statements in the record, however, do not establish any clear record of payables that were set off against Knoedler's interdivisional receivables with respect to 8-31.  See 8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Exs. 342-344.

While Knoedler is free to lend money to 8-31, the fact that it did so without observing the formalities and procedures typical of an arm's-length transaction is persuasive evidence that the two entities are "one and the same."  As the Second Circuit stated in NetJets Aviation, Inc., "if two entities with common ownership 'failed to follow legal formalities when contracting with each other it would be tantamount to declaring that they are indeed one [and] the same.'"  NetJets Aviation, Inc., 537 F.3d at 178 (quoting Trustees of Village of Arden v. Unity Construction Co., No. C.A. 15025, 2000 WL 130627, at *3 (Del. Ch. Jan. 26, 2000) (emphasis in NetJets Aviation, Inc.)).

### b.   8-31's Siphoning of Funds from Knoedler

A reasonable jury could also conclude that 8-31 siphoned approximately $23.9 million from Knoedler.  8-31 admits that $23.9 million that Knoedler had previously classified on its financial statements as an interdivisional receivable – an asset in the form of money Knoedler provided or loaned to 8-31 (Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 304; 8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Exs. 342-344 (listing interdivisional receivables as assets)) – was reclassified in the 2011-2012 financial statements as a "distribution" to 8-31.  (8-31 Br. (De Sole Dkt. No. 218) at 17 ("The transfers from Knoedler to 8-31 that were used by 8-31 to pay taxes and other expenses are set forth on Knoedler's

78

[2011/2012 financial statements] as accumulated distributions.  Prior to that they were classified as interdivisional receivables.") (internal citations omitted))

         The financial accounting policies attached to Knoedler and 8-31's consolidated financial statements plainly state, however, that items listed on the balance sheet as receivables are monies that management expects to receive.  (8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Ex. 342 at 3)  Indeed, the financial statements list the interdivisional receivables as assets of Knoedler.  (Id., Exs. 342-344)  In Knoedler's 2011/2012 financial statements, however, $23.9 million in interdivisional receivables was reclassified as distributions to 8-31.  See id.; 8-31 Br. (De Sole Dkt. No. 218) at 17; 8-31 R. 56.1 Stmt. (De Sole Dkt. No. 219) ¶¶ 973-74.  Stated another way, in its 2011/2012 financial statements, Knoedler reclassified a $23.9 million asset as a shareholder dividend.

         8-31 argues that this "distribution" from Knoedler to 8-31 – although listed under the "shareholder equity" portion of the financial statements (8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Ex. 343 at 83) – was, in reality, a payment to 8-31 to cover $23.9 million in legitimate business expenses that 8-31 had incurred on Knoedler's behalf in preceding years.  (8-31 Br. (De Sole Dkt. No. 218) at 17; Blankschen Decl. (De Sole Dkt. No. 219), Ex. 354 ¶¶ 10-14)

         This argument suffers from a number of flaws.  As an initial matter, the $23.9 million is not listed as a liability on any of the consolidated financial statements, including the 2011/2012 financial statements.  See 8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Exs. 342-344.  The money is instead listed as a "distribution" in the "shareholder equity" section of the 2011/2012 balance sheet.  (8-31 Consolidated Financial Statements (De Sole Dkt.

No. 236), Ex. 343 at 1)  Money that is owed to another entity to cover expenses is not "shareholder equity"; it is a liability.

Assuming arguendo that what the balance sheet identifies as a shareholder "distribution" is actually the payment of an expense, 8-31 has pointed to no line-items in any of the balance sheets in the record that would justify an abrupt reclassification of a $23.9 million asset as a liability.  To the extent Knoedler had accumulated liabilities to 8-31 over the preceding years totaling $23.9 million, these are not reflected in the balance sheets currently before the Court.  See 8-31 Consolidated Financial Statements (De Sole Dkt. No. 236), Exs. 342-344.  8-31 has not identified any "interdivisional payable" or other liability in the financial statements that would justify a sudden $23.9 million reimbursement of expenses to 8-31.

8-31's theory as to how $23.9 million could be reclassified on the 2011/2012 financial statements as the payment of legitimate business expenses necessarily rests on one of two implausible assertions:  (1) the interdivisional receivables listed as assets on the balance sheets prior to 2011/2012 were incorrectly entered on the balance sheets in prior years, and instead should have been entered as "payables" (see Blankschen Dep. (De Sole Dkt. No. 236), Ex. 4 at 304) or other liabilities; or (2) even as it was accumulating interdivisional receivables – i.e., assets in its favor – over this period, Knoedler was simultaneously accumulating $23.9 million in liabilities to 8-31 that were omitted from the balance sheets until 2011.  Both of these theories are entirely implausible on their face.

Indeed, the only basis in the record for 8-31's claim that the $23.9 million "distribution" was related to legitimate business expenses is a declaration submitted by Ms. Blankschen.  In her declaration, Blankschen states, in conclusory fashion, that – based on her

review of the consolidated financial statements[50] – the business expenses that Knoedler owed to 8-31 total $23.9 million.  (Blankschen Decl. (De Sole Dkt. No. 219), Ex. 354 ¶¶ 1, 10)  Although Blankschen purports to provide several examples of expenses that 8-31 paid on Knoedler's behalf (see id. ¶¶ 11-14), 8-31 has not attached to her declaration any of the relevant financial statements upon which these assertions are based.  Blankschen's bald statement in her declaration as to what the consolidated financial statements reflect cannot be relied on by this Court, given that 8-31 has refused to produce the consolidated financial statements Blankschen purports to describe.  See Oct. 2, 2014 Crowell Decl. (De Sole Dkt. No. 235) ¶¶ 25-36.  In light of the contrary documentary evidence submitted by Plaintiffs, 8-31's assertions at best raise a factual dispute as to whether Knoedler in fact accumulated $23.9 million in legitimate liabilities to 8-31 over the relevant time period.  See United States v. Philatelic Leasing Ltd., 601 F. Supp. 1554, 1565-66 (S.D.N.Y. 1985), aff'd, 794 F.2d 781 (2d Cir. 1986) ("[W]here a party withholds (or seeks to suppress) relevant evidence within its control, the court may conclude that such evidence would be harmful to the party's cause."); Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2d Cir. 1980) ("showing [of party opposing summary judgment] appears stronger still in light of defendants' successful efforts to resist discovery. . . .  At least when the party opposing the motion has not been dilatory in seeking discovery, summary judgment should not be granted when he is denied reasonable access to potentially favorable information.").  Blankschen's declaration – unaccompanied by the supporting documentation upon which it is based – is not sufficient to establish 8-31's entitlement to summary judgment on Plaintiffs' alter ego claim.

---

[50]  The financial statements Blankschen relies on have not been produced to Plaintiffs or submitted to the Court.

\*      \*      \*      \*

Plaintiffs have proffered sufficient evidence for a reasonable jury to conclude that 8-31 and Knoedler acted as a single economic entity.  The contrary evidence submitted by 8-31 suggests – at best – that material questions of fact exist as to this issue.  Accordingly, summary judgment is not appropriate on the question of whether 8-31 and Knoedler operated as a single economic entity.

### 2.      <u>Fundamental Unfairness In Observing Corporate Distinction</u>

A reasonable jury could also find an "overall element of injustice or unfairness," <u>NetJets Aviation, Inc.</u>, 537 F.3d at 177, if a corporate distinction between 8-31 and Knoedler were recognized.  As discussed above, Plaintiffs have proffered sufficient evidence for a reasonable jury to conclude that 8-31 siphoned $23.9 million from Knoedler.  There is also evidence that the $23.9 million distribution to 8-31 occurred shortly after federal authorities commenced an investigation into Knoedler's activities.  (Freedman Lagrange Tr. (<u>De Sole</u> Dkt. No. 236), Ex. 51 at 136)  This sequence of events gives rise to an inference that the purpose of transferring $23.9 million from Knoedler to 8-31 was to shield those assets from the reach of law enforcement or Knoedler's creditors, and constitutes evidence of "injustice or unfairness that is a result of an abuse of the corporate form."  <u>See</u> <u>Nat'l Gear & Piston, Inc.</u>, 975 F. Supp. 2d at 406.

\*      \*      \*      \*

Plaintiffs have proffered sufficient evidence to demonstrate that a reasonable jury could conclude that (1) 8-31 and Knoedler operated as a single entity, and (2) the observance of corporate distinctions between the entities under the circumstances would result in a fundamental injustice.  The evidence offered by 8-31 at best raises disputed issues of fact.  Accordingly, 8-31

is not entitled to summary judgment on Plaintiffs' claims to the extent those claims rely on a

theory of <u>alter ego</u> liability.[51]

## **CONCLUSION**

Defendants' motions for summary judgment are denied in part and granted in part

as set forth above and in this Court's September 30, 2015 Order.

Consistent with this Court's individual rules, the joint pretrial order, motions <u>in</u>

<u>limine</u>, proposed <u>voir dire</u>, and requests to charge are due on November 9, 2015. Any responsive

papers are due November 23, 2015. Trial will commence in this matter on January 25, 2016, at

9:00 a.m., in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New

York, New York.

Dated: New York, New York           SO ORDERED.
      October 9, 2015

                                             _____
                                             Paul G. Gardephe
                                             United States District Judge

---

[51]  8-31 argues that it cannot be held liable for the actions of Freedman under the doctrine of <u>respondeat superior</u>. (8-31 Br. (<u>De Sole</u> Dkt. No. 218; <u>Howard</u> Dkt. No. 273) at 20-23) Given the Court's findings as to the <u>alter ego</u> theory of liability against 8-31, a reasonable jury could also conclude that Freedman was an employee of 8-31 and was acting within the scope of her employment during the course of the alleged fraud scheme. Therefore, 8-31 is not entitled to summary judgment on Plaintiffs' claims to the extent they rely on Freedman's conduct and a <u>respondeat superior</u> theory of liability.